UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

R.R. and D.R. o/b/o M.R.

        Plaintiffs,

    -against-

SCARSDALE UNION FREE SCHOOL DISTRICT,

        Defendant.

**AFFIDAVIT OF**
**MICHAEL MENDELSON**
**IN SUPPORT OF THE**
**DISTRICT'S MOTION FOR**
**SUMMARY JUDGMENT AND**
**IN OPPOSITION TO**
**PLAINTIFFS' MOTION OF**
**SUMMARY JUDGMENT**

08-CV-0247 (BSK)(FM) – ECF
Case

Hon. Barbara Jones

------------------------------------------------------------------------x

STATE OF NEW YORK     )
                       ) ss.:
COUNTY OF WESTCHESTER   )

    MICHAEL MENDELSON, being duly sworn, deposes and says:

    1.    I am the Director of Special Education for the Scarsdale Union Free School District (hereinafter the "District"), serving in that capacity at all times relevant to this matter. Accordingly, I am fully familiar with the facts and circumstances surrounding this proceeding. I make this Affidavit in support of the District's motion for summary judgment and in opposition to the Plaintiffs' motion for summary judgment.

    2.    This action is brought pursuant to the Individuals with Disabilities Education Act (hereinafter the "IDEA") and Article 89 of the New York State Education Law. The primary purpose of these laws is to insure that students with disabilities receive a free and appropriate public education in the least restrictive environment. School districts are charged with convening a Committee on Special Education (hereinafter the "CSE"), comprised of certain mandated members, who make recommendations as to programs and related services for these

students so that the education they receive is tailored to their unique needs. The CSE is required to identify, locate and evaluate all disabled children who are attending the schools within the District's borders and thereafter, develop an Individualized Education Program (hereinafter an "IEP") that will set forth the child's needs and recommendations as to programming and related services.

3.    Plaintiffs' petitioned this Court under the provisions of the IDEA and Article 89 of the New York State Education Law, claiming that the decision of the State Review Officer of the New York State Education Department (hereinafter the "SRO") was erroneous. The SRO found that the District offered Plaintiffs' daughter, M.R., a free and appropriate public education program for the school years 2005-2006 and 2006-2007. The result of this determination was that Plaintiffs' request for reimbursement of tuition paid for those two years to the Windward School (hereinafter "Windward") was denied.

4.    It is respectfully submitted that this Court should grant the District's motion for summary judgment and deny Plaintiffs' motion for summary judgment. The record of this hearing demonstrates that M.R. was offered a program in each school year in question that was designed to meet her unique educational needs in the least restrictive environment and that the offered programs would have resulted in M.R. making meaningful progress. The SRO, who has specialized knowledge and expertise in this area of law, determined that the District's program was sufficient in light of the standards of IDEA and Article 89 of the New York State Education Law for the years 2005-2006 and 2006-2007.

## FACTUAL BACKGROUND

5.    Despite the contention of Plaintiffs, the District did recommend a free and appropriate public education to M.R. in the 2005-2006 and 2006-2007 school years. In order

that the Court can review the District's motion with a full understanding of all the issues raised therein, I will briefly provide the relevant facts regarding M.R.'s history in the District.

6.    At the time of the impartial hearing, M.R. was a student classified as having a learning disability and her classification is not in dispute (Transcript p. 532, line 18).[1]  For the 2005-2006 and 2006-2007 school years, M.R. was unilaterally placed by the Plaintiffs' at Windward.  Windward is not approved by the Commissioner of Education of the State of New York as a school in which public school districts may place students for instruction of students with disabilities.

7.    M.R. was first classified by the District's CSE on January 21, 2003, during M.R.'s second grade year.  (Parents' Exhibit #45).  During the initial referral process, M.R. was privately tested for both her cognitive and academic functioning.  In terms of her cognitive functioning, a review of the WISC-III indicate that, at that time, M.R. had a full scale Intelligent Quotient (hereinafter "IQ") in the 23rd percentile, a verbal IQ in the 42nd percentile and a performance IQ in the 12th percentile, all within the average range.  (Parents' Exhibit #43). However, there was some concern about the discrepancy in M.R.'s functioning between the verbal and performance scores.

8.    On educational achievement testing at that time, M.R.'s functioning was found to be in the average range on all administered subtests of the Woodcock-Johnson Test of Achievement, except for applied problems subtest, which she received a below average score in the 19th percentile and the story recall subtest, which she received an above average score in the 93rd percentile.  (Id.).  On other administered assessment tools, such as the Gray Oral Reading

---

[1]  Hereinafter, transcript citations will appear as "T. __:__."

Test – 4 and the Test of Written Language, M.R. was found to be in either the average or low average range. (*Id.*).

9.    On District administered testing, M.R. received solidly average scores on the Stanford Diagnostic Reading test. On the Stanford Math test, her scores were below average, but her teacher noted she was anxious on the day that portion of the test was given. Her written language scores on the Woodcock-Johnson III were average, while spelling was noted as a weakness (District Exhibit # 45).

10.    M.R.'s private evaluator also tested her executive functioning. Her scores were variable, with a high average score on the Story Memory subtest of the Wide Range Assessment of Memory and Learning, but a deficient score on the Fingertip Tapping subtest. (Parents Exhibit #43).

11.    Based upon the testing reported and the discussions as the initial CSE meeting, M.R. was classified as Learning Disabled and it was recommended that she receive a program of a resource room to provide additional support. M.R. was also provided accommodations and modifications to her program, such as extended time for tests, preferential seating, repetition of directions, teacher prompting and refocusing and special locations for examinations. (Parents' Exhibit #45).

12.    During the 2002-2003 and 2003-2004 school years, the CSE continued to recommend the resource room program at M.R.'s elementary school. During the annual review in the Spring of 2004, where the IEP for the 2004-2005 school year was developed, the CSE reviewed some additional testing. First, the CSE reviewed a report of M.R.'s emotional functioning, dated April 3, 2004. The evaluator found that while M.R. was generally happy, she was experiencing feelings of inadequacies and was self-conscious about her academic abilities

and her looks. (Parents' Exhibit #36). Second, the CSE considered the results of the Stanford Achievement Test, administered on May 20, 2004. On that examination, M.R. achieved a score in the 57th percentile (4.1 grade level equivalency) in the total reading domain. On the math domain, M.R. achieved a score in the 34th percentile. (Parents' Exhibit #34). The CSE recommended a continuation of the resource room program for the 2004-2005 school year, which was M.R.'s fourth grade year. (District Exhibit #44).

13.   While M.R. made progress in her fourth grade year (Parents' Exhibit #15, Parents' Exhibit #33), the progress was not as significant as it had been in prior years. This was especially true in the area of math; as the math curriculum became more complex, M.R. began to struggle. (Tr. 969:1). There was concern by both the District and Plaintiffs by the end of M.R.'s fourth grade year. (Tr. 939:20).

14.   The CSE met on May 5, 2005 to review M.R.'s progress over the 2004-2005 school year and make a recommendation for services for the 2005-2006 school year. It is undisputed that the Committee on that date was properly constituted. The CSE discussed the progress M.R. made over the past year, including that she was now decoding on grade level and had received a "3" on the New York State English Language Arts test, which indicates that she was meeting expectations for her grade in reading and writing. (District Exhibit #28; Tr. 637:13). However, during the meeting, Plaintiffs indicated that, sometime during the school year, they had verbally requested that M.R.'s resource room teacher provide updated testing and that she denied such request. This was the first time I learned of the request and I determined to honor it. Accordingly, I adjourned the meeting in anticipation of additional testing. At the meeting on May 5, 2005, Plaintiffs informed the CSE that M.R. had been already accepted at Windward.

15.   Thereafter, I contacted Plaintiffs to arrange for the testing they requested only to find out that Plaintiffs already had the evaluations done by a private evaluator.  (District Exhibit #37).  In fact, their evaluator, Dr. Allison Bell, commenced her evaluation on March 16, 2005 and completed it on March 25, 2005.  (Parents' Exhibit #23).  At no time during the May 5, 2005 meeting did Plaintiffs inform the CSE that the testing had not only been arranged, but completed.

