UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

R.R. and D.R. o/b/o M.R.

        Plaintiffs,

-against-

SCARSDALE UNION FREE SCHOOL DISTRICT,

        Defendant.

------------------------------------------------------------------x

**STATEMENT PURSUANT TO LOCAL RULE 56.1**

08-CV-0247 (BSJ)(FM) – ECF Case

Hon. Barbara Jones

Defendant, the Scarsdale Union Free School District (hereinafter the "District"), by its attorneys Keane & Beane, P.C., contends that there are no genuine issues to be tried as to the following material facts:

1.    This action is brought pursuant to the Individuals with Disabilities Education Act (hereinafter "the IDEA") and Article 89 of the New York State Education Law. The primary purpose of these laws is to ensure that students with disabilities receive a free and appropriate public education in the least restrictive environment. School districts are charged with convening a Committee on Special Education (hereinafter the "CSE"), comprised of certain mandated members, who make recommendations as to programs and related services for these students so that the education students receive is tailored to their unique needs. The CSE is required to identify, locate and evaluate all disabled children who are attending the schools within the District's borders and thereafter, develop an Individualized Education Program (hereinafter an "IEP") that will set forth the child's needs and recommendations as to programming and related services. See Affidavit of Michael Mendelson, sworn to on June 27, 2008, hereinafter referred to as the "Mendelson Aff." at ¶ 2.

2. Plaintiffs petitioned this Court under the provisions of the IDEA and Article 89 of the New York State Education Law, claiming that the decision of the State Review Officer of the New York State Education Department (hereinafter the "SRO") was erroneous. See Mendelson Aff. at ¶ 3.

3. The SRO found that the District offered Plaintiffs' daughter, M.R., a free and appropriate public education program for the school years 2005-2006 and 2006-2007. The result of this determination was that Plaintiffs' request for reimbursement of tuition paid for those two years to the Windward School (hereinafter "Windward") was denied. See Mendelson Aff. at ¶3; Exhibit "A" to Mendelson Affidavit.[1]

4. The record of this hearing demonstrates that M.R. was offered a program in each school year in question that was designed to meet her unique educational needs in the least restrictive environment and that the offered programs would have resulted in M.R. making meaningful progress in school. See Mendelson Aff. at ¶ 4.

5. The SRO, who has specialized knowledge and expertise in this area of law, determined that the District's program was sufficient in light of the standards of IDEA and Article 89 of the New York State Education Law for the years 2005-2006 and 2006-2007. See Mendelson Aff. at ¶ 4; Ex. A to Mendelson Affid.

6. At the time of the impartial hearing, M.R. was a student classified as having a learning disability and her classification is not in dispute. See Mendelson Aff. at ¶ 6; Transcript p. 532, line 18.[2]

---

[1] Hereinafter "Ex. A to Mendelson Affid."
[2] Hereinafter, transcript citations will appear as "T. __:__."

7. For the 2005-2006 and 2006-2007 school years, M.R. was unilaterally placed by the Plaintiffs at Windward. Windward is not approved by the Commissioner of Education of the State of New York as a school in which public school districts may place students with disabilities for special education instruction. See Mendelson Aff. at ¶ 6; Tr. 219:14.

8. M.R. was first classified as a student with a disability by the District's CSE on January 21, 2003, during M.R.'s second grade year. See Mendelson Aff. at ¶ 7; Parents' Exhibit #45.

9. During the initial referral process, M.R. was privately tested for both her cognitive and academic functioning. In terms of her cognitive functioning, a review of the WISC-III indicates that, at that time, M.R. had a full scale Intelligent Quotient (hereinafter "IQ") in the 23rd percentile, a verbal IQ in the 42nd percentile and a performance IQ in the 12th percentile, all within the average range. However, there was some concern about the discrepancy in M.R.'s functioning between the verbal and performance scores. See Mendelson Aff. at ¶ 7; Parents' Exhibit #43.

