UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

R.R. and D.R. o/b/o M.R.

              Plaintiffs,

       -against-

SCARSDALE UNION FREE SCHOOL DISTRICT,

             Defendant.

------------------------------------------------------------------- x

08-CV-0247 (BSK)(FM) – ECF Case

Hon. Barbara Jones

# MEMORANDUM OF LAW
## ON BEHALF OF THE DEFENDANT, THE
## **SCARSDALE UNION FREE SCHOOL DISTRICT**

KEANE & BEANE, P.C.
Attorneys for Defendant
Scarsdale Union Free School District
445 HAMILTON AVENUE, 15TH FLOOR
WHITE PLAINS, NEW YORK 10601
(914) 946-4777

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................ 1

II.  FACTUAL BACKGROUND ........................................................................ 1

III.  ARGUMENT ........................................................................................ 12

    A.  The Decision of the State Review Officer is entitled to due consideration by this Court ............................ 12

    B.  The Program recommended for the 2005-2006 school year was appropriate ........................................ 13

    C.  The Program recommended for the 2006-2007 school year was appropriate ........................................ 25

    D.  The District's recommendations were made in accordance with the applicable Federal and State Laws ............ 27

    E.  The Plaintiffs are not entitled to the relief requested ................................................................ 31

    F.  The question of bias ............................................................ 36

IV.  CONCLUSION ........................................................................................ 38

# TABLE OF AUTHORITIES

**Cases**.................................................................................................................... **Page**

*Allen v. Cuomo*, 100 F.3d 253, 259 (2nd Cir. 1996). .................................................. 38

*Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.,*
   281 F.Supp.2d 710, 724 (S.D.N.Y. 2003 ................................................................. 36

*Application of a Child with a Disability*, Appeal No. 01-073. .................................... 28

*Application of a Child with a Disability*, Appeal No. 01-105, ..................................... 34

*Application of a Child with a Disability*, Appeal No. 02-092 ...................................... 13

*Application of a Child with a Disability*, Appeal No. 04-019. ............................... 21, 22

*Application of a Child with a Disability*, Appeal No. 05-039 ...................................... 35

*Application of a Child with a Disability*, Appeal No. 05-125 ...................................... 30

*Application of a Child With a Disability*, Appeal No. 06-019..................................22, 30

*Application of Child with a Disability*, Appeal No. 04-008 ......................................... 14

*Application of the Bd. of Educ. of the Morris Cent. School*
   *Dist.*, Appeal No. 05-058 ......................................................................................... 16

*Application of the Bd. of Educ. of the Smithtown Cent. Sch.*
   *Dist.*, Appeal No. 04-072 ........................................................................................ 35

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v.*
   *Rowley,* 458 U.S. 176, 106 (1982). ..................................................................... 13, 14

*Bettinger v. New York City Bd. of Educ.,* 2007 WL 4208560
   (S.D.N.Y. Nov. 20, 2007 *4). ................................................................................. 13

*Board of Educ. of the City School Dist. of the City of New*
   *York v. R.R.*, 2006 WL 1441375 (SDNY May 24, 2006), ................................... 15, 16

*Briggs v. Bd. of Educ. of the State of Connecticut,* 882 F.2d
   688 (2d Cir. 1989)...................................................................................................... 30

*Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 191 (2d
   Cir. 2005). ................................................................................................................ 13

*Florence County School Dist. v. Carter*, 510 U.S. 7, 15
   (1993); 42 U.S.C. §1412(a)(10)(c)(ii); 34 C.F.R.
   §300.403(c). ........................................................................................................ 32, 35

*Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 108
   (2d Cir. 2007)...................................................................................................... 12, 13

*In Board of Educ. of the City of New York v. Mills*, 2005
    WL 1618765 (S.D.N.Y. Jul. 11, 2005),.................................................. 15

*J.R. v. Rye City Sch. Dist.*, 345 F.Supp.2d 386, 394
    (S.D.N.Y. 2004)............................................................................................. 12

*M.B. v. Arlington Cent. Sch. Dist.*, 2002 WL 389151
    (S.D.N.Y.)..................................................................................................... 32

*M.S. v. Bd. of Educ. of the City School Dist. of the City of
    Yonkers*, 231 F.3d 96, 104 (2d Cir. 2000)................................................... 32

*Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*,
    995 F.2d 1204 (3d Cir. 1993); .................................................................... 30

*Pinn v. Harrison Cent. Sch. Dist.*, 473 F.Supp.2d 477, 482
    (S.D.N.Y. 2007)............................................................................................. 13

*Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d
    87, 93 (2d Cir. 2003)..................................................................................... 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

R.R. and D.R. o/b/o M.R.,

               Plaintiffs,

       -against-

Scarsdale Union Free School District,

               Defendant.

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW
ON BEHALF OF THE
DEFENDANT, THE
SCARSDALE UNION FREE
SCHOOL DISTRICT**

08-CV-0247 (BSJ)(FM)

## I.   **PRELIMINARY STATEMENT**

This is an appeal of a decision by the State Review Officer of the New York State Education Department (hereinafter the "SRO") from a determination denying Plaintiffs' request for a ruling that the Scarsdale Union Free School District (hereinafter the "District") failed to offer a free and appropriate public education to their daughter, M.R. The SRO denied Plaintiffs' request for tuition reimbursement to the private school where they unilaterally placed M.R. during the 2005-2006 and 2006-2007 school years, the years in question herein. This action is brought under the auspices of the Individuals with Disabilities Education Act (hereinafter the "IDEA") and Article 89 of the New York State Education Law.

## II.   **FACTUAL BACKGROUND**

At the time of the underlying hearing in this matter, which occurred between October of 2006 and March of 2007, M.R. was a student classified as learning disabled. Her classification in this hearing is not in dispute. (Transcript from Impartial Hearing p. 532, line 18).[1] Two years are in question in this proceeding – the 2005-2006 school year, when M.R. was in fifth grade, and the 2006-2007 school year, when M.R. was in sixth grade. The District's Committee on

---

[1] Hereinafter, transcript citations will appear as "T. __:__."

Special Education (hereinafter the "CSE") recommended programs housed in-district for M.R. during both those two years. Plaintiffs rejected the District's offer of programming for both years and unilaterally placed M.R. at the Windward School (hereinafter "Windward"), a private school for learning disabled students that is not approved by the Commissioner of Education of the State of New York as a school with which public schools may contract to instruct students with disabilities.[2]

M.R. began receiving building level supports during kindergarten and was referred to the CSE in second grade. She was first classified by a CSE of the District at a meeting held on January 21, 2003, during her second grade year. (Plaintiffs' Exhibit #45).[3] The decision to classify M.R. was made due to a number of factors, including both the evaluations administered by District personnel and an independent evaluation administered by a private evaluator in the Fall of 2002. (Exs. D-45; P-43). Given the results of the these evaluations, plus reports from her classroom teacher, M.R. was classified learning disabled and recommended for a resource room program. Additionally, the CSE recommended modifications and accommodations, such as double time for tests, preferential seating, repetition of directions, teacher prompting and refocusing, and a special location to take examinations. (Ex. P-45).

Thereafter, and until the development of the 2005-2006 IEP in controversy herein, the CSE continued to recommend a resource room program. During these ensuing years, M.R. made steady progress in reading, writing and math skills. By the Spring of 2004, M.R. was achieving scores on grade level in reading vocabulary and reading comprehension on standardized tests administered to measure her progress. On the Stanford Achievement Test administered on

---

[2] The District has no authority to contract with a non-approved private school to provide education to students with disabilities on behalf of the District. N.Y. Educ. L. §4402(2)(b)(2).

[3] Hereinafter, exhibit citations will appear as "Ex. P-__" for Plaintiffs-Parents exhibits and "Ex. D-__" for Defendant-District exhibits.

May 20, 2004, M.R. achieved a score in the 57th percentile (4.1 grade level equivalency), with a reading vocabulary and reading comprehension score both in the 57th percentile. In the math domain, she scored in the 34th percentile on total math, with composite scores of 34th percentile on math problem solving and 38th percentile on math procedures. (Ex. P-34, p.4). However, in the 2004-2005 school year, which was M.R.'s fourth grade year, academic issues arose. While M.R. made progress (Ex. P. 15, Ex. P-33), the progress was not as robust as in the past. This was especially true in math. Her teacher reported that as the content of the curriculum became more complex, M.R. struggled. (Tr. 969:1). By the end of the year, both Plaintiffs and the District were concerned about the progress M.R. was making. (Tr. 939:20).