16.   Dr. Bell tested M.R.'s cognitive functioning and found that her full scale IQ was in the 25th percentile.  M.R. scored in the 79th percentile on verbal comprehension and the 42nd percentile on the working memory subtests.  Her scores in the perceptual reasoning subtest (4th percentile) and the processing speed subtest (16th percentile) were more depressed.  (Parents' Exhibit #23).

17.   Dr. Bell also administered various educational achievement tests.  For the most part, M.R. was found to be functioning in the average range.  Significantly, on the Wide Range Achievement Test-3, Dr. Bell found that M.R. was on or about grade level for reading, spelling and mathematics, which she noted were "consistent with her overall functioning."  Some of M.R.'s scores on the Gray Oral Reading Test were depressed, but overall, Dr. Bell determined that M.R.'s strengths were her verbal comprehension and processing and that her comprehension was at grade level.  (*Id.*; Tr. 35:11; 75:7).

18.   Dr. Bell also assessed M.R.'s neuropsychological functioning, noting that there was no auditory discrimination difficulties and that M.R.'s sensory processing were in normal limits. There was a notation in her report that she had some perceptual problems and difficulties with her eye tracking.  (Parents' Exhibit #23).  Further assessments were performed in the area of memory; M.R. was found to have a strength as a verbal learner, however, she was found to have weaker abilities in other subtests of the memory assessment tool.  (*Id.*).

19. Dr. Bell found that M.R. had low self-concept when it came to her performance in the academic arena. The evaluator noted that M.R. felt pressure due to the expectation of her family. (*Id.*).

20. In her summary and recommendations, Dr. Bell recommended a "highly individualized teaching program that emphasizes multi-sensory learning approaches in the classroom and plenty of 1:1 attention." She further stated that M.R. would be best served in a class with students sharing similar learning needs. (*Id.*).

21. The CSE reconvened on June 14, 2005 to consider Dr. Bell's report and the other assessments prepared in anticipation of the annual review in May. Significantly, there was a decrease in M.R.'s scores on an April 2005 administration of the Stanford Achievement Test. (District Exhibit #41). Dr. Bell attended the meeting and reviewed her evaluation. She stated that she believed that anxiety, while not a primary factor in her learning disability, exacerbated her disability.

22. M.R.'s fourth grade teachers indicated that her progress over the past academic year was slow. (Parents' Exhibit #28; Tr. 939:20). Plaintiffs, while acknowledging progress on M.R.'s part, expressed dissatisfaction with same. (Parents' Exhibit #15). Plaintiffs also expressed their concerns that the resource room program was not rigorous enough for M.R. and that the pull out nature of that service was not optimal for M.R. (A "pull out" is a service or program provided to the student in a setting other than her regular classroom – the student is pulled out of the regular setting and may miss class time to receive these special education programming). (*Id.*).

23. The CSE discussed and adopted goals and objectives, with the participation of Plaintiffs and Dr. Bell.

24.  Given Dr. Bell's recommendation and the other reports reviewed, the CSE recommended a special class with a twelve student, one teacher, one teaching assistant model. In this class, a multi-modal approach to learning would be presented. (Tr. 543:12).

25.  After the meeting, a class profile for the proposed class was provided to Plaintiffs and a visit to the class was arranged. The visit occurred at the end of June, 2005. (Tr. 1058:9).

26.  Thereafter, Plaintiffs rejected the program recommendation and unilaterally placed M.R. at Windward.

27.  Windward administered the Stanford Reading Test at the time of M.R.'s enrollment in September of 2005. (Parents' Exhibit #31). M.R.'s reading comprehension skills were found to be on grade level. On the Stanford Math Test, M.R. received a score which was consistent with the fourth grade level, or at that time, one grade level below. The Gates-MacGinnitie Reading Test was also administered; M.R. was found to be in the average range on the vocabulary subtest, but below average on the comprehension subtest. (*Id.*).

28.  The Plaintiffs filed a request for due process for the 2005-2006 school year on November 7, 2005.   Plaintiffs, however, withdrew that request without explanation on January 19, 2006. (District Exhibits #24, 22).

29.  The District routinely observes classified students who are placed in private schools by their parents in anticipation of annual reviews of their IEPs.  M.R. was observed by Dr. Stephanie Kutin-Senzon, a District psychologist, in January of 2006.

30.  In the Scarsdale School District, the sixth grade is housed in the Scarsdale Middle School.  Therefore, when the District's CSE held its annual review to plan for the 2006-2007 school year for M.R., the Committee consisted of both elementary and middle school regular and

special education teachers and psychologists. Additionally, the head of Windward's Middle School, Barbara Landau and a parent member were present at the meeting.

31. Ms. Landau reported that M.R.'s decoding skills were more fluent, accurate and expressive. (Tr. 1466:9). It was reported that M.R. was also making progress in comprehension and writing skills. Some progress was also noted in her computational math skills. (Tr. 1466:17).

32. A progress report drafted by her teachers at Windward was also reviewed. (Parents' Exhibit #8). It was noted that M.R. had more confidence in reading. Some weaknesses were set forth, such as in inferential thinking and complex writing tasks. As was noted when she was a student at Scarsdale, M.R.'s language difficulties impeded her math abilities.

33. The CSE also reviewed the Spring 2006 administration of the Stanford Reading Achievement Test. M.R.'s total reading score was in the 41st percentile when timed, and higher when untimed. On the Stanford Math Test, M.R.'s total math score was an improved 36th percentile. (Parents' Exhibit #31). Even though M.R.'s math scores demonstrated an improvement, Ms. Landau thought the scores a bit depressed as M.R. did not have the ability to write out her answers.

34. Plaintiffs and Ms. Landau also reported that M.R. was improved emotionally and that the anxiety that M.R. had experienced had decreased.

35. Given all of this information, the CSE recommended that M.R. receive a special education program at the Scarsdale Middle School that consisted of resource room on a daily basis. (District Exhibit #13). Resource room was recommended for her for two (2) reasons. First, at the Middle School, all classes are taught on a departmentalized basis, and students travel from class to class to receive instruction. Therefore, resource room could be scheduled into

M.R.'s school day and she would not be pulled out of an academic class to receive this support. This alleviated Plaintiffs' concern about the pull out nature of resource room. Second, M.R.'s academic performance indicated she could make progress in such a setting.

36.    Due to her individualized needs and the CSE's concerns, the CSE recommended that M.R. be placed in Cooper House. The Scarsdale Middle School is made up of four "houses" where students have their home room and receive all their academic classes. The house system is a way of making the large middle school seem smaller, as for most of the day, students are educated in classrooms in one part of the building, with the same cohort group of students. In the Cooper House academic offerings, there is a parallel curriculum of each of the content area classes for the sixth grade. These parallel classes, which are designed to be small group instruction taught by special educators, are scheduled at the same time as the regular education offerings of the same content area classes. For instance, the regular education social studies class is offered the same period as the parallel, special education social studies class. By placing M.R. in Cooper House, should she need to receive special education small group instruction in one or more of her content area classes, she could have her scheduled changed easily. Such a change in schedule would necessitate a program review by the CSE to recommend same; however, the potential for such change was contemplated as a safety net for M.R. by the CSE. (Tr. 1650:15).

37.    At the CSE meeting for the 2006-2007 school year, the CSE reviewed goals for M.R.'s upcoming academic year. These goals were sent to Windward in advance of the meeting, and Ms. Landau was participating in the CSE meeting when they were discussed and adopted. (Tr. 1644:20).

38. The 2006-2007 IEP was mailed to Plaintiffs on June 14, 2006. (Parents' Exhibit #4). Plaintiffs rejected the program recommended by the CSE and notified the District that M.R. was remaining at Windward. The same letter requested the impartial hearing that results in this appeal.