10. On educational achievement testing at that time, M.R.'s functioning was found to be in the average range on all administered subtests of the Woodcock-Johnson Test of Achievement, except for applied problems subtest, on which she received a below average score in the 19th percentile, and the story recall subtest, on which she received an above average score in the 93rd percentile. On other administered assessment tools, such as the Gray Oral Reading Test – 4 and the Test of Written Language, M.R. was found to be in either the average or low average range. See Mendelson Aff. at ¶ 8; Parents' Exhibit #43.

11. On District-administered testing, M.R. received solidly average scores on the Stanford Diagnostic Reading test. On the Stanford Math test, her scores were below average, but

her teacher noted she was anxious on the day that portion of the test was given. Her written language scores on the Woodcock-Johnson III were average, while spelling was noted as a weakness. See Mendelson Aff. at ¶ 9; District Exhibit # 45.

12. M.R.'s private evaluator also tested her executive functioning. Her scores were variable, with a high average score on the Story Memory subtest of the Wide Range Assessment of Memory and Learning, but a deficient score on the Fingertip Tapping subtest. See Mendelson Aff. at ¶ 10; Parents Exhibit #43.

13. Based upon the testing reported and the discussions at the initial CSE meeting, M.R. was classified as Learning Disabled and it was recommended that she receive a program of a resource room to provide additional support. M.R. was also provided accommodations and modifications to her program, such as extended time for tests, preferential seating, repetition of directions, teacher prompting and refocusing, and special locations for examinations. See Mendelson Aff. at ¶ 11; Parents' Exhibit #45.

14. During the 2002-2003 and 2003-2004 school years, the CSE continued to recommend the resource room program at M.R.'s elementary school. See Mendelson Aff. at ¶ 12.

15. During the annual review in the Spring of 2004, when the IEP for the 2004-2005 school year was developed, the CSE reviewed some additional testing. The CSE reviewed a report of M.R.'s emotional functioning, dated April 3, 2004. The evaluator found that while M.R. was generally happy, she was experiencing feelings of inadequacies and was self-conscious about her academic abilities and her looks. See Mendelson Aff. at ¶ 12; Parents' Exhibit #36.

16. The CSE also considered the results of the Stanford Achievement Test, administered on May 20, 2004. On that examination, M.R. achieved a score in the 57th percentile (4.1 grade

level equivalency) in the total reading domain. On the math domain, M.R. achieved a score in the 34th percentile. See Mendelson Aff. at ¶ 12; Parents' Exhibit #34.

17. Based upon this information, the CSE recommended a continuation of the resource room program for the 2004-2005 school year, which was M.R.'s fourth grade year. See Mendelson Aff. at ¶ 12; District Exhibit #44.

18. While M.R. made progress in her fourth grade year, the progress was not as significant as it had been in prior years. This was especially true in the area of math; as the math curriculum became more complex, M.R. began to struggle. There was concern by both the District and Plaintiffs by the end of M.R.'s fourth grade year. See Mendelson Aff. at ¶ 13; Parents' Exhibits #15, Parents' Exhibits #33; Tr. 939:20 and 969:1.

19. The CSE met on May 5, 2005 to review M.R.'s progress over the 2004-2005 school year and make a recommendation for services for the 2005-2006 school year. The Committee on that date was properly constituted. See Mendelson Aff. at ¶ 14; District Exhibit #28.

20. The CSE discussed the progress M.R. made over the past year, including that she was now decoding on grade level and had received a "3" on the New York State English Language Arts test, which indicates that she was meeting expectations for her grade in reading and writing. See Mendelson Aff. at ¶ 14; District Exhibit #28; Tr. 637:13.

21. During the meeting, Plaintiffs indicated that, sometime during the school year, they had verbally requested that M.R.'s resource room teacher provide updated testing and that she denied such request. The meeting was adjourned by the CSE Chair, Dr. Michael Mendelson, so as to honor Plaintiffs' request to garner additional testing. See Mendelson Aff. at ¶ 14; District Exhibit #28.