On May 5, 2005 the CSE convened to make a recommendation for the 2005-2006 school year. It is undisputed that, at that meeting, the CSE was properly constituted. At that meeting, Plaintiffs stated that at some point during the 2004-2005 school year, they orally requested updated testing from M.R.'s special education teacher and she denied the request. Dr. Michael Mendelson, the District's Director of Special Education and the chair for the CSE, indicated that this was the first time such a request was coming to his attention and the District would honor Plaintiffs' request for updated testing. While the CSE, in May 2005, did discuss M.R.'s progress, including the fact that she was decoding on grade level and had received a "3" on the State English Language Arts test (Ex. D-28; Tr. 637:13), no substantive decision was made as to a program given the upcoming testing. Plaintiffs did express their belief that M.R. needed more attention academically, and the subject of a special class was broached. Plaintiffs indicated at this meeting that M.R. had already been accepted to Windward already.

Thereafter, the District contacted Plaintiffs to arrange for the requested evaluations, only to be informed by Plaintiffs that they were having the evaluation done privately.

(Ex. D-37). Dr. Allison Bell performed the evaluation of M.R. on March 16, 24 and 25, 2005. (Ex. P-23). As part of her evaluation, Dr. Bell observed M.R. in her class at Scarsdale. She also attended the next scheduled CSE meeting to discuss this evaluation.

According to Dr. Bell's testing, from a cognitive standpoint, M.R was in the average range, with a "substantial scatter" in her subtest scores. Her full scale IQ was a 90, placing her in the 25th percentile, just in the average range. However, she scored within the 79th percentile (a standard score of 112) on verbal comprehension and in the 42nd percentile (a standard score of 97) on the working memory subtest. In contrast, she was in the 4th percentile (SS 73) on the perceptual reasoning subtest and the 16th percentile (SS 85) on the processing speed subtest. (*Id.*)

Academically, Dr. Bell used various assessment tools to gauge M.R.'s functioning levels. On the Wide Range Achievement Test – 3 ("WRAT-3"), M.R. was found to be on or about grade level for reading, spelling and mathematics. Dr. Bell found these scores to be "consistent with her overall intellectual functioning. . . ." On the GORT Diagnostic version, M.R. demonstrated average abilities in the word ordering (SS 9, 37th percentile), word identification (SS 9, 37th percentile), paragraph reading (SS 8, 25th percentile), and contextual analysis (SS 8, 25th percentile) subtests. Her scores on the word attack and morphemic analysis subtests were below average, however (both SS 7, 16th percentile). (*Id.*) Dr. Bell testified that based upon her testing, M.R.'s verbal comprehension and processing were strengths. (Tr. 35:11). In fact, her comprehension was at the fourth grade level, which was her actual grade level at the time of testing. (Tr. 75:7).

Dr. Bell administered the Detroit Test of Learning Aptitude-4 ("DTLA-4"), which is reported in the academic functioning section of her evaluation despite the fact that the DTLA-4

is a cognitive test. M.R. performed well on the sub-tests relating to her verbal abilities, receiving a standard score of 11 in both Word Opposites and Sentence Imitation subtests. She also received an average score on the story construction subtest (SS 8). However, the results of other subtests were in the below average standard range. The results of this test indicated that M.R. has "strong verbal abilities" that were hampered by her perceptual difficulties. (Ex. P-23).

Dr. Bell also performed evaluations to assess M.R.'s neuropsychological functioning. Some strengths were noted, particularly the fact that there was no auditory discrimination difficulties and that her sensory processing abilities are essentially within normal limits. However, Dr. Bell did note difficulties with the concept of "after" in terms of time orientation and that her graphomotor functioning was influenced by her perceptual problems. Additionally, M.R. could not "track fluidly on a test of eye tracking." (*Id.*)

M.R.'s memory was also assessed by Dr. Bell. On the Wide Range Assessment of Memory and Learning ("WRAML") M.R. scored in the above average range for the Story Memory and Sound Symbol subtest (SS 14 on both subtests) and in the average range on the visual learning subtest. These scores again demonstrated M.R.'s strength as a verbal learner. In the other subtests however, M.R. had significantly weaker abilities. Dr. Bell noted that given these scores, M.R. will "do best when . . . material is paired with verbal stimuli." (*Id.*)

In her report, Dr. Bell also made note of M.R.'s personality and emotional functioning. Dr. Bell's report describes a student who has a low self concept vis-à-vis her performance in school. Dr. Bell notes that M.R. "acknowledges that she struggles in school and feels burdened by the work she has to complete." Further, M.R. stated to Dr. Bell that she "does not feel valued amongst her classmates and feels left out of things." M.R. was found to be worrisome and nervous and sad. There was a notation that she has difficulty controlling her temper and that she

"feels she is 'clumsy' awkward, forgetful, 'dumb' and frequently sick". M.R. also acknowledges the expectations of her family and indicated that she does not like being yelled at by adults in her family. Dr. Bell did note that M.R. believes that "she is a good, trustworthy person who possesses a lot of energy and is easy to get along with" and that she believes that she possesses "many positive attributes". (*Id.*)

In her summary and recommendations, Dr. Bell indicates that M.R. was having difficulties in learning "due largely to the interference of perceptual processing deficits." While the fact that her verbal abilities were her strength was noted, Dr. Bell indicated that her weakness in visual-perceptual processing and visual memory, as well as her poor self concept, were making it difficult to achieve academically. Accordingly, Dr. Bell recommended a "highly individualized teaching program that emphasizes multi-sensory learning approaches in the classroom and plenty of 1:1 attention." Dr. Bell also indicated that M.R. would be best served in a class with students of similar learning needs. (*Id.*)

The CSE reconvened on June 14, 2005 to consider Dr. Bell's evaluation and also review the other available evaluations and assessments of M.R. (Tr. 546:2). Included among them were a speech and language assessment performed by the District. (Ex. D-34). That evaluation, the Clinical Evaluation of Language Fundamentals-4 ("CELF-IV") indicated no speech and language deficits. However, the evaluator did note that M.R. has weaker receptive language skills and that she needs thing repeated to improve processing of orally presented materials. (*Id.*) The CSE also considered the results of the administration of the Stanford Achievement Test in April of 2005. M.R.'s scores declined from the previous year's administration in both reading and math. Her total reading score fell to the 35th percentile, due to a decline in her reading vocabulary score to the 19th percentile. Her reading comprehension score remained relatively

stable at the 52nd percentile. M.R.'s math scores also decreased, with a math total score in the 23rd percentile. (Ex. D-41). Additionally, the CSE reviewed the results of the Metropolitan Achievement Test, which was administered to M.R. on April 25, 2005. On that test, M.R. received a score in the 63rd percentile in writing. (Ex. D-28). The CSE also considered the report of M.R.'s fourth grade regular education teacher. (Ex. P-28).

At the June 14, 2005 CSE meeting, M.R.'s current teachers, as well as Plaintiffs, made statements with regards to her progress in the past academic year. While Plaintiffs admit M.R. made progress, they were not satisfied with the progress made. (Ex. P-15). There were concerns expressed with regards to M.R.'s academic functioning expressed by both her teachers (Tr. 939:20) and Plaintiffs. Dr. Bell, who accompanied Plaintiffs to the meeting, reviewed her evaluation and indicated that she believed that M.R.'s difficulties were directly related to short-term memory deficits. Dr. Bell did indicate that she did not believe that M.R.'s anxiety was a primary factor in her learning difficulties, but that such anxiety did exacerbate the problem. Plaintiffs again expressed concerns with regards to the type and level of services M.R. received in the resource room program. Also, there was a discussion about M.R.'s reaction to being pulled out of class for resource room. Plaintiffs expressed their opposition to pull-out resource room continuing as a program for M.R. The CSE did consider push-in services for M.R. but rejected this model as the CSE believed this would not adequately address M.R.'s needs. (Ex. D-28). This concern was voiced throughout the meeting. (Ex. P-15).