## PROCEDURAL HISTORY

39. Plaintiffs first challenged the 2005-2006 IEP by request for due process dated November 7, 2005. (District Exhibit #24). That request was withdrawn by Plaintiffs without any explanation. (District Exhibit #22). Plaintiffs then waited for the academic year to pass to renew their challenge of the 2005-2006 school year. By letter date June 22, 2006, Plaintiffs requested a hearing on that year's recommendation, as well as challenging the recommendation for the 2006-2007 school year. As required by the regulations of the Commissioner of Education of the State of New York, the District appointed an impartial hearing officer from amongst an alphabetical list of hearing officers certified to hear challenges pursuant to Part 200 of the Commissioner's Regulations.

40. Plaintiffs' request for due process did not set forth any grounds as to why they were making their request, nor did it set forth the relief request. Accordingly, the District, through its attorney, challenged the sufficiency of the request for due process before the impartial hearing officer assigned to this matter. (District Exhibit #9). Thereafter, Plaintiffs, through their attorney, agreed to submit an amended request for due process, which was submitted on August 9, 2006. (District Exhibit #1).

41. In the interim, on July 25, 2006, Plaintiffs then made a motion to the impartial hearing officer requesting that he recuse himself. (District Exhibit #6). This motion was, in my opinion, vitriolic, and focused on quotes taken out of context and misstatements of facts. When

boiled down to its essence, the motion seems to rely on one fact – that the impartial hearing officer had represented school districts prior to retiring from the active practice of law – as the basis of the request.

42.    By decision dated August 2, 2006, the IHO denied the request that he recuse himself. (District Exhibit #4). Despite the fact that interlocutory appeals are reserved for matters of pendency placements, Plaintiffs filed a notice with the District and the SRO, announcing their intention to appeal this decision. (District Exhibit #1). This notice necessitated the District to prepare a Record on Appeal and Certification of same. After this was filed by the District's attorney, Plaintiffs failed to perfect their appeal on this issue. It should be noted that, despite the fact that Plaintiffs did not argue IHO bias as a ground for appeal before the SRO, they do so in this proceeding.

43.    This proceeding began on October 23, 2006 and there were seven (7) days of testimony.

44.    The IHO rendered his decision on May 3, 2007, finding that the District failed to offer a free and appropriate public education for M.R. in both years at controversy in the proceeding. He awarded tuition reimbursement for the 2005-2006 school year. However, for the 2006-2007 school year the IHO found that Plaintiffs did not act in good faith when they barred the District from observing M.R. at Windward during the pendency of the hearing. (Impartial Hearing Officer's Decision).[2]

45.    Plaintiffs appealed the decision of the IHO relating to the 2006-2007 school year; the District cross-appealed arguing that it recommended a free and appropriate public education in both school years.

---

[2]    This decision was part of the Record on Appeal to the SRO which is being sent directly from the Office of State Review to the Court.

46.    In Appeal No. 07-60, the SRO found that the District had offered to provide a free and appropriate public education to M.R. in both years in controversy.    More specifically, the SRO found that the IEPs for both 2005-2006 provided the type of programs required by M.R. in the least restrictive environmental so that she could make meaningful progress.    (SRO Decision, attached hereto as Exhibit "A").

### THE DISTRICT DID PROVIDE
### A FREE AND APPROPRIATE PUBLIC EDUCATION FOR M.R.
### IN THE 2005-2006 AND 2006-2007 SCHOOL YEARS

47.    M.R.'s IEP for the 2005-2006 school year, developed at two CSE meeting that occurring on May 4, 2005 and June 14, 2005, was prepared in a manner consistent with the IDEA and appropriately addresses M.R.'s then current needs.    This is so, despite the fact that the Plaintiffs argued that the lack of a parent member at the second meeting rendered the IEP null and void.

48.    A parent member, who is a parent of a student in the district who is classified, is a required member of a CSE.    (N.Y. Educ. Law §4402(1)(b)(1)(a); 8 NYCRR 200.3(a)(i)(viii)).    Parents may waive their rights to have a parent member present should they chose to proceed without same.    (8 NYCRR 200.5(c)(2)(v)).

49.    At the first CSE meeting in May of 2005, a parent member was present.    That meeting was adjourned to consider updated testing.    Thereafter, I invited a parent member to the second meeting on June 14, 2005, which was scheduled for 8:30 a.m.    It was not until the morning of that meeting that I learned that the parent member could not attend.    Therefore, at the meeting, I gave Plaintiffs the option of proceeding without the parent member or scheduling another meeting.    They chose to proceed.    In my letter, dated June 21, 2005, transmitting the IEP,

I offered to reconvene the CSE to have a parent member if the lack of a parent member was an issue to them. (District Exhibit #29). Plaintiffs did not respond to this offer.

50.  The lack of a parent member, under these circumstances, was not a substantial procedural violation that would result in an IEP being deemed null and void. This is especially true, herein, as Plaintiffs were accompanied to this meeting by Dr. Bell, who could provide them with the knowledge and support that parent members are typically called upon to provide to the parents of the student at issue in the meeting. Also, Plaintiffs have attended numerous CSE meetings on behalf of M.R. and were well versed in both the CSE process and the special education law.  Plaintiffs were given every opportunity to fully participate and ask questions at the CSE meeting, and in fact, did fully participate.

51.  The CSE that developed the 2005-2006 IEP appropriately addressed M.R.'s cognitive profile, as developed through the testing of Dr. Bell.  Dr. Bell was present at the meeting and was able to share her results and recommendations to the CSE directly.  Dr. Bell recommended that M.R. be educated in a small class where her fellow students shared a similar cognitive and academic profile, and that the instruction be provided in a multi-modal way.  The CSE's recommendation of a small class of no more than twelve students who shared M.R.'s strengths and weaknesses, taught by a special education teacher who used a multi-sensory approach to learning addressed this recommendation.

52.  The CSE that developed the 2005-2006 IEP appropriately addressed M.R.'s academic functioning.  M.R.'s special education and regular education teacher were present at the meeting and were able to report as to M.R.'s current levels of performance.  Additionally, the District administered periodic academic testing to chart M.R.'s progress, and these results were reviewed.  The 2005-2006 IEP adequately set forth M.R.'s abilities and addressed same through

the special class recommendation. Significantly, the CSE considered continuing M.R. in the resource room program which was the previous recommendation and rejected same, given the slow progress she made through fourth grade.

53.  The class recommended by the CSE was made up of students who were similar to M.R. in terms of their academic profile. As the student profile for the class demonstrated, the students therein were of average cognitive ability, just like M.R. (Parents' Exhibit #19). The academic functioning of the students scheduled into the special class were similar to M.R. also. The special education teacher of the class in question testified as to how he individualized instruction for the different learning styles and profiles of his students. (Tr. 1741:2; 1742:1, 15; 1743:5).

54.  The students in the proposed class were not dissimilar to M.R. with regards to their behavioral needs. While two of the students in the class required monitoring due to the way their disability manifested itself in the classroom, the teacher indicated that these needs were addressed appropriately by him and his teaching assistant (Tr. 1738:6) and that the class itself was not atypical of any fifth grade class, with some students who were more compliant than others.

55.  Plaintiffs also argued that the class recommended was not appropriate due to the gender make-up of the students therein. M.R. would have been the only female in the classroom during instruction for English, Social Studies and Science. However, two female students pushed into the special class for math instruction. During the balance of the day, M.R. would have been integrated into the mainstream, where the breakdown of the classes is close to fifty percent of each gender. By my calculations, M.R. would have been the only female in her class for only forty percent of her instructional day. If you take into account lunch and recess, it

would have been only thirty percent of the time that M.R. would have been the only female. Plaintiffs' argument about the effects of this gender issue was purely speculative. I note that the law requires the CSE to place M.R. in a program where she is grouped with students of similar needs vis-à-vis educational achievement, social development, physical development and management needs, which the CSE did in this instance.

56. The CSE that developed the 2005-2006 IEP appropriately addressed M.R.'s emotional functioning. Dr. Bell reported that M.R. suffered from anxiety and was not a confident learner. Plaintiffs reported that M.R. was not positive in her assessments towards school and that she particularly did not like being pulled out of her classes to attend resource room. The 2005-2006 IEP adequately addressed these issues by recommending the special class which eliminated the pull outs that were the concern of the Plaintiffs. Additionally, the CSE recommended a once weekly counseling session for M.R. with the school psychologist to discuss her feelings about her learning disability.