22. At the meeting on May 5, 2005, Plaintiffs informed the CSE that M.R. had been already accepted at Windward. See Mendelson Aff. at ¶ 14; District Exhibit #28.

23. When Dr. Mendelson contacted Plaintiffs to arrange for the additional testing he was informed that Plaintiffs already had the evaluations done by a private evaluator. See Mendelson Aff. at ¶ 15; District Exhibit #37.

24. In fact, their evaluator, Dr. Allison Bell, commenced her evaluation on March 16, 2005 and completed it on March 25, 2005. See Mendelson Aff. at ¶ 15; Parents' Exhibit #23.

25. At no time during the May 5, 2005 meeting did Plaintiffs inform the CSE that the testing had not only been arranged, but completed. See Mendelson Aff. at ¶ 15.

26. Dr. Bell tested M.R.'s cognitive functioning and found that her full scale IQ was in the 25th percentile. M.R. scored in the 79th percentile on verbal comprehension and the 42nd percentile on the working memory subtests. Her scores in the perceptual reasoning subtest (4th percentile) and the processing speed subtest (16th percentile) were more depressed. See Mendelson Aff. at ¶ 16; Parents' Exhibit #23.

27. Dr. Bell also administered various educational achievement tests. For the most part, M.R. was found to be functioning in the average range. Significantly, on the Wide Range Achievement Test-3, Dr. Bell found that M.R. was on or about grade level for reading, spelling and mathematics, which she noted were "consistent with her overall functioning." Some of M.R.'s scores on the Gray Oral Reading Test were depressed, but overall, Dr. Bell determined that M.R.'s strengths were her verbal comprehension and processing and that her comprehension was at grade level. See Mendelson Aff. at ¶ 17; Parents' Exhibit #23; Tr. 35:11; 75:7.

28. Dr. Bell also assessed M.R.'s neuropsychological functioning, noting that there was no auditory discrimination difficulties and that M.R.'s sensory processing were in normal limits.

There was a notation in her report that she had some perceptual problems and difficulties with her eye tracking. See Mendelson Aff. at ¶ 18; Parents' Exhibit #23.

29. Further assessments were performed in the area of memory; M.R. was found to have a strength as a verbal learner, however, she was found to have weaker abilities in other subtests of the memory assessment tool. See Mendelson Aff. at ¶ 18; Parents' Exhibit #23.

30. Dr. Bell found that M.R. had low self-concept when it came to her performance in the academic arena. The evaluator noted that M.R. felt pressure due to the expectation of her family. See Mendelson Aff. at ¶ 19; Parents' Exhibit #23.

31. In her summary and recommendations, Dr. Bell recommended a "highly individualized teaching program that emphasizes multi-sensory learning approaches in the classroom and plenty of 1:1 attention." She further stated that M.R. would be best served in a class with students sharing similar learning needs. See Mendelson Aff. at ¶ 20; Parents' Exhibit #23.

32. The CSE reconvened on June 14, 2005 to consider Dr. Bell's report and the other assessments prepared in anticipation of the annual review in May. See Mendelson Aff. at ¶ 21; District Exhibit #28.

33. There was a decrease in M.R.'s scores on an April 2005 administration of the Stanford Achievement Test. See Mendelson Aff. at ¶ 21; District Exhibit #41.

34. Dr. Bell attended the meeting and reviewed her evaluation. She stated that she believed that anxiety, while not a primary factor in her learning disability, exacerbated her disability. See Mendelson Aff. at ¶ 21; District Exhibit #28.

35. M.R.'s fourth grade teachers indicated that her progress over the past academic year was slow. See Mendelson Aff. at ¶ 22; Parents' Exhibit #28; Tr. 939:20.

36. Plaintiffs, while acknowledging progress on M.R.'s part, expressed dissatisfaction with same. See Mendelson Aff. at ¶ 22; Parents' Exhibit #15.

37. Plaintiffs also expressed their concerns that the resource room program was not rigorous enough for M.R. and that the "pull out" nature of that service was not optimal for M.R. See Mendelson Aff. at ¶ 22; Parents' Exhibit #15; District Exhibit #28.