Ultimately, the Committee recognized that Dr. Bell recommended a special class for M.R. This, coupled with Plaintiffs' issues with the resource room, led the CSE to recommend that M.R. be placed in a special class with a 12:1:1 ratio taught by a special education teacher for the 2005-2006 school year. As Dr. Mendelson testified, the evaluations presented indicated that

M.R. would benefit from a multimodal approach to learning, which the recommended special class would provide. (Tr. 543:12). Thereafter the goals and objectives for M.R.'s program for 2005-2006 were reviewed with Plaintiffs and Dr. Bell.

A class profile of the special class recommended for M.R. for the 2005-2006 school year was provided to Plaintiffs (Ex. P-19) and a visit to the class was arranged. Plaintiffs observed the special class at the end of June, 2005. (Tr. 1058:9) Plaintiffs rejected the recommendation by the CSE for the 2005-2006 school year and unilaterally placed M.R. at Windward. M.R. began attending there in September of 2005.

On a September 13, 2005, Windward administered the Stanford Reading Test to M.R. She received a score in the 42nd percentile in comprehension when untimed, and the 56th percentile when timed. (Ex. P-31). This placed M.R.'s comprehension skills on grade level. On the math problem solving subtest of the Stanford Math Test, M.R. was in the 24th percentile, which was on the fourth grade level. (*Id.*) Windward also administered the Gates-MacGinnitie Reading Test, where she was in the average range on the vocabulary subtest (38th percentile) but well below average on the comprehension subtest (6th percentile).

Despite the fact that M.R. had registered and began at Windward in September, Plaintiffs again visited the special class in October of 2005. Shortly thereafter, Plaintiffs filed a request for due process, (Ex. D-24), which request was subsequently withdrawn by them. (Ex. D-22). Pursuant to its normal practice, the District performed an observation of M.R. at Windward in January of 2006 in preparation for its annual review. Thereafter a Committee on Special Education was convened to develop a program for the 2006-2007 school year for M.R. During the 2006-2007 school year M.R. would be in sixth grade; within the District, sixth grade is housed at the Scarsdale Middle School. Accordingly, the CSE was made up of both elementary

special education and regular education teachers and middle school special education and regular education teachers. Additionally, the CSE had a psychologist from both the elementary school and the middle school participating. Barbara Landau, the head of the middle school at the Windward School, participated via telephone and a parent member was also present.

The CSE heard from Ms. Landau with regard to M.R.'s progress at Windward over the 2005-2006 school year. (Tr. 1466:1; Tr. 1467:6). There was an indication that M.R.'s decoding skills had become more fluent, accurate and expressive. (Tr. 1466:9). Additionally, she was making progress in comprehension though her concrete comprehension was stronger than her inferential comprehension. M.R.'s writing improved; however, she still needed support and remediation with regard to organization and language and syntax. Windward noted some progress with regard to her math skills; her computational skills were fine but the language of math did impact M.R.'s ability to work on math problems. (Tr. 1466:17).

The CSE also reviewed the February, 2007 progress report from the Windward School. (Ex. P-8). M.R. was noted as having more confidence in her reading class. A weakness in inferential thinking was still noted. In terms of writing, weakness in language and syntax, as well as complexity of her work was still an issue. M.R. was still performing variably in math. As was seen at Scarsdale, language difficulties were impeding her abilities.

The CSE reviewed updated testing performed by Windward. (Ex. P-31). On a May 15, 2006 administration of a Stanford Reading Achievement test, when untimed, M.R. was in the 50th percentile on vocabulary, and the 38th percentile in comprehension, resulting in a total reading score in the 41st percentile. These scores went up when M.R. was untimed. Additionally, on a Stanford Math Achievement test administered on May 15, 2006, M.R. scored within the average range on both procedures and problem solving, resulting in a total math score

on the untimed test in the 36th percentile. (Ex. P-31). Ms. Landau indicated, however, that the scores on the Stanford Math Test were not accurate given the fact that M.R. was not able to write out her answers, indicating that the score should be higher.

The CSE also reviewed information from both Windward and Plaintiffs relating to M.R.'s emotional functioning. The CSE took note of the fact that the anxiety and emotional difficulties that M.R. was experiencing at the end of fourth grade were no longer being observed. (Ex. D-13).

Accordingly, the CSE recommended that M.R. continue to be classified as a student with a learning disability and be placed in a program at the Scarsdale Middle School. (Ex. D-13). Given her progress over the past year and the testing performed by Windward, as well as the results of Dr. Bell's previous evaluation, the CSE recommended that M.R. receive resource room services on a daily basis. (Tr. 1509:23; 1649:20). The Committee believed that this would be an appropriate way to address M.R.'s learning difficulties, given that at the middle school resource room would be scheduled into her regular schedule. There would be no pull-outs from class, which would alleviate the concerns expressed by Plaintiffs the year prior. However, the CSE did recommend that M.R. be placed in the resource room program at the Cooper House, one of the four (4) houses within the Scarsdale Middle School. The recommendation to this house was made due to the fact that the self-contained content area classes for the sixth grade were housed at Cooper House for the 2006-2007 school year. (Tr. 1458:17). These special classes (called parallel classes in the District vernacular) are scheduled at the same time as the regular education classes – the regular education math class for the sixth grade is scheduled at the same time as the self contained math class for the special education students and the English sixth grade education class is schedule at the same time as the special education English class for special education

students.   In this way, should the CSE determine during a program review that M.R. needed increased support during the course of the 2006-2007 school year, her schedule could be changed without any real disruption to her day. (Tr. 1650:15).

The CSE then reviewed the goals for the 2006-2007 school year program.  These goals were sent to Windward in advance of the meeting and Ms. Landau was present, on the telephone, as they were being discussed. (Tr. 1644:20).

The 2006-2007 IEP recommendation was mailed to Plaintiffs on June 14, 2006.  (Ex. P-4).  Subsequently, Plaintiffs indicated that they rejected the recommendation of the CSE and through their request for due process, notified the District that they were intended to keep M.R. at Windward for the 2006-2007 school year.  Thereafter, this impartial hearing was commenced. (Ex. D-1).

The impartial hearing commenced on October 23, 2006 and continued over seven (7) hearing days.  After written closing statements were submitted, the Impartial Hearing Officer (hereinafter "IHO") assigned to this matter found that the District did not recommend a free and appropriate education to M.R. for either the 2005-2006 and 2006-2007 school years.  Additionally, he found that Windward was appropriate for M.R.  Accordingly, he ordered the District to pay the tuition costs for Windward for the 2005-2006 school year.  For the 2006-2007 school year, however, the IHO determined that the Plaintiffs did not act in good faith when they denied the District the ability to observe their daughter at Windward during the Winter of 2007.  Therefore, the IHO denied tuition reimbursement for the 2006-2007 school year.

Plaintiffs appealed the IHO determination to the SRO and the District cross-appealed.  In Appeal No 07-060, dated September 24, 2007, the SRO found that the District had recommended

a free and appropriate public education for M.R. for each year in controversy. (Exhibit "A" to

Mendelson Affidavit).

## III.    ARGUMENT

### A.    The Decision of the State Review Officer is entitled to due consideration by this Court

The IDEA provides that parents may appeal administrative determinations regarding their

child's special education needs to federal court. 20 U.S.C. §1415(i)(2)(A). In New York State, a

parent who does not agree with the recommendations of the CSE is afforded an impartial hearing

before an IHO certified by the New York State Education Department (hereinafter "SED").

N.Y. Educ. Law. §4404(1). If a parent wishes to challenge the decision of the IHO, it may be

appealed to the SRO.  N.Y. Educ. Law §4404(2). The SRO, while employed by SED, is

independent of the Commissioner of Education and is charged with reviewing the determinations

of the IHOs to ensure consistency in application of the IDEA and the New York State Education

Law and Regulations of the Commissioner of Education, as they relate to special education.

The determination of the SRO may be appealed by either the parent or the district to the

federal district court. *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 108 (2d Cir. 2007).

The review by this Court is generally made upon motions for summary judgment. *J.R. v. Rye

City Sch. Dist.,* 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004).  However, if a genuine issue of

material facts exists, the Court should not deny the motion for summary judgment, but instead,

the Court shall make an independent review of the record and determine such issues using a

preponderance of the evidence standard. *Bettinger v. New York City Bd. of Educ.,* 2007 WL

4208560 (S.D.N.Y. Nov. 20, 2007 *4).