57. The special class recommended for M.R. during the 2005-2006 school year was self-contained, in the sense that she would be educated only with special education students for her academic classes. However, the class was located in a mainstream building and M.R. would interface with her mainstream peers in music, art and physical education, as well as during lunch and recess.

58. The goals and objectives for the 2005-2006 school year were related to M.R.'s individual needs and sufficiently detailed to provide meaningful feedback on progress.

59. M.R.'s IEP for the 2006-2007 school year, developed at a CSE meeting on June 7, 2006, was prepared in a manner consistent with the IDEA and appropriately addresses M.R.'s then current needs.

60.   The CSE considered the tests administered by Windward both in the fall of 2005 when M.R. first commenced at the school, and the spring of 2006. (Parents' Exhibits #31 and 8). Progress was noted in the administration of these tests. More significantly, M.R. was found to be in the average range of functioning on reading, vocabulary, reading comprehension and math.

61.   Ms. Landau reported as to M.R.'s academic year to the CSE. Additionally, the CSE reviewed the progress reports of M.R.'s teachers which detailed her growth throughout the school year.

62.   M.R. was observed at Windward and the findings of this observation was reviewed at the CSE.

63.   Given the profile of M.R. that emerged at the CSE held on June 7, 2006, it was recommended that she be placed in a resource room setting.   While this was a decrease in support from that which was recommended the year prior, the CSE determined that based upon her academic progress over the 2005-2006 school year, M.R. was equipped to handle the academic challenged adequately. (Tr. 1509:23, 1649:20). Additionally, the fact that M.R. would not be pulled out for resource room, but that it would have been scheduled into her academic day was also discussed as grounds for the appropriateness of this program model.

64.   The goals developed for the 2006-2007 school year addressed each of M.R.'s individual needs and provided evaluation criteria which provided the evaluators with specific information to allow for meaningful reports on progress.   These goals were developed with the participation of Ms. Landau.

## WINDWARD IS INAPPROPRIATE FOR M.R.

65.   Plaintiffs failed to demonstrate that Windward was appropriate for M.R.  There was no evidence presented that set forth Windward's curriculum, the text books that M.R. used or the qualifications of the teachers that were educating M.R.

66.   More importantly, there was no evidence presented that demonstrated the need for M.R. to be educated in such a restrictive setting.  Windward does not provide any opportunity for its students to interface with their mainstream peers.  M.R. did not present as a student who needed to be segregated from her mainstream peers throughout the school day to succeed academically.

67.   Plaintiffs attempt to prove Windward's appropriateness by arguing that (a) a large number of District residents send their children to Windward and (b) that Dr. Michael McGill, the Superintendent of Schools for the District is on the Windward Board of Trustees.  Neither of these assertions has any bearing on the appropriateness of Windward for M.R.

68.   There are a number of reasons that District residents choose to send their children to a school like Windward, such as proximity of Windward to the District, the affluence of the community which allows for District residents to make the choice to potentially "maximize" their children's education by sending them to a private school which concentrates heavily on reading skills and the size of the District, which increases the potential number of residents making this choice.  The District maintains that its programming is sufficient and appropriate for students with learning disabilities and that there would be limited circumstances where a student could not receive an appropriate education at the District's schools and where she could receive it at Windward.  However, I know there is a sentiment in the community that the District's schools are so competitive, even on the elementary school level, that if a student is struggling

with their reading, a school like Windward can advance their skills at a greater rate in an environment where the student would not feel different or disabled. While I dispute that Windward can provide an education that would held a learning disabled student significantly more than a program within the District, the District has faced this problem head on.

69. One of the ways that the District has faced this problem is that Dr. McGill has joined the Board of Trustees of Windward. Dr. McGill explained to me that his participation on the Board was meant to strengthen the bonds between two community schools educating the children living in the Scarsdale area and to help address some of the concerns that District parents were expressing about their learning disabled children's education in the competitive arena of the District's schools. His participation on the Board, however, was not an endorsement of Windward as an appropriate school for students such as M.R., who were offered a free and appropriate public education by the District.

## PLAINTIFFS' CONDUCT FORECLOSES TUITION REIMBURSEMENT

70. Plaintiffs herein did not act in good faith with regards to the development of either years' IEP. Accordingly, the law provides that an award of tuition reimbursement can be denied due to same. The conduct of Plaintiffs herein necessitate such a finding.

71. The Plaintiffs applied to Windward on March 13, 2004, a full year prior to her attending school there. Prior to the May 2005 CSE meeting, M.R. had visited Windward and had been accepted. A contract for enrollment was signed on March 10, 2005. (Parents' Exhibit #25).

72. For the 2006-2007 school year, Plaintiffs signed the contract for enrollment and paid a $2,500 deposit on March 8, 2006, well in advance on the June 7, 2006 CSE meeting. (Parents' Exhibit #52).

1833/102/338798 V1  6/27/08

## THE WALL STREET JOURNAL ARTICLE REGARDING THE SRO

73. I read the Wall Street Journal article referenced by Plaintiffs in their Complaint. While I understand that the number of cases being decided in school districts' favor has increased in the past few years, I believe there are a number of reasons for such an increase; none of these reasons, in my opinion, relate to the bias of the SRO or his personal living arrangements. In my view, the change in the IDEA when it was reauthorized in 2004, coupled with an increasing number of federal court cases that provided a better guide as to how the IDEA was to be interpreted and applied has resulted in school districts being more successful in these cases. For instance, in the past, if a procedural error occurred during the development of the IEP, that IEP was declared a nullity, even if the recommended program was appropriate and the procedural error did not substantially impact the substantive decision. That is no longer the case – and this SRO has been consistent with that finding, as he should be.

74. However, this reasoning is simply that, my own reasoning. Just as the Wall Street Journal article only speculates to the reason why the SRO is deciding cases as he is, without any evidence presented as to SRO's bias, I do not believe this Court should accept this author's opinion, which is simply speculative. This speculation is akin to Plaintiffs' speculative claims of bias against the IHO prior to the case proceeding. After sitting through the seven days of hearing and reading the IHO's decision, I am convinced that he evidenced no bias against Plaintiffs or their daughter. I am equally convinced that the SRO was not biased against Plaintiffs or their daughter when he made his determination.

Michael Mendelson

Sworn to before me this
27 day of June, 2008

Notary Public

JANE CIARDI
Notary Public, State of New York
Qualified in Westchester County
No. 4957486
My Commission Expires 10-16-09

1833/102/338798 V1  6/27/08

-21-

**EXHIBIT A**



# The University of the State of New York

## The State Education Department
### State Review Officer

No. 07-060

Application of a CHILD WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Scarsdale Union Free School District

**Appearances:**

Mayerson & Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Keane & Beane, P.C., attorney for respondent, Stephanie M. Roebuck, Esq., of counsel

## DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition at Windward School (Windward) for the 2006-07 school year. Respondent cross-appeals from the impartial hearing officer's determinations that it failed to offer appropriate educational programs to the student for the 2005-06 and 2006-07 school years, that Windward offered an appropriate program to the student for those school years, and that petitioners' conduct in the development of the 2005-06 individualized education program (IEP) did not preclude an award of tuition reimbursement. The appeal must be dismissed. The cross-appeal must be sustained.

The student was attending Windward when the impartial hearing began in October 2006. Windward has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.1[d], 200.7).

The student's verbal abilities are in the high average range of cognitive functioning and her perceptual abilities are in the borderline range (Parent Ex. 23 at p. 3). Her greatest weakness is in the area of visual-perceptual processing and visual memory (id. at p. 7). The student's scores on tests measuring academic functioning are on the lower end of the average range, consistent with her overall intellectual functioning (id. at p. 3). Attention and emotional factors also influence the student's functioning (id. at p. 7). The student's classification and eligibility

for special education programs and services as a student with a learning disability are not in dispute (8 NYCRR 200.1[zz][6]).