38. The CSE discussed and adopted goals and objectives, with the participation of Plaintiffs and Dr. Bell. See Mendelson Aff. at ¶ 23.

39. Given Dr. Bell's recommendation and the other reports reviewed, the CSE recommended a special class with a twelve student, one teacher, one teaching assistant model. In this class, a multi-modal approach to learning would be presented. See Mendelson Aff. at ¶ 24; Tr. 543:12.

40. After the meeting, a class profile for the proposed class was provided to Plaintiffs and a visit to the class was arranged. The visit occurred at the end of June, 2005. See Mendelson Aff. at ¶ 25; District Exhibit #31; Tr. 1058:9.

41. Thereafter, Plaintiffs rejected the program recommendation and unilaterally placed M.R. at Windward. See Mendelson Aff. at ¶ 26; District Exhibit #30.

42. Windward administered the Stanford Reading Test at the time of M.R.'s enrollment in September of 2005. M.R.'s reading comprehension skills were found to be on grade level. On the Stanford Math Test, M.R. received a score which was consistent with the fourth grade level, or at that time, one grade level below. See Mendelson Aff. at ¶ 27; Parents' Exhibit #31.

43. The Gates-MacGinnitie Reading Test was also administered; M.R. was found to be in the average range on the vocabulary subtest, but below average on the comprehension subtest. See Mendelson Aff. at ¶ 27; Parents' Exhibit #31.

44. Plaintiffs filed a request for due process for the 2005-2006 school year on November 7, 2005. See Mendelson Aff. at ¶ 28; District Exhibit #24.

45. Plaintiffs, however, withdrew that request without explanation on January 19, 2006. See Mendelson Aff. at ¶ 28; District Exhibits #22.

46. The District routinely observes classified students who are placed in private schools by their parents in anticipation of annual reviews of their IEPs. M.R. was observed by Dr. Stephanie Kutin-Senzon, a District psychologist, in January of 2006. See Mendelson Aff. at ¶ 29; District Exhibit #21.

47. When the District's CSE held its annual review to plan for the 2006-2007 school year for M.R., the Committee consisted of both elementary and middle school regular and special education teachers and psychologists. Additionally, the head of Windward's Middle School, Barbara Landau, and a parent member were present at the meeting. See Mendelson Aff. at ¶ 30; District Exhibit #13.

48. Ms. Landau reported that M.R.'s decoding skills were more fluent, accurate and expressive. It was reported that M.R. was also making progress in comprehension and writing skills. Some progress was also noted in her computational math skills. See Mendelson Aff. at ¶ 31; District Exhibit #13; Tr. 1466:9, 17; 1637:19.

49. A progress report drafted by her teachers at Windward was also reviewed. It was noted that M.R. had more confidence in reading. Some weaknesses were set forth, such as in inferential thinking and complex writing tasks. M.R.'s language difficulties impeded her math abilities. See Mendelson Aff. at ¶ 32; Parents' Exhibit #8.

50. The CSE also reviewed the Spring 2006 administration of the Stanford Reading Achievement Test. M.R.'s total reading score was in the 41st percentile when timed, and higher

when untimed. On the Stanford Math Test, M.R.'s total math score was an improved 36th percentile. Even though M.R.'s math scores demonstrated an improvement, Ms. Landau thought the scores a bit depressed as M.R. did not have the ability to write out her answers. See Mendelson Aff. at ¶ 33; Parents' Exhibit #31.

51. Plaintiffs and Ms. Landau also reported that M.R. was improved emotionally and that the anxiety that M.R. had experienced had decreased. See Mendelson Aff. at ¶ 34; District Exhibit #13; Tr. 1639:8.

52. Given all of this information, the CSE recommended that M.R. receive a special education program at the Scarsdale Middle School that consisted of resource room on a daily basis. See Mendelson Aff. at ¶ 35; District Exhibit #13.