"While federal courts do not simply rubber stamp administrative decisions, they are

expected to give due weight to these proceedings, mindful that the judiciary generally lacks the

specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93 (2d Cir. 2003) (citations omitted).  In fact, the Second Circuit has determined that "it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 191 (2d Cir. 2005).  This is not to state that the District Court cannot engage in independent review of the record developed by both the IHO and the SRO.  When the Court does so, it must be based upon a "preponderance of the evidence." *Gagliardo,* 489 F.3d at 112 (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997)).  However, the Court, as noted above, must not substitute its "own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 106 (1982).  This deference applied to the SRO's decision is appropriate even when the SRO disagrees with the IHO who initially heard the matter. *Pinn v. Harrison Cent. Sch. Dist.,* 473 F.Supp.2d 477, 482 (S.D.N.Y. 2007).

**B.    The Program recommended for the**
**2005-2006 school year was appropriate**

The District's program should be found appropriate if (a) the District is shown to have complied with the procedural requirements set forth in the IDEA, and (b) that the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to received educational benefits. *Application of a Child with a Disability*, Appeal No. 02-092.  There is no requirement to maximize a student's potential, but instead, the program must ensure that the child receives an educational benefit. *Application of Child with a Disability*, Appeal No. 04-008, see also, *Board of Educ. of the Hendrick Hudson Cent. School Dist. v. Rowley,* 458 U.S. 176 (1982).  While parents may believe that their child should receive full time special education

services to ensure optimal potential, "[t]he IDEA's directive that 'all children with disabilities have available to them a free appropriate public education does not create a duty to maximize the child's academic potential'". *Application of Child with a Disability*, Appeal No. 04-008.

### The 2005-2006 IEP Recommended an Appropriate Program

At the hearing, Plaintiffs argued that the 2005-2006 recommendation is not appropriate for a number of reasons. First, they argued that the CSE was not properly constituted. Second, Plaintiffs claimed that the recommended special class program is not a suitable grouping for M.R. as it is unduly restrictive in its constitution. Third, Plaintiffs alleged that the related service of counseling was not appropriate given M.R.'s evaluations and assessments. The District disagreed with Plaintiffs' position and affirmatively stated that the recommended program for the 2005-2006 school year was reasonably calculated to provide M.R. with an educational benefit in the least restrictive environment. The SRO ruled that the program recommended by the District was appropriate. (Ex. A to Mendelson Affid.)

### The 2005-2006 IEP was Adopted in a Manner Consistent with the Law

In their request for due process, Plaintiffs made various claims relating to the procedural aspects of the adoption of the 2005-2006 IEP. (Ex. D-1). The most significant complaint is that there was not a parent member at the June 14, 2005 CSE meeting. In his testimony, Dr. Mendelson stated that a parent member was invited to the June 14, 2005 CSE meeting and that it was not until that morning (the meeting was scheduled for 8:30 a.m.) that he found out that the parent member could not attend. The invitation for the June 14, 2005 meeting clearly indicates that a parent member was invited. (Ex. D-35). At the meeting, Dr. Mendelson gave Plaintiffs the option of rescheduling the meeting or moving forward without the parent member present. Dr. Mendelson also informed Plaintiffs in his letter forwarding the final IEP that he

would reconvene the CSE to have a parent member. (Ex. D-29). Plaintiffs did not elect to do this.

The District maintains that the waiver of the parent member was valid. A parent member was invited. Through no fault of the District, the parent member was unable to attend at the last minute. The District could have simply cancelled the meeting without providing the option to Plaintiffs to move forward. However, Dr. Mendelson did give the option to Plaintiffs and they voluntarily decided to proceed.

In the underlying action, Plaintiffs argued that their waiver was coerced. The SRO rejected this claim, and the law supports this ruling. The lack of a parent member in instances such as the one presented herein is not a substantial procedural violation so as to result in declaring the IEP a nullity. *In Board of Educ. of the City of New York v. Mills*, 2005 WL 1618765 (S.D.N.Y. Jul. 11, 2005), the parent waived the presence of a parent member at the CSE meeting when the parent member failed to appear. In finding that there was no violation of IDEA, the Court observed that the federal statute does not require a parent member. The Court found that there was no procedural defect as there was "no indication that the parent member's absence resulted in a loss of educational opportunity for [the student] or infringed on [the parent's] ability to participate in the CSE". (*Id.)* at *5. Similarly, in *Board of Educ. of the City School Dist. of the City of New York v. R.R.*, 2006 WL 1441375 (SDNY May 24, 2006), the Court found that because the parent waived her right to a parent member at the CSE meeting, "[t]his alone satisfies the waiver requirements of New York Education Law." This is true even though the parent therein claimed she did not affirmatively waive her right to a parent member.

It is undisputed that Plaintiffs waived the presence of a parent member in writing on June 14, 2006. In accordance with *R.R., supra.,* this written waiver is sufficient under the New

York Commissioner's Regulations. Moreover, the District submits that the lack of a parent member did not result in a loss of educational opportunity for M.R. or impact Plaintiffs' ability to fully participate at the CSE meeting. Plaintiffs were accompanied to the meeting by Dr. Bell. They fully participated and advocated for M.R. They have been through the CSE process previously. These factors mitigate against a finding of a procedural defect that would find the IEP null and void. See *Application of the Bd. of Educ. of the Morris Cent. School Dist.*, Appeal No. 05-058 (despite an invalid waiver, no impact on parents by lack of parent member).

As the SRO noted in his decision, the District offered to reschedule the CSE meeting at the time of the meeting and that the District offered to have another meeting should Plaintiffs desire the participation of a parent member. Additionally, the SRO highlighted Dr. Bell's presence at the meeting, Plaintiffs' familiarity with the CSE process and their active participation at the meeting as factors that demonstrate that the composition of the CSE did not result in the loss of an educational opportunity for M.R. or an infringement on Plaintiffs' ability to participate in the CSE.

During the hearing, Plaintiffs also claimed that they were not allowed to meaningfully participate at the CSE meeting and that certain issues (namely counseling, the goals and objectives and the possibility of push-in services and an aide) were never discussed. The record disputes these allegations. Dr. Bell testified that the June 14, 2005 meeting lasted for one and one-half hours (Tr. 54:15) and that the goals and objectives were reviewed. (Tr. 54:23). The CSE did, in fact, discuss push-in services (Tr. 315:18) and the use of an aide (Tr. 315:20). M.R.'s emotional needs were discussed, and the effect of her anxiety on her classroom performance and the transition to Edgewood were considered by the Committee. (Tr. 323:19;

325:15). Plaintiffs even reference in their own letters to the District that they voiced concerns, opinions and objections to the CSE's recommendation. (Ex. D-27).

### *The Program was Appropriate*

The District maintained that its program for the 2005-2006 school year was appropriate and the SRO agreed. The cornerstone of the District's recommended program for the 2005-2006 school year was the special class, a self-contained 12:1:1 setting taught by a special education teacher certified by the State of New York. (Tr. 1732:4). This class, with its small student/teacher ratio, would allow for more individualized instruction for M.R. The classroom teacher, Mr. Scholl, testified that for the 2005-2006 school year he had two (2) aides present in his class. (Tr. 1736:14). Additionally, the class was instructed in a multi-sensory approach, namely, the Preventing Academic Failure ("PAF") methodology. (Tr. 1740:6). The PAF program, an off-shoot of the Orton-Gillingham methodology, was the same multi-sensory approach that Windward utilized for students such as M.R. (Tr. 1191:3).

M.R. did exhibit certain strengths as a learner which resulted in a discussion about continuation of the resource room model. M.R. received a "3" on the New York State English Language Arts Assessment. (Ex. D-28). Her scores on the Stanford Diagnostic Reading Test were in the average range. (*Id.*) Her decoding skills were improving and her comprehension skills, especially contextually, were strong. However, given the recommendation of Dr Bell and Plaintiffs' request for an increase in services, the CSE ultimately recommended the special class.