When the student entered elementary school in respondent's district for the 2000-01 school year, she received support services in the school's Learning Resource Center (LRC) in the areas of basic concepts and pre-reading skills (Dist. Ex. 45 at p. 1). During the 2001-02 school year, she experienced difficulty acquiring basic skills and continued to receive support in the areas of reading and mathematics (id.). The following school year, in January 2003, the student was classified and received support in the LRC for reading, writing and mathematics (Parent Ex. 45). She continued to attend school in respondent's district for the 2003-04 school year (Dist. Ex. 44 at p. 4).

A subcommittee of respondent's Committee on Special Education (CSE) met on June 30, 2004 to develop the student's IEP for the 2004-05 school year (Dist. Ex. 44). The CSE subcommittee recommended that the student continue to be classified as having a learning disability and that she receive daily resource room services (id. at p. 1). The student continued to attend school in respondent's district for the 2004-05 school year (Parent Ex. 20 at p. 5).

In an April 2005 report, the student's regular education teacher noted that the student was making slow, steady growth in her decoding skills (Parent Ex. 28 at p. 1). She further noted that comprehension was sometimes difficult for the student and described strategies that were used to assist the student, such as sequencing events to help the student recall important information and reinforcing comprehension skills through questioning techniques and repetition (id.). The regular education teacher indicated that grammar and appropriate usage presented a challenge for the student and that the spelling program was modified to better meet the student's needs (id. at p. 2). The regular education teacher also noted that mathematics was difficult for the student and that concepts were reinforced in the classroom and in the LRC (id. at p. 1).

Administration of the Stanford Achievement Test Ninth Edition (Intermediate 1, Form S, Abbreviated) in April 2005 yielded a reading vocabulary score in the 19th percentile and a reading comprehension score in the 52nd percentile (Dist. Ex. 41). The student's total reading score was in the 35th percentile and her total mathematics score was in the 23rd percentile (id.).

The CSE convened on May 4, 2005 (Parent Ex. 20). It reviewed the student's current levels of performance, noting that the student experienced the most difficulty in mathematics (id. at p. 5). It further noted that while written language continued to be a problem for the student and her comprehension abilities declined when presented with questions testing inferential reasoning, the student's performance on the New York Statewide Testing Program for English language arts (ELA) indicated that she had mastered the ELA skills expected of students in her grade (id.). The student's teachers indicated that the student demonstrated a lack of self-confidence that interfered with her class functioning and they expressed concern with the student's emotional functioning (id.). The student's mother indicated that she did not believe that her daughter had made progress during the year and expressed concern about the complexity of the material (id.). Petitioners indicated that their daughter required more attention than she had been receiving and inquired about whether her services could be increased (id.). They requested

that additional testing be conducted and the CSE agreed to reconvene when the additional test results were available (id.).

On May 10, 2005, the student participated in the New York Statewide Testing Program for Mathematics and scored within performance level 2 out of 4 (Parent Ex. 25). On May 24, 2005, one of respondent's school psychologists observed the student in her classroom when the class was transitioning into literature discussion groups (Parent Ex. 24). The school psychologist noted that the student appeared attentive to the book she was reading, but did not appear as interested or participatory as the other students (id.). The school psychologist further noted that the student was asked to read a word aloud and had some difficulty blending and sequencing the sounds as she decoded them (id.). When asked a question about the book, the student answered with an appropriate response and without hesitancy, however, she had some difficulty organizing the language of the response and performed better when guided by her teacher asking questions (id.). When other students read from the book, the student seemed to read along silently, was focused and was not distracted by the activity or low level noise in the classroom (id.). The psychologist indicated that the student was working with effort, but seemed to need more time than her peers (id. at p. 2).

The student was evaluated by a private psychologist in May and June 2005 (Parent Ex. 23). Administration of the Wechsler Intelligence Scale for Children-IV (WISC-IV) yielded a verbal comprehension composite score (and percentile) of 112 (79th), a perceptual reasoning composite score of 73 (4th), a working memory composite score of 97 (42nd), a processing speed composite score of 85 (16th), and a full scale score of 90 (25th) (id. at p. 3). The evaluator noted substantial scatter among the student's subtest scores, conveying a wide variability in the student's performance and functioning (id.). She also noted that the student demonstrated strong verbal reasoning skills and markedly weaker perceptual abilities (id.). The evaluator reported that during administration of the block design subtest the student rotated elements of the designs, shifted figure and ground elements, saw larger blocks of color than were in the model, and did not perceive the shapes of triangles (id.). She further reported that during administration of the matrix reasoning subtest the student was similarly confounded by the picture puzzle patterns (id.). She also reported that the student demonstrated difficulty discerning relevant from irrelevant visual information on the picture completion subtest (id.). On the arithmetic subtest, the student demonstrated difficulty retaining the details of word problems and seemed to perform random operations with the numbers she could remember (id.). The evaluator attributed the student's poorer performance on the arithmetic subtest to attention factors (id.).

Administration of the Wide Range Achievement Test 3 (WRAT 3) resulted in the student obtaining a reading standard score (SS) of 97, a spelling SS of 95, and an arithmetic SS of 97 (Parent Ex. 23 at p. 3). The evaluator indicated that the student's scores were on or about at grade level, on the lower end of the average range, and consistent with the student's overall intellectual functioning (id.). The evaluator further noted that the student had a limited sight word vocabulary for her age, and she attempted to use a phonetic approach to decode unfamiliar words, but her word attack strategies were not always successful (id. at p. 4). The evaluator reported that on the arithmetic test, the student made a few errors of inattention related to sign of operation and carrying/borrowing in subtraction (id.). She indicated that the student did not appear to have mastered division or the relationship between hours and minutes of time (id.).

Administration of the Gray Oral Reading Test yielded a total reading quotient of 88, a meaning cues score of 91, a graphic/phonemic cues score of 91, and a function cues score of 87 (Parent Ex. 23 at p. 4). The evaluator reported that the student read even the simplest material word by word (id.). Upon administration of selected subtests of the Detroit Tests of Learning Aptitude-Fourth Edition (DTLA-4), the evaluator concluded that the student had strong verbal abilities that were severely hampered by perceptual problems, and that when the student needed to sequence visual information she processed very slowly and consistently rotated or reversed what she saw (id. at p. 5). In addition, the evaluator indicated that as a result of administration of the Wide Range Assessment of Memory and Learning (WRAML), it became apparent that the student's strength was as a verbal learner, and if required to learn visually presented material, the student would do best when that material was paired with verbal stimuli (id. at p. 6). The evaluator also indicated that auditory memory was more subject to interference from attention factors and to difficulties with sequential order (id.).

A personality assessment revealed that the student acknowledged her struggles in school and felt burdened by the work she had to complete (Parent Ex. 23 at p. 6). She was aware that she was slower to process information than most of her peers, and had incorporated this into her self-concept (id.). The evaluation report indicated that the student expressed that she did not feel valued among her classmates and felt left out of things (id.). Sadness and worry about school were noted (id.).

The evaluator indicated that the student struggled in school, largely due to the interference of perceptual processing deficits (Parent Ex. 23 at p. 7). The evaluator opined that although respondent offered special education services for the student, those services presented in the context of the mainstream classroom life were not adequate for her (id.). The evaluator indicated that the student's "needs in the classroom are significant and continuous cutting across all subject areas and therefore all aspects of her day" (id.). The evaluator suggested that the student receive a highly individualized teaching program that emphasized multisensory learning approaches in the classroom and plenty of 1:1 attention, in the presence of other children who have similar learning needs, so that she could see herself as part of a community of learners (id.).

The evaluation report indicated that the student had been accepted by a private school (Parent. Ex. 23 at p. 1). The evaluator indicated that the private school was the right kind of placement for the student at that time, so that she could eventually transfer back into respondent's school district with a strong sense of her own value and abilities (id.).

In a June 2005 speech and language initial assessment conducted by respondent, administration of the Clinical Evaluation of Language Fundamentals - Fourth Edition (CELF-4) yielded a core language SS (and percentile rank) of 97 (42), a receptive language SS of 93 (32), an expressive language SS of 103 (58), and a language memory SS of 90 (25) (Parent Ex. 22 at p. 1). Administration of The Listening Test yielded a total test SS of 103 (39) (id.). The student's scores on four out of five subtests were within the average range of ability when compared to same age peers, except on the reasoning subtest, where the student's score was in the low average range (id.).