53. Resource room was recommended because at the Middle School, all classes are taught on a departmentalized basis, and students travel from class to class to receive instruction. Therefore, resource room could be scheduled into M.R.'s school day and she would not be pulled out of an academic class to receive this support. This alleviated Plaintiffs' concern about the pull out nature of resource room. Also, M.R.'s academic performance indicated she could make progress in such a setting. See Mendelson Aff. at ¶ 35.

54. Due to her individualized needs and the CSE's concerns, the CSE recommended that M.R. be placed in Cooper House. The Scarsdale Middle School is made up of four "houses" where students have their home room and receive all their academic classes. The house system is a way of making the large middle school seem smaller, as for most of the day, students are educated in classrooms in one part of the building, with the same cohort group of students. In the Cooper House academic offerings, there is a parallel curriculum of each of the content area classes for the sixth grade. These parallel classes, which are designed to be small group

instruction taught by special educators, are scheduled at the same time as the regular education offerings of the same content area classes. Such a change in schedule would necessitate a program review by the CSE to recommend same; however, the potential for such change was contemplated as a safety net for M.R. by the CSE. See Mendelson Aff. at ¶ 36; Tr. 1650:15.

55. At the CSE meeting for the 2006-2007 school year, the CSE reviewed goals for M.R.'s upcoming academic year. These goals were sent to Windward in advance of the meeting, and Ms. Landau was participating in the CSE meeting when they were discussed and adopted. See Mendelson Aff. at ¶ 37; District Exhibit #13; Tr. 1644:20.

56. The 2006-2007 IEP was mailed to Plaintiffs on June 14, 2006. See Mendelson Aff. at ¶ 38; Parents' Exhibit #4.

57. Plaintiffs rejected the program recommended by the CSE and notified the District that M.R. was remaining at Windward. The same letter requested the impartial hearing that resulted in this appeal. See Mendelson Aff. at ¶ 38; District Exhibit #11.

58. Plaintiffs first challenged the 2005-2006 IEP by request for due process dated November 7, 2005. See Mendelson Aff. at ¶ 39; District Exhibit #24.

59. That request was withdrawn by Plaintiffs without any explanation. See Mendelson Aff. at ¶ 39; District Exhibit #22.

60. Plaintiffs then waited for the academic year to pass to renew their challenge of the 2005-2006 school year. By letter date June 22, 2006, Plaintiffs requested a hearing on that year's recommendation, as well as challenging the recommendation for the 2006-2007 school year. See Mendelson Aff. at ¶ 39; District Exhibit #11.

61. As required by the regulations of the Commissioner of Education of the State of New York, the District appointed an impartial hearing officer from amongst an alphabetical list

of hearing officers certified to hear challenges pursuant to Part 200 of the Commissioner's Regulations. See Mendelson Aff. at ¶ 39.

62. Plaintiffs' request for due process did not set forth any grounds as to why they were making their request, nor did it set forth the relief request. Accordingly, the District, through its attorney, challenged the sufficiency of the request for due process before the impartial hearing officer assigned to this matter. See Mendelson Aff. at ¶ 40; District Exhibit #9.

63. Thereafter, Plaintiffs, through their attorney, agreed to submit an amended request for due process, which was submitted on August 9, 2006. See Mendelson Aff. at ¶ 40; District Exhibit #1.

64. In the interim, on July 25, 2006, Plaintiffs made a motion to the impartial hearing officer requesting that he recuse himself. See Mendelson Aff. at ¶ 41; District Exhibit #6.

65. By decision dated August 2, 2006, the IHO denied the request that he recuse himself. See Mendelson Aff. at ¶ 42; District Exhibit #4.

66. Despite the fact that interlocutory appeals are reserved for matters of pendency placements, Plaintiffs filed a notice with the District and the SRO, announcing their intention to appeal this decision. See Mendelson Aff. at ¶ 42; District Exhibit #1.

67. This notice necessitated the District to prepare a Record on Appeal and Certification of same. After this was filed by the District's attorney, Plaintiffs failed to perfect their appeal on this issue. See Mendelson Aff. at ¶ 42.