This self-contained class was consistent with the recommendation of Dr. Bell. As Dr. Bell wrote in her report, special education services in the "context of mainstream classroom life" were not adequate for M.R. at that time. M.R.'s "needs in a classroom are significant and continuous, cutting across all subject areas and therefore all aspects of her day. She requires a

highly individualized teaching program that emphasizes multi-sensory learning approaches in the classroom and plenty of 1:1 attention." Plaintiffs indicated a similar need for M.R. Among the numerous complaints Plaintiffs had regarding the program provided by the District in the 2004-2005 school year was that M.R. not be removed from the mainstream classroom each time she needed special education services. Plaintiffs were particularly insistent that these type of pull-out services were doing harm to M.R. in the sense that she felt singled out when she was left out of the mainstream and that she missed work. By all accounts, by the end of her fourth grade year, M.R.'s progress had slowed and there were concerns about continuing provision of special education services in the resource room model.

At the hearing, Plaintiffs made the point that push-in services should have been considered as an alternative. The District maintains that the CSE did discuss using push-in services for M.R. but ultimately decided that this method of service was not adequate. (Tr. 315:18; Ex. D-28). Considering Dr. Bell was recommending a self-contained class for 2005-2006, for the CSE to recommend a push-in model, which is less restrictive than a pull-out resource room model, would be wholly inappropriate.

Accordingly, after input from Dr. Bell at the June 14, 2005 CSE meeting, the CSE recommended the 12:1:1 special class. This class, located at the Edgewood Elementary School, was made up of learning disabled and speech and language delayed students with similar profiles to M.R. Each of the academic content area subjects was to be taught by a special education teacher, certified in special education by New York State. (Tr. 1732:4). The teacher, Mr. Scholl, used the PAF methodology. (Tr. 1740:6). The fifth grade curriculum is broken down and modified for these students given their unique learning needs. Significantly, while this self-contained class did not include any mainstream peers within its four walls, the classroom is

located in a mainstream building and the students within that class were scheduled to have specials, such as music, art and physical education, and lunch and recess, with regular education peers.

This type of program, providing M.R. with the intensified special education support recommended by Plaintiffs' independent evaluator, but located within a mainstream building to allow for access to regular education peers, is consistent with IDEA and the Commissioner's regulations relating to appropriate programming in the least restrictive environment. Given M.R.'s academic needs at the time, especially considering her scores in the area of math and reading as indicated on the Stanford Achievement test, it was only appropriate for the CSE to recommend a more restrictive program than the one previously recommended for the 2004-2005 year. Significantly, this self-contained program is substantially similar to the type of programming being provided to M.R. at Windward – namely, a small structured class, with an Orton-Gillingham based approach to learning across each content area. The major difference was that the District's program is in a regular education building, providing M.R. with the opportunities to interact with her mainstream peers.

### *Plaintiffs' Objections*

At the hearing Plaintiffs objected to this recommendation on a number of grounds. First, they argued that the class profile of the students in the special class were allegedly not of similar academic and behavioral levels as M.R. Second, Plaintiffs argued that as the class is made up of mainly males, the special class was not appropriate. Lastly, Plaintiffs contended that due to M.R.'s lack of progress in fourth grade, they had no choice but to determine that the recommended program was not appropriate. None of these arguments withstand the scrutiny required under law.

The SRO found that M.R. was appropriately grouped with the students who were scheduled to attend the special class at the Edgewood School for the 2005-2006 school year. (Ex. A to Mendelson Affid.)  The Regulations of the Commissioner of Education require that the composition of a special class must be based on "the similarity of the individual needs of the students according to (i) levels of academic or educational achievement and learning characteristics; (ii) levels of social development; (iii) levels of physical development; and (iv) the management needs of the students in the classroom."  8 N.Y.C.R.R. 200.6(g)(2).  Additionally, the special class must be composed of students with disabilities of similar individual needs. 8 N.Y.C.R.R. 200.6(g)(3).  Despite Plaintiffs' protestations, M.R.'s needs were similar to the needs of the students within the special class.

A class profile was provided to Plaintiffs in June of 2005 (Ex. P-19) and was entered into evidence at the hearing.  For the most part, the students within the recommended self-contained class were in the average cognitive ability range, as was M.R.'s cognitive ability.  M.R.'s full scale IQ is 90, the class included students that had full scale IQs in a similar range to M.R.  In fact, many of the students within the class had a higher full scale IQ score than M.R.  Plaintiffs make an issue of the fact that one student in the class had a full scale IQ of 69, which is below M.R.'s full scale IQ level.  However, as Plaintiffs' expert points out, the breakdown of domain scores is important in assessing similarity of needs.  The student with the full scale IQ of 69 had a perceptual reasoning score of 69; M.R.'s perceptual reasoning score is a 73.  Additionally, her working memory score was depressed in comparison to her verbal comprehension score, with a score of 97.  The student which Plaintiffs highlight as making the class inappropriate had a working memory score of 68.  While this is certainly discrepant from M.R.'s score, it shows a similar weakness in perceptual reasoning and working memory.  Another of the students who

had a higher full scale IQ than M.R. had a working memory score of 99, similar to M.R.'s working memory score of 97. From a cognitive standpoint, the class did provide for a similar grouping for M.R.

From an academic standpoint the class was appropriate for M.R. Mr. Scholl testified that, in terms of reading and math abilities, there was a spread of less than three (3) grade level equivalencies in his class. (Tr. 1737:13). M.R. fell within this range. The SRO has upheld this type of grouping as appropriate. *Application of a Child with a Disability*, Appeal No. 04-019. As for the class profile, while there is not a consistency to the assessment tools used amongst the students in the proposed class, it is clear from the profile that each of the students therein had a problem with their basic reading and math skills. For instance, the student listed on page "3" of the class profile had a noted difficulty making inferences and drawing conclusions when reading text, much like the deficits Dr. Bell noted in her evaluation of M.R. Additionally, this student got overwhelmed when tasks became difficult, just like M.R. The student who is listed on page "6" of the class profile had appropriate comprehension skills, just like M.R.; however, inconsistent decoding skills were noted to impact overall fluency and comprehension. This was similar to M.R.'s profile. The student listed on page "13" is noted as having difficulty with auditory and working memory, just like M.R. Further, for the student listed on page "14" of the class profile, his decoding skill impacted his reading fluency, but when he read in context, he exhibited strong comprehension skills. This was similar to M.R.'s skills. The student listed on page "20" of the class profile had reading comprehension and vocabulary scores in the average range for his age, just like M.R. The student listed on page "23" had difficulties with math, and with his day to day performance being inconsistent, just like M.R. The student listed on page

"26" of the class profile had difficulties in math problem solving despite a good computational skills, just like M.R.

There is no requirement for a class grouping to be such that all students are on exactly the same level of academic achievement and exactly the same level of cognitive ability. The SRO has upheld groupings as appropriate when the reading and math abilities amongst student have ranged over three grade level equivalency, which is similar to the type of grouping the District was proposing for M.R. See *Application of a Child with a Disability,* Appeal No. 04-019. Additionally, the testimony of the self-contained class teacher, David Scholl, indicated that differentiated instruction was provided for each student and that the instruction would be individualized based upon the unique needs of each student in the class. The SRO has found that the ability to individualize for each student indicates that a grouping may be appropriate. See *Application of a Child With a Disability,* Appeal No. 06-019. In that decision, the parents were concerned that their son would be "several levels behind in academic performance" vis-à-vis the other students in his proposed class. The SRO credited the testimony of the teacher who indicated that that the student at issue could be accommodated based upon his unique learning style. Similarly, Plaintiffs here argued that M.R. is academically performing in advance of some of the students that they observed in Mr. Scholl's class. While Mr. Scholl's testimony puts the allegation of the differing academic functioning of his students in question, his statements as to how he can individualize the curriculum based upon M.R.'s strengths and weaknesses are factors that were considered when determining whether or not the class was appropriate for M.R. (Tr. 1741:2; 1742:1; 1742:15; 1743:5).

Plaintiffs also argued that the students in the proposed class had behavioral issues that M.R. did not exhibit. First, the District submits that the students in the proposed class are not

behavioral problems. (Tr. 1737:4). Mr. Scholl testified that his students, for the most part, act in an age and grade appropriate manner. (Tr. 1738:10). There were two (2) students who, due to their disabilities, presented as students with management needs that required monitoring, but the teacher and teaching assistants addressed these needs through appropriate supports within the classroom. (Tr. 1738:6). Plaintiffs and their experts, during testimony, picked out statements within the class profile that to their mind cause concerns with regards to the students' behavioral needs. However, the testimony of Mr. Scholl indicated that this speculation is not substantiated. Additionally, M.R. has her own set of social and emotional needs. At the time the CSE was recommending the special class at the Edgewood School, Dr. Bell noted anxiety and lack of self concept that impacted upon her educational performance. While this was not her primary disability, the fact is that the CSE recognized some impact upon her learning and her ability to progress. There is nothing within the class profile presented that indicated that the students within the special class are substantially different, from a behavioral or management standpoint, than M.R.