4

The evaluator summarized assessment results, indicating that the student's comprehension and use of language fell within the average range when compared to same age peers (Parent Ex. 22 at p. 3). She indicated that the student was able to generate age-appropriate sentences that were grammatically and semantically correct and could identify and describe relationships among words (id.). She also indicated that the student's receptive language was slightly weaker than her expressive language (id.). The evaluator noted that the student was not always able to discriminate between essential and non-essential information and that she might struggle with more complex and lengthy language (id.). She further noted that the student seemed to perform better on tasks that broke down orally presented information into manageable parts (id.). The evaluator recommended that the student be encouraged to ask for a repetition of information to improve overall processing of orally presented information (id.).

A June 13, 2005 progress report for the goals and objectives listed on the 2004-05 IEP showed that the student had mastered objectives related to capitalization and punctuation, and had made some progress or was progressing satisfactorily toward the remainder of the objectives (Parent Ex. 21). Comments on the student's 2004-05 final report card indicated that she showed slow steady progress in her reading skills and that math basics continued to show growth with a "differentiated" curriculum (Parent Ex. 32).

The CSE reconvened on June 14, 2005 for the student's annual review and to develop her program for the 2005-06 school year (Parent Ex. 20). Comments from the CSE meeting indicate that petitioners were advised that the additional parent member was unavailable (id. at p. 5). They were asked if they wanted to have the CSE meeting rescheduled and they indicated that they wished to proceed as they had their private psychologist present (id.). Comments further indicate that the private psychologist reviewed the results of her evaluation, the classroom teacher described how differentiated instruction was provided, and petitioners expressed concerns about the modifications their daughter was receiving (id.). The CSE revisited the option of a special class, which, comments note, petitioners had rejected at the previous CSE meeting (id. at p. 6). Comments also note that petitioners inquired about the other students in the recommended class and whether they could observe the class (id.). Comments provide that "[a]fter further discussion, the CSE recommended the special class and reviewed the goals and objectives" (id.).

By letter dated June 17, 2005 to petitioners, respondent's director of special education provided a profile report of students attending the special class recommended for petitioners' daughter (Parent Ex. 19). In a June 20, 2005 letter, petitioners advised respondent's director of special education that the proposed special class was inappropriate (Parent Ex. 18). They indicated that their daughter would be the only girl in the class and that their daughter's learning profile was different from the other students in the class (id.).

On June 21, 2005, respondent's director of special education sent petitioners a letter advising them of the June 2005 CSE's recommendation for services and seeking their consent for services (Parent Ex. 17). In the letter, he summarized the events of the June 2005 CSE meeting with respect to the unavailability of the additional parent member and offered to have the CSE reconvene with a parent member present (id.).

In a letter dated July 12, 2005 to respondent's director of special education, petitioners identified discrepancies between the discussions at the May and June 2005 CSE meetings and the summary of those discussions reflected on the June 2005 IEP (Parent Ex. 15). They attached a June 30, 2005 letter from the private psychologist who accompanied them to the June 2005 CSE meeting which summarized her recollection of the meeting (Parent Ex. 16). Petitioners advised respondent's director of special education that they disagreed with the proposed program (id. at p. 3). They indicated that they had enrolled their daughter in a private school for the 2005-06 school year and that they would be filing a request for an impartial hearing to seek reimbursement (id.). Respondent's director of special education responded in a letter dated July 14, 2005 indicating that he disagreed with many of petitioners' assertions and characterizations, and that he would attach petitioners' letter to the June 2005 IEP as an addendum (Dist. Ex. 26).

The student began attending Windward for the 2005-06 school year (Parent Ex. 6). On November 7, 2005, petitioners again advised respondent's director of special education that they believed that respondent's recommendation for their daughter for the 2005-06 school year did not appropriately address her special education needs (Dist. Ex. 24). They indicated that they had placed their daughter at Windward for the 2005-06 school year and requested an impartial hearing to consider the issue of tuition reimbursement (id.). Petitioners subsequently withdrew their November 7, 2005 due process complaint notice (Dist. Ex. 22).

The same private psychologist that evaluated the student in May and June 2005 met with the student on November 4, 2005 for a follow-up interview and to administer the WRAT 3 (Parent Ex. 14). The evaluator reported that the student's academic functioning appeared to be stable, in the low average to solidly average range (id.). She also reported that the student still presented as a somewhat anxious and fidgety child (id.). The evaluator indicated that the student appeared to be happy and that the student's demeanor was completely altered from when she had tested the student earlier in the year (id.). The evaluator noted that the student demonstrated a clear awareness about learning difficulties and conveyed a sense of relief and comfort at being able to be part of a group of children who shared some of the struggles that she had experienced in the classroom (id.).

On January 25, 2006, the student was observed by one of respondent's school psychologists at Windward during a reading and writing class as part of the student's annual review (Parent Ex. 9). The observer reported that the student appeared easily distracted by extraneous noise (id.). The student's teacher advised the observer that the student could be internally and externally distracted (id.).

In a February 2006 progress report from Windward, the student's reading/skills teacher reported that the student had difficulty with tasks that required inferential thinking (Parent Ex. 8). She indicated that skills such as drawing conclusions and making predictions would be areas of concentration during the following semester (id.). The student's math teacher reported that the student's work in class had been extremely variable (id. at p. 4). He indicated that at times the student's language difficulty strongly impeded her ability to solve a problem correctly (id.).

The CSE convened on June 7, 2006 for the student's annual review and to develop an IEP for the 2006-07 school year (Parent Ex. 4). It determined that the student was eligible to

continue to receive special education services as a student with a learning disability (id. at p. 1). The CSE recommended that the student be placed in respondent's school with resource room services (5:1) four times per week for 45 minutes (id.). It further recommended that the student participate in all general education programs (id. at p. 2). Comments from the CSE meeting note that the placement recommendation was suggested to facilitate a move to a parallel class in the event the student experienced increased academic difficulty (id. at p. 5). Comments further note that if the student returned to respondent's schools for the 2006-07 school year, the CSE would reconvene after six weeks to review her program (id.). The IEP developed as a result of the June 2006 CSE meeting included annual goals to address the student's study skills, reading, writing, and mathematics needs (id. at pp. 6-9).

By electronic mail dated July 18, 2006, petitioners advised respondent's director of special education that they were unable to accept the June 2006 IEP (Dist. Ex. 8). In an August 3, 2006 response to the director of special education's request for an explanation of their disagreement, petitioners set forth their reasons for rejecting the June 2006 IEP (Dist. Ex. 2).

On August 9, 2006, petitioners filed a due process complaint notice amending their June 22, 2006 due process complaint notice seeking tuition reimbursement for the 2005-06 and 2006-07 school years as well as "transportation relief" (Parent Ex. 1). With respect to the 2005-06 school year, petitioners listed numerous allegations including that respondent failed to ensure the full attendance of the mandated members of the CSE, engaged in impermissible "predetermination," that the proposed class was "skewed in terms of available peers," that the CSE failed to properly develop appropriate goals and objectives with petitioners' full participation, and that the "proposed classroom was not an appropriate placement to meet [the student's] unique and individual needs" (id. at pp. 3-5). For the 2006-07 school year, petitioners asserted that respondent "repeated a number" of the same "problems" (id. at p. 5).