68. Despite the fact that Plaintiffs did not argue IHO bias as a ground for appeal before the SRO, they do so in this proceeding. See Mendelson Aff. at ¶ 42.

69. The impartial hearing began on October 23, 2006 and there were seven (7) days of testimony. See Mendelson Aff. at ¶ 43.

70. The IHO rendered his decision on May 3, 2007, finding that the District failed to offer a free and appropriate public education for M.R. in both years at controversy in the proceeding. He awarded tuition reimbursement for the 2005-2006 school year. However, for the 2006-2007 school year the IHO found that Plaintiffs did not act in good faith when they barred the District from observing M.R. at Windward during the pendency of the hearing. See Mendelson Aff. at ¶ 44; Impartial Hearing Officer's Decision.[3]

71. Plaintiffs appealed the decision of the IHO relating to the 2006-2007 school year; the District cross-appealed arguing that it recommended a free and appropriate public education in both school years. See Mendelson Aff. at ¶ 45.

72. In Appeal No. 07-60, the SRO found that the District had offered to provide a free and appropriate public education to M.R. in both years in controversy. More specifically, the SRO found that the IEPs for both 2005-2006 provided the type of programs required by M.R. in the least restrictive environment so that she could make meaningful progress. See Mendelson Aff. at ¶ 46; Ex. A to Mendelson Affid.

73. M.R.'s IEP for the 2005-2006 school year, developed at two CSE meeting that occurred on May 4, 2005 and June 14, 2005, was prepared in a manner consistent with the IDEA and appropriately addresses M.R.'s then current needs. See Mendelson Aff. at ¶ 47; Ex. A to Mendelson Affid.

74. At the first CSE meeting in May of 2005, a parent member was present. That meeting was adjourned to consider updated testing. See Mendelson Aff. at ¶ 49.

---

[3] This decision was part of the Record on Appeal to the SRO which is being sent directly from the Office of State Review to the Court.

75. A parent member was invited to the second meeting on June 14, 2005, which was scheduled for 8:30 a.m. The CSE found out the morning of the meeting that the parent member could not attend. See Mendelson Aff. at ¶ 49.

76. At the meeting, Plaintiffs were given the option of proceeding without the parent member or scheduling another meeting. They chose to proceed. See Mendelson Aff. at ¶ 49.

77. In a letter, dated June 21, 2005, in which Dr. Mendelson enclosed the IEP, he offered to reconvene the CSE to have a parent member if the lack of a parent member was an issue for the Plaintiffs. Plaintiffs did not respond to this offer. See Mendelson Aff. at ¶ 49; District Exhibit #29.

78. The lack of a parent member, under these circumstances, was not a substantial procedural violation that would result in an IEP being deemed null and void. This is especially true, herein, as Plaintiffs were accompanied to this meeting by Dr. Bell. Plaintiffs attended numerous CSE meetings on behalf of M.R. and were well versed in both the CSE process and the special education law. Plaintiffs had every opportunity to participate in development of the IEP and they took advantage of that opportunity. See Mendelson Aff. at ¶ 50; Ex. A to Mendelson Aff.

79. Dr. Bell was present at the meeting and was able to share her results and recommendations to the CSE directly. See Mendelson Aff. at ¶ 51.

80. Dr. Bell recommended that M.R. be educated in a small class where her fellow students shared a similar cognitive and academic profile, and that the instruction be provided in a multi-modal way. See Mendelson Aff. at ¶ 51; Parents' Exhibit #23.

81. The CSE's recommendation of a small class of no more than twelve students who shared M.R.'s strengths and weaknesses, taught by a special education teacher who used a multi-sensory approach to learning addressed this recommendation. See Mendelson Aff. at ¶ 51.

82. The CSE that developed the 2005-2006 IEP appropriately addressed M.R.'s academic functioning. See Mendelson Aff. at ¶ 52; Ex. A to Mendelson Affid.