The SRO found that M.R. would have been appropriately grouped with the students in the special class. The SRO, who is the individual designated by the State Education Department to ensure consistency of application of the special education laws, carefully reviewed the class profile and corresponding testimony when coming to this conclusion. In this analysis, the SRO found that two of the students in her class were female, thus addressing Plaintiffs' next objections. Plaintiffs presented significant testimony to the effect that the class proposed for M.R. was inappropriate in terms of grouping because of the gender makeup. During the time that M.R. would have been in the class for English, Science and Social Studies, she would have been the only female student. As Dr. Mendelson testified, that would have been only 40th

percentile of her instructional day (Tr. 644:4), in that during Math, two female students would have been placed in that class (Tr. 334:15) and during her specials lunch and recess, she would have been fully mainstreamed into a co-educational class. M.R. would have only been with all boys for 30% of her entire school day. (Tr. 643:21). From a legal standpoint, the Commissioner's regulations do not indicate that gender makeup be a consideration as to appropriateness of class composition.

The testimony that this grouping would have a detrimental effect upon M.R. was speculative and not supported by any objective measure. (Tr. 20:7). No testimony was provided that M.R. had difficulties interacting with male students or that her self concept would be affected by such a grouping. The only testimony provided was that M.R. felt different when she was pulled out of the mainstream program, so she may feel different if she was the only girl in a small class of boys. The IHO did not find the program inappropriate on the this ground, and neither did the SRO. While it would be ideal to have a completely homogeneous grouping of students with a diverse population in terms of gender, race and national origin, unfortunately, that is not always possible in a public school setting. Significantly, that type of makeup is not required under the law. All that the law obliges the District to do is group students in a special class based upon their levels of educational achievement, social development, physical development and management needs. There can be variability in those criteria, as long as the variability is not so broad as to make the student inappropriately grouped. There is simply no obligation to balance a class based upon other characteristics.

The District took into account Plaintiffs' concerns about their daughter's educational progress. The willingness of the CSE to recommend a more restrictive program after Plaintiffs indicated their dissatisfaction with the resource room model indicated that the CSE took the

Parents' input seriously. In her report and her testimony, Dr. Bell indicated that she did not believe that the District, and the personnel that were educating M.R. during her fourth grade year, understood her disability. She opined that M.R. needed to be in a more structured supported environment over the course of the school day. The CSE recommended just that. Placement within the special class, with a special education teacher who was trained to meet the individual needs of the few students within his classroom, and who will provide a multi-sensory approach to learning across all content areas, was what was called for by Plaintiffs' independent evaluator and by their own statements at the CSE meeting.

Plaintiffs also challenge the fact that the CSE recommended counseling for M.R. for the 2005-2006 school year, as they claim she is not in need of such services. However, Dr. Bell's report has a significant recitation of M.R.'s emotional problems, which she noted impacts her in school. (Ex. P-23). Additionally, Dr. Bell testified that M.R.'s "self-esteem was clearly suffering." (Tr. 19:10). While the emotional problems were not viewed by the CSE as primary, there still was a recognition of M.R.'s anxiety and lack of self-concept. A full discussion of M.R.'s emotional needs did occur (Tr. 355:18; Ex. D-26) and the CSE determined that counseling would be appropriate given the transition of M.R. from the mainstream class at her neighborhood school to a special class at a different elementary school. The recommendation of counseling was appropriate given the way M.R. presented in June of 2005 and the recommended program for the 2005-2006 school year.

## C.    The Program recommended for the 2006-2007 school year was appropriate

Despite the fact that the District provided a special class for M.R. for the 2005-2006 school year, Plaintiffs unilaterally placed her at Windward. During the course of the 2005-2006 school year, Windward evaluated M.R. and prepared progress reports which were sent to her

parents. Those progress reports were provided to the District in anticipation of the annual review for the 2006-2007 school year. Additionally, Dr. Stephanie Kutin-Sezon, a District psychologist and CSE Chair, observed M.R. at Windward on January 25, 2006. An annual review was held for M.R. on June 7, 2006. The CSE that convened was appropriately constituted. During the course of the meeting, Barbara Landau, head of the Windward Middle School, participated via telephone and provided the Committee with information regarding M.R.'s progress during the school year. (Tr. 1466:1, Tr. 1467:6). The CSE reviewed the testing and progress reports of Windward. (Ex. P-31 and Ex. P-8). Given the information provided, the CSE recommended that M.R. be placed in a resource room program four times a week for 45 minutes a day. (Ex. D-13).

While this was a reduction in intensity from the previous year's recommendation, there were reasons why the CSE made such a recommendation. M.R.'s test results from the Spring of 2006 indicated that she was functioning well within the average range on both reading vocabulary and comprehension. (Ex. P-31). Additionally, her math functioning was shown to be in the average range. (*Id.*). From a skills standpoint M.R. demonstrated she could handle such a setting. (Tr. 1509:23; 1649:20).

The resource room program at the Middle School is scheduled into the class day, such that M.R. would attend her special education support class at the same time as her classmates were attending other electives. M.R. would not miss any instruction, nor would she be singled out by leaving in the middle of a class and returning into the middle of a lesson. This situation is in contrast to what occurred at the elementary school level. The scheduling of the resource room into M.R.'s day addressed Plaintiffs' concerns about the impact of pull-outs on M.R.'s emotional well-being.

The CSE did discuss the transition to the middle school for a student such as M.R. Having left the District to attend a restrictive program like Windward, there was a concern about her transition to the Middle School. The CSE recommended that her resource room program be scheduled into the Cooper House, one of the four houses in the Middle School. In that way, should M.R. have difficulty in a particular subject area, the CSE could reconvene and recommend a more intensive parallel class for a particular subject area and M.R. could make the switch without any significant change to her schedule. This is possible because the special classes for the sixth grade in the 2006-2007 school year are housed in Cooper House.

In his decision, the IHO found that the program recommended by the CSE for the 2006-2007 school year was appropriate, but invalidated the IEP on other grounds. The SRO also determined that the program was appropriate, and overturned the IHO's ruling relating to the other grounds for invalidating the IEP. (Ex. A to the Mendelson Affid.) The program recommended by the CSE was tailored to M.R.'s unique needs. It recognized each of her weaknesses and addressed same through a program that provided academic support in the least restrictive environment.

**D.    The District's recommendations were made in accordance with the applicable Federal and State Laws**

The SRO has consistently stated that an appropriate program is one that "accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short terms instructional objectives related to those needs, and provides for the use of appropriate special education services." *Application of a Child with a Disability*, Appeal No. 01-073. The record indicates that for its 2005-2006 recommendation, the CSE analyzed the following timely evaluations and assessments: Dr. Bell's neuropsychological evaluation; the Stanford Diagnostic Math test administered on April 25, 2005; the Stanford Diagnostic Reading test administered on

April 25, 2005; and a speech and language evaluation administered on June 3, 2005. Additionally, the CSE reviewed the classroom observation completed by Dr. Bell, an occupational therapy evaluation from 2003, a social history from 2003, the teacher report of Ms. Suzanne Burn, M.R.'s fourth grade teacher, and an educational progress report dated April 1, 2005. From these evaluations, the CSE gleaned that M.R. was "a child with average cognitive ability who has significant weaknesses in perceptual organization, executive functioning phonological processing and short-term memory." Additionally, the CSE noted that Dr. Bell found that M.R.'s self-concept and anxiety impact her learning. (Ex. D-28). The CSE then developed goals and objectives a recommended a program and related services that addressed M.R.'s needs.

M.R.'s 2006-2007 IEP also contains the results of several evaluations. The CSE considered the report of Windward from February of 2005, as well as the observation of Dr. Kutin-Sezon. These reports were utilized in conjunction with the Dr. Bell's evaluation and the input of Ms. Landau from Windward. From this information, the CSE determined that M.R. had "become more confident and self-assured in her reading and skills class." M.R. showed progress in all areas, but still needed "to learn and apply strategies" to assist in learning. (Ex. D-13).