The impartial hearing began on October 23, 2006 and concluded on March 1, 2007, after seven days of testimony. In November 2006, while the impartial hearing was pending, respondent's director of special education advised petitioners that the CSE was planning for their daughter's annual review and requested permission to conduct an observation of their daughter at Windward (Joint Ex. 1 at pp. 1, 5). In a letter dated December 5, 2006, petitioners advised respondent's director of special education that they would provide consent if respondent agreed not to testify about the observation or submit any documents in connection with such observation at the impartial hearing for the 2005-06 and 2006-07 school years (id. at p. 2). In a response dated December 18, 2006, respondent's director of special education requested that petitioners provide unrestricted consent (id. at p. 6). By letter dated February 16, 2007, petitioners granted unrestricted consent for additional information for the exclusive purpose of the annual review for the 2007-08 school year (id. at p. 7). During the impartial hearing, one of petitioner's witnesses testified that she observed the student at Windward in December 2006 (Tr. p. 1204). Respondent objected to testimony relating to the witness's observation. The impartial hearing officer permitted the witness to testify as a fact witness with the understanding that the issue of obtaining her opinion regarding the appropriateness of the private school would be resolved at a later time (IHO Decision at p. 46). The witness provided an opinion on direct examination (Tr. p. 1255), and was cross-examined (Tr. pp. 1260-83).

The impartial hearing officer rendered his decision on May 3, 2007. With respect to the 2005-06 school year, the impartial hearing officer found that the June 14, 2005 CSE was improperly composed due to the absence of an additional parent member and that the IEP developed by the invalidly composed CSE was a nullity (IHO Decision at p. 25). He also found that the discussion of placement impermissibly preceded the "flushing out" of the goals and objectives (id. at p. 28). In addition, the impartial hearing officer determined that the student was not an appropriate candidate for the recommended class when compared to the composition of the class contained in the class profile (id. at p. 30). He further found that the goals on the June 2005 IEP did not give any indication of where the student was expected to be one year from the date of the goal, and that such deficiency applied to all of the goals on the June 2005 IEP and deprived the student of an appropriate IEP for the 2005-06 school year (id. at p. 31). The impartial hearing officer also found that Windward was an appropriate placement for the student for the 2005-06 school year and that petitioners' conduct did not bar their claim for tuition reimbursement (id. at p. 35).

With respect to the 2006-07 school year, the impartial hearing officer found that the goals on the June 2006 IEP did not give any indication of where the student was expected to be one year from the date of the goal, that such deficiency applied to all of the goals on the June 2006 IEP and deprived the student of an appropriate IEP for the 2006-07 school year (IHO Decision at p. 37). He also found that Windward was an appropriate placement for the student for the 2006-07 school year (id. at p. 42), but that equitable considerations weighed against petitioners requiring dismissal of the tuition reimbursement claim for that school year (id. at p. 49).

Petitioners appeal from the impartial hearing officer's determination that equitable considerations weighed against them with respect to the 2006-07 tuition reimbursement claim because they declined to grant consent to permit respondent to observe their daughter at Windward during the 2006-07 school year.

Respondent cross-appeals from the impartial hearing officer's findings that the 2005-06 IEP was a nullity due to the lack of a parent member, that the CSE's recommendation for the 2005-06 school year was deficient, that the student was not appropriately grouped in the recommended special class for the 2005-06 school year, that the goals contained in the 2006-07 IEP were deficient, that petitioners demonstrated that Windward was appropriate for both school years and that petitioners' conduct in the development of the 2005-06 IEP did not preclude an award of tuition reimbursement.

Petitioners filed an answer to respondent's cross-appeal. They reiterated their position that the impartial hearing officer's decisions and findings with respect to the 2005-06 school year should be affirmed and that his finding that equitable considerations precluded an award for tuition reimbursement for the 2006-07 school year should be reversed.[1]

---

[1] In petitioners' reply memorandum annexed to their answer to respondent's cross-appeal, petitioners ask that I recuse myself. I have considered petitioners' request and find no basis for recusal (see 8 NYCRR 279.1).

First I will address respondent's cross-appeal. The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482)[2] is to ensure that students with disabilities have available to them a free appropriate public education (FAPE) (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 546 U.S. 49, 51 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17[d];[3] see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[4]

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that

---

[2] On December 3, 2004, Congress amended the IDEA, effective July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 [2004]). Some of the relevant events in the instant appeal took place prior to the effective date of these 2004 amendments to the IDEA, and therefore the provisions of the IDEA 2004 do not apply. The newly amended provisions of IDEA 2004 apply to the relevant events that took place after the July 1, 2005 enactment date. Citations in this decision are to the newly amended statute unless otherwise noted.

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the IDEA, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. For convenience, citations in this decision refer to the regulations as amended because the regulations have been reorganized and renumbered.

[4] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]).

instruction" (Rowley, 458 U.S. at 203).  However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189).  The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379).  Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).  Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see Perricelli, 2007 WL 465211, at *15).  The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 546 U.S. at 59-62 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a child by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 111 [2d Cir. 2007]; Cerra, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the child a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

Respondent appeals from the impartial hearing officer's determination that the June 2005 IEP was a nullity due to the absence of an additional parent member.  Although not required by the IDEA (20 U.S.C. § 1414 [d][1][B]; see 34 C.F.R. § 300.344), New York State law requires the presence of an additional parent member on the committee that formulates a student's IEP (Educ. Law § 4402[1][b][1][a]; 8 NYCRR 200.3[a][1][viii]; see Bd. of Educ. v. Mills, 2005 WL

10

1618765, at *5 [S.D.N.Y. July 11, 2005]; Bd. of Educ. v. R.R., 2006 WL 1441375, at *5 [S.D.N.Y. May 24, 2006]; Application of the Bd. of Educ., Appeal No. 05-058). New York law provides that membership of a CSE shall include an additional parent member of a student with a disability residing in the school district or a neighboring school district, provided that such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting (Educ. Law § 4402[1][b][1][a]; 8 NYCRR 200.3[a][1][viii]). Parents have the right to decline, in writing, the participation of the additional parent member at any meeting of the CSE (8 NYCRR 200.5[c][2][v]).

No additional parent member attended the June 2005 CSE meeting. The record shows, however, that petitioners declined respondent's offer to reschedule the meeting at a time when a parent member could participate, though they did not make this declination in writing (Parent Ex. 20 at p. 5). I note that when respondent's director of special education advised petitioners in writing of the June 2005 CSE's recommendation, he again offered to have the CSE reconvene with a parent member present (Parent Ex. 17). The record shows that the private psychologist who evaluated the student in May and June 2005 attended the June 2005 CSE meeting with petitioners during which she reviewed the results of her evaluation and made various recommendations (Parent Exs. 16; 20 at p. 4). In addition, petitioners questioned some of the goals and objectives and modifications were made (Parent Ex. 20 at p. 6). I note that petitioners are familiar with the CSE process and knowledgeable about IEP development (Tr. pp. 1030-31). Under the circumstances, the record does not demonstrate that the composition of the CSE resulted in a loss of educational opportunity for the student or infringed on petitioners' ability to participate in the CSE (see Mills, 2005 WL 1618765 at *5).

Respondent also appeals from the impartial hearing officer's determination that the substantive discussion of placement at the June 2005 CSE meeting impermissibly preceded review of the goals and objectives for the 2005-06 school year. In determining the educational placement of a student, the school district must ensure that the placement is based upon the student's IEP (34 C.F.R. § 300.116[b][2]). The record shows that the CSE initially convened for the student's annual review for the 2005-06 school year in May 2005 (Parent Ex. 20). The record further shows that at that meeting petitioners were provided a CSE draft data form which included goals and objectives (Parent Ex. 27 at pp. 8-10). As noted above, when the CSE reconvened in June 2005, the private psychologist reviewed the results of her evaluation which included a program recommendation (Parent Exs. 20 at p. 5; 23). The CSE discussed the option of a special class placement and recommended that the student be placed in a special class (Parent Ex. 20 at p. 6). It also reviewed the goals and objectives and made slight modifications (id.). While there is information in the record that the June 2005 CSE discussed the option of a special class placement before reviewing the goals and objectives, the record demonstrates that the placement recommendation was based upon the student's IEP. I note that the CSE considered continuing the student in a regular class with supportive and resource room services, but did not believe that her needs could adequately be addressed with push-in services (Parent Ex. 20 at p. 2). I also note that in their July 12, 2005 letter to respondent's director of special education identifying discrepancies between the discussions at the May and June 2005 CSE meetings and the summary of those discussions reflected on the June 2005 IEP, petitioners do not raise concerns about the placement recommendation preceding the development of the goals and objectives (Parent Ex. 15).