83. M.R.'s special education and regular education teacher were present at the meeting and were able to report as to M.R.'s current levels of performance. Additionally, the District administered periodic academic testing to chart M.R.'s progress, and these results were reviewed. See Mendelson Aff. at ¶ 52.

84. The 2005-2006 IEP adequately set forth M.R.'s abilities and addressed same through the special class recommendation. See Mendelson Aff. at ¶ 52; Ex. A to Mendelson Affid.

85. The CSE considered continuing M.R. in the resource room program which was the previous recommendation and rejected same, given the slow progress she made through fourth grade. See Mendelson Aff. at ¶ 52.

86. The class recommended by the CSE was made up of students who were similar to M.R. in terms of their academic profile. As the student profile for the class demonstrated, the students therein were of average cognitive ability, just like M.R. The academic functioning of the students scheduled into the special class were similar to M.R. also. See Mendelson Aff. at ¶ 53; Ex. A to Mendelson Affid.; Parents' Exhibit #19.

87. The special education teacher of the class in question testified as to how he individualized instruction for the different learning styles and profiles of his students. See Mendelson Aff. at ¶ 53; Tr. 1741:2; 1742:1, 15; 1743:5.

88. The students in the proposed class were not dissimilar to M.R. with regard to their behavioral needs. While two of the students in the class required monitoring due to the way their disability manifested in the classroom, the teacher indicated that these needs were addressed appropriately by him and his teaching assistant and that the class itself was not atypical of any fifth grade class, with some students who were more compliant than others. See Mendelson Aff. at ¶ 54; Tr. 1738:6.

89. Two female students pushed into the special class for math instruction. During the balance of the day, M.R. would have been integrated into the mainstream, where the breakdown of the classes is close to fifty percent of each gender. M.R. would have been the only female in her class for only forty percent of her instructional day. When one takes into account lunch and recess, it would have been only thirty percent of the time that M.R. would have been the only female. See Mendelson Aff. at ¶ 55.

90. The CSE that developed the 2005-2006 IEP appropriately addressed M.R.'s emotional functioning. Dr. Bell reported that M.R. suffered from anxiety and was not a confident learner. Plaintiffs reported that M.R. was not positive in her assessments towards school and that she particularly did not like being pulled out of her classes to attend resource room. See Mendelson Aff. at ¶ 56; Parents' Exhibit #23;

91. The 2005-2006 IEP adequately addressed these issues by recommending the special class which eliminated the pull outs that were of concern to Plaintiffs. See Mendelson Aff. at ¶ 56; Ex. A to Mendelson Affid.

92. Additionally, the CSE recommended a once weekly counseling session for M.R. with the school psychologist to discuss her feelings about her learning disability. See Mendelson Aff. at ¶ 56; District Exhibit #28.

93. The special class recommended for M.R. during the 2005-2006 school year was located in a mainstream building and M.R. would interface with her mainstream peers in music, art and physical education, as well as during lunch and recess. See Mendelson Aff. at ¶ 57.

94. The goals and objectives for the 2005-2006 school year were related to M.R.'s individual needs and were sufficiently detailed to provide meaningful feedback on progress. See Mendelson Aff. at ¶ 58; Ex. "A" to Mendelson Aff.

95. M.R.'s IEP for the 2006-2007 school year, developed at a CSE meeting on June 7, 2006, was prepared in a manner consistent with the IDEA and appropriately addresses M.R.'s then current needs. See Mendelson Aff. at ¶ 59; Ex. "A" to Mendelson Aff.

96. The CSE considered the tests administered by Windward both in the fall of 2005, when M.R. first commenced attending the school, and the spring of 2006. See Mendelson Aff. at ¶ 60; Parents' Exhibits #31 and 8.

97. Upon review of these test results, progress was noted. M.R. was found to be in the average range of functioning on reading, vocabulary, reading comprehension and math. See Mendelson Aff. at ¶ 60; Parents' Exhibits #31 and 8.

98. The Head of Windward's Middle School reported as to M.R.'s academic year to the CSE. See Mendelson Aff. at ¶ 61; District Exhibit #13.