Therefore, in anticipation of both the 2005-2006 and 2006-2007 school years, the CSE had taken care to develop a profile of M.R.'s academic needs by conducting and analyzing evaluations, and reviewing reports submitted by M.R.'s evaluators and teachers at both the District and Windward. The record reflects that the CSE used these evaluations (and the reports of the evaluators) to create both IEPs, which accurately describe M.R. and her needs.

The IEPs contain detailed descriptions of M.R.'s current levels of academic performance, and set forth specific expectations for progress through annual goals and short and long-term objectives. These goals and objectives would provide M.R.'s special education teachers, her mainstream class teachers, and the school psychologist with direction regarding the expectations of the CSE. Goals and objectives were developed based on M.R.'s needs (gleaned from assessments and evaluations): decoding; written and verbal expression; perceptual weakness; and math skills. Each of these goals and objectives were composed to reflect the recommendations of Dr. Bell, M.R.'s fourth grade special education and regular education teacher and, in the case of M.R.'s sixth grade year, the Windward staff. The District submits that M.R.'s program was developed in a manner consistent with the dictates of IDEA and New York State Education Law.

The District's recommended programs provide M.R. with an education in the least restrictive environment. This is in accordance with the IDEA, which requires that:

> all students with disabilities be educated with non-disabled children to the maximum extent appropriate and may only be placed in a more restrictive environment when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Application of a Child with a Disability,* Appeal No. 05-125 (internal citations omitted); see also *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.,* 995 F.2d 1204 (3d Cir. 1993); *Briggs v. Bd. of Educ. of the State of Connecticut,* 882 F.2d 688 (2d Cir. 1989).

For 2005-2006, the CSE recommended that M.R. be placed in a self-contained class at the Edgewood School. This placement constituted an increase in the services M.R. had received during her final year at the District (fourth grade). In developing M.R.'s IEP for 2005-2006, the CSE moved along the continuum of services to a more restrictive placement. However, because opportunities for mainstreaming are critical to a child's education, M.R.'s program provided

special education and related services.  Therefore, the District program remained the least
restrictive environment for M.R.  As the State Review Officer has noted:

> [i]n determining whether a student can be educated in regular
> classes, it is not necessary to establish that the student will learn at
> the same rate, or master as much of the regular education
> curriculum as his or her disabled peers…The fact that a student
> with a disability might make greater academic progress in a special
> education class may not warrant excluding the student from a
> regular education program.  The CSE must also consider the
> unique benefits, academic and otherwise, which a student may
> receive by remaining in regular classes, e.g., language and role
> modeling with non-disabled peers.  In determining whether a
> special education class is appropriate, objective factors such as the
> attainment of passing grades and regular advancement from grade
> to grade are generally accepted indicators of satisfactory progress
> and one important factor in determining educational benefit.

(internal citations omitted).  The record in this matter demonstrates that the Edgewood class
would have provided M.R. with the factors listed above, i.e., language and role modeling with
both disabled *and* non-disabled peers, and the opportunity to remain in a mainstream class for
specials.  Windward offers none of these advantages which are deemed important by the SRO.

The limited testimony presented regarding Windward indicates that M.R.'s class there is
similar to the program recommended by the District for the 2005-2006 school year, in that both
programs provide small group reading instruction in one's cohort group, and in both programs
class size is limited to 12:1:1.  However, Windward offers no opportunity for mainstreaming,
whereas the District's program would give M.R. the chance to take classes with her regular
education peers.  In this regard, the Windward program is too restrictive for M.R.  M.R.'s
learning disability is not so severe as to warrant full-time special education with *no* opportunity
for mainstreaming, even for specials.  Particularly for a child such as M.R., who has a learning
disability but whose intellect is solidly in the average range, being placed where she cannot
socialize with mainstream students does not benefit M.R.

As to the recommendation for the resource room services for the 2006-2007 school year, this program provides M.R. with an even greater access to the mainstream. The objective evidence reviewed by the CSE – the Windward report and testing, Ms. Landau's verbal report and Dr. Bell's evaluation – indicate that M.R. could be successful with this level of support. This is especially true given the progress she made in her year at Windward. It should be noted that the IHO found M.R.'s program for 2006-2007 to be appropriate, though he determined that the goals were developed in such a way to nullify the IEP. The District disagrees with that finding, as did the SRO. The SRO found both years' programs and goals to appropriate for M.R.

**E.    The Plaintiffs are not entitled
       to the relief requested**

Parents who unilaterally change their child's placement without the consent of the school district do so at their own financial risk and are only entitled to reimbursement upon a showing that (1) the school district failed to offer a free appropriate public education; (2) the private school placement was appropriate; and (3) equitable considerations support the award of tuition reimbursement. *Florence County School Dist. v. Carter*, 510 U.S. 7, 15 (1993); 42 U.S.C. §1412(a)(10)(c)(ii); 34 C.F.R. §300.403(c). Plaintiffs bear the burden to establish that the private placement is appropriate for the child and that tuition reimbursement is warranted. *M.S. v. Bd. of Educ. of the City School Dist. of the City of Yonkers*, 231 F.3d 96, 104 (2d Cir. 2000).

As argued above, the District offered a free appropriate public education to M.R. The consideration of Plaintiffs' claim should end there and their request for tuition reimbursement should be denied. Should the Court find that the District's programs developed for the 2005-2006 and 2006-2007 were inappropriate, Plaintiffs' tuition request should be denied for two

reasons: (1) Plaintiffs failed to show that Windward was an appropriate placement; and (2) equitable considerations do not support an award of tuition reimbursement in this case.

### *Plaintiffs did not demonstrate that Windward was an appropriate program*

Plaintiffs did not demonstrate that Windward was appropriate for M.R. They did not present any evidence concerning the Windward curriculum. Plaintiffs did not present any evidence about textbooks used by Windward students. Only one witness could state that she knew of <u>one</u> (1) of M.R.'s teachers as being certified by New York State to teach special education. Plaintiffs presented no evidence as to the qualifications of other teachers.

The testimony of Plaintiffs and their witnesses indicated that they believed that a school such as Windward would maximize M.R.'s potential. Public school districts are not required to "maximize" a child's education. Plaintiffs' choice to unilaterally place M.R. at Windward (while absolutely within their own prerogative) must not bind the District as the financially responsible entity, especially when the District's program is appropriate for M.R. See *M.B. v. Arlington Cent. Sch. Dist.*, 2002 WL 389151 (S.D.N.Y.) (in holding that a public school cannot be held to the level of providing the maximum or best educational services, the court noted that "[w]hile I have no reason to doubt [the witness's] testimony that a full-blown Orton-Gillingham approach would be ideal, I am convinced that the school district did meet the minimum requirements of IDEA…I agree with the hearing officer that Plaintiffs wished to 'obtain an educational placement that is not within the purview of the district to provide.'").

Dr. Lydia Soifer testified on behalf of Plaintiffs with regard to M.R.'s placement at Windward. Dr. Soifer is a consultant who worked for the Windward School in that capacity. While Dr. Soifer spoke to the Windward program in a general sense, she could not provide any particulars with regard to M.R.'s program. Her testimony relating to specifically to M.R., such

as it was, was second-hand. She could not indicate what textbooks M.R. was using or what curriculum was being followed (Tr. 1264:2, *et seq.*). Dr. Soifer did not know the qualifications of most of M.R.'s teachers. Dr. Soifer testified as to two visits to M.R.'s classrooms. She admitted that these visits pre-dated her relationship with Plaintiffs and that she was not there for the purpose of observing M.R. (Tr. 1225:24). She admitted on cross-examination that she could not remember the lesson that was taking place or what M.R. was doing during the visits (Tr. 1272:18).