In addition, respondent appeals from the impartial hearing officer's determination that the student was not an appropriate candidate for respondent's special class for the 2005-06 school year in light of her learning characteristics and social development. State regulations provide that students who are placed together for purposes of special education are to be grouped by similarity of individual needs, including social needs, and that the size and composition of special classes are to be based on the similarity of the individual needs of the students, including their levels of social development (see 8 NYCRR 200.6[a][3] and [g][2]; see also 8 NYCRR 200.1[ww][3]). As discussed below, the record does not show that the composition of respondent's special education class renders that recommended placement inappropriate. The record shows that the student's verbal abilities are in the high average range of cognitive functioning and her perceptual abilities are in the borderline range (Parent Ex. 23 at p. 3). The record also shows that attention and emotional factors influence the student's functioning (id. at p. 7). The June 17, 2005 class profile for the class recommended by respondent for the 2004-05 school year indicated that nine of the students enrolled in the class at that time were classified as having a learning disability (three students), an other health impairment (two students), a speech and language impairment (three students), or an orthopedic impairment (one student) (Dist. Ex. 31 at pp. 1-2, 4, 6, 9-10, 12, 14, 17, 20). Several of the students' cognitive test results ranged from the average to superior range of cognitive ability (id. at pp. 2, 4, 7, 12, 13). Some of the students had attention difficulties (id. at pp. 2, 4, 12, 13, 14) and some needed small group instruction and supports such as graphic organizers, preplanning, sequential steps when writing paragraphs and stories, manipulatives, picture representation regarding math concepts, breaking down or "chunking" information into manageable steps, multisensory instruction, repetition and reteaching (id. at pp. 2, 4, 6, 7, 8, 9, 10, 11-13, 17-18, 20). Two of the students in the class were girls (id. at pp. 2, 20). The record does not show that the composition of the recommended class would result in petitioners' daughter being placed in a class composed of students of dissimilar needs. I find that the record does not demonstrate that respondent's proposed class was inappropriate for petitioners' daughter.

Respondent also appeals from the impartial hearing officer's determination that the goals included on the June 2005 IEP were deficient because they did not indicate a target achievement level against which progress could be measured (IHO Decision at p. 31). An IEP must include a statement of measurable annual goals (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]). The impartial hearing officer found that the June 2005 IEP contained sufficient information for understanding the student's present levels of performance (IHO Decision at p. 30). To address the student's identified needs, the June 2005 IEP contained annual goals and objectives in reading, writing, mathematics and social/emotional/behavioral needs (Parent Ex. 20 at pp. 6-8). The June 2005 IEP had two reading goals with a total of nine detailed objectives or benchmarks, two writing goals with a total of eight detailed objectives or benchmarks, one mathematics goal with 12 detailed objectives or benchmarks, and one social/emotional/behavioral goal with two detailed objectives or benchmarks (id.). Corresponding objectives further clarified the goals. Each objective specified a skill the child needed to demonstrate, and included percentage of accuracy required, as well as expected target dates (id.). For example, a reading goal to address word recognition and decoding skills has a corresponding objective specifying that the student demonstrate a specific decoding skill with 80 percent mastery evaluated by classroom and standardized tests assessed by the regular and special education teacher by June 15 (id. at p. 6).

The goal to address mathematical concepts, reasoning and computation has a corresponding objective specifying that the student understand a specific mathematical concept with 70 percent accuracy evaluated by classroom and standardized tests assessed by the regular and special education teacher by June 15 (id.). While the annual goals on the June 2005 IEP should have included information about the level of performance expected to be reached by the student during the year the IEP was in effect, the objectives are specific and provide sufficient information to measure the student's performance (Application of a Child with a Disability, Appeal No. 07-022; Application of a Child with a Disability, Appeal No. 05-038). Under the circumstances, I am unable to find that any inadequacy in the annual goals rises to the level of a denial of a FAPE (see W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147 [S.D.N.Y. 2006]).

I have reviewed the June 2005 IEP and find that it accurately reflects the results of evaluations to identify the student's needs. I also have reviewed the content of the goals and objectives and find that they are appropriate and related to the student's needs. In addition, I have reviewed the June 2005 IEP recommendations and find that the recommended program offered appropriate special education services. I have considered petitioners' challenges to the June 2005 IEP and I am not persuaded that their daughter was not offered a FAPE for the 2005-06 school year.

The impartial hearing officer also found that the annual goals on the June 2006 IEP were deficient because they did not indicate a target achievement level against which progress could be measured. Pursuant to IDEA 2004, in addition to including a statement of measurable annual goals, an IEP must include a description of how the child's progress toward meeting the annual goals will be measured (20 U.S.C. § 1414[d][1][A][i][II], [III], see also 8 NYCCR 200.4[d][2][iii][b]). As with the June 2005 IEP, the impartial hearing officer determined that the June 2006 IEP sufficiently indicated the student's present level of performance based on information available at the time of the June 2006 CSE meeting (IHO Decision at p. 36). In order to address the student's identified needs, the June 2006 IEP contained annual goals in the areas of study skills, reading, writing, and mathematics (Parent Ex. 4 at pp. 6-9). Each goal contained a specific evaluation criterion, evaluation procedure and an evaluation schedule (id.; see 8 NYCRR 200.4[d][2][iii][b]). Evaluation Criteria is described in the IEP as how well and over what period of time the student must demonstrate performance (Parent Ex. 4 at p. 6). "Procedures to Evaluate Goal" is described in the IEP as the method that will be used to measure progress (id.).

Respondent's special education teacher who taught respondent's parallel curriculum classes as well as a learning resource center class and who was a push-in collaborative teacher for social studies testified about her understanding of what each goal was addressing and how she would present and assess individual goals for the student (Tr. pp. 1472-96). She testified that she would likely assess a reading goal involving multisyllabic words and syllable identification that had an anticipated success rate of 80 percent over five weeks by keeping a checklist, conducting an error analysis and recording missed words (Tr. p. 1480; Parent Ex. 4 at p. 7). Regarding the goal pertaining to the student's need to refocus without prompts when distracted (Dist. Ex. 13 at pp. 6-7), the special education teacher testified that the progression would be from needing lots of teacher support to needing less teacher support (Tr. p. 1478). She indicated that to assess the goal she would go into the student's mainstream class and do some recorded

observations as well as ask the student's team for feedback (Tr. p. 1479). She indicated that she did not believe that study skill goals could be worked on in isolation, that they are worked on "with the content and in the context of the classroom," and are "recycled over and over again in different settings" (Tr. pp. 1478-79). Based upon the record before me, I find that the annual goals on the June 2006 IEP are measurable and include a description of how the student's progress toward meeting the annual goals will be measured during the year the IEP is in effect.

The impartial hearing officer indicated that despite his determination that the goals in the June 2006 IEP were deficient, the record demonstrated that the recommendations for the 2006-07 school year were otherwise appropriate. I have reviewed the June 2006 IEP and find that it accurately reflects the results of evaluations to identify the student's needs. I also have reviewed the goals and find that they are appropriate and related to the student's needs. In addition, I have reviewed the June 2006 IEP recommendations and find that the recommended program offered appropriate special education services. I have considered petitioners' challenges to the June 2006 IEP and I am not persuaded that the record demonstrates that their daughter was not offered a FAPE for the 2006-07 school year.

Based on the information before me, I find that petitioners have not prevailed with respect to the first criterion of the Burlington/Carter analysis for an award of tuition reimbursement for the 2005-06 and 2006-07 school years. Having so determined, the necessary inquiry is at an end and there is no need to reach the issue of whether Windward was an appropriate placement (see M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d. Cir. 2000]; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 03-058).

I have considered the parties' other contentions, including the arguments referenced by petitioners in footnote 8 of their petition, and find them to be without merit.

**THE APPEAL IS DISMISSED.**

**THE CROSS-APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the impartial hearing officer's decision is annulled.

Dated:     Albany, New York
           September     , 2007          **PAUL F. KELLY**
                  2 4                    **STATE REVIEW OFFICER**

14