99. Additionally, the CSE reviewed the progress reports of M.R.'s teachers which detailed her growth throughout the school year. See Mendelson Aff. at ¶ 61; District Exhibit #28.

100. M.R. was observed at Windward and the findings of this observation were reviewed at the CSE meeting. See Mendelson Aff. at ¶ 62; District Exhibits 13 and 21.

101. Given the profile of M.R. that emerged at the CSE held on June 7, 2006, it was recommended that she be placed in a resource room setting. See Mendelson Aff. at ¶ 63.

102. While this was a decrease in support from that which was recommended the year prior, the CSE determined that based upon her academic progress over the 2005-2006 school year, M.R. was equipped to handle the academic challenges adequately. See Mendelson Aff. at ¶ 63; Tr. 1509:23, 1649:20.

103. The fact that M.R. would not be pulled out for resource room, but it would have been scheduled into her academic day, was also discussed as grounds for the appropriateness of this program model. See Mendelson Aff. at ¶ 63.

104. The goals developed for the 2006-2007 school year addressed each of M.R.'s individual needs and provided evaluation criteria to enable the evaluators to learn specific information about M.R. and allow for meaningful reports on progress. These goals were developed with the participation of Ms. Landau. See Mendelson Aff. at ¶ 64.

105. Plaintiffs did not present evidence to demonstrate that Windward was appropriate for M.R. There was no evidence presented that set forth Windward's curriculum, the text books that M.R. used or the qualifications of the teachers that were educating M.R. See Mendelson Aff. at ¶ 65.

106. More importantly, there was no evidence presented that demonstrated the need for M.R. to be educated in such a restrictive setting. See Mendelson Aff. at ¶ 66.

107. Windward does not provide any opportunity for its students to interface with their mainstream peers. M.R. did not present as a student who needed to be segregated from her mainstream peers throughout the school day to succeed academically. See Mendelson Aff. at ¶ 66.

108. There was no correlation made at the hearing between the number of students that live in the District attending Windward and a failure on the District's part to recommend an appropriate program for M.R. See Mendelson Aff. at ¶ 68.

109. Dr. Michael McGill, the Superintendent of the District, sits on the Board of Trustees of Windward. He does so to strengthen the bonds between two community schools educating children living in the Scarsdale area and to help address some of the concerns that District parents were expressing about their learning disabled children's education in the competitive arena of the District's schools. See Mendelson Aff. at ¶ 69.

110. Dr. McGill's participation on the Board is not an endorsement of Windward as an appropriate school for students such as M.R., who were offered a free and appropriate public education by the District. See Mendelson Aff. at ¶ 69.

111. No connection was established that Dr. McGill's membership on the Board of Trustees proved that the District's program was not appropriate for M.R. See Mendelson Aff. at ¶ 69.

112. Plaintiffs herein did not act in good faith with regards to the development of either years' IEP. See Mendelson Aff. at ¶ 70.

113. Plaintiffs applied to Windward on March 13, 2004, a full year prior to her attending school there. Prior to the May 2005 CSE meeting, M.R. had visited Windward and had been accepted. A contract for enrollment was signed on March 10, 2005. See Mendelson Aff. at ¶ 71; Parents' Exhibit #25.

114. For the 2006-2007 school year, Plaintiffs signed the contract for enrollment and paid a $2,500 deposit on March 8, 2006, well in advance on the June 7, 2006 CSE meeting. See Mendelson Aff. at ¶ 72; Parents' Exhibit #52.

115. The Wall Street Journal article appended as an exhibit to Plaintiffs' Complaint does not establish any bias on the part of the SRO.

Dated:   White Plains, New York
         June 30, 2008

                                            KEANE & BEANE, P.C.

                                     By:    _____
                                            Eric L. Gordon (ELG 7301)
                                            Attorneys for Defendant
                                            445 Hamilton Avenue, 15th Floor
                                            White Plains, New York  10601
                                            (914) 946-4777

1833/102/340779 V1  6/30/08