Plaintiffs also presented the testimony of Kathleen Kelly, a former special education teacher who is acting as now acting as an educational consultant. Ms. Kelly observed M.R. in anticipation of this hearing. (Ex. P-2). Ms. Kelly's report and testimony was equally devoid of specifics as to M.R.'s program at Windward and her progress therein. Additionally, there is evidence to demonstrate that the information presented is suspect. Ms. Kelly testified that Windward is a state approved school (Tr. 105:3), when it is not. (Tr. 219:14). Ms. Kelly wrote in her report that Ms. Gay, M.R.'s language arts teacher, is "certified", when on cross-examination she admits that she does not know what certification Ms. Gay holds. (Tr. 174:2). In her report, Ms. Gay is referred to as M.R.'s language arts teacher (Ex. P-2); in testimony, Ms. Gay is referenced as her Social Studies teacher. (Tr. 172:24). Ms. Gay is actually her reading teacher. (Ex. P-64). When asked about the Social Studies curriculum, she indicated it was American history and, "that particular day, they were talking about basically current events; an update on Hurricane Katrina . . ." (Tr. 173:12). However, this is what was being covered in Ms. Gay's class – M.R.'s <u>reading</u> class. Ms. Kelly opines about the class profile of the parallel curriculum at Scarsdale (Ex. P-2), yet admits that she has no knowledge of the students in that class.

Beyond the inconsistencies, Ms. Kelly demonstrated the same lack of knowledge as to teacher certification, textbooks and curriculum as Dr. Soifer. (Tr. 170:5, et seq.) This lack of information regarding the appropriateness of the Windward program specifically for M.R. is fatal to Plaintiffs' case. Plaintiffs marked exhibits allegedly relating to the Windward curriculum, but no one testified as to who prepared those documents, the accuracy of them and the authenticity of them. Certainly, the District had no ability to question anyone regarding the curriculum and texts used at Windward, nor the qualification of their teachers.

Mr. R. testified that even he had only visited M.R. a few times during the two (2) years that M.R. has been a student at Windward; several of these visits occurred not during instructional time but during "evening" activities.

In *Application of a Child with a Disability*, Appeal No. 01-105, the State Review Officer denied Plaintiffs' request for tuition reimbursement. Among the reasons he did so was that no one from Windward testified to:

> explain how the school's program had met this student's special education needs. Absent evidence of progress <u>or</u> a description of how the private school's educational program specifically met this student's needs, [the SRO found that] [the parent] has not met her burden of proof with respect to the appropriateness of the services provided to her son by Windward during the 2000-2001 school year.

(emphasis added). <u>See</u> also, *Application of a Child with a Disability*, Appeal No. 05-039 (lack of evidence as to what services the private placement teacher provided resulted in a denial of tuition reimbursement); *Application of the Bd. of Educ. of the Smithtown Cent. Sch. Dist.*, Appeal No. 04-072 (lack of information about a unilateral placement's services resulted in no basis for finding that the private school met the child's special education needs.). Accordingly, as Plaintiffs did not present evidence to establish whether M.R. was properly and appropriately educated at Windward, Plaintiffs' request should be denied.

### *Plaintiffs' Conduct Forecloses the Award of Tuition Reimbursement*

The law requires that parents act in good faith in the CSE process to be eligible for tuition reimbursement. Courts have frequently held that requests for reimbursement may be denied if the parents behaved in a manner such that it would be inequitable to award tuition. See *Florence County School Dist. v. Carter*, 510 U.S. 15, 114 S. Ct. 361 (1993). It is the District's contention that Plaintiffs in this matter went into the CSE process with the intention of enrolling M.R. at Windward, and that whatever the program recommendation, Plaintiffs were going to reject it and place M.R. at Windward and subsequently request a due process hearing for tuition reimbursement. The District maintains that the evidence bears this out.

Plaintiffs initially applied to Windward on March 13, 2004 during the 2003-2004 school year, one (1) full year prior to when M.R. began attending school there. M.R. visited the program in advance of her admission and an acceptance was garnered prior to the CSE making its recommendation in June of 2005. Dr. Bell indicated in her evaluation that M.R. had been accepted to Windward. In fact, a contract for enrollment was signed on March 10, 2005, prior to Dr. Bell's testing and the CSE meetings to develop the 2005-2006 IEP. (Ex. P-52). For the 2006-2007 school year, Plaintiffs signed the contract for enrollment and paid a $2,500.00 deposit towards tuition on March 8, 2006. (Ex. P-50). This was well in advance of the June 7, 2006 CSE Meeting.

Additionally, Plaintiffs submitted their first "Request for Due Process" on November 7, 2005, alleging their entitlement for reimbursement for the 2004-2005 school year. This request was withdrawn, without explanation, on January 19, 2006. By the time Plaintiffs filed the instant request for due process, covering both the 2005-2006 and the 2006-2007 school year, M.R. had already been enrolled in Windward for one (1) school year.

It is well-settled that an IEP is a "snapshot" of the student at the time the IEP is developed. It is inappropriate to analyze a challenge to an IEP retrospectively since the IEP in question is created using only the information available to the CSE at the time. See *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F.Supp.2d 710, 724 (S.D.N.Y. 2003) ("Though the Second Circuit has not addressed this precise issue, other courts have found that 'appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming *arguendo* there was no progress, does not render that IEP inappropriate'…Thus, whether the [IEP] was reasonably calculated to confer educational benefits on [the student] must be evaluated as of the time the CSE devised the IEP…and the IHO and SRO erred by regarding any information about [the student's] education after that date.")

Plaintiffs' decision, in this matter, to wait until the summer of 2006 before requesting reimbursement for both school years is disingenuous as they are attempting to use M.R.'s alleged progress during the 2005-2006 school year to support their claims for both school years. The IDEA does not allow for such approach and the evidence garnered due to this conduct should not consider such evidence in determining whether Windward was appropriate.

**F.    The question of bias**

At the hearing level, Plaintiffs requested that the IHO recuse himself based upon the fact that he represented school districts when he practiced law prior to the time he became certified to hear special education hearings (Ex. D-6). Plaintiffs' motion was premised on the fact that the IHO's views were "extreme" and they supported their opinion with two (2) newspaper articles. The IHO denied Plaintiffs' request for recusal. (Ex. D-4). In his decision on recusal, the IHO rightly noted that IHOs are not prohibited from hearing cases due to who they represented in private practice. IHOs are only to recuse themselves when their personal or professional interest would conflict with their objectivity. 8 NYCRR §200.1(x)(3). The IHO also explained the

1833/102/337217 V1 6/30/08

-36-

context of quotes contained in one of the newspaper articles which Plaintiffs found "extreme." The context was crucial to understanding the IHO's statement and demonstrated that the IHO was acting in his role as advocate, not expressing his private views. It is proof, also, that relying on newspaper articles solely, without any other evidence, leads to misinterpretation of facts, which further lead to speculative conclusion. More succinctly, these type of articles are not good evidence.

Now, Plaintiffs again engage in arguing bias through a newspaper article that passes opinions off as fact. Plaintiffs attach a Wall Street Journal article to their complaint as proof that the SRO is biased and did not rule fairly in this matter. The article in question raises the question as to why there is a seeming shift in decisions in the favor of school districts on the SRO level. The article speculates as to reasons, including disclosing the fact that the SRO is cohabitating with an employee of the State Education Department.

There are any number of reasons why the SRO is deciding more cases on behalf of the school district then his office has in the past. Dr. Mendelson, in his affidavit in this proceeding, speculates to a few. The District is not asking the Court to decide whose opinion is right in this regard. The District is requesting this Court disregard Plaintiffs' argument on this issues, as they do not present facts that this Court can accept as evidence as to bias.

Essentially, Plaintiffs are requesting that this Court take judicial notice of the facts contained in the Wall Street Journal article as evidence in support of their claim of bias. The Court may only take judicial notice of adjudicative facts if the facts in question are "not subject to reasonable dispute." Fed. R. Evid. 201(b). The "facts" contained in the Wall Street Journal article are subject to reasonable dispute. More specifically, when, as here, the statements

contained in the newspaper article are speculative in nature, use of such statement should be denied as inference of bias. See, *Allen v. Cuomo*, 100 F.3d 253, 259 (2nd Cir. 1996).

## IV.     CONCLUSION

The Defendant, the Scarsdale Union Free School District, respectfully requests that this Court deny Plaintiffs' request for relief and rules that the District met its obligations under the law in recommending a free and appropriate public education to M.R. for the 2005-2006 and 2006-2007 school years.

Dated:    White Plains, New York
          June 30, 2008

                              **KEANE & BEANE, P.C.**

                    By:       _____
                              Eric L. Gordon (7301)
                              Attorneys for Defendant
                              Scarsdale Union Free School District
                              445 Hamilton Avenue, 15th Floor
                              White Plains, New York 10601
                              (914) 946-4777


On Brief:  Stephanie M. Roebuck