**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------

R.R. and D.R. o/b/o M.R.,

                Plaintiffs-Appellants,
                                                  **AFFIDAVIT OF**
                                                    **GARY S. MAYERSON**

        --against--

SCARSDALE UNION FREE SCHOOL DISTRICT,
                                                  **08 CV 0247 (BSJ) (FM)**

                        Defendant-Appellee.

----------------------------------------------------------------

STATE OF NEW YORK
COUNTY OF NEW YORK

GARY S. MAYERSON, being duly sworn, deposes and says:

1.  I am the principal of Mayerson & Associates, counsel to plaintiffs M.R. and her parents, R.R. and D.R. I respectfully submit this Affidavit and the accompanying Memorandum of Law in support of plaintiffs-appellants' motion for a modified *de novo* review and reversal of the State Review Officer's ("SRO") Decision No. 07-060, dated September 24, 2007 (Exhibit A annexed hereto).[1]

2.  The SRO arbitrarily reversed, yet fairly glossed over IHO Jerome Schad's 51-page decision and extensive fact-findings (Exhibit B) to rule that the Scarsdale Union Free School District ("Scarsdale") had done nothing wrong with respect to Prong I of the classic, three-pronged test for reimbursement.  As a matter of law, the SRO was required to give great deference to IHO Schad's fact findings, but he failed to do so. Having arbitrarily reversed IHO Schad on Prong I for both school years, the SRO then decided not even to bother genuinely addressing Prongs II and III i.e. whether the Windward School was "reasonably calculated" to

---

[1] This appeal is based on this Court's independent review of the full evidentiary record, including all of the transcripts from the hearing dates held on: October 23, 24 and December 6, 2006; February 16, 26, 28, and March 1, 2007, as well as all of the documentary exhibits.  Upon information and belief, Scarsdale's counsel has arranged to have that record transmitted to this Court.

provide M.R. with a meaningful educational benefit ("Prong II") and whether or not there were any compelling equitable considerations that would require preclusion or diminishment of any reimbursement award that would otherwise be rendered in plaintiffs' favor.[2]

3.  This appeal is thus entirely unlike the garden variety IDEA appeal to federal court, where the student and his or her parents have already lost before the IHO and the SRO.  Here, M.R. and her parents largely *won* before the IHO, after an extended trial, where the trier of fact was a highly experienced IHO who had for many years headed up his law firm's practice area representing *school districts* in IDEA-based cases, and whose service as IHO was of concern to plaintiffs because he had been quoted in his local newspaper in Buffalo, New York being critical of parents and their attorneys.  Where, as here, an attorney with a long history of representing school districts rules that Scarsdale deprived M.R. of a FAPE for two successive school years, it is worthy of note.

4.  For both the 2005-2006 and 2006-2007 school years, the IHO held that Scarsdale had deprived M.R. of a "free and appropriate public education" ("FAPE"), establishing Prong I in favor of M.R. and her parents.  For both the 2005-2006 and 2006-2007 school years, the IHO also held that the Windward School, located in White Plains and known nationally for its work teaching children with learning disabilities, was appropriate for M.R. and thus reimbursable under Prong II.  Predictably, however, and despite Scarsdale's recent relationship with the Windward School[3], and despite the fact that Scarsdale Schools Superintendent Michael McGill

---

[2] Last Summer, <u>The Wall Street Journal</u> published an investigatory article (Exh. C) challenging the integrity of the IHO, and raising significant issues as to whether the SRO was biased in favor of school districts.  While this article would be of serious concern to any parent, we do not ask this Court to make any findings about the SRO's impartiality or integrity.  We simply ask this Court to reverse the SRO's decision, upon the grounds that the SRO failed to give the IHO's Decision and fact findings the deference that it was owed, and additionally upon the grounds that the evidentiary record established before the IHO warrants reinstatement of the IHO's fact findings on Prongs I and II.

[3] <u>See</u>, Gilpan, Carrie, "Partnership Planned with Windward School," <u>The Scarsdale Inquirer</u>, (Friday, Oct. 19, 2007). (Exh. D).

has served and, upon information and belief, continues to serve on the Windward board[4], and despite the fact that Scarsdale's witnesses at the hearing were highly complimentary about the Windward program, Scarsdale's legal *position* at the hearing was that it was resisting any finding that the Windward School was appropriate for M.R.

5. In a 51-page decision, IHO Schad made numerous findings of fact and law based upon the evidence presented at the hearing, holding 100% in favor of M.R. on *all* three prongs for her tuition reimbursement claim for the 2005-2006 school year. However, as for the 2006-2007 school year, IHO Schad held, as a matter of law, admittedly in a case of first impression with no controlling legal authority to guide him, that "equitable considerations" existed under Prong III that barred and precluded plaintiffs' 2006-2007 tuition reimbursement claim in its entirety.

6. Plaintiffs initiated a limited appeal from the IHO's May 3, 2007 Decision solely to challenge the IHO's conclusion on law (on Prong III) that there were "equitable considerations" that barred and precluded plaintiffs' 2006-2007 tuition claim.[5] Scarsdale, on the other hand, cross-appealed from everything *but* that portion of the IHO's Decision.[6]

7. Here, IHO Schad held that, both from a procedural and substantive perspective, Scarsdale had deprived M.R. of a FAPE for both the 2005-2006 and 2006-2007 school years, based upon the following findings, among others:

- The June 14, 2005 CSE meeting was improperly composed and violated the Parents' procedural rights under Article 89 of the Education Law and 8 N.Y.C.R.R. §200.3(a)(1)(vii) for failure to have a parent member present resulting in the IEP as a nullity  (IHO Decision at 25; see also, Tr. pp. 58-59, 263-66, 267, 1055-1056, 1074, 1101-1397);

---

[4] See, *The Beacon:  The Windward School Newsletter for Professionals and Parents, Spring Summer '07* at 16 (Exh. E).

[5] As the accompanying memorandum of law demonstrates at Point II, there were no equitable considerations that would have warranted even diminishment (much less full preclusion) of the tuition reimbursement award that the IHO would otherwise have rendered in favor of M.R. and her parents for the second school year i.e. 2006-2007.

[6] Plaintiffs took a limited appeal to the SRO from the IHO's conclusion of law on Prong III for purposes of the 2006-2007 school year claim because, as a matter of law, the record does not even support *diminishment* of the reimbursement award that the IHO should have rendered with respect to 2006-2007.  By precluding the 2006-2007 reimbursement award in its entirety based on an erroneous legal conclusion that this Court should review on a purely *de novo* basis, the IHO gave Scarsdale an unwarranted windfall (for 2006-2007).

- Scarsdale engaged in **impermissible predetermination** of the goals and objectives for the 2005-2006 IEP (IHO Decision at 28; see also, Tr. pp. 215-216, 225, 1055, 1056, 1083-84, 919, P-20, 1049-1050, 1106, 1074, 1397, 1245, 1766-1770, 1737, 1768, 837-839);

- Scarsdale's IEP **misstates** that M.R.'s parents "expressed" their agreement with Scarsdale's IEP recommendations. (IHO Decision at 41; see also, Tr. pp. 1654, 1664-65).

- Scarsdale staff **mistreated** M.R., eroding her confidence and self-esteem. (IHO Decision at 12, 16; Tr. pp. 1042, 1045, 1117).

- Scarsdale personnel caused M.R. to **deteriorate** in her performance by inducing her parents to terminate outside tutoring support that M.R.'s parents were paying for privately, and which M.R. needed while she was still in the Scarsdale program. (IHO Decision at 9-11; see also, Tr. pp. 1028-29);

- ***M.R. was not making overall good and meaningful progress in Scarsdale's program***, which for years involved ***Scarsdale largely regurgitating and repeating stale and otherwise inappropriate IEP goals and objectives that, for the most part, were not objectively measurable.*** Scarsdale allowed this situation to continue and failed to take appropriate remedial steps. (IHO Decision; see also, Tr. pp. 28-30, 35, 143-46, 154, 430, 678, 898, 953, 1581, 1678, 1663)

- There was a significant decrease in M.R.'s progress in fourth grade and by June 14, 2006, she was not an appropriate fit for Scarsdale's proposed classroom placement, mainly for failure to provide adequate classroom support (IHO Decision at 30; see also, Tr. pp. 794, 796, 927, 1053-54, 1397, 1555); and

- The 2005-2006 and 2006-2007 IEP goals were "fatally deficient" and deprived M.R. of FAPE (IHO Decision at 31, 37).

8.   On the parties' appeal and cross-appeal, the SRO was required to give significant deference and weight to IHO Schad's findings of fact—findings that necessarily had to assess and weigh the impact of considerations of credibility and demeanor.    See, M.V. v. Shenendehowa Cent. Sch. Dist., 2008 U.S. Dist. LEXIS 182 (N.D.N.Y. 2008). The SRO fairly disregarded and ignored the IHO's fact findings, just as he had improperly done in the M.V. v. Shenendehowa case.  The SRO unjustly and improperly stripped away *all* relief for M.R. while never even bothering to address or decide Prongs II and III of the applicable test for

reimbursement for both school years, ultimately holding that Scarsdale did absolutely nothing wrong.

9.    The SRO's Decision should be reversed because it is erroneous and contrary to law and statute.  The SRO's Decision should be reversed because it failed to accord proper deference to the IHO's fact-findings. The SRO's Decision should be reversed because it is contrary to the clear weight of the evidence, including damning admissions made by Scarsdale's own witnesses. Upon such reversal, this Court should modify the IHO's conclusions of law only insofar as the IHO erroneously concluded that there were "equitable circumstances" under Prong III that warranted a preclusion order as to plaintiffs' tuition claim for the 2006-2007 school year. Accordingly, this Court should conclude that plaintiffs were entitled to tuition reimbursement for *both* the 2005-2006 and 2006-2007 school years.

10.    In the balance of this affidavit, I will provide this Court with a recitation of the salient evidence, with appropriate citations to the underlying record.

## The Evidence Adduced at the Trial

### The October 23, 2006 Testimony of Dr. Allison Bell

11.    Dr. Bell has been a clinical psychologist for almost twenty years, evaluating and assessing upwards of 300 children in that time period.  (Tr. p. 6) (P-49)   Dr. Bell last met with M.R. just weeks prior to her testimony and reported that "the M.R. that I saw a couple of weeks ago looks very different from the M.R. that I saw when I was [originally] testing her." (Tr. p. 10) "When I met M.R., she was much more withdrawn.  It was hard to make eye contact with her. She was nervous and fidgety….I felt like I was handling a kid who was much harder to reach." (Tr. p. 10)

12.    Dr. Bell has referred children to Windward because children "do really well there and then could come out and be mainstreamed back in their regular school district." (Tr. p. 13)

Windward is "very careful in their admissions about choosing kids….They were looking for heterogeneity in terms of gender, trying to keep a *gender balance* which is not always easy with learning disabled kids." (Tr. p. 17)

     13.  Dr. Bell did not recommend a classroom for M.R that would be composed of all boys.  According to Dr. Bell, this "would have presented certain social problems for her…I would have concerns that it would not be a setting that would maximize both her self-esteem….This was a child whose self-esteem was clearly suffering.  It came through in the psychological testing." (Tr. pp. 18-19)

     14.  When Dr. Bell observed M.R. in the (Scarsdale) classroom setting on May 24, 2005 she noticed that on multiple occasions, M.R. chose to work by herself, secluded herself from her classmates, and was not comfortable enough to choose a partner out of the class.  (Tr. pp. 28-30) (P-23)  M.R.'s behavior was "not typical of what I would see walking into a classroom near the end of the school year amongst kinds who are all comfortable with one another." (Tr. p. 31)

     15.  In testing M.R., Dr. Bell noted that M.R. "is a kid that expresses well" but whose "comprehension actually is problematic." (Tr. p. 35)  "[T]he things that jumped out at me since I was hearing that there were reading comprehension issues, I was hearing that there were spelling problems; those are immediate red flags for me, from a neuropsychological points of view." (Tr. p. 36)

     16.  "When M.R. is reading, she is still reading word by word." "So much like a younger child, she is still sort of stuck or at least at the time of this testing, she was still stuck in this choppy kind of way of approaching words.  And her comprehension would have to suffer because if you don't get the music of it going, you are not going to carry the meaning along with you in the language." (Tr. p. 38)

17. Dr. Bell administered a verbal memory index to M.R. and estimated her to be in the 50th percentile: "What this test suggested is that her strength is as a verbal learner as opposed to a visual learner. That [is] because she has visual processing deficits." (Tr. p. 42) Dr. Bell recommended a multisensory approach for M.R.. (Tr. p. 42) M.R. also requires a highly individualized teaching program. (Tr. p. 45) Dr. Bell was describing the hallmarks of the Windward program.

18. Significantly, Dr. Bell testified that the classroom that Scarsdale School District put on the table as a possibility for M.R. "was not adequate, given what the report findings were, to meet the level of need that she has." (Tr. p. 51)

19. Dr. Bell was present at the IEP meeting from June 14, 2005 (P-20), and reported that the district's placement and services were inadequate: "My recollection is that … [the] LRC was not adequate enough." (Tr. p. 52)

20. Dr. Bell assessed the IEP and said that the language was not specific enough to target M.R.'s goals and objectives. The IEP did not give any indication of how to measure the mastery of goals and objectives. (Tr. p. 58) Moreover, contrary to the presence of the last two goals set forth in the 05-06 IEP, Dr. Bell testified that she and Diane Schein had agreed that no intervention was warranted. (Tr. pp. 58-59)

21. The district's proposed classroom struck Dr. Bell as "not a match for M.R." (Tr. p. 64) "The class was made up of boys who, though they might in fact have had similar kinds of learning issues, all had behavioral issues. And it struck me that this would be a place where M.R. would feel like odd man out." (Tr. p. 64) It worried Dr. Bell that "the district was considering placing her in an environment in which there would be as many behavioral issues or behavioral emotional issues as learning issues, that this was not going to serve M.R. well." (Tr. p. 65)

22. Dr. Bell wrote to the District on June 30, 2005 (P-16) to share her concerns with the school's intended placement for M.R. and frustration with M.R.'s program. Here, Dr. Bell communicated her concern that M.R.'s teacher, Mrs. D'Amore, was "very frustrated trying to teach M.R." Dr. Bell expressed shock that M.R. was <u>not</u> being considered for a pilot program Mrs. D'Amore created for another child in M.R.'s grade regarding math – "Which was notoriously M.R.'s *weakest* subject." (Tr. p. 66) Dr. Bell expressed her concern that the district was attempting to slot M.R. into a program without regard for her real learning needs: "it was going to be this class because there was nothing else on the table. Again, nothing else was presented to me that was a viable alternative." (Tr. p. 70)

23. Dr. Bell testified that the Windward School is an appropriate placement for M.R. (Tr. p. 50) Thereafter, the record shows that there were numerous witnesses, including a variety of *Scarsdale* witnesses, who spoke of the quality of the Windward program, and why it was appropriate for M.R.[7]

**The October 23, 2006 Testimony of Kathleen Kelley, M.A.**

24. Ms. Kelley, formerly employed by a neighboring school district, has been a special educator for 28 years and now provides observation, assessment, and advocacy services for CPSE and CSE meetings in Westchester County as an independent consultant. (Tr. pp. 94-97)(P-2) Ms. Kelley first observed M.R. at Windward during a two-and-a-half hour observation session. (Tr. p. 121) After observing M.R.'s Windward classroom, Mrs. Kelley's opinion of Windward teachers "is that they are well trained and that they know what to look for and how to take care of [classroom behavior]." (Tr. p. 123) Mrs. Kelley confirmed that Windward school has a reputation of representing children with disabilities who have higher levels of functioning.

---

[7] By the conclusion of the evidentiary proceedings, only Dr. Mendelson (Scarsdale's head special education administrator) held back, refusing to give Windward his "appropriateness" blessing, insisting (ostensibly for political reasons) that he was "neutral" on the issue.

(Tr. p. 104)  Windward ascertains each student's strengths and weaknesses by using "assessments; but they also use pre-testing in their classes and then from there, their observation is on a daily basis.  And then they do a post-test." (Tr. p. 130)

25.  Windward groups students according to homogeneous classification: "It means that the children are functioning at or about the same level….I think in a special education setting, it's an excellent thing." (Tr. p. 105)   By comparison, in Scarsdale "you have children in a self-contained class that could be classified as learning disabled, speech disabled, emotionally disabled."  (Tr. p. 182)  On cross examination, Ms. Kelley clarified that the Scarsdale class included "students who were acting out…there were students who functioned *much below* where M.R. would be functioning." (Tr. p. 185)[8]

26.  Ms. Kelley observed M.R. first to see whether the Scarsdale parallel class would be appropriate for M.R.  (Tr. p. 116)  "I think what the real word 'parallel' refers to here is the use of an adapted version of the regular curriculum but not, by any means, the services."  (Tr. p. 117)

27.  Windward teachers use an Orton-Gillingham intervention approach: "I see it as a good thing.  I actually observed her utilizing the strategies of self-correct when she read….If she can, you know, self-correct then she will, in the end, comprehend much more of what she's reading." (Tr. p. 126)

28.  Before M.R. attended Windward, and while M.R. was still attending the Scarsdale program, she received private tutoring at her parents' expense.  (Tr. p. 127)  Now, Windward supplies all the teaching M.R. needs as part of the basic Windward tuition.  (Tr. p. 127)  There is no longer any need for M.R. to have to receive any supplemental services, as she did when she was still attending the Scarsdale program.  Since attending Windward, M.R.'s self esteem is

---

[8] As shown *infra*, Dr. Kutin-Senzon testified that Scarsdale Middle School personnel, at M.R.'s 2006-2007 review, expressed the opinion that Scarsdale's so-called "parallel program" was neither appropriate nor suitable to meet M.R.'s individual needs.  Yet, *prior* to this admission by Dr. Kutin-Senzon, certain Scarsdale witnesses attempted to paint a quite different picture

"much higher than what it had been before….I personally observed her raising her hand without any prompting. I also observed her, you know, joining the drama group there and interacting with other students….I saw somebody who seems to be a good, active listener at this point." (Tr. p. 134)

29. Windward makes an effort to have some level of gender balance and inclusion in the classroom. Ms. Kelley has never visited a Windward classroom that was exclusively made for females. "I don't think it would be beneficial, if it was strictly a learning disabled class, to have all one gender." (Tr. p. 106)   M.R.'s classroom was "approximately five girls…I think there was approximately six boys." (Tr. p. 125)  In stark contrast, the Scarsdale classroom that was slated for M.R.: "they were all boys." (Tr. p. 185)

30. The Scarsdale IEP does not give clearly defined goals – "I also think the goal is ridiculous…I don't see it as realistic." (Tr. pp. 143, 145)  Mrs. Kelley evaluated the IEP goals regarding refocusing a distracted child (P-4, goal 4, page 6): "That's what my professional problem with a goal like this would be. That the child wouldn't realize were distracted so how, therefore, are they self-correcting." (Tr. p. 145)  Mrs. Kelley stated that the Scarsdale goal is not measurable as an annual goal.   Ms. Kelley also identified many of Scarsdale's IEP goals as generic. "It's not specific as to how many questions; what types of questions….Seventy-five percent success rate is also generic. I mean for a child [like M.R.] with above average intelligence, you would hope that they would want at least an 85 to 90 percent success rate." (Tr. p. 146)  Mrs. Kelley continued by saying "this is, you know, the computerized annual goals, if you chose from the menu, are generic." (Tr. p. 154)

31. Windward places a specific emphasis and has "specific strategies and goals" for spelling. (Tr. p. 149)  Mr. Kelley thinks "it is important for everyone to try to learn how to spell correctly." (Tr. p. 149)  Scarsdale, however, was willing to *waive* M.R.'s spelling requirements.

This troubled Ms. Kelley: "Usually at this age level, spelling is only waived for a child that is so severely language impaired that you don't believe they are going to be able to meet the goal of remediating." (Tr. p. 151)

**The October 23, 2006 Testimony of Dr. Michael Mendelson**

32.  Dr. Mendelson has been the Director of Special Education in Scarsdale for seven years.  Although Dr. Mendelson may have observed an LRC classroom with M.R. physically present by happenstance, *he apparently never personally observed or met M.R. i.e. by going into the classroom with the intention of focusing on M.R.*  Dr. Mendelson acknowledged that it is impermissible under the statutory and common law of the New York to predetermine a child's placement or program.  Yet, Dr. Mendelson *refused* to admit that it would constitute predetermination to place a child like M.R. into a program, essentially "shoehorning" her into a program, without first focusing on defining her goals and objectives.[9]

33.  Dr. Mendelson claimed that "shoehorning" a child into a program without focusing on goals and objectives would only be impermissible in an *initial* evaluation.  (Tr. p. 214)  Dr. Mendelson, however, could not cite to a single SRO or IHO decision that vindicated this "initial" scenario. (Tr. pp. 215-216)  For the '05-'06 school year, Dr. Mendelson only considered one special education class for M.R-- the fifth grade "special class…[w]e have one for each grade…" (Tr. p. 225)  Scarsdale thus offered what it *had*, without due regard to whether or not it would meet M.R.'s unique and individual needs.

34.  Although Dr. Mendelson said he would not recommend the Windward School for any student because it is not "certified" by the state (Tr. p. 219), he admits to sending his

_____

[9]  *But see* Deal v. Hamilton County, 392 F.3d 840 (6th Cir. 2004), *en banc denied* (2005), cert denied (2005).  *See also* Spielberg ex rel Spielberg v. Henrico County Public Schools, 853 F.2d 256 (4th Cir. 1988); T.P. and S.P. v. Mamaroneck Union FSB, 2007 U.S. Dist. LEXIS 35288 (S.D.N.Y. 2007); Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988).

teachers to receive instruction and attend seminars at Windward.  In fact, the Scarsdale Union

Free School District *pays* for its teachers to attend Windward trainings.  (Tr. p. 238)  Dr.

Mendelson even produced invoices showing that Scarsdale spends money to send teachers to

Windward's training courses.  (Tr. p. 314) Even Dr. Mendelson was compelled to acknowledge

"I believe [Windward] is a well-recognized school….It has a good reputation." (Tr. p. 246)

35. Dr. Mendelson acknowledged that Windward has "been accommodating" in opening

their school for Scarsdale personnel to observe M.R. (Tr. p. 248) In fact, Dr. Mendelson sends

his colleague, Dr. Kutin-Senzon, to "observe all the kids at Windward from the [Scarsdale]

district.  So she goes there periodically over the years to observe the children from the district

who attend that school." (Tr. p. 251) (P-9)

36. Dr. Mendelson confirmed that the principal of the (Scarsdale) school program that

M.R. had attended holds the opinion that Windward has an "excellent program and reputation in

successfully helping children with learning disabilities as M.R.'s"   (Tr. p. 479)

37. There were procedural violations at the 05-06 IEP**.** Dr. Mendelson admitted that

M.R.'s parents did not decline or waive having a parent member attend any IEP meetings.  (Tr.

p. 267)  This being the case, Dr. Mendelson admitted that there was not a parent member in

attendance at the June 14, 2005 IEP meeting.[10]  (Tr. pp. 263-266) (D-29)  In addition to the

absent parent member, the district's school psychologist who attended the meeting, Ms. Diane

Shein, had never treated M.R. on an ongoing basis.  Dr. Mendelson could not even confirm

whether Ms. Shein had ever seen M.R. in any school psychology capacity.  (Tr. p. 369) No

supporting documentation was ever submitted by Scarsdale to support Dr. Mendelson's bare

contentions.  More to the point, Scarsdale never called Diane Schein to the witness stand.  The

IHO should draw appropriate inferences.

---

[10] Since M.R. and her parents were entitled to have a "parent member" in attendance at M.R.'s IEP, we urge that this
failure was a deprivation of M.R.'s parents' independent rights under IDEA.  *See* <u>Winkelman v. Parma City School
District</u>, 127 S.Ct. 1994 (2007).

38.  Dr. Mendelson admitted that goals and objectives are required to be developed at the IEP meeting with parents as equal members and participants of the IEP team.  (Tr. p. 217)  While this much certainly is true, M.R.'s teacher, Ms. D'Amore admitted to "preselecting" the goals and objectives: "I preselect them and then we present them, and we can discuss why or why not." (Tr. p. 831)  In his February 16, 2007 testimony, however,  <u>M.R.'s father explained that there</u> <u>wasn't even any discussion of individual goals and objectives: "There wasn't any....The</u> <u>discussion came up in terms of that Dr. Mendelson was recommending that she go in the self-</u> <u>contained classroom</u>." (Tr. p. 1055)  In fact, M.R.'s father later explained that what was discussed in the IEP meeting did not remotely translate to the paper IEP that they received. (Tr. p. 1056)  Dr. Mendelson also admitted that all goals should be measurable.  In reviewing M.R.'s IEP, Dr. Mendelson contended that the goals and objectives were sufficiently challenging and objectively measurable.  (Tr. p. 429) (P-20)  Dr. Mendelson admitted, however, that he did not have specific baseline assessments for many of the goals. (E.g. Tr. p. 430)

39.  Dr. Mendelson confirmed that the district classroom that was recommended for M.R. for fifth grade had nine students enrolled in it.  The classroom teacher was Dave Scholl.  (Tr. p. 315)  Of those nine, one student left prior to the beginning of the school year.  Of the eight remaining students, two female students were *only* present during mathematics class.  The six students who were enrolled for the class for the remainder of the periods during the day were male.  (Tr. p. 368)

40.  On redirect, Dr. Mendelson conceded that Scarsdale does not strive for any gender diversity in the classroom.  (Tr. p. 638)   In an effort to rationalize and put a positive "spin" on the District's stark gender imbalance, Dr. Mendelson repeatedly suggested that there *might be* a girl who *could* react well with being placed in an all-boy classroom instead of looking at what an all-boy classroom would be like for M.R. or a child like M.R.  (Tr. p. 640)

41. Dr. Mendelson acknowledged that M.R.'s parents found the classroom makeup – all male peers and a male teacher – troubling.  In addition, Dr. Mendelson reported that people from the district thought that the school should take into account M.R.'s "feelings of differentness…and [be] given serious consideration." (Tr. p. 403)  However, even with the parents and district members voicing these serious concerns, Dr. Mendelson refused to admit that there might be a problem with placing M.R. in this kind of educational setting.  Ironically, Dr. Mendelson acknowledged that it was unusual for a child already in the district to be transferred in the fifth grade to a special class in another school (Tr. p. 243) and that transitions should be managed so as to be least disruptive. (Tr. p. 1814, 404)   It was only on cross examination that Dr. Mendelson admitted that the district had "certainly concerns of emotionality" with respect to M.R.  (Tr. p. 549)

42. Dr. Mendelson admitted that in '04-'05, there was a skew towards male students in the special classroom in that it was an *all-male* environment. (Tr. p. 229)(P-19)  In later testimony, Mr. Scholl, the Scarsdale fourth and fifth grade teacher, noted that his classroom was composed of all male students for much of the day.  (Tr. p. 1763)  Dr. Mendelson admitted that in the '05-'06 class, there was at least one child with interfering behaviors who required a behavior plan.  (Tr. p. 233)(P-19)

43. On cross examination Dr. Mendelson claimed "We don't just mix the kids into one pool.  We look at the functioning levels of the students and when the children do not meet services that we can provide…we send students to neighboring districts and/or private schools." (Tr. p. 516).

44. For the '05-'06 school year, Dr. Mendelson only ever considered one special education class for M.R., the fifth grade "special class…[w]e have one for each grade…" (Tr. p. 225)  In his February 16, 2007 testimony, M.R.'s father stated "They tried to fit her into what

was *available*...nobody knew the makeup [of the class], nobody knew anything about the self-contained class other than it was a self-contained class." (Tr. pp. 1083-1084)

45.   The Scarsdale classroom that M.R. attended in fourth grade employed a "Trail Blazer" math program.  Math was a problem for M.R.  Dr. Mendelson admitted that "people were picking up that she [M.R.] was not progressing" in math.  (Tr. p. 662)  Moreover, Dr. Mendelson recounted that M.R.'s classroom teacher acknowledged that she should have changed her tactics in teaching math to M.R.: "I think she did acknowledge that in the area of math, that there needs to be some changes in the way the material is presented." (Tr. p. 678)

46.   That year, M.R.**'s** (LRC) classroom teacher, Ms. D'Amore, employed a modified math program for one of M.R.'s classmates – but inexplicably, such a program was <u>never</u> offered to M.R. despite M.R.'s admitted difficulties. (Tr. 898)  Scarsdale thus never appropriately altered M.R.'s program to respond to M.R.'s difficulties.  (Tr. p. 679)

47. Dr. Mendelson explained the absence of any Scarsdale e-mail evidence.  He admitted that he has "been advised that electronic communications, it *may be discoverable* and, therefore, unless it's something that I want to be part of the record or should be part of the record….I don't list it as such." (Tr. p. 618)

48.  It is significant to note that when Dr. Mendelson was being asked questions by <u>Scarsdale's</u> counsel, his memory skills were spot on.  However, when answering questions posed by <u>M.R.</u>'s counsel, the record reflects that Dr. Mendelson inexplicably and repeatedly began to experience serious short term and long term memory loss.  (Tr. p. 252, ln. 14); (Tr. p. 258, ln. 14); (Tr. p. 264, ln. 23); (Tr. p. 266, ln. 8); (Tr. p. 266, ln. 9); (Tr. p. 266, ln. 12); (Tr. p. 266, ln. 24); (Tr. p. 267, ln. 2); (Tr. p. 268, ln. 3); (Tr. p. 318, ln. 11); (Tr. p. 335, ln. 24); (Tr. p. 336, ln. 18); (Tr. p. 337, ln. 16); (Tr. p. 349, ln. 4); (Tr. p. 349, ln. 15); (Tr. p. 369, ln. 16); (Tr. p. 371, ln. 15); (Tr. p. 372, ln. 13); (Tr. p. 372, ln. 22); (Tr. p. 372, ln. 23); (Tr. p. 402; ln. 14); (Tr. p. 408;

ln. 12); (Tr. p. 408; ln. 24); (Tr. p. 433, ln. 18); (Tr. p. 449, ln. 1); (Tr. p. 449, ln. 3); (Tr. p. 455, ln. 14); (Tr. p. 462, ln. 2); (Tr. p. 463, ln. 6); (Tr. p. 467, ln. 13); (Tr. p. 477, ln. 18); (Tr. p. 478, ln. 18); (Tr. p. 479, ln. 16); (Tr. p. 489, ln. 11-13); (Tr. p. 505, ln. 5); (Tr. p. 505, ln. 15)**;** (Tr. p. 590, ln. 15); (Tr. p. 628, ln. 13); (Tr. p. 628, ln.15); (Tr. p. 631, ln.1); (Tr. p. 637, ln. 22); (Tr. 638, ln. 6), (Tr. 649, ln. 3), (Tr. ln. 649, ln.12), (Tr. p. 652, ln.7 ); (Tr. 655, ln.15 ); (Tr. 693, ln. 2); (Tr. 693, ln. 21); (Tr. P.694, ln. 10); (Tr. 717, ln. 22); (Tr. 718 ln. 3).[11]

49.  Dr. Mendelson confirmed that M.R.'s parents were "at all times courteous and professional."  (Tr. p. 681)   Dr. Mendelson said that M.R.'s parents were not blameworthy because that they explored options for M.R., including Windward, prior to the IEP meeting.  Dr. Mendelson stated that it is "a parent's right and privilege to explore all options for children – for their children."  (Tr. p. 392)  Significantly, there were no "equitable circumstances" in the record, and no findings by the IHO, that M.R.'s parents had done anything wrong in the development of M.R.'s IEP's. The evidence showed that M.R.'s parents had acted reasonably, and had cooperated with Scarsdale in the IEP development process.

**The December 6, 2006 Testimony of Judith D'Amore**

50.  Judy D'Amore is employed by the Scarsdale Public schools, although not currently as a classroom teacher, she was and has been an LRC teacher. Ms. D'Amore worked with M.R. as one of nine third graders in the LRC, as well as in the fourth grade.  (Tr. p. 751)

51.  Ms. D'Amore was part of the Child Study Team, a group that did not involve M.R.'s parents, but who met to "discuss M.R. and her programs and her progress." (Tr. pp. 815-818) Ms. D'Amore confirmed that Diane Shein, the school psychologist, kept minutes and notes on these meetings.  Although these notes were called for by M.R.'s counsel, they never materialized

[11] The IHO thus had every reason and opportunity to make the fact findings that he made based upon his assessment of the demeanor and credibility of the various witnesses, including but not limited to Dr. Mendelson.  As a matter of law, the SRO should have, but failed to, accord the IHO the significant "deference" and weight that the IHO's fact findings were entitled to.  The SRO essentially ignored the IHO's fact findings and substituted his own.

during the course of the hearing.  (Tr. pp. 816, 900)  In addition, although Ms. D'Amore kept

files and information regarding M.R., she ostensibly *destroyed* these same files when M.R. went

to Windward. (Tr. p. 756)[12]

52.   Ms.  D'Amore  answered "I – I don't know" as to whether she ever told M.R.'s

parents  family that M.R. didn't need to receive outside services, tutoring, or extra help.  (Tr. pp.

772-774)  This memory lapse was significant because, in November of M.R.'s fourth grade year,

Ms. D'Amore had suggested to M.R.'s parents that they *discontinue* the tutor they had secured

for M.R..  (Tr. p. 777) Her rationale for communicating that M.R. should discontinue a tutor is

that "M.R. was overwhelmed"; yet in the same comment Ms. D'Amore stated that "M.R. also, at

that point, was showing progress…" (Tr. p. 778)  In reality, as M.R.'s father later explained in

his testimony, M.R.'s receipt of tutoring coincided with her making meaningful progress in the

third grade.  (Tr. P. 1028)  M.R.'s parents followed Ms. D'Amore's advice.  (Tr. P. 1028)

However, once the tutoring support was discontinued, M.R. deteriorated.  (Tr. P. 1029)

53.   Ms. D'Amore stated that M.R.'s "self-esteem at times would be in some ways

dampened when it came to issues of academics." (Tr. p. 781)  At the IEP meeting, "there was

some conversation that we had that M.R. had some issues with her self confidence and her – her

sense of herself as a learner, and that these impacted sometimes."

54.   Even with Ms. D'Amore's concerns about M.R.'s having had stigmatizing

experiences, and being an "emotional" child (Tr. P. 935), the IEP team stated on page four of the

IEP that "there are no social and emotional needs that need to be addressed." (Tr. P. 937)  This

statement also is directly contrary to Dr. Mendelson's assessment of M.R.: "I think she has [an

emotional disability] I agree with you as far as that is not a primary disability....There was

discussion about that certainly at the first CSE meeting."  (Tr. p. 212)  However, Ms. D'Amore

---

[12] This is the same Scarsdale that claims that *plaintiffs* engaged in "equitable circumstances."

testified that she never communicated to Dr. Mendelson, the district, or M.R.'s parents that M.R. was emotionally disturbed. (Tr. p. 779)

55. Ms. D'Amore stated that "M.R.'s parents [felt] that the LRC and the pull-out (sic) was somewhat stigmatizing and was not really in M.R.'s best interest, and that it, you know, her sense of self would be diminished, if you will."

56.  M.R.'s father explained that his concern regarding "pull out" services stemmed from how the pull out system worked at the school.  "[S]he would go back to the classroom and come back in the middle of another class, if you will, and try to catch up....We had concerns about some of the oversight and some of the books that she was assigned and some of the projects that she was given that didn't match up with what was actually written in the IEP." (Tr. pp. 1053-1054)

57.  Even though M.R.'s parents were in favor of trying push-in services, Scarsdale did not meaningfully try push-in services for M.R. to determine whether she would succeed with that type of support.  Why?  Ms. D'Amore simply "not believe that [M.R.'s] needs could be adequately addressed with push-in services." (Tr. p. 927)

58.  Ms. D'Amore estimated that there may have been upwards of *20 days* through the course of the year when she was absent from M.R.'s class.  (Tr. p. 796)  Ms. D'Amore has "activities that….may have been parts of my job" which coincide with her teaching, like the "principal search….CSE meetings, child study team meetings….make-up testing, state make-up testing…. [meeting] with parents…" (Tr. pp. 791-792)  When Ms. D'Amore was not in the classroom, she said her assistant took over.  Her assistant, however, does not have a teaching degree, teaching or special education licensure.  (Tr. p. 794)

59.  M.R.'s father explained his concern regarding the assistant teacher during his February 16, 2007 testimony: "...we know the ["teacher aide"] because her – her daughter is with

– in the same class as my older daughter... [she] is a stay-at-home mom who took a position as an

aide at the – at the elementary school....that is who was teaching our daughter, not a teacher, not

a special ed teacher, but some, a quote aide." (Tr. pp. 1053-1054)

    60. <u>Scarsdale's IEP (P-20) was not objectively measurable.  Not only did Ms. D'Amore</u>

<u>admit this point, but she stated "this is why we [the district] have changed, subsequent to this we</u>

<u>have changed" how they set criteria for creating IEP goals and objectives.  (Tr. p. 953)</u>

    61. <u>M.R. did not make meaningful progress during the 04-05 school year, even though</u>

<u>some of Scarsdale's teacher reports may suggest otherwise, according to Ms. D'Amore.   When</u>

<u>asked to explain the discrepancy between M.R.'s lack of meaningful progress and the teacher</u>

<u>reports, Ms. D'Amore admitted that she had no explanation.  (Tr. p. 953)  Ms. D'Amore's candid</u>

<u>analysis of M.R.'s stagnation is directly contrary to previous testimony by Dr. Mendelson, who</u>

<u>testified glibly that M.R. *was* making meaningful progress during the '04-'05 school year</u>. (Tr. p.

373)  In assessing the credibility and weight of the <u>conflicting</u> testimony given by M.R.'s teacher

and Scarsdale's principal administrator, the IHO was entitled to parse through this and other

evidentiary conflicts to rule that Scarsdale was not providing M.R. with a FAPE.

    62.   The only recommendations that Scarsdale made for placement for M.R. for the fifth

grade was its self-contained class or the mainstream classroom with LRC support.  No other

option was ever considered for M.R. besides these two options.  (Tr. p. 919) (P-20)

**The December 6, 2006 Testimony of M.R.'s Father (R.R.)**

    63.   M.R. first began to receive private tutoring in the third grade, approximately 1-2

times per week.  (Tr. P. 1026)  M.R.'s receipt of tutoring coincided with her making meaningful

progress in the third grade.  (Tr. P. 1028)  In November of M.R.'s fourth grade year, her parents

stopped taking M.R. for tutoring, from the suggestion of Ms. D'Amore and M.R.'s classroom

teacher, Ms. Burns.  (Tr. P. 1028)  Once the tutoring supports were removed (at D'Amore's

suggestion) and once M.R.'s progress began to deteriorate, no one in Scarsdale suggested that M.R. return to tutoring. (Tr. P. 1029)  In fact, Scarsdale kept assuring M.R.'s parents that her classroom teachers could do the job without additional support: "they said they would work on some ideas to try and help support [M.R.] better.  One of which was giving her less work to do..." (Tr. p. 1033) This, however, was not a genuine support—but rather a decrease in demand.

64.  M.R.'s parents have attended every IEP meeting within the district and have consented to every evaluation. (Tr. P. 1029)  M.R.'s parents even have an older daughter in the Scarsdale schools with an IEP.  The reason M.R.'s parents are keeping their older daughter in the Scarsdale public schools while M.R. attends Windward is simple: "We were concerned...she [M.R.] wasn't making the progress that we thought she should be able to make." (Tr. P. 1031)

65.  Since attending Windward, M.R. "is very comfortable doing [work].  She has no problem starting it and finishing it on her own." (Tr. p. 1039)  Such evidence stands in stark contrast to Ms. D'Amore's opinion of M.R.'s work ability while at the fourth grade Scarsdale classroom, where she described M.R. as reluctant to produce work. (Tr. p. 781)  Additionally, M.R. has increased self-esteem and confidence: "she's become a confident person, a confident learner....to me it is night and day." (Tr. p. 1041) (P-14)

66.  Contrary to the positive relationship between Ms. D'Amore and M.R. that Ms. D'Amore painted during her testimony, M.R.'s father stated that M.R. would come home upset with how Ms. D'Amore had treated her: "she said that Ms. D'Amore was yelling at her [after taking a state science test] for not remembering things she should have remembered in the second grade." (Tr. p. 1042)  According to Ms. D'Amore, she suggested that M.R. use a "spell check...because it really is a good modification..." (Tr. p. 780)

67.  M.R.'s father testified that Ms. D'Amore had stated "that [M.R.] would never spell, and what's the big deal, she could always use the Spellcheck." (Tr. p. 1045)  M.R.'s father

explained that M.R. did not always lack confidence: "her confidence eroded over time."  He

placed the beginning of the erosion "in the fourth grade…they were trying to blame it on M.R.

and not on the fact that she has a neurological…that she has learning issues." (Tr. p. 1117) (P-20)

68.  For the 2004-2005 IEP meeting, "The only services that were discussed in the...in

both CSE meetings were mainstream with the learning resource center, pullouts and the

possibility of the self-contained class.  No other options were given to us."  Additionally, the

person who voiced approval of and recommendation for the self-contained classroom was Dr.

Mendelson.  In fact, M.R.'s father reported that Dr. Mendelson did most of the talking for

Scarsdale whenever the issue of M.R.'s placement came up. (Tr. pp. 1049-1050)

69.  M.R.'s father observed the district's proposed classroom: "We saw children that, you

know, for – I think there were three different children that needed help just to be able to function

in the classroom for whatever reasons because I'm not equipped to say what those were.  We saw

children that in doing an assignment had to hide behind a...big moveable blackboard in the back

of the left corner of the rooms so that they could concentrate properly.  Scarsdale teacher David

Scholl confirmed this. (Tr. pp. 1757-58)  And there were no...girls present in the room." (Tr. p.

1060)  Upon seeing the proposed in-district class, M.R.'s father promptly "sent some

correspondence over to Dr. Mendelson saying that we felt it was inappropriate.  And in fact, if

she attended that class it would probably mentally destroy her." (Tr. p. 1068)(P-18)

70.  Scarsdale's placement suggestion was so inappropriate that at a later IEP meeting in

June 2006, "there was a discussion concerning why M.R. was recommended for the self-

contained classroom in general....they said she does not fit the profile for that class, and she

shouldn't be in the parallel class at all in the middle school, she just doesn't fit the profile.

Everyone was in a hundred percent agreement."  (Tr. pp. 1099-1100)

71.  <u>The June 2006 IEP proceeded without a discussion of individual goals or developing</u> <u>appropriate goals for M.R.</u> (Tr. p. 1106)  The meeting began 25 minutes late and ended early: "The bottom line is once again we were interrupted in a meeting because they [Scarsdale] had to go somewhere else, and they weren't taking care of my – my meeting for my daughter." (Tr. p. 1006)

72.  <u>Contrary to Dr. Mendelson's previous testimony, M.R.'s father explained that there</u> <u>was no discussion of individual goals and objectives during any CSE or IEP meetings: "There</u> <u>wasn't any....The discussion came up in terms of that Dr. Mendelson was recommending that she</u> <u>go in the self-contained classroom." (Tr. p. 1055)</u>  In fact, M.R.'s father later explained that what was discussed in the IEP meeting did not remotely translate to the paper IEP that they received. (Tr. p. 1056)  "I don't know [who drafted the goals and objectives that appeared on the IEPs]. We didn't write it." (Tr. p. 1074)  M.R.'s father confirmed that he was never involved in a goal-by-goal discussion of M.R.'s IEP during the meeting.  (Tr. p. 1106)

73.  M.R.'s father stated that he "expected the school district to do what's best for the child, our child" when writing up the IEP in an appropriate way that conformed with state requirements and expectations. (Tr. p. 1075)  At that 2006 IEP meeting, M.R.'s father discussed the possibility of M.R. entering the Scarsdale Middle School system for sixth grade.  Scarsdale's suggestion was to place M.R. in the school "[a]nd that's when they came up with the idea of, after I think it was six weeks, to reassess her and see if she needed to go into the – I think its the parallel class that they call it, the parallel class." (Tr. p. 1101)  M.R.'s father found that the parallel class "was pretty much to be a continuation of the self-contained class in the middle school." (Tr. p. 1101)  "We asked [the question of why the parallel class was being offered if M.R. didn't meet the profile of the class] at that time, and our answer was that well – there really

was no answer.  It was just that's what we got.  It was like you had A and B.  So you can either take A or go to B." (Tr. p. 1397)

74.   When, during the 2005-2006 IEP meeting, M.R.'s parents expressed concerns about the pull-out services offered to M.R., Scarsdale "took it personally." (Tr. p. 1116)    In contrast to Scarsdale's proposed classroom, Windward is appropriate for M.R.  For the first two marking periods this year, M.R. has made the honor roll at Windward School.  In addition, the Windward faculty has reported that M.R. is making meaningful progress.  (Tr. pp. 1036-1038) Additionally, during the June 2006 IEP meeting, <u>Scarsdale district representatives suggested to M.R.'s father that "everybody thought that she was making progress at Windward</u>.  Further, everybody was – there was a lot of discussion in the room during this meeting about what a – what a great job Windward does.  Everybody in the room, Andrea Tripodi, the special education teacher, several commenting on what a job Windward does with – with the kids and they...do a good job remediating (sic) them." (Tr. pp. 1097-1098)

75.   M.R.'s father first filled out an application for the Windward school on March 13, 2004.  At that point, there already were problems with M.R.'s Scarsdale placement and program and he was concerned that Scarsdale might not have an appropriate placement for M.R. for the upcoming school year.  (Tr. pp. 1133-1134)  Mr. R was attempting to create another option for M.R. in the event that there was no appropriate placement available in Scarsdale.

76.   M.R.'s father said that he and his wife first began considering Windward in the second or third grade when the principal at Scarsdale, Mrs. Jeri Farren, "had very positive things to say about the school….I know it was repeated at some point in the – you know, in the fourth grade, but we certainly discussed it in the third grade." (Tr. p. 1378)

77.   M.R.'s parents asked Ms. D'Amore and Suzanne Burns to provide additional testing for M.R. in the Winter of 2004.  (Tr. pp. 1314-1316)   Ms. D'Amore admitted as much during

her earlier testimony.  Ms. D'Amore, however, insisted that the parents <u>wait</u> to undergo

additional testing – so it would be part of the triennial. (Tr. p. 903)  Essentially, the "plan"

apparently was to have M.R. wait for almost a year later, as her triennial was in the following

Fall.

78.  M.R.'s parents were not timely advised and consulted about the fact that their

previous attorney apparently had withdrawn M.R.'s request for due process for the 2005-2006

school year.  Once they learned it was withdrawn, it took months to "figur[e] out what to do,

loo[k] for counsel and [go] forward, that was the time." (Tr. pp. 1357, 1359)

### <u>The February 26, 2007 Testimony of Dr. Lydia Soifer</u>

79.  From 2000 to the present, Dr. Soifer has held a faculty position at the Windward

Teacher Training Institute.  Prior to this, Dr. Soifer served as a language consultant for

Windward for 10 years.  (Tr. p. 1176) (P-63)  She has provided instruction for Scarsdale Public

School teachers.  (Tr. p. 1175)  In her faculty position at Windward, Dr. Soifer would "observe

specific children then speak with their teachers about their needs based on what I observed and

what I read in their records.  I was there to mentor specific teachers, to train staff, to consult in

regard to language, learning cognitive and pedagogical needs." (Tr, p. 1179)

80.  "Windward is an independent school for children who have learning disabilities.  It is

a population of kids who have average to above average intelligence with specific learning

disabilities." (Tr. p. 1180)  It serves approximately 160 students in the middle school.  As

compared to a typical middle school, "the class size is typically about 10.  Sometimes a little

smaller.  Sometimes a little bit larger.  Never more than 12." (Tr. p. 1181)

81.  Windward groups the child and places them according to a specific philosophy:

<u>"their philosophy is to group the children homogeneously so they tend to group children of same

ability levels based on that information."</u>  This grouping "facilitates the intensity and consistency

of their instruction." (Tr. p. 1184)  The teachers all have a "minimal requirement… [of] a bachelor's degree.  The majority of the faculty have a Master's degree either in special education, reading or learning disability." (Tr. p. 1187)

82.  In placing a child in a classroom, the Windward school assesses "evaluation, psycho-educational, language and speech, and then each child is seen by one of the special educators during a two-day visit where they are tested again according to the standards that Windward uses, a variety of reading, math, spelling, language tests." (Tr. p. 1196)

83.  Instead of creating an IEP For each student, Windward "establish[es] goals for the children's reading level, both for decoding and comprehension.  Language levels as in regarding to their writing comprehension levels based on their intake testing and on testing that's done every September and every May." (Tr. pp. 1199-1200)

84.  Windward teaches based on a philosophy of Orton-Gillingham, "a multi-sensory approach that is language based…the structure of the language from the sound to the word, to the word structure, to the sentence, to the paragraph, and it is sequential and heirarchial, predicated on multi-sensory teaching." (Tr. p. 1190)  "All of the middle school teachers – all of the teachers possibly…" have been trained in the Orton-Gillingham approach to learning.  (Tr. p. 1190)

85.  Windward has consistency of instruction across each subject area: "Because the same approach is used across subject areas…there's additional reinforcement, additional practice." (Tr. p. 1195)   All of the classes at windward are "co-educational": "It is a co-educational setting and as a rule the classes are made up of both boys and girls." (Tr. p. 1185)

86.  "Windward is not a continuing school.  People go there for remediation, and they leave.  And so they typically spend about three-and-a-half…years." (Tr. p. 1201)  "[A]bout half of the children return to public schools and half return to – go to independent schools….The goal

of Windward is to remediate students to a functional level of mastery and return them to the mainstream." (Tr. p. 1202)

87.  Dr. Soifer has observed M.R. in a classroom a few times during the 2006-2007 school year.  She noted that M.R. stood out in the class because "M.R. is tall." (Tr. p. 1223)   In speaking with M.R.'s teachers, Dr. Soifer learned that "M.R. was initially struggling with decoding, but has responded well to instruction in Orton-Gillingham methodology at the level and intensity that has been provided.  She is more comfortable with reading and with reading aloud." (Tr. pp. 1227-1228)  In social studies "it was hard for M.R. to integrate information, that she tended to see things, concepts and vocabulary, in parts, and it was hard for her to pull that information together conceptually." (Tr. p. 1233)  In science, "The pattern is similar….[there are] consistent needs, the stability, the consistency, the predictability…" (Tr. p. 1234)

88.  "Based on [M.R.] teacher's reports, she is making meaningful progress" at Windward.  (Tr. p. 1251)  The fact that M.R. has made the honor roll at Windward means that she has "worked hard and done well and got recognized by [her] teachers for [her] grades, participation and improvement towards [her] goals…" (Tr. p. 1252)  M.R. is "appropriately placed in a program that can provide her with the specific level of individualization, intensity, consistency and the awareness of her learning needs that would enable her not only to be remediated, but also to develop ownership of the skills and their application." (Tr. pp. 1256-1257)

89.  The Scarsdale Union Free Public School placement had student "profiles that were provided to [Dr. Soifer] represented a range of intellectual ability and needs that were very, very diverse from very high IQ since the 130 rage which is superior intelligence to children whose IQs were in the 60s" (Tr. p. 1245)  "Children with such disparity needs have very – intellectual ability have very different learning needs and it is not educationally appropriate to place kids

with such disparic (sic) intellectual potential and learning needs in the same class." (Tr. pp.
1245-1246)

90. If M.R. was placed in a classroom essentially of all boys, Dr. Soifer expects it would
have "a negative impact….it's hard for a child at this developmental stage to be the only boy or
the only girl in a group of other sex children and, you know, that would be hard for any
youngster.  I think it would be, according to this profile, I think it might be hard for her within
that mix of children in particular." (Tr. p. 1255)

91.  "The IEP for '05-'06 [offered by Scarsdale] has M.R. in a special class, not
integrated…with weekly counseling, and the goals…reflect the pattern that was consistent with
the previous IEPs, with the addition of social emotional behavior."  For the '06-'07 IEP [also
offered by Scarsdale], some of the goals "are carryovers, and some of them reflect skills that she
does not yet appear to have or she should have….I would be concerned about this IEP for her,
for '06-'07." (Tr. pp. 1257-1258)

**The February 28, 2006 Testimony of Rene Lund**

92.  Rene Lund is a sixth grade teacher in a parallel curriculum program for the Scarsdale
Union Free School District.  (Tr. p. 1452)  Ms. Lund would dodge questions posed to her during
cross-examination, offering: "I know that [you didn't ask me this], but I thought I'd throw it in
for you." (Tr. p. 1579)

93.  Ms. Lund attended a June 2006 CSE meeting for M.R. and reviewed her 2006-2007
IEP for that meeting. (P-4) (Tr. p. 1460)  Ms. Lund did not dispute the evidence that M.R. was
making good and meaningful progress at Windward.  (Tr. p. 1537)  Ms. Lund claimed that the
district placed all of the "options" of programs for M.R. "on the table." She admitted, however,
that *nowhere* in the proposed IEP does the document explain a variety of options for M.R., like
push-in classrooms or hybrid classrooms.  (Tr. p. 1555)

94.  The committee agreed to put M.R. in a regular education classroom with learning resource support for a six-week period, then "we would review her program….to make sure we've made the right decision…" (Tr. p. 1465)  The committee chose to review M.R. after six weeks because "Based on [the information] from Windward, it appeared that the parallel curriculum program would be more restrictive than what her needs were at that current time." (Tr. p. 1470)[13]

95.  Although Ms. Lund stated that there would be a full IEP meeting with parents in attendance to review whether M.R. would be changed to a different classroom, on cross-examination she admitted that the IEP "does not" say that M.R.'s program would be reviewed by a full committee.  (Tr. p. 1516)  Ms. Lund also claimed that M.R.'s transition from the regular education classroom to the parallel classroom could be "seamless."  (Tr. p. 1524)  However, on cross-examination, she revealed that M.R. would not only have different classes, but also different teachers, transitions of different students, and different classrooms!  (Tr. p. 1525)

96.  The Scarsdale IEP ostensibly had planned to measure M.R.'s progress throughout the year by evaluating her success by percentage.  Ms. Lund, however, stated that the she does *not* quantify her analysis of students: "Can I quantify it for you, no….Do I sit with a timer? No, I do not."  When asked directly about how the district can come up with quantitative analysis to satisfy the IEP, Ms. Lund could not come up with any answer: "What would you like me to say to that?" was her answer.  She even suggested that "You have to allow a little wiggle room here and there" when evaluating children.  (Tr. p. 1581)

97.  Ms. Lund attended a June 2006 CSE meeting for M.R. and reviewed her 2006-2007 IEP for that meeting. (P-4) (Tr. p. 1460)  Ms. Lund stated during direct examination by

---

[13] As the authorities set forth in the accompanying memorandum of law demonstrate, the Second Circuit has held that once a parent establishes Prong I, the standard on Prong II is somewhat more relaxed, and does not require the parent to meet "least restrictive environment" standards that a school district would be required to meet on Prong I. See, e.g. Frank G. v. Board of Educ. of Hyde Park, 459 F.2d 356 (2d Cir. 2006), *cert denied*, ___U.S.___(200_).

Scarsdale's counsel that "in all the time that I've been at Scarsdale, Windward has been an exceptional school in terms of supplying us testing information, narrative information on student progress." (Tr. p. 1468)  Ms. Lund even explained that "I have always been pleased" with the progress of students who have transitioned from Windward to the Scarsdale middle school.  (Tr. p. 1499)  Ms. Lund, however, does not recall anyone from Windward recommending that M.R. was ready for a transition back to the Scarsdale District.  (Tr. p. 1535)  Ms. Lund admitted that M.R.'s parents were reasonable throughout the IEP meeting and that they were involved parents. (Tr. p. 1553)

**The February 28, 2006 Testimony of Stephanie Kutin-Senzon**

98.  Dr. Stephanie Senzon is Scarsdale's chair for children placed unilaterally out of district and she chaired M.R.'s 2006-2007 IEP.  She also served as a school psychologist for Scarsdale.  (Tr. p. 1621) Significantly, Dr. Senzon observed M.R. at Windward, on January 25, 2006, in a reading class.  (Tr. p. 1626) M.R.'s parents consented to the Dr. Senzon's January 2006 observation of M.R. (Tr. p. 1028)  This observation at Windward is significant to show plaintiffs' cooperation in the IEP development process, and it also shows that Scarsdale had an opportunity to assess the appropriateness of the Windward program for M.R.[14]

---

[14] Scarsdale's "equitable circumstances" defense is based on the fact that in the middle of the impartial hearing, *after* the subject IEP's had already been developed, Scarsdale demanded *another* opportunity to observe the Windward program.  Plaintiffs and their counsel did not consider that request to be a reasonable one, and put the issue squarely to the IHO, communicating that they *were* prepared to proceed with a further Windward observation if the IHO were prepared to order it.  (Tr. 1216:11-12—1217:1-8)  The IHO did not order the requested further observation, but nevertheless, he sanctioned plaintiffs with a  100% preclusion order—the greatest sanction he could have imposed even in the face of egregious and horrendous "inequitable" conduct.  As a matter of law, the IHO would have erred here even had he issued only a *diminishment* of the tuition reimbursement award for 2006-2007.  There is absolutely no mechanism for "discovery" in the middle of an impartial hearing. Moreover, "equitable considerations" sanctions are available only against parents, not against school districts.  Where, as here, a school district is attempting to engage in discovery *during* the hearing, particularly where that "discovery" was already consented to and afforded to the school district *prior* to the issuance of the IEP, the child's parents are not acting unreasonably or inequitably to take a position at the hearing that they will abide by the directives of the court, but that they do not consider it reasonable to be the subject of a demand for yet another Windward observation.  This is especially the case here, where the burden was on plaintiffs to establish the Prong II appropriateness of Windward and where, as here, the Second Circuit has made it fairly clear that the evidentiary test is primarily, if not exclusively, a *prospective* test, based on whether the Prong II placement and program is "reasonably calculated" to provide the

99.   The class that Dr. Senzon observed was a "typical" class day, however the classroom teacher said that M.R. "was internally and externally distracted and seemed to have some social issues going on." (Tr. p. 1674)  Dr. Senzon made <u>no</u> attempt to come back to observe M.R. even though this was not necessarily a representative day of M.R.'s abilities. (Tr. p. 1675)

100.   Dr. Senzon chaired M.R.'s CSE meeting during the 2006-2007 annual review meeting.  (Tr. p. 1629) (D-13)  Mr. and Mrs. R. were "kind enough to understand that [Dr. Senzon] needed to change it [ the date of the annual review to accommodate Dr. Senzon's schedule]."  (Tr. p. 1629)  Additionally, Dr. Senzon arrived at the 2006-2007 review late due to "traffic." (Tr. p. 1630)  <u>Windward staff also participated during M.R.'s 2006-2007 CSE review, and reported that M.R. was "coming along" in reading, math, etc. (Tr. p. 1638)  M.R. had established a nice group of friends at Windward. (Tr. p. 1639)</u><u>[15]</u>

101.   Prior to the annual review for 2006-2007, Dr. Senzon creates a draft copy of an IEP by using the previous year's minutes and carries over the goals and objectives from the old IEP. (Tr. pp. 1634-1635)  Then, during the meeting, Dr. Senzon goes through the goals "maybe not every study skill goal, but the main content area."  (Tr. p. 1644)  Dr. Senzon said that she made a "single change" to the prior year's IEP. (Tr. p. 1663<u>)  She admitted, however, that the goals and objectives [for 2006-2007] pretty much stayed the same from the prior year [2005-2006]. (Tr. p. 1678)</u> What kind of progress, if any, was "calculated"?

102.   The CSE discussed having M.R. in a special class with a parallel curriculum. (Tr. p. 1649)  To the extent that Scarsdale's counsel had earlier sought to elicit testimony that Scarsdale was not going to make any changes contemplated in the IEP without convening another CSE

---

student with a meaningful educational benefit, and not the extent to which the student actually progressed in the Prong II placement. *See* <u>Frank</u> <u>G.</u>, *supra*.

[15] All such reports went to the then *prospective* analysis of whether, for 2006-2007, Windward was "reasonably calculated" to provide M.R. with a meaningful educational benefit, the Prong II test set out by the Second Circuit in <u>Frank G.</u>

meeting, Dr. Senzon had no recollection making any statement at the CSE that any transition in the Fall to another classroom setting would require a CSE meeting. (Tr. p. 1652)

103.  Significantly, Dr. Senzon admitted that the Scarsdale Middle School staff communicated at the CSE review that the parallel program was neither suitable nor appropriate to meet M.R.'s needs. (Tr. pp. 1681-82)  This admission thus corroborated what M.R.'s parents had testified to, and it also rebutted and contradicted earlier testimony by other Scarsdale witnesses.  It was refreshing to see Dr. Senzon tell the truth in this regard.  The IHO did not ignore Scarsdale's numerous admissions going to the Prong I FAPE deprivation.  How and why did the SRO do so?

104.  To the extent that Scarsdale's counsel initially got Dr. Senzon to testify on direct examination that M.R. allegedly could write a "cohesive essay," Dr. Senzon admitted on cross-examination that what she was referring to was, in reality, "one paragraph." (Tr. p. 1660)  That admission certainly put Dr. Senzon's prior testimony in its proper perspective.

105.  Although the IEP document (P-4) expressly represents that the M.R.'s parents allegedly "expressed" their agreement with the recommended IEP, Dr. Senzon stated "I probably should have used a different words than "expressed, "indicated….The word "expressed" is not accurate." (Tr. pp. 1664-1665)  M.R.'s parents never actually affirmatively said that they were in agreement. (Tr. p. 1654) Translation:  Scarsdale's IEP misstates, if not misrepresents, that M.R.'s parents were in agreement with its recommendations! [16]

106.  Dr. Senzon testified and acknowledged that Windward *admits* when they feel a youngster attending Windward is ready to go back into district. (Tr. p. 1660) Clearly then, Windward does not hod a student longer than necessary.  Ms. Senzon  admitted, however, that

---

[16] We respectfully submit that inasmuch as Scarsdale, in the IEP itself, memorialized a state of affairs that was entirely untrue, the IHO was entitled to draw his own conclusions as to the credibility and reliability of other things that certain Scarsdale witnesses testified to.  The IHO's fact findings were entitled to significant deference and weight, and it was entirely improper, as a matter of law, for the SRO to gloss over or ignore such findings.  See, M.V. v. Shenedehowa Cent. Sch. Dist., 2008 U.S. Dist. LEXIS 182 (N.D.N.Y. 2008).

she never posed the pointed question of whether it was appropriate to transition M.R. from

Windward back to the Scarsdale program. (Tr. pp. 1669-1674, 1677-75)   Dr. Senzon testified

that the reports were that M.R. had had a good year at Windward and that she had improved. (Tr.

p. 1683)  There was, of course, full agreement as to M.R.'s IEP classification as "learning

disabled." (Tr. pp. 1686-87)  "Learning disabled" is, of course, the profile of the student that

Windward serves.

**The March 1, 2007 Testimony of David Scholl**

107.  Mr. Scholl teaches fourth and fifth grade in the Scarsdale School district.  (Tr. p.

1730)  For the '05-'06 school year, Mr. Scholl taught fifth grade.    There are two teacher's aides

in his class.  (Tr. p. 1794)  Mr. Scholl stated that during a typical day he spends about 45 minutes

doing reading-out-loud with students.  (Tr. p. 1754)  Mr. Scholl had no understanding what

M.R.'s eligible disability is, has never seen one of M.R.'s IEPs, and has never been told how she

would have fit into his class. (Tr. pp. 1758-1759)

108.  In September of 2005,  in "reading, science and social studies," only male students

had enrolled. (Tr. p. 1763)  Out of those students, one child displayed behaviors of "calling out,

consistently calling out without raising a hand."  Other children exhibited behaviors of "teasing

in the class." (Tr. p. 1775)  This hardly would have been an appropriate environment for a child

like M.R. and the IHO was entitled to so conclude.

109.  Mr. Scholl confirmed that the students in his class had varying levels of cognition,

ability and academic levels.  (Tr. pp. 1766-1770, 1737)  He acknowledged that his classroom had

a child with above-average intelligence (with an IQ about 130), whereas another child had an IQ

"between 69 and 85." (Tr. p. 1768)  This gross disparity in functioning levels in Scarsdale's

classroom stands in stark contrast to the way that Windward appropriately groups students for its

own classrooms, focusing on each child's individual needs.  Once again, the IHO was entitled to

conclude that Scarsdale's IEP program offering was not appropriate for M.R. The evidence amply showed that Scarsdale offered what it *had*, not what M.R. *needed* to meet her unique and individual needs.

110. The Scarsdale classroom makeup did not trouble Mr. Scholl; however, the makeup of this classroom runs directly against earlier testimony by Mr. Scholl's colleague, Ms. D'Amore. Ms. D'Amore admitted the importance of "children to be with a group of children who function as they do." Ms. D'Amore admitted she did not even know the makeup of the class that was being recommended for M.R. – a classroom of children with IQs ranging from 60 to 130. (Tr. pp. 837-839)

**The March 1, 2007 Testimony of Susan Goodman**

111. Ms. Goodman is the teacher in charge of elementary education classes for Scarsdale. (Tr. p. 1819) Ms. Goodman never met M.R., and she never participated in any of her CSE meetings. (Tr. p. 1822) Ms. Goodman gave M.R.'s parents a tour of Edgewood, the Scarsdale public school that was suggested for M.R. for fourth grade. (Tr. p. 1823) Ms. Goodman gave M.R.'s parents the class profile for the Edgewood school for the '05-'06 school year, reflecting the all-male environment. (Tr. p. 1824) The classroom that Ms. Goodman showed M.R.'s parents was Mr. Scholl's classroom. Mr. Scholl's students were using the computers and, at first, they were unable to view Mr. Scholl's teaching. (Tr. p. 1834) Thereafter, M.R.'s parents observed Mr. Scholl's teaching methods, which included rotely saying out loud the sound "beep" when students apparently were expected to be ready to turn the page.

**CONCLUSION**

112. As a matter of law, the SRO should not have disturbed the IHO's detailed and comprehensive fact findings as to Prong I for either school year. The SRO should have accorded appropriate deference to the IHO's fact findings, which clearly included assessments of the

credibility and reliability of testimony statements made within the four corners of the challenged IEP's and Scarsdale's numerous admissions. The SRO, who did not serve as the trier of fact, should not have disturbed those findings. As for Prong III for the 2006-2007 school year, the IHO, based on facts that are undisputed, erroneously mistook plaintiffs' mere *advocacy* during the hearing as constituting "inequitable circumstances" that would warrant precluding, in its entirety, the tuition reimbursement award that the IHO otherwise would have rendered for the 2006-2007 school year. Accordingly, as the authorities set forth in the accompanying memorandum of law demonstrate, this Court, upon its independent review of the record, should, after giving due weight to the IHO's fact findings:

(a) reverse, as erroneous and contrary to law, the SRO's Decision in its entirety;

(b) reinstate the IHO's decision as to the 2005-2006 and 2006-2007 school years, except as to the IHO's conclusion of law regarding the ostensible application of Prong III "equitable circumstances" to preclude, in its entirety, the tuition reimbursement award that the IHO would have otherwise rendered for the 2006-2007 school year;

(c) declare that plaintiffs adequately met all three of the recognized prongs for tuition reimbursement relief for both the 2005-2006 and 2006-2007 school years;

(d) order that the defendant reimburse M.R. and her parents for the Windward Tuition for the 2005-2006 and 2006-2007 school years;

(e) declare M.R. and her parents to be the "substantially prevailing party" (for purposes of IDEA's fee shifting provision);

(f)  grant leave to plaintiffs to submit a fee application pursuant to the IDEA statute's fee-shifting provision; and

(g)  grant plaintiffs such other, further and different relief as the Court may determined to be just pursuant to 20 U.S.C. Sec. 1415.

Gary S. Mayerson (8413)

Sworn to before me this
30 day of June, 2008.

Notary Public

SUSAN KUZNICKI
Notary Public State of New York
02KU6...
...fied in Kings...
Commission Expire 10/30/ 09



# The University of the State of New York

## The State Education Department
### State Review Officer

No. 07-060

**Application of a CHILD WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Scarsdale Union Free School District**

**Appearances:**

Mayerson & Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Keane & Beane, P.C., attorney for respondent, Stephanie M. Roebuck, Esq., of counsel

## DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition at Windward School (Windward) for the 2006-07 school year. Respondent cross-appeals from the impartial hearing officer's determinations that it failed to offer appropriate educational programs to the student for the 2005-06 and 2006-07 school years, that Windward offered an appropriate program to the student for those school years, and that petitioners' conduct in the development of the 2005-06 individualized education program (IEP) did not preclude an award of tuition reimbursement. The appeal must be dismissed. The cross-appeal must be sustained.

The student was attending Windward when the impartial hearing began in October 2006. Windward has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.1[d], 200.7).

The student's verbal abilities are in the high average range of cognitive functioning and her perceptual abilities are in the borderline range (Parent Ex. 23 at p. 3). Her greatest weakness is in the area of visual-perceptual processing and visual memory (id. at p. 7). The student's scores on tests measuring academic functioning are on the lower end of the average range, consistent with her overall intellectual functioning (id. at p. 3). Attention and emotional factors also influence the student's functioning (id. at p. 7). The student's classification and eligibility

that additional testing be conducted and the CSE agreed to reconvene when the additional test results were available (id.).

On May 10, 2005, the student participated in the New York Statewide Testing Program for Mathematics and scored within performance level 2 out of 4 (Parent Ex. 25). On May 24, 2005, one of respondent's school psychologists observed the student in her classroom when the class was transitioning into literature discussion groups (Parent Ex. 24). The school psychologist noted that the student appeared attentive to the book she was reading, but did not appear as interested or participatory as the other students (id.). The school psychologist further noted that the student was asked to read a word aloud and had some difficulty blending and sequencing the sounds as she decoded them (id.). When asked a question about the book, the student answered with an appropriate response and without hesitancy, however, she had some difficulty organizing the language of the response and performed better when guided by her teacher asking questions (id.). When other students read from the book, the student seemed to read along silently, was focused and was not distracted by the activity or low level noise in the classroom (id.). The psychologist indicated that the student was working with effort, but seemed to need more time than her peers (id. at p. 2).

The student was evaluated by a private psychologist in May and June 2005 (Parent Ex. 23). Administration of the Wechsler Intelligence Scale for Children-IV (WISC-IV) yielded a verbal comprehension composite score (and percentile) of 112 (79th), a perceptual reasoning composite score of 73 (4th), a working memory composite score of 97 (42nd), a processing speed composite score of 85 (16th), and a full scale score of 90 (25th) (id. at p. 3). The evaluator noted substantial scatter among the student's subtest scores, conveying a wide variability in the student's performance and functioning (id.). She also noted that the student demonstrated strong verbal reasoning skills and markedly weaker perceptual abilities (id.). The evaluator reported that during administration of the block design subtest the student rotated elements of the designs, shifted figure and ground elements, saw larger blocks of color than were in the model, and did not perceive the shapes of triangles (id.). She further reported that during administration of the matrix reasoning subtest the student was similarly confounded by the picture puzzle patterns (id.). She also reported that the student demonstrated difficulty discerning relevant from irrelevant visual information on the picture completion subtest (id.). On the arithmetic subtest, the student demonstrated difficulty retaining the details of word problems and seemed to perform random operations with the numbers she could remember (id.). The evaluator attributed the student's poorer performance on the arithmetic subtest to attention factors (id.).

Administration of the Wide Range Achievement Test 3 (WRAT 3) resulted in the student obtaining a reading standard score (SS) of 97, a spelling SS of 95, and an arithmetic SS of 97 (Parent Ex. 23 at p. 3). The evaluator indicated that the student's scores were on or about at grade level, on the lower end of the average range, and consistent with the student's overall intellectual functioning (id.). The evaluator further noted that the student had a limited sight word vocabulary for her age, and she attempted to use a phonetic approach to decode unfamiliar words, but her word attack strategies were not always successful (id. at p. 4). The evaluator reported that on the arithmetic test, the student made a few errors of inattention related to sign of operation and carrying/borrowing in subtraction (id.). She indicated that the student did not appear to have mastered division or the relationship between hours and minutes of time (id.).

3

The evaluator summarized assessment results, indicating that the student's comprehension and use of language fell within the average range when compared to same age peers (Parent Ex. 22 at p. 3). She indicated that the student was able to generate age-appropriate sentences that were grammatically and semantically correct and could identify and describe relationships among words (id.). She also indicated that the student's receptive language was slightly weaker than her expressive language (id.). The evaluator noted that the student was not always able to discriminate between essential and non-essential information and that she might struggle with more complex and lengthy language (id.). She further noted that the student seemed to perform better on tasks that broke down orally presented information into manageable parts (id.). The evaluator recommended that the student be encouraged to ask for a repetition of information to improve overall processing of orally presented information (id.).

A June 13, 2005 progress report for the goals and objectives listed on the 2004-05 IEP showed that the student had mastered objectives related to capitalization and punctuation, and had made some progress or was progressing satisfactorily toward the remainder of the objectives (Parent Ex. 21). Comments on the student's 2004-05 final report card indicated that she showed slow steady progress in her reading skills and that math basics continued to show growth with a "differentiated" curriculum (Parent Ex. 32).

The CSE reconvened on June 14, 2005 for the student's annual review and to develop her program for the 2005-06 school year (Parent Ex. 20). Comments from the CSE meeting indicate that petitioners were advised that the additional parent member was unavailable (id. at p. 5). They were asked if they wanted to have the CSE meeting rescheduled and they indicated that they wished to proceed as they had their private psychologist present (id.). Comments further indicate that the private psychologist reviewed the results of her evaluation, the classroom teacher described how differentiated instruction was provided, and petitioners expressed concerns about the modifications their daughter was receiving (id.). The CSE revisited the option of a special class, which, comments note, petitioners had rejected at the previous CSE meeting (id. at p. 6). Comments also note that petitioners inquired about the other students in the recommended class and whether they could observe the class (id.). Comments provide that "[a]fter further discussion, the CSE recommended the special class and reviewed the goals and objectives" (id.).

By letter dated June 17, 2005 to petitioners, respondent's director of special education provided a profile report of students attending the special class recommended for petitioners' daughter (Parent Ex. 19). In a June 20, 2005 letter, petitioners advised respondent's director of special education that the proposed special class was inappropriate (Parent Ex. 18). They indicated that their daughter would be the only girl in the class and that their daughter's learning profile was different from the other students in the class (id.).

On June 21, 2005, respondent's director of special education sent petitioners a letter advising them of the June 2005 CSE's recommendation for services and seeking their consent for services (Parent Ex. 17). In the letter, he summarized the events of the June 2005 CSE meeting with respect to the unavailability of the additional parent member and offered to have the CSE reconvene with a parent member present (id.).

continue to receive special education services as a student with a learning disability (id. at p. 1). The CSE recommended that the student be placed in respondent's school with resource room services (5:1) four times per week for 45 minutes (id.). It further recommended that the student participate in all general education programs (id. at p. 2). Comments from the CSE meeting note that the placement recommendation was suggested to facilitate a move to a parallel class in the event the student experienced increased academic difficulty (id. at p. 5). Comments further note that if the student returned to respondent's schools for the 2006-07 school year, the CSE would reconvene after six weeks to review her program (id.). The IEP developed as a result of the June 2006 CSE meeting included annual goals to address the student's study skills, reading, writing, and mathematics needs (id. at pp. 6-9).

By electronic mail dated July 18, 2006, petitioners advised respondent's director of special education that they were unable to accept the June 2006 IEP (Dist. Ex. 8). In an August 3, 2006 response to the director of special education's request for an explanation of their disagreement, petitioners set forth their reasons for rejecting the June 2006 IEP (Dist. Ex. 2).

On August 9, 2006, petitioners filed a due process complaint notice amending their June 22, 2006 due process complaint notice seeking tuition reimbursement for the 2005-06 and 2006-07 school years as well as "transportation relief" (Parent Ex. 1). With respect to the 2005-06 school year, petitioners listed numerous allegations including that respondent failed to ensure the full attendance of the mandated members of the CSE, engaged in impermissible "predetermination," that the proposed class was "skewed in terms of available peers," that the CSE failed to properly develop appropriate goals and objectives with petitioners' full participation, and that the "proposed classroom was not an appropriate placement to meet [the student's] unique and individual needs" (id. at pp. 3-5). For the 2006-07 school year, petitioners asserted that respondent "repeated a number" of the same "problems" (id. at p. 5).

The impartial hearing began on October 23, 2006 and concluded on March 1, 2007, after seven days of testimony. In November 2006, while the impartial hearing was pending, respondent's director of special education advised petitioners that the CSE was planning for their daughter's annual review and requested permission to conduct an observation of their daughter at Windward (Joint Ex. 1 at pp. 1, 5). In a letter dated December 5, 2006, petitioners advised respondent's director of special education that they would provide consent if respondent agreed not to testify about the observation or submit any documents in connection with such observation at the impartial hearing for the 2005-06 and 2006-07 school years (id. at p. 2). In a response dated December 18, 2006, respondent's director of special education requested that petitioners provide unrestricted consent (id. at p. 6). By letter dated February 16, 2007, petitioners granted unrestricted consent for additional information for the exclusive purpose of the annual review for the 2007-08 school year (id. at p. 7). During the impartial hearing, one of petitioner's witnesses testified that she observed the student at Windward in December 2006 (Tr. p. 1204). Respondent objected to testimony relating to the witness's observation. The impartial hearing officer permitted the witness to testify as a fact witness with the understanding that the issue of obtaining her opinion regarding the appropriateness of the private school would be resolved at a later time (IHO Decision at p. 46). The witness provided an opinion on direct examination (Tr. p. 1255), and was cross-examined (Tr. pp. 1260-83).

First I will address respondent's cross-appeal. The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482)[2] is to ensure that students with disabilities have available to them a free appropriate public education (FAPE) (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 546 U.S. 49, 51 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17[d];[3] see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[4]

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that

---

[2] On December 3, 2004, Congress amended the IDEA, effective July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 [2004]). Some of the relevant events in the instant appeal took place prior to the effective date of those 2004 amendments to the IDEA, and therefore the provisions of the IDEA 2004 do not apply. The newly amended provisions of IDEA 2004 apply to the relevant events that took place after the July 1, 2005 enactment date. Citations in this decision are to the newly amended statute unless otherwise noted.

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the IDEA, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. For convenience, citations in this decision refer to the regulations as amended because the regulations have been reorganized and renumbered.

[4] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]).

1618765, at *5 [S.D.N.Y. July 11, 2005]; Bd. of Educ. v. R.R., 2006 WL 1441375, at *5 [S.D.N.Y. May 24, 2006]; Application of the Bd. of Educ., Appeal No. 05-058). New York law provides that membership of a CSE shall include an additional parent member of a student with a disability residing in the school district or a neighboring school district, provided that such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting (Educ. Law § 4402[1][b][1][a]; 8 NYCRR 200.3[a][1][viii]). Parents have the right to decline, in writing, the participation of the additional parent member at any meeting of the CSE (8 NYCRR 200.5[c][2][v]).

No additional parent member attended the June 2005 CSE meeting. The record shows, however, that petitioners declined respondent's offer to reschedule the meeting at a time when a parent member could participate, though they did not make this declination in writing (Parent Ex. 20 at p. 5). I note that when respondent's director of special education advised petitioners in writing of the June 2005 CSE's recommendation, he again offered to have the CSE reconvene with a parent member present (Parent Ex. 17). The record shows that the private psychologist who evaluated the student in May and June 2005 attended the June 2005 CSE meeting with petitioners during which she reviewed the results of her evaluation and made various recommendations (Parent Exs. 16; 20 at p. 4). In addition, petitioners questioned some of the goals and objectives and modifications were made (Parent Ex. 20 at p. 6). I note that petitioners are familiar with the CSE process and knowledgeable about IEP development (Tr. pp. 1030-31). Under the circumstances, the record does not demonstrate that the composition of the CSE resulted in a loss of educational opportunity for the student or infringed on petitioners' ability to participate in the CSE (see Mills, 2005 WL 1618765 at *5).

Respondent also appeals from the impartial hearing officer's determination that the substantive discussion of placement at the June 2005 CSE meeting impermissibly preceded review of the goals and objectives for the 2005-06 school year. In determining the educational placement of a student, the school district must ensure that the placement is based upon the student's IEP (34 C.F.R. § 300.116[b][2]). The record shows that the CSE initially convened for the student's annual review for the 2005-06 school year in May 2005 (Parent Ex. 20). The record further shows that at that meeting petitioners were provided a CSE draft data form which included goals and objectives (Parent Ex. 27 at pp. 8-10). As noted above, when the CSE reconvened in June 2005, the private psychologist reviewed the results of her evaluation which included a program recommendation (Parent Exs. 20 at p. 5; 23). The CSE discussed the option of a special class placement and recommended that the student be placed in a special class (Parent Ex. 20 at p. 6). It also reviewed the goals and objectives and made slight modifications (id.). While there is information in the record that the June 2005 CSE discussed the option of a special class placement before reviewing the goals and objectives, the record demonstrates that the placement recommendation was based upon the student's IEP. I note that the CSE considered continuing the student in a regular class with supportive and resource room services, but did not believe that her needs could adequately be addressed with push-in services (Parent Ex. 20 at p. 2). I also note that in their July 12, 2005 letter to respondent's director of special education identifying discrepancies between the discussions at the May and June 2005 CSE meetings and the summary of those discussions reflected on the June 2005 IEP, petitioners do not raise concerns about the placement recommendation preceding the development of the goals and objectives (Parent Ex. 15).

11

The goal to address mathematical concepts, reasoning and computation has a corresponding objective specifying that the student understand a specific mathematical concept with 70 percent accuracy evaluated by classroom and standardized tests assessed by the regular and special education teacher by June 15 (id.). While the annual goals on the June 2005 IEP should have included information about the level of performance expected to be reached by the student during the year the IEP was in effect, the objectives are specific and provide sufficient information to measure the student's performance (Application of a Child with a Disability, Appeal No. 07-022; Application of a Child with a Disability, Appeal No. 05-038). Under the circumstances, I am unable to find that any inadequacy in the annual goals rises to the level of a denial of a FAPE (see W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147 [S.D.N.Y. 2006]).

I have reviewed the June 2005 IEP and find that it accurately reflects the results of evaluations to identify the student's needs. I also have reviewed the content of the goals and objectives and find that they are appropriate and related to the student's needs. In addition, I have reviewed the June 2005 IEP recommendations and find that the recommended program offered appropriate special education services. I have considered petitioners' challenges to the June 2005 IEP and I am not persuaded that their daughter was not offered a FAPE for the 2005-06 school year.

The impartial hearing officer also found that the annual goals on the June 2006 IEP were deficient because they did not indicate a target achievement level against which progress could be measured. Pursuant to IDEA 2004, in addition to including a statement of measurable annual goals, an IEP must include a description of how the child's progress toward meeting the annual goals will be measured (20 U.S.C. § 1414[d][1][A][i][II], [III], see also 8 NYCCR 200.4[d][2][iii][b]). As with the June 2005 IEP, the impartial hearing officer determined that the June 2006 IEP sufficiently indicated the student's present level of performance based on information available at the time of the June 2006 CSE meeting (IHO Decision at p. 36). In order to address the student's identified needs, the June 2006 IEP contained annual goals in the areas of study skills, reading, writing, and mathematics (Parent Ex. 4 at pp. 6-9). Each goal contained a specific evaluation criterion, evaluation procedure and an evaluation schedule (id.; see 8 NYCRR 200.4[d][2][iii][b]). Evaluation Criteria is described in the IEP as how well and over what period of time the student must demonstrate performance (Parent Ex. 4 at p. 6). "Procedures to Evaluate Goal" is described in the IEP as the method that will be used to measure progress (id.).

Respondent's special education teacher who taught respondent's parallel curriculum classes as well as a learning resource center class and who was a push-in collaborative teacher for social studies testified about her understanding of what each goal was addressing and how she would present and assess individual goals for the student (Tr. pp. 1472-96). She testified that she would likely assess a reading goal involving multisyllabic words and syllable identification that had an anticipated success rate of 80 percent over five weeks by keeping a checklist, conducting an error analysis and recording missed words (Tr. 1480; Parent Ex. 4 at p. 7). Regarding the goal pertaining to the student's need to refocus without prompts when distracted (Dist. Ex. 13 at pp. 6-7), the special education teacher testified that the progression would be from needing lots of teacher support to needing less teacher support (Tr. p. 1478). She indicated that to assess the goal she would go into the student's mainstream class and do some recorded

13



## The University of the State of New York

### The State Education Department
#### State Review Officer

No. 07-060

Application of a CHILD WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Scarsdale Union Free School District

**Appearances:**

Mayerson & Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Keane & Beane, P.C., attorney for respondent, Stephanie M. Roebuck, Esq., of counsel

### DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their daughter's tuition at Windward School (Windward) for the 2006-07 school year. Respondent cross-appeals from the impartial hearing officer's determinations that it failed to offer appropriate educational programs to the student for the 2005-06 and 2006-07 school years, that Windward offered an appropriate program to the student for those school years, and that petitioners' conduct in the development of the 2005-06 individualized education program (IEP) did not preclude an award of tuition reimbursement. The appeal must be dismissed. The cross-appeal must be sustained.

The student was attending Windward when the impartial hearing began in October 2006. Windward has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.1[d], 200.7).

The student's verbal abilities are in the high average range of cognitive functioning and her perceptual abilities are in the borderline range (Parent Ex. 23 at p. 3). Her greatest weakness is in the area of visual-perceptual processing and visual memory (id. at p. 7). The student's scores on tests measuring academic functioning are on the lower end of the average range, consistent with her overall intellectual functioning (id. at p. 3). Attention and emotional factors also influence the student's functioning (id. at p. 7). The student's classification and eligibility

for special education programs and services as a student with a learning disability are not in dispute (8 NYCRR 200.1[zz][6]).

When the student entered elementary school in respondent's district for the 2000-01 school year, she received support services in the school's Learning Resource Center (LRC) in the areas of basic concepts and pre-reading skills (Dist. Ex. 45 at p. 1). During the 2001-02 school year, she experienced difficulty acquiring basic skills and continued to receive support in the areas of reading and mathematics (id.). The following school year, in January 2003, the student was classified and received support in the LRC for reading, writing and mathematics (Parent Ex. 45). She continued to attend school in respondent's district for the 2003-04 school year (Dist. Ex. 44 at p. 4).

A subcommittee of respondent's Committee on Special Education (CSE) met on June 30, 2004 to develop the student's IEP for the 2004-05 school year (Dist. Ex. 44). The CSE subcommittee recommended that the student continue to be classified as having a learning disability and that she receive daily resource room services (id. at p. 1). The student continued to attend school in respondent's district for the 2004-05 school year (Parent Ex. 20 at p. 5).

In an April 2005 report, the student's regular education teacher noted that the student was making slow, steady growth in her decoding skills (Parent Ex. 28 at p. 1). She further noted that comprehension was sometimes difficult for the student and described strategies that were used to assist the student, such as sequencing events to help the student recall important information and reinforcing comprehension skills through questioning techniques and repetition (id.). The regular education teacher indicated that grammar and appropriate usage presented a challenge for the student and that the spelling program was modified to better meet the student's needs (id. at p. 2). The regular education teacher also noted that mathematics was difficult for the student and that concepts were reinforced in the classroom and in the LRC (id. at p. 1).

Administration of the Stanford Achievement Test Ninth Edition (Intermediate 1, Form S, Abbreviated) in April 2005 yielded a reading vocabulary score in the 19th percentile and a reading comprehension score in the 52nd percentile (Dist. Ex. 41). The student's total reading score was in the 35th percentile and her total mathematics score was in the 23rd percentile (id.).

The CSE convened on May 4, 2005 (Parent Ex. 20). It reviewed the student's current levels of performance, noting that the student experienced the most difficulty in mathematics (id. at p. 5). It further noted that while written language continued to be a problem for the student and her comprehension abilities declined when presented with questions testing inferential reasoning, the student's performance on the New York Statewide Testing Program for English language arts (ELA) indicated that she had mastered the ELA skills expected of students in her grade (id.). The student's teachers indicated that the student demonstrated a lack of self-confidence that interfered with her class functioning and they expressed concern with the student's emotional functioning (id.). The student's mother indicated that she did not believe that her daughter had made progress during the year and expressed concern about the complexity of the material (id.). Petitioners indicated that their daughter required more attention than she had been receiving and inquired about whether her services could be increased (id.). They requested

that additional testing be conducted and the CSE agreed to reconvene when the additional test results were available (id.).

On May 10, 2005, the student participated in the New York Statewide Testing Program for Mathematics and scored within performance level 2 out of 4 (Parent Ex. 25). On May 24, 2005, one of respondent's school psychologists observed the student in her classroom when the class was transitioning into literature discussion groups (Parent Ex. 24). The school psychologist noted that the student appeared attentive to the book she was reading, but did not appear as interested or participatory as the other students (id.). The school psychologist further noted that the student was asked to read a word aloud and had some difficulty blending and sequencing the sounds as she decoded them (id.). When asked a question about the book, the student answered with an appropriate response and without hesitancy, however, she had some difficulty organizing the language of the response and performed better when guided by her teacher asking questions (id.). When other students read from the book, the student seemed to read along silently, was focused and was not distracted by the activity or low level noise in the classroom (id.). The psychologist indicated that the student was working with effort, but seemed to need more time than her peers (id. at p. 2).

The student was evaluated by a private psychologist in May and June 2005 (Parent Ex. 23). Administration of the Wechsler Intelligence Scale for Children-IV (WISC-IV) yielded a verbal comprehension composite score (and percentile) of 112 (79th), a perceptual reasoning composite score of 73 (4th), a working memory composite score of 97 (42nd), a processing speed composite score of 85 (16th), and a full scale score of 90 (25th) (id. at p. 3). The evaluator noted substantial scatter among the student's subtest scores, conveying a wide variability in the student's performance and functioning (id.). She also noted that the student demonstrated strong verbal reasoning skills and markedly weaker perceptual abilities (id.). The evaluator reported that during administration of the block design subtest the student rotated elements of the designs, shifted figure and ground elements, saw larger blocks of color than were in the model, and did not perceive the shapes of triangles (id.). She further reported that during administration of the matrix reasoning subtest the student was similarly confounded by the picture puzzle patterns (id.). She also reported that the student demonstrated difficulty discerning relevant from irrelevant visual information on the picture completion subtest (id.). On the arithmetic subtest, the student demonstrated difficulty retaining the details of word problems and seemed to perform random operations with the numbers she could remember (id.). The evaluator attributed the student's poorer performance on the arithmetic subtest to attention factors (id.).

Administration of the Wide Range Achievement Test 3 (WRAT 3) resulted in the student obtaining a reading standard score (SS) of 97, a spelling SS of 95, and an arithmetic SS of 97 (Parent Ex. 23 at p. 3). The evaluator indicated that the student's scores were on or about at grade level, on the lower end of the average range, and consistent with the student's overall intellectual functioning (id.). The evaluator further noted that the student had a limited sight word vocabulary for her age, and she attempted to use a phonetic approach to decode unfamiliar words, but her word attack strategies were not always successful (id. at p. 4). The evaluator reported that on the arithmetic test, the student made a few errors of inattention related to sign of operation and carrying/borrowing in subtraction (id.). She indicated that the student did not appear to have mastered division or the relationship between hours and minutes of time (id.).

3

Administration of the Gray Oral Reading Test yielded a total reading quotient of 88, a meaning cues score of 91, a graphic/phonemic cues score of 91, and a function cues score of 87 (Parent Ex. 23 at p. 4). The evaluator reported that the student read even the simplest material word by word (id.). Upon administration of selected subtests of the Detroit Tests of Learning Aptitude-Fourth Edition (DTLA-4), the evaluator concluded that the student had strong verbal abilities that were severely hampered by perceptual problems, and that when the student needed to sequence visual information she processed very slowly and consistently rotated or reversed what she saw (id. at p. 5). In addition, the evaluator indicated that as a result of administration of the Wide Range Assessment of Memory and Learning (WRAML), it became apparent that the student's strength was as a verbal learner, and if required to learn visually presented material, the student would do best when that material was paired with verbal stimuli (id. at p. 6). The evaluator also indicated that auditory memory was more subject to interference from attention factors and to difficulties with sequential order (id.).

A personality assessment revealed that the student acknowledged her struggles in school and felt burdened by the work she had to complete (Parent Ex. 23 at p. 6). She was aware that she was slower to process information than most of her peers, and had incorporated this into her self-concept (id.). The evaluation report indicated that the student expressed that she did not feel valued among her classmates and felt left out of things (id.). Sadness and worry about school were noted (id.).

The evaluator indicated that the student struggled in school, largely due to the interference of perceptual processing deficits (Parent Ex. 23 at p. 7). The evaluator opined that although respondent offered special education services for the student, those services presented in the context of the mainstream classroom life were not adequate for her (id.). The evaluator indicated that the student's "needs in the classroom are significant and continuous cutting across all subject areas and therefore all aspects of her day" (id.). The evaluator suggested that the student receive a highly individualized teaching program that emphasized multisensory learning approaches in the classroom and plenty of 1:1 attention, in the presence of other children who have similar learning needs, so that she could see herself as part of a community of learners (id.).

The evaluation report indicated that the student had been accepted by a private school (Parent. Ex. 23 at p. 1). The evaluator indicated that the private school was the right kind of placement for the student at that time, so that she could eventually transfer back into respondent's school district with a strong sense of her own value and abilities (id.).

In a June 2005 speech and language initial assessment conducted by respondent, administration of the Clinical Evaluation of Language Fundamentals - Fourth Edition (CELF-4) yielded a core language SS (and percentile rank) of 97 (42), a receptive language SS of 93 (32), an expressive language SS of 103 (58), and a language memory SS of 90 (25) (Parent Ex. 22 at p. 1). Administration of The Listening Test yielded a total test SS of 103 (39) (id.). The student's scores on four out of five subtests were within the average range of ability when compared to same age peers, except on the reasoning subtest, where the student's score was in the low average range (id.).

4

The evaluator summarized assessment results, indicating that the student's comprehension and use of language fell within the average range when compared to same age peers (Parent Ex. 22 at p. 3). She indicated that the student was able to generate age-appropriate sentences that were grammatically and semantically correct and could identify and describe relationships among words (id.). She also indicated that the student's receptive language was slightly weaker than her expressive language (id.). The evaluator noted that the student was not always able to discriminate between essential and non-essential information and that she might struggle with more complex and lengthy language (id.). She further noted that the student seemed to perform better on tasks that broke down orally presented information into manageable parts (id.). The evaluator recommended that the student be encouraged to ask for a repetition of information to improve overall processing of orally presented information (id.).

A June 13, 2005 progress report for the goals and objectives listed on the 2004-05 IEP showed that the student had mastered objectives related to capitalization and punctuation, and had made some progress or was progressing satisfactorily toward the remainder of the objectives (Parent Ex. 21). Comments on the student's 2004-05 final report card indicated that she showed slow steady progress in her reading skills and that math basics continued to show growth with a "differentiated" curriculum (Parent Ex. 32).

The CSE reconvened on June 14, 2005 for the student's annual review and to develop her program for the 2005-06 school year (Parent Ex. 20). Comments from the CSE meeting indicate that petitioners were advised that the additional parent member was unavailable (id. at p. 5). They were asked if they wanted to have the CSE meeting rescheduled and they indicated that they wished to proceed as they had their private psychologist present (id.). Comments further indicate that the private psychologist reviewed the results of her evaluation, the classroom teacher described how differentiated instruction was provided, and petitioners expressed concerns about the modifications their daughter was receiving (id.). The CSE revisited the option of a special class, which, comments note, petitioners had rejected at the previous CSE meeting (id. at p. 6). Comments also note that petitioners inquired about the other students in the recommended class and whether they could observe the class (id.). Comments provide that "[a]fter further discussion, the CSE recommended the special class and reviewed the goals and objectives" (id.).

By letter dated June 17, 2005 to petitioners, respondent's director of special education provided a profile report of students attending the special class recommended for petitioners' daughter (Parent Ex. 19). In a June 20, 2005 letter, petitioners advised respondent's director of special education that the proposed special class was inappropriate (Parent Ex. 18). They indicated that their daughter would be the only girl in the class and that their daughter's learning profile was different from the other students in the class (id.).

On June 21, 2005, respondent's director of special education sent petitioners a letter advising them of the June 2005 CSE's recommendation for services and seeking their consent for services (Parent Ex. 17). In the letter, he summarized the events of the June 2005 CSE meeting with respect to the unavailability of the additional parent member and offered to have the CSE reconvene with a parent member present (id.).

In a letter dated July 12, 2005 to respondent's director of special education, petitioners identified discrepancies between the discussions at the May and June 2005 CSE meetings and the summary of those discussions reflected on the June 2005 IEP (Parent Ex. 15). They attached a June 30, 2005 letter from the private psychologist who accompanied them to the June 2005 CSE meeting which summarized her recollection of the meeting (Parent Ex. 16). Petitioners advised respondent's director of special education that they disagreed with the proposed program (id. at p. 3). They indicated that they had enrolled their daughter in a private school for the 2005-06 school year and that they would be filing a request for an impartial hearing to seek reimbursement (id.). Respondent's director of special education responded in a letter dated July 14, 2005 indicating that he disagreed with many of petitioners' assertions and characterizations, and that he would attach petitioners' letter to the June 2005 IEP as an addendum (Dist. Ex. 26).

The student began attending Windward for the 2005-06 school year (Parent Ex. 6). On November 7, 2005, petitioners again advised respondent's director of special education that they believed that respondent's recommendation for their daughter for the 2005-06 school year did not appropriately address her special education needs (Dist. Ex. 24). They indicated that they had placed their daughter at Windward for the 2005-06 school year and requested an impartial hearing to consider the issue of tuition reimbursement (id.). Petitioners subsequently withdrew their November 7, 2005 due process complaint notice (Dist. Ex. 22).

The same private psychologist that evaluated the student in May and June 2005 met with the student on November 4, 2005 for a follow-up interview and to administer the WRAT 3 (Parent Ex. 14). The evaluator reported that the student's academic functioning appeared to be stable, in the low average to solidly average range (id.). She also reported that the student still presented as a somewhat anxious and fidgety child (id.). The evaluator indicated that the student appeared to be happy and that the student's demeanor was completely altered from when she had tested the student earlier in the year (id.). The evaluator noted that the student demonstrated a clear awareness about learning difficulties and conveyed a sense of relief and comfort at being able to be part of a group of children who shared some of the struggles that she had experienced in the classroom (id.).

On January 25, 2006, the student was observed by one of respondent's school psychologists at Windward during a reading and writing class as part of the student's annual review (Parent Ex. 9). The observer reported that the student appeared easily distracted by extraneous noise (id.). The student's teacher advised the observer that the student could be internally and externally distracted (id.).

In a February 2006 progress report from Windward, the student's reading/skills teacher reported that the student had difficulty with tasks that required inferential thinking (Parent Ex. 8). She indicated that skills such as drawing conclusions and making predictions would be areas of concentration during the following semester (id.). The student's math teacher reported that the student's work in class had been extremely variable (id. at p. 4). He indicated that at times the student's language difficulty strongly impeded her ability to solve a problem correctly (id.).

The CSE convened on June 7, 2006 for the student's annual review and to develop an IEP for the 2006-07 school year (Parent Ex. 4). It determined that the student was eligible to

continue to receive special education services as a student with a learning disability (id. at p. 1). The CSE recommended that the student be placed in respondent's school with resource room services (5:1) four times per week for 45 minutes (id.). It further recommended that the student participate in all general education programs (id. at p. 2). Comments from the CSE meeting note that the placement recommendation was suggested to facilitate a move to a parallel class in the event the student experienced increased academic difficulty (id. at p. 5). Comments further note that if the student returned to respondent's schools for the 2006-07 school year, the CSE would reconvene after six weeks to review her program (id.). The IEP developed as a result of the June 2006 CSE meeting included annual goals to address the student's study skills, reading, writing, and mathematics needs (id. at pp. 6-9).

By electronic mail dated July 18, 2006, petitioners advised respondent's director of special education that they were unable to accept the June 2006 IEP (Dist. Ex. 8). In an August 3, 2006 response to the director of special education's request for an explanation of their disagreement, petitioners set forth their reasons for rejecting the June 2006 IEP (Dist. Ex. 2).

On August 9, 2006, petitioners filed a due process complaint notice amending their June 22, 2006 due process complaint notice seeking tuition reimbursement for the 2005-06 and 2006-07 school years as well as "transportation relief" (Parent Ex. 1). With respect to the 2005-06 school year, petitioners listed numerous allegations including that respondent failed to ensure the full attendance of the mandated members of the CSE, engaged in impermissible "predetermination," that the proposed class was "skewed in terms of available peers," that the CSE failed to properly develop appropriate goals and objectives with petitioners' full participation, and that the "proposed classroom was not an appropriate placement to meet [the student's] unique and individual needs" (id. at pp. 3-5). For the 2006-07 school year, petitioners asserted that respondent "repeated a number" of the same "problems" (id. at p. 5).

The impartial hearing began on October 23, 2006 and concluded on March 1, 2007, after seven days of testimony. In November 2006, while the impartial hearing was pending, respondent's director of special education advised petitioners that the CSE was planning for their daughter's annual review and requested permission to conduct an observation of their daughter at Windward (Joint Ex. 1 at pp. 1, 5). In a letter dated December 5, 2006, petitioners advised respondent's director of special education that they would provide consent if respondent agreed not to testify about the observation or submit any documents in connection with such observation at the impartial hearing for the 2005-06 and 2006-07 school years (id. at p. 2). In a response dated December 18, 2006, respondent's director of special education requested that petitioners provide unrestricted consent (id. at p. 6). By letter dated February 16, 2007, petitioners granted unrestricted consent for additional information for the exclusive purpose of the annual review for the 2007-08 school year (id. at p. 7). During the impartial hearing, one of petitioner's witnesses testified that she observed the student at Windward in December 2006 (Tr. p. 1204). Respondent objected to testimony relating to the witness's observation. The impartial hearing officer permitted the witness to testify as a fact witness with the understanding that the issue of obtaining her opinion regarding the appropriateness of the private school would be resolved at a later time (IHO Decision at p. 46). The witness provided an opinion on direct examination (Tr. p. 1255), and was cross-examined (Tr. pp. 1260-83).

The impartial hearing officer rendered his decision on May 3, 2007. With respect to the 2005-06 school year, the impartial hearing officer found that the June 14, 2005 CSE was improperly composed due to the absence of an additional parent member and that the IEP developed by the invalidly composed CSE was a nullity (IHO Decision at p. 25). He also found that the discussion of placement impermissibly preceded the "flushing out" of the goals and objectives (id. at p. 28). In addition, the impartial hearing officer determined that the student was not an appropriate candidate for the recommended class when compared to the composition of the class contained in the class profile (id. at p. 30). He further found that the goals on the June 2005 IEP did not give any indication of where the student was expected to be one year from the date of the goal, and that such deficiency applied to all of the goals on the June 2005 IEP and deprived the student of an appropriate IEP for the 2005-06 school year (id. at p. 31). The impartial hearing officer also found that Windward was an appropriate placement for the student for the 2005-06 school year and that petitioners' conduct did not bar their claim for tuition reimbursement (id. at p. 35).

With respect to the 2006-07 school year, the impartial hearing officer found that the goals on the June 2006 IEP did not give any indication of where the student was expected to be one year from the date of the goal, that such deficiency applied to all of the goals on the June 2006 IEP and deprived the student of an appropriate IEP for the 2006-07 school year (IHO Decision at p. 37). He also found that Windward was an appropriate placement for the student for the 2006-07 school year (id. at p. 42), but that equitable considerations weighed against petitioners requiring dismissal of the tuition reimbursement claim for that school year (id. at p. 49).

Petitioners appeal from the impartial hearing officer's determination that equitable considerations weighed against them with respect to the 2006-07 tuition reimbursement claim because they declined to grant consent to permit respondent to observe their daughter at Windward during the 2006-07 school year.

Respondent cross-appeals from the impartial hearing officer's findings that the 2005-06 IEP was a nullity due to the lack of a parent member, that the CSE's recommendation for the 2005-06 school year was deficient, that the student was not appropriately grouped in the recommended special class for the 2005-06 school year, that the goals contained in the 2006-07 IEP were deficient, that petitioners demonstrated that Windward was appropriate for both school years and that petitioners' conduct in the development of the 2005-06 IEP did not preclude an award of tuition reimbursement.

Petitioners filed an answer to respondent's cross-appeal. They reiterated their position that the impartial hearing officer's decisions and findings with respect to the 2005-06 school year should be affirmed and that his finding that equitable considerations precluded an award for tuition reimbursement for the 2006-07 school year should be reversed.[1]

---

[1] In petitioners' reply memorandum annexed to their answer to respondent's cross-appeal, petitioners ask that I recuse myself. I have considered petitioners' request and find no basis for recusal (see 8 NYCRR 279.1).

First I will address respondent's cross-appeal.  The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482)[2] is to ensure that students with disabilities have available to them a free appropriate public education (FAPE) (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 546 U.S. 49, 51 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]).  A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17[d];[3] see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[4]

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).  While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]).  Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]).  A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that

---

[2] On December 3, 2004, Congress amended the IDEA, effective July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647 [2004]).  Some of the relevant events in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA, and therefore the provisions of the IDEA 2004 do not apply.  The newly amended provisions of IDEA 2004 apply to the relevant events that took place after the July 1, 2005 enactment date.  Citations in this decision are to the newly amended statute unless otherwise noted.

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the IDEA, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006.  For convenience, citations in this decision refer to the regulations as amended because the regulations have been reorganized and renumbered.

[4] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]).

instruction" (<u>Rowley</u>, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (<u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 130 [2d Cir. 1998]; <u>see Rowley</u>, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (<u>Walczak</u>, 142 F.3d at 132, quoting <u>Tucker v. Bay Shore Union Free Sch. Dist.</u>, 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; <u>see Grim</u>, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (<u>Rowley</u>, 458 U.S. at 189, 199; <u>Grim</u>, 346 F.3d at 379; <u>Walczak</u>, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (<u>Cerra</u>, 427 F.3d at 195, quoting <u>Walczak</u>, 142 F.3d at 130 [citations omitted]; <u>see Perricelli</u>, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (<u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1120 [2d Cir. 1997]; <u>see Rowley</u>, 458 U.S. at 192).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (<u>Application of the Dep't of Educ.</u>, Appeal No. 07-018; <u>Application of a Child with a Disability</u>, Appeal No. 06-059; <u>Application of the Dep't of Educ.</u>, Appeal No. 06-029; <u>Application of a Child with a Disability</u>, Appeal No. 04-046; <u>Application of a Child with a Disability</u>, Appeal No. 02-014; <u>Application of a Child with a Disability</u>, Appeal No. 01-095; <u>Application of a Child Suspected of Having a Disability</u>, Appeal No. 93-9).

The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (<u>see Schaffer</u>, 546 U.S. at 59-62 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a child by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (<u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359 [1985]; <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 [1993]). In <u>Burlington</u>, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (<u>Burlington</u>, 471 U.S. at 370-71; <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 111 [2d Cir. 2007]; <u>Cerra</u>, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the child a FAPE (<u>Burlington</u>, 471 U.S. at 370-71; <u>see</u> 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148).

Respondent appeals from the impartial hearing officer's determination that the June 2005 IEP was a nullity due to the absence of an additional parent member. Although not required by the IDEA (20 U.S.C. § 1414 [d][1][B]; <u>see</u> 34 C.F.R. § 300.344), New York State law requires the presence of an additional parent member on the committee that formulates a student's IEP (Educ. Law § 4402[1][b][1][a]; 8 NYCRR 200.3[a][1][viii]; <u>see Bd. of Educ. v. Mills</u>, 2005 WL

1618765, at *5 [S.D.N.Y. July 11, 2005]; Bd. of Educ. v. R.R., 2006 WL 1441375, at *5 [S.D.N.Y. May 24, 2006]; Application of the Bd. of Educ., Appeal No. 05-058). New York law provides that membership of a CSE shall include an additional parent member of a student with a disability residing in the school district or a neighboring school district, provided that such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting (Educ. Law § 4402[1][b][1][a]; 8 NYCRR 200.3[a][1][viii]). Parents have the right to decline, in writing, the participation of the additional parent member at any meeting of the CSE (8 NYCRR 200.5[c][2][v]).

No additional parent member attended the June 2005 CSE meeting. The record shows, however, that petitioners declined respondent's offer to reschedule the meeting at a time when a parent member could participate, though they did not make this declination in writing (Parent Ex. 20 at p. 5). I note that when respondent's director of special education advised petitioners in writing of the June 2005 CSE's recommendation, he again offered to have the CSE reconvene with a parent member present (Parent Ex. 17). The record shows that the private psychologist who evaluated the student in May and June 2005 attended the June 2005 CSE meeting with petitioners during which she reviewed the results of her evaluation and made various recommendations (Parent Exs. 16; 20 at p. 4). In addition, petitioners questioned some of the goals and objectives and modifications were made (Parent Ex. 20 at p. 6). I note that petitioners are familiar with the CSE process and knowledgeable about IEP development (Tr. pp. 1030-31). Under the circumstances, the record does not demonstrate that the composition of the CSE resulted in a loss of educational opportunity for the student or infringed on petitioners' ability to participate in the CSE (see Mills, 2005 WL 1618765 at *5).

Respondent also appeals from the impartial hearing officer's determination that the substantive discussion of placement at the June 2005 CSE meeting impermissibly preceded review of the goals and objectives for the 2005-06 school year. In determining the educational placement of a student, the school district must ensure that the placement is based upon the student's IEP (34 C.F.R. § 300.116[b][2]). The record shows that the CSE initially convened for the student's annual review for the 2005-06 school year in May 2005 (Parent Ex. 20). The record further shows that at that meeting petitioners were provided a CSE draft data form which included goals and objectives (Parent Ex. 27 at pp. 8-10). As noted above, when the CSE reconvened in June 2005, the private psychologist reviewed the results of her evaluation which included a program recommendation (Parent Exs. 20 at p. 5; 23). The CSE discussed the option of a special class placement and recommended that the student be placed in a special class (Parent Ex. 20 at p. 6). It also reviewed the goals and objectives and made slight modifications (id.). While there is information in the record that the June 2005 CSE discussed the option of a special class placement before reviewing the goals and objectives, the record demonstrates that the placement recommendation was based upon the student's IEP. I note that the CSE considered continuing the student in a regular class with supportive and resource room services, but did not believe that her needs could adequately be addressed with push-in services (Parent Ex. 20 at p. 2). I also note that in their July 12, 2005 letter to respondent's director of special education identifying discrepancies between the discussions at the May and June 2005 CSE meetings and the summary of those discussions reflected on the June 2005 IEP, petitioners do not raise concerns about the placement recommendation preceding the development of the goals and objectives (Parent Ex. 15).

11

In addition, respondent appeals from the impartial hearing officer's determination that the student was not an appropriate candidate for respondent's special class for the 2005-06 school year in light of her learning characteristics and social development. State regulations provide that students who are placed together for purposes of special education are to be grouped by similarity of individual needs, including social needs, and that the size and composition of special classes are to be based on the similarity of the individual needs of the students, including their levels of social development (see 8 NYCRR 200.6[a][3] and [g][2]; see also 8 NYCRR 200.1[ww][3]). As discussed below, the record does not show that the composition of respondent's special education class renders that recommended placement inappropriate. The record shows that the student's verbal abilities are in the high average range of cognitive functioning and her perceptual abilities are in the borderline range (Parent Ex. 23 at p. 3). The record also shows that attention and emotional factors influence the student's functioning (id. at p. 7). The June 17, 2005 class profile for the class recommended by respondent for the 2004-05 school year indicated that nine of the students enrolled in the class at that time were classified as having a learning disability (three students), an other health impairment (two students), a speech and language impairment (three students), or an orthopedic impairment (one student) (Dist. Ex. 31 at pp. 1-2, 4, 6, 9-10, 12, 14, 17, 20). Several of the students' cognitive test results ranged from the average to superior range of cognitive ability (id. at pp. 2, 4, 7, 12, 13). Some of the students had attention difficulties (id. at pp. 2, 4, 12, 13, 14) and some needed small group instruction and supports such as graphic organizers, preplanning, sequential steps when writing paragraphs and stories, manipulatives, picture representation regarding math concepts, breaking down or "chunking" information into manageable steps, multisensory instruction, repetition and reteaching (id. at pp. 2, 4, 6, 7, 8, 9, 10, 11-13, 17-18, 20). Two of the students in the class were girls (id. at pp. 2, 20). The record does not show that the composition of the recommended class would result in petitioners' daughter being placed in a class composed of students of dissimilar needs. I find that the record does not demonstrate that respondent's proposed class was inappropriate for petitioners' daughter.

Respondent also appeals from the impartial hearing officer's determination that the goals included on the June 2005 IEP were deficient because they did not indicate a target achievement level against which progress could be measured (IHO Decision at p. 31). An IEP must include a statement of measurable annual goals (34 C.F.R. § 300.320[a][2]; 8 NYCRR 200.4[d][2][iii]). The impartial hearing officer found that the June 2005 IEP contained sufficient information for understanding the student's present levels of performance (IHO Decision at p. 30). To address the student's identified needs, the June 2005 IEP contained annual goals and objectives in reading, writing, mathematics and social/emotional/behavioral needs (Parent Ex. 20 at pp. 6-8). The June 2005 IEP had two reading goals with a total of nine detailed objectives or benchmarks, two writing goals with a total of eight detailed objectives or benchmarks, one mathematics goal with 12 detailed objectives or benchmarks, and one social/emotional/behavioral goal with two detailed objectives or benchmarks (id.). Corresponding objectives further clarified the goals. Each objective specified a skill the child needed to demonstrate, and included percentage of accuracy required, as well as expected target dates (id.). For example, a reading goal to address word recognition and decoding skills has a corresponding objective specifying that the student demonstrate a specific decoding skill with 80 percent mastery evaluated by classroom and standardized tests assessed by the regular and special education teacher by June 15 (id. at p. 6).

The goal to address mathematical concepts, reasoning and computation has a corresponding objective specifying that the student understand a specific mathematical concept with 70 percent accuracy evaluated by classroom and standardized tests assessed by the regular and special education teacher by June 15 (id.). While the annual goals on the June 2005 IEP should have included information about the level of performance expected to be reached by the student during the year the IEP was in effect, the objectives are specific and provide sufficient information to measure the student's performance (Application of a Child with a Disability, Appeal No. 07-022; Application of a Child with a Disability, Appeal No. 05-038). Under the circumstances, I am unable to find that any inadequacy in the annual goals rises to the level of a denial of a FAPE (see W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147 [S.D.N.Y. 2006]).

I have reviewed the June 2005 IEP and find that it accurately reflects the results of evaluations to identify the student's needs. I also have reviewed the content of the goals and objectives and find that they are appropriate and related to the student's needs. In addition, I have reviewed the June 2005 IEP recommendations and find that the recommended program offered appropriate special education services. I have considered petitioners' challenges to the June 2005 IEP and I am not persuaded that their daughter was not offered a FAPE for the 2005-06 school year.

The impartial hearing officer also found that the annual goals on the June 2006 IEP were deficient because they did not indicate a target achievement level against which progress could be measured. Pursuant to IDEA 2004, in addition to including a statement of measurable annual goals, an IEP must include a description of how the child's progress toward meeting the annual goals will be measured (20 U.S.C. § 1414[d][1][A][i][II], [III], see also 8 NYCCR 200.4[d][2][iii][b]). As with the June 2005 IEP, the impartial hearing officer determined that the June 2006 IEP sufficiently indicated the student's present level of performance based on information available at the time of the June 2006 CSE meeting (IHO Decision at p. 36). In order to address the student's identified needs, the June 2006 IEP contained annual goals in the areas of study skills, reading, writing, and mathematics (Parent Ex. 4 at pp. 6-9). Each goal contained a specific evaluation criterion, evaluation procedure and an evaluation schedule (id.; see 8 NYCRR 200.4[d][2][iii][b]). Evaluation Criteria is described in the IEP as how well and over what period of time the student must demonstrate performance (Parent Ex. 4 at p. 6). "Procedures to Evaluate Goal" is described in the IEP as the method that will be used to measure progress (id.).

Respondent's special education teacher who taught respondent's parallel curriculum classes as well as a learning resource center class and who was a push-in collaborative teacher for social studies testified about her understanding of what each goal was addressing and how she would present and assess individual goals for the student (Tr. pp. 1472-96). She testified that she would likely assess a reading goal involving multisyllabic words and syllable identification that had an anticipated success rate of 80 percent over five weeks by keeping a checklist, conducting an error analysis and recording missed words (Tr. p. 1480; Parent Ex. 4 at p. 7). Regarding the goal pertaining to the student's need to refocus without prompts when distracted (Dist. Ex. 13 at pp. 6-7), the special education teacher testified that the progression would be from needing lots of teacher support to needing less teacher support (Tr. p. 1478). She indicated that to assess the goal she would go into the student's mainstream class and do some recorded

observations as well as ask the student's team for feedback (Tr. p. 1479). She indicated that she did not believe that study skill goals could be worked on in isolation, that they are worked on "with the content and in the context of the classroom," and are "recycled over and over again in different settings" (Tr. pp. 1478-79). Based upon the record before me, I find that the annual goals on the June 2006 IEP are measurable and include a description of how the student's progress toward meeting the annual goals will be measured during the year the IEP is in effect.

The impartial hearing officer indicated that despite his determination that the goals in the June 2006 IEP were deficient, the record demonstrated that the recommendations for the 2006-07 school year were otherwise appropriate. I have reviewed the June 2006 IEP and find that it accurately reflects the results of evaluations to identify the student's needs. I also have reviewed the goals and find that they are appropriate and related to the student's needs. In addition, I have reviewed the June 2006 IEP recommendations and find that the recommended program offered appropriate special education services. I have considered petitioners' challenges to the June 2006 IEP and I am not persuaded that the record demonstrates that their daughter was not offered a FAPE for the 2006-07 school year.

Based on the information before me, I find that petitioners have not prevailed with respect to the first criterion of the Burlington/Carter analysis for an award of tuition reimbursement for the 2005-06 and 2006-07 school years. Having so determined, the necessary inquiry is at an end and there is no need to reach the issue of whether Windward was an appropriate placement (see M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d. Cir. 2000]; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 03-058).

I have considered the parties' other contentions, including the arguments referenced by petitioners in footnote 8 of their petition, and find them to be without merit.

**THE APPEAL IS DISMISSED.**

**THE CROSS-APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the impartial hearing officer's decision is annulled.

Dated:        Albany, New York
              September      , 2007        **PAUL F. KELLY**
                      24                   **STATE REVIEW OFFICER**

14

**Jerome D. Schad**
Attorney at Law

Telephone: 716-634-8906

Facsimile: 716-632-2048

E-mail: jschad1@adelphia.net

May 3, 2007

Gary Mayerson, Esq.
Mayerson & Associates
330 W. 38th Street, Suite 600
New York, New York 10018

Stephanie Roebuck, Esq.
Keane & Beane
445 Hamilton Avenue – Suite 1500
White Plains, NY 10601

Dear Mr. Mayerson and Ms. Roebuck:

Re:    Impartial Hearing Request by Robert and Donna Rifkin, 7 Stonewall Lane,
       Mamaroneck, NY 10543, on behalf of Melissa Rifkin, dated June 22, 2006, and
       received by the Scarsdale UFSD on June 26, 2006.
       <u>Scarsdale Union Free School District - Case No. 21038</u>

I enclose my Decision in Case 21038. I am also mailing a signed original to the District
Clerk for filing. Please advise your respective clients of the Decision. Please accept my
apology for not getting this to you by April 24, 2007. Also, please note that you have a
right to appeal my Decision.

Notice to Parents and Board of Education of their right to
obtain Review of this Decision

Pursuant to 8 N.Y.C.R.R. §200.5(k), any party aggrieved by this decision has a right to
obtain a review by the State review officer. The decision of the impartial hearing officer
shall be binding upon both parties unless appealed to the State review officer. Such
review shall be initiated and conducted in accordance with the provisions of 8
N.Y.C.R.R. Part 279.

Very truly yours,

Jerome D. Schad
Impartial Hearing Officer

199 Meadowview Lane, Williamsville, NY 14221
716-634-8906 (tel)  716-632-2048 (fax)  716-445-0842 (cell)

## Jerome D. Schad
### Attorney at Law

Telephone: 716-634-8906

Facsimile: 716-632-2048

E-mail: jschad1@adelphia.net

May 3, 2007

Mrs. Lois Q. Rehm
District Clerk
Scarsdale Union Free School District
2 Brewster Road
Scarsdale, NY 10583

Dear Mrs. Rehm:

Re:    Impartial Hearing Request by Robert and Donna Rifkin, 7 Stonewall Lane,
Mamaroneck, NY 10543, on behalf of Melissa Rifkin, dated June 22, 2006, and
received by the Scarsdale UFSD on June 26, 2006.
<u>Scarsdale Union Free School District - Case No. 21038</u>

I enclose my Decision in Case Number 21038 which determines the claims made by the
Parents of the above child as delineated in their August 9, 2006 amended hearing request
seeking tuition reimbursement. I have forwarded an originally signed copy to each of the
attorneys representing the Parents and representing the Scarsdale UFSD.

Please file this Decision and notify the Board of Education of its receipt and provisions.

Very truly yours,

Jerome D. Schad
Impartial Hearing Officer

Enclosure:    Originally Signed Decision in Case 21038 dated May 3, 2007

C:    Stephanie Roebuck, Esq., Attorney for the Scarsdale UFSD
    Gary Mayerson, Esq., Attorney for Mr. & Mrs. Rifkin

The University of the State of New York
The State Education Department
Impartial Hearing Pursuant to 8 N.Y.C.R.R. 200.5(j)
Jerome D. Schad, IHO Presiding

In the Matter of the June 22, 2006 Due
Process Hearing Request of R.R. and D.R.,
parents of M.R., seeking Tuition
reimbursement.
           vs.                 Case Identification Number 21038
Scarsdale Union Free School District
2 Brewster Road
Scarsdale, NY 10583

## Decision

On June 22, 2006, the Parents of an eleven year old girl wrote to the Scarsdale Union Free School District (hereafter "Scarsdale" or the "District") seeking *"tuition reimbursement for [their] daughter . . . at the Windward School for the 2005-2006 school year."* The District received their letter on June 26, 2006.[1]  A prior, November 7, 2005, hearing request[2] had been filed by the Parent's former counsel but withdrawn on January 19, 2006.[3]  The Parents' first filing was not adjudicated on the merits of the claim and the re-filing is not barred.  The June 22, 2006 hearing request was amended on August 9, 2006 to particularize the claims and add a claim for tuition reimbursement for the 2006-2007 school year.[4]

---

[1]     June 22, 2006 due process hearing request letter, on stationery of the mother and father, at paragraph 1.
[2]     Exhibit District 24.
[3]     Exhibit District 22.
[4]     Exhibits District 1 and Parents 1.

The hearing was conducted over seven days on October 23 and 24, and December 6, 2006, February 16, 26 and 28 and March 1, 2007.  The following witnesses testified at the hearing:

Allison Bell, Ph.D. Clinical Psychologist and participant in June 14, 2005 CSE meeting;[5]

Kathleen Kelly, Educational Consultant;[6]

Michael Mendelson, Director of Special Education and Chairperson of May 4 and June 14, 2005 CSE meetings;[7]

Judith D'Amore, Special Education Teacher of the Student in third and fourth grades and participant in May 4 and June 14, 2005 CSE meetings;[8]

Father of the Student and participant in May 4 and June 14, 2005 and June 7, 2006 CSE meetings;[9]

Lydia Soifer, Ph.D., CCC. Sp.;[10]

Mother of the Student and participant in May 4 and June 14, 2005 and June 7, 2006 CSE meetings;[11]

Rene Lund, Special Education Teacher involved in teaching the parallel curriculum classes for sixth grade and participant in June 7, 2006 CSE meeting;[12]

Stephanie Kutin-Senzon, Ph.D., School Psychologist and Chairperson of June 7, 2006 CSE meeting;[13]

David Scholl, Special Education Teacher who taught the special class into which the Student had been recommended for placement in fifth grade;[14]

Susan Goodman, Special Education Teacher / Subcommittee Chairperson;[15]

---

[5]    *See,* Exhibit Parents 49, resume; Tr. 4 – 93.
[6]    *See,* Exhibit Parents 2, resume; Tr. 93 – 186.
[7]    Tr. 206 – 742:1-14; 1799:14-24 – 1817:1-22.
[8]    Tr. 742:16-24 –1024:1-4.
[9]    Tr. 1026 – 1138; 1311:8-24 – 1411:1-23; 1843:20-24 –1849:1-13.
[10]   Tr. 1174:1-24 – 1285:1-7; and *see* Exhibit Parent 63, vitae.
[11]   Tr. 1306:19-24 –1310:1-8.
[12]   Tr. 1451:4-24 – 1618:1-12.
[13]   Tr. 1619:15-24 – 1689:1-4.
[14]   Tr. 1729:2-24: -- 1800:1-8.
[15]   Tr. 1818:12-24 – 1841:1-15.

## FACTS

The Student is classified as a student with a learning disability with the classification not in dispute.[16]

The Scarsdale UFSD educates approximately six thousand students in five elementary schools, one middle school and one high school.[17]  Students attend one of five elementary schools through grade five and attend the District's one middle school in grades six through eight.[18]

The District has self-contained classes for subject areas for general education for lower functioning children, sometimes referred to as the parallel curriculum,[19] cooperative teaching in social studies and English and sometimes math,[20] special classes for children who cannot function in a regular class or the cooperative teaching class,[21] and resource rooms called learning centers.[22]

Kindergarten : 2000 -- 2001:  The Student entered Kindergarten in the District's *Quaker Ridge Elementary School in September 2000 and participated in a general education class.[23]*  The Student "received some support services in the Learning Resource Center in the area of basic concepts and pre-reading skills."[24]

---

[16]     *See,* August 9, 2006 amended hearing request, Exhibit Parents 1 and District 1.
[17]     Tr. 514-15-24 – 515:1-5.
[18]     Tr. 594:3-14.
[19]     Tr. 515:15-24; 516:13-18; 1455:17-24 – 1456:1-9; 1512:11-24 – 1513:1-3.
[20]     Tr. 516:19-21.
[21]     Tr. 516:21-24 –517:1-2; 518:19-24 –519:1-10.
[22]     Tr. 517:2-4.
[23]     *See,* Exhibit Parent 54 at p. 4, history of schools of attendance which was included as part of the Parents' information on their March 13, 2004 Application to the Windward School.
[24]     Exhibit District 45, p. 1.

First Grade : 2001-2002:  In first grade, 2001-2002, the Student was educated in a general education class and received some Learning Resource Center support as an unclassified student.[25]

Second Grade : 2002-2003:  In second grade, 2002-2003, the Student was referred to the Committee on Special Education (CSE) because of difficulties in reading.[26] She was evaluated over a period from October 2002 through January 2003.[27] The Parents' social history report indicated some gross and fine motor problems and that an older sibling had some learning issues.[28]

Gates MacGinitie Reading Test scores from September 23, 2002, the beginning of second grade, indicated word decoding skills in the 16th percentile, word knowledge in the 10th percentile, and comprehension at the 12th percentile.[29]  The scores were one and more standard deviation below mean.  The grade-equivalent scores indicated mastery at the mid-first-grade level.[30]  The total score was in the 12th percentile.  The narrative description of those results in January 2002, described the scores in decoding and comprehension as "a year and a half below grade level."[31]

In addition, a Stanford Diagnostic Reading Test was administered on December 11, 2002 with scores in auditory discrimination in the 40th percentile, phonemic analysis in the 60th percentile, auditory vocabulary in the 47th percentile, word reading in the 31st

---

[25]     *See,* Learning Resource Center Progress Report and the Grade One report card, Exhibit Parents 44.
[26]     Oct.-Nov., 2002 Psychological Evaluation Report, Exhibit Parents 43 at p. 1.
[27]     *See,* Exhibit Parent 43 (Psychological Evaluation), Exhibit Parents 42 (Classroom Observation), Exhibit Parents 40 (Occupational Therapy Evaluation), Exhibit District 45 (Educational Evaluation), Exhibit District 47 (Social History) and Exhibit District 48 (Health Report).
[28]     Exhibit District 47, pp. 1 & 2.
[29]     Exhibit District 45, p. 1.
[30]     Exhibit District 45 at p. 1.
[31]     Exhibit District 45 at p. 2.

percentile, and reading comprehension in the 39[32] percentile. The SDRT total score in the 39th percentile was also reported as a 1.7 grade equivalent. The report of the educational evaluation indicated that certain Woodcock-Johnson subtest results from October-November 2002 were consistent with the SDRT administered in December.

The Woodcock-Johnson II Tests of Achievement were administered in January 2003 with results in spelling in the 18th percentile, writing fluency in the 36th percentile, writing samples in the 50th percentile and a broad written language score in the 28th percentile.[33] The narrative of these results described the Student's abilities in written language and written expression as within the average range, but qualified that she had difficulty spelling and with punctuation, needed support in letter formation and spacing, and that she would benefit from use of a pencil grip to help position her fingers and that she benefited from visual clues and structure.[34] All of these suggest a language based impairment. In comments of what benefited the Student, the evaluator indicated that the Student benefits from "instruction in Orton-Gillingham reading and writing program."[35]

In October 2002, the Stanford Diagnostic Mathematics Test (SDMT) was administered with results in concepts-applications in the 19th percentile and computation in the 5th percentile with a total score in the 8th percentile.[36]

On January 11, 2003 a Social/Developmental History was completed by the Student's Mother[37] in which she noted some concerns in both gross and fine motor areas. The Parent also noted that the student had received additional assistance in both

---

[32]     Exhibit District 45 at pp. 1 & 2.
[33]     Exhibit District 45 at p. 3.
[34]     Exhibit District 45 at p. 3.
[35]     Exhibit District 45 at p. 3.
[36]     Exhibit District 45 at p. 2.
[37]     Exhibit District 47.

Kindergarten, first, and second grade, including that the Student was receiving tutorial assistance "to perform at grade level."[38]

On January 16, 2003 an Occupational Therapy Evaluation by Occupational Therapist Kristin Caldarola, found that the Student's gross motor skills were in tack and within the normal limits for her age (then 7 years, 10 months), that no tactile or balance hypersensitivity was exhibited, that her visual tracking skills were "smooth and coordinated as well as convergence and divergence" and that the Student had "good strength and normal tone throughout her upper extremities."[39]   The Student is right handed and used "a lateral tripod grasp with overlapping thumb" to write and scored in *the high average range for her age group, in the 85th, 81st and 83rd percentiles, on the Evaluation Tool of Children's Handwriting Regarding.*[40]   Her letters and numbers were all legible but her spacing of letters and words were very tight and brought her scores down.[41]   The evaluator described the spacing issue as "age appropriate"[42] but did recommend that the spacing issue be addressed "by both the classroom and LRC teachers" and suggested that simple verbal cues and demonstration of the utilization of finger spacing will help the Student enhance hear writing skills.[43]   The ETCH "Score Sheet" and the ETCH "Response Booklet" recorded the areas of deficit noted by the evaluator.[44]

---

[38]      Exhibit District 47 at p. 2.
[39]      Exhibit District 46 and Parent 40 at p. 1.
[40]      Exhibits District 46 and Parent 40 at p. 1.
[41]      *Exhibits District 46 and Parent 40 at p. 2.*
[42]      Exhibits District 46 and Parent 40 at p. 2.
[43]      Exhibits District 46 and Parent 40 at p. 2.
[44]      Exhibits District 46 and Parent 40 at the 3rd page (the 1st page of the Score Sheet) and at the 4th ^ 5th pages (the 1st and 2nd pages of the ETCH Response Booklet.).

On January 21, 2003, the CSE identified the Student as having a Learning Disability and recommended a program of Resource Room support in a group five-times weekly for one hour and thirty minutes (pull-out) and one time weekly individually (push-in) with program modifications and testing accommodations.[45] The IEP noted that the student was a "child with average cognitive ability who has significant weaknesses in perceptual organization, executive functioning, phonological processing and short term memory."[46] The '02-'03 IEP identified the Student's needs as follows:

> "[The Student] continues to need a structured reading program which emphasizes phonics. She needs to learn to decode multi-syllabic words and to spell more effectively. [The Student] needs to continue to acquire math facts and she needs to learn to apply this knowledge when problem solving. [The Student] needs to learn to structure, organize and punctuate her written language. She needs to learn strategies to assist her in keying into details more effectively. Visual anchors and repetition help her."[47]

The IEP also noted that there were no social or emotional needs that should be addressed at this time.[48]   Testing in reading and mathematics in the spring of 2003 indicated developing skills in "explicit information," "inference," and "analysis" in reading and "geometry and four areas in mathematics.[49]   Also, the Director of Special Education recalled that there were some concerns expressed about the Student's math progress in the District's Trail Blazer's math-based program.[50]

Third Grade : 2003-2004:  In her third-grade year, 2003-2004, the Student was apparently placed in the general education program with three hours per day of resource

---

[45]    Exhibit Parents 45 at p. 1.
[46]    Exhibit Parents 45 at p. 2.
[47]    Exhibit Parents 45 at p. 2.
[48]    Exhibit Parents 45 at p. 3.
[49]    Exhibit Parents 38.
[50]    Tr. 656:22-24 –659:1-6; Tr. 931:13-19 and Exhibit Parent 20 and District 28 at page 3.

room support on a pull-out basis.[51]  Ms. D'Amore, special education teacher in the Quaker Ridge Elementary School, first began working with the Student for services called for on her IEP.[52]  During the third grade, the Parents began to provide tutoring assistance for their daughter at their own expense.[53]

In March 2004, the Parents began exploring possible private-school placement for their daughter and submitted a March 13, 2004 application to the Windward School.[54]

On April 3, 2004, Rebecca King, Psy.D., assessed the Student's emotional functioning as part of the application process for her admission to private school.[55]  The Father indicated that Dr. King's report reference to "her application to private school"[56] "would be referring to Windward, is my guess.  I don't know.  I don't recollect this."[57]  In further questioning, it appears clear that although the parents explored other possible private schools, the only application actually filed was with the Windward School.[58]  The Student was not accepted into Windward for her fourth-grade year, but in March of 2005, she was accepted for her fifth-grade year.[59]

Dr. King's projective testing results indicated that the Student "is prone to misreading situations and may over personalize them,"[60] that there was some suggestion

---

[51]    See, Exhibit Parents 37, a CSE Data Form for a June 3, 2003 CSE Meeting; see also, Exhibit Parents 35 (Third Grade Report Card) and Exhibit Parents 33 (Progress Report for IEP Goals and Objectives for the 2003-2004 school year).
[52]    D'Amore, Tr. 746:19-22 and 747:8-22.
[53]    Father, Tr. 1026:13-24.
[54]    Exhibit Parents 54.
[55]    Exhibit Parents 36.
[56]    Exhibit Parent 36 at page one under "Reason for Referral."
[57]    Tr. 1375:13-22.
[58]    Tr. 1375:23-24 – 1377:1-14.
[59]    Father, Tr. 1058:11-16.
[60]    Exhibit Parents 36 at p. 2.

that she has "feelings of anger and frustration that she may be concealing,"[61] and "some self-consciousness about how she is perceived by others."[62]    The evaluator's recommendations called for "clarification, repetition, deconstruction, and visualization of concepts and tasks" and that the Student would benefit from "added reassurance, support and validation from her teachers."[63]

<u>Fourth Grade : 2004-2005:</u>  In her fourth-grade year, 2004-2005, the Student was placed in general education with forty-five minutes of resource room support on a pull-out basis.[64]   Special education teacher, Judith D'Amore, was the Student's learning resource center teacher at the Quaker Ridge Elementary School for that fourth-grade year.[65]

In November 2004, the Parents terminated the private tutoring for their daughter[66] after a discussion with their daughter's special education teacher who suggested that they stop because the school would be able to address of the Student's needs.[67]

In December 2004, the Parents had a conference with special education teacher D'Amore and general education teacher Burns at which the Parents expressed concern that their daughter was struggling and not making the progress that they had hoped for that year.[68]  One of the ways the general and special education teacher modified the

---

[61]    Exhibit Parents 36 at p. 3.
[62]    Exhibit Parents 36 at p. 3.
[63]    Exhibit Parents 36 at p. 3.
[64]    <i>See,</i> Exhibit Parents 34, a CSE Data Form for a June 3, 2004 CSE Meeting; <i>see also,</i> Exhibit Parents 32 (Fourth Grade Report Card).
[65]    Tr. 743:8-12; 748:22-24 –749:1-10.
[66]    Tr. 1027:16-20.
[67]    <i>Father,</i> Tr. 1027:21-24 – 1028:1-5; <i>Special Education Teacher,</i> Tr. 755:2-18; 765:19-24 –7671-9.
[68]    Tr. 1032:14-24.

curriculum for the Student following that meeting was in terms of the quantity and times of review.[69]

In March 2005, the Parents received notice from the Windward School that their daughter had been accepted for the following year.[70]

On May 10, 2005, the Student participated in the New York State Mathematics assessment and scored a Two, with a scaled score of 614. Her year-end report card also showed Mathematics as her weakest area.[71]

On May 16, 24 & 25, 2005, the privately-retained psychologist, Allison Bell, Ph.D., evaluated the Student.

On May 24, 2005, Dr. Bell observed the Student in her fourth-grade classroom.[72] On that date, school psychologist, Diane Shein, also observed the student.[73]

On June 3, 2005, an evaluation of the Student's expressive and receptive language reported comprehension and use of language as within the average range and receptive language "slightly weaker than expressive" language.[74]

Dr. Bell reported that the WISC-IV scores showed a "wide variability in performance and functioning"[75] indicating

> "Strong verbal reasoning skills, and markedly weaker perceptual abilities, with nearly three standard deviations separating her Verbal Comprehension and Perceptual Reasoning scores. Her Verbal abilities are in the High Average range of cognitive functioning, while her

[69]    Special Education Teacher, Tr. 990:11-24 – 994:1.
[70]    Tr. 1058:11-16 (Father).
[71]    Exhibit Parents 32 at p. 2.
[72]    Exhibit Parents 23 and District 33 at p. 2.
[73]    Exhibit Parents 24 and District 36.
[74]    Exhibit Parents 22 and District 34 at p. 3.
[75]    Exhibit Parents 23 and District 33 at p. 3.

perceptual abilities are in the Borderline range of cognitive functioning."[76]

She found a perceptual impairment on the Block Design subtest, that the Student had "great difficulty discerning relevant from irrelevant visual information," noted that the Student's poor performance on the Arithmetic assessment was due to "attention factors" and that the Student "had difficulty retaining the details of the word-problems and seemed to perform random operations with the numbers she could remember."[77] On the WRAT, the Student received standard scores of 97 in reading, 95 in spelling and 97 in arithmetic, all within the lower end of the average range. Dr. Bell reported that the Student has "limited sight-word vocabulary for her age,"[78] "reads even the simplest material word-by-word," [79] "her comprehension is good up to and at fourth grade level" [80] and that she has "strong verbal abilities that are severely hampered by perceptual problems."[81] In both the WISC-IV Block design subtest and the neuropsychological assessment subtest on the Ravens Coloured Progressive Matrices indicate that the Student has difficulty discriminating pattern relationships. Finally, she reported that the Student's strength was "as a verbal learner" and that "if she is required to learn visually-presented material, she will do best when that material is paired with verbal stimuli. . . ."[82] Dr. Bell's report concluded that:

> "[The Student] . . . is struggling in school, due largely to the interference of perceptual processing deficits. There is a great variability in her functioning, which is also influenced by attentional and emotional factors. Her strength is as a verbal learner; her greatest weakness is in

---

[76]     Exhibit Parents 23 and District 33 at p. 3.
[77]     Exhibit Parents 23 and District 33 at p. 3.
[78]     Exhibit Parents 23 and District 33 at p. 4.
[79]     Exhibit Parents 23 and District 33 at p. 4.
[80]     Exhibit Parents 23 and District 33 at p. 4.
[81]     *Exhibit Parents 23 and District 33 at p. 5,*
[82]     Exhibit Parents 23 and District 33 at p. 6.

the area of visual-perceptual processing and visual memory. At this time, she is still able to conceive of herself in positive terms; however, she is plagued by worries, anxiety and some depression, as she already perceives herself as quite different from her peers and as set apart from them academically.

. . . [The Student's] needs in the classroom are significant and continuous, cutting across all subject areas and therefore all aspects of her day. She requires a highly individualized teaching program that emphasizes multisensory learning approaches in the classroom and plenty of 1:1 attention."[83]

Dr. Bell testified that she observed a degree of separateness of the Student in the classroom and often close to the general education teacher to look for adult guidance[84] and in a pairing up situation in class, she was "not comfortable enough to choose a partner out of the class."[85] Dr. Bell expressed reluctance with concluding, from the results of the WISC-IV, that the student be accurately described as average when some of the subtest scores were not average[86] but, on cross-examination, she indicated that the Student's academic functioning from the Spring 2005 to the November 2005 administration of the WRAT-3 "were virtually identical"[87] and in the average range academically.[88] She described the Student's strengths were in verbal processing, but that the Student's comprehension was good only at a literal level but not when the Student has to "synthesize information and initiate and develop" that information.[89] She said that a

---

[83]    Exhibit Parents 23 and District 33 at p. 7.
[84]    Tr. 24:20-24 -25:1-19.
[85]    Tr. 28:5-9 and 31:1-7; *see also,* Exhibit Parents 23 and District 33 at page 2.
[86]    Tr. 33:219-24 – 34:1-17.
[87]    Tr. 89:1-5.
[88]    Tr. 89:16-21.
[89]    Tr. 35:9-19 and 38:13-24 – 39:1-3.

multi-sensory approach is likely to be good for the student,[90] that visual material needs to be paired with another channel and that "her verbal channel is her strong point."[91]

The Director of Special Education testified that the Student made progress during the 2004-2005 school year,[92] but the Parents disputed whether progress was being made.[93] The resource teacher appears to have concurred with the Parents in December 2004 that the Student was not making the progress that they were expecting[94] and even conceded that meaningful progress was not made.[95] The teacher commented that at the *end of fourth grade, the Student had some problems with generalization of skills,*[96] continued to have spelling issues,[97] and she did have some self-esteem issues associated with academics.[98] She recalled discussion of the Student's difficulty "with some of the core curriculum"[99] and "her attending"[100] and her "underlying memory issues."[101]

The Student had difficulty in math in the Trail Blazer's math program of the elementary school.[102] It is a language-based program "to a large extent."[103] A parallel

---

[90]    Tr. 43:9-13.
[91]    Tr. 42:16-20.
[92]    Director of Special Education, Tr. 485:23-24 – 486:1-2; *see, also,* Exhibit Parent 21.
[93]    Tr. 812:8-24 – 813:1-7.
[94]    Tr. 813:5-14; 817:2-17.
[95]    Tr. 939:21-24 – 940:1-9;  A collateral issue was raised by the Parents regarding the amount of time that the resource teacher was available to provide direct service to their daughter, in part, because the teacher was engaged outside of the classroom during the year while serving on a search team to fill a District position. [Tr. 785:4-24 – 796:1-9] The resource teacher indicated that her teaching assistant would provide support for the Student during those absences [Tr. 793:8-15] and that the number of such occurrences was more than ten times that school year. [Tr. 795:12-23]  I do not find the evidence to be materially significant on the issue of meaningful progress.
[96]    Tr. 776:17-24 –777:1-9.
[97]    Tr. 781:1-10.
[98]    Tr. 781:20-24 -782:1-3; 821:17-21.
[99]    Tr. 818:21-24 – 819:1-3.
[100]    Tr. 819:4-5.
[101]    Tr. Tr. 819:4-5.3-10.
[102]    Tr. 801:5-14.
[103]    Tr. 898:7-12.

math program was a completely different program[104] and not recommended for the Student by the building's child study team[105] or the CSE during the 2004-2005 school year.  Rather it was recommended after the Student did not perform well on the state math test.[106]  The resource teacher described that she saw a "great change towards the latter part of the year ['04-'05] in [the Student's] being able to acquire,  you know, make continued progress"[107] which she attributed in part to the increased challenge of the academic work she encountered in fourth grade.[108]  Toward the end of the school year, *the resource teacher and the Student's fourth grade teacher made a decision to scale back the amount of academic work which would be expected of the Student.*[109]  The Father *indicated that this scaling back of the quantity of school work was suggested in* December 2004 and that the Parents were hesitant about that approach.[110]

  <u>Fifth Grade : 2005-2006:</u>  The June 14, 2005 IEP, for the Student's fifth grade year, 2005-2006,[111] is being challenged.  It proposed to place the Student in a special class, 12-1+1 for four and one-half hours per day with counseling in a group not to exceed five one weekly for thirty minutes.  The IEP also stated that she would "participate in a parallel math program"[112] and the only general education program in which the Student would have participated was physical education class.[113]

---

[104] Tr. 936:20-24 – 937:1-16.
[105] Tr. 798:20-24 – 799:1; *note,* The Father testified that the first time that he ever heard of the existence of child study teams (CSTs) during the hearing on December 6 and never earlier in his daughter's educational career [Tr. 1025:17-24 – 1026:1-5.
[106] Tr. 799:24 – 801:1-4; *see,* Exhibit Parent 25.
[107] Tr. 805:17-19.
[108] Tr. 806:2-24 – 8071-7.
[109] Tr. 827:14-24 – 830:1-7.
[110] Tr. 1033:12-24 – 1034:1-3;  1034:15-24 – 1035: 1-13.
[111] Exhibit Parents 20 and District 28 at p. 1 of 8.
[112] Exhibit Parents 20 and District 28 at p. 1 of 8.
[113] Exhibits Parent 20 and District 28 at p. 2 of 8.

At the end of the '04-'05 school year, the District anticipated about eight students in the 12-1+1 special class,[114] of whom two were females[115] who, in September, were present and part of the class only for mathematics.[116] Nine students started the year in the proposed placement but the number declined to six with one of the original females among those who did not attend.[117] The Parents observed the class in June, after receiving the class profile[118] and, on June 20, 2005, they registered their disagreement with the class focused on the predominance of boys and that the issues of the children in the class were more complex than the Student.[119]

The Student would have been assigned to the Edgewood Elementary School within the District had she attend public school during the 2005-2006 school year in the placement recommended in her IEP.[120] The resource room service in the elementary schools is a pull out service whereas in the middle school is part of an assigned period as part of the student's schedule.[121]

On November 4, 2005, Dr. Bell did a follow-up interview with the Student and administered the WRAT-3.[122] While Dr. Bell indicated concurrence with the CSE's recommendation of a special class placement for the student,[123] she expressed strong disagreement with the particular class recommended because of the Student's own anxiety issues, the composition of the class in terms of the range of behaviors of the other

---

[114]    Special Education Director, Tr. 226:16-24 – 1-9.
[115]    Special Education Director, Tr. 229:21-22; Special Education Teacher Scholl, Tr. 1735:10-18 and 1763:8-23.
[116]    Special Education Director, Tr. 13-19.
[117]    Tr. 367:12-24 –368:1-18.
[118]    Tr. 457:16-20; Exhibits Parent 19 and District 31.
[119]    Exhibits Parent 18 at page one, 2nd and 3rd paragraph..
[120]    Tr. 519:14-24.
[121]    Tr. 521:20-24 –522:1-5.
[122]    Exhibit Parent 14.
[123]    Tr. 62:16-22.

students and on gender grounds because the Student would likely be the only female in the class throughout most of the school day.[124] The Parents argue that the mixture was inappropriate and exacerbated by the fact that there was a male teacher assigned to the class which the CSE contemplated for placement of the Student during the 2005-2006 school year.[125] I do find that the gender grouping issue is not persuasive or determinative, in light of a public school's affirmative obligation to provide services to all resident students and because an individual student's needs, independent of gender, are the only legally appropriate criteria under the IDEA.

Additionally, on a November 4, 2005, Dr. Bell conducted a follow-up with the Student in which she administered the WRAT-3 achievement test and met with the Student.[126] She testified that she observed a "dramatic difference . . . her emotional presentation, her esteem, her confidence was what was dramatically different"[127] and she opined that the placement, at that time at the Windward School, was appropriate.[128] She acknowledged that her belief that Windward grouped students in homogeneous groupings was based on information reported to her by families and not her own first-hand knowledge.[129] Dr. Bell's November 4, 2005 WRAT-3 test scores[130] were not shared with the District's CSE but their findings and recommendations are consistent with District assessments.

The Parents gave notice of their disagreement with the IEP recommended for the 2005-2006 school year and that they were enrolling their daughter in the Windward

---

[124]   Tr. 63:24 – 65:1-19; 85:6-11; and Exhibit 16, Dr. Bell's letter dated June 30, 2005.
[125]   Director of Special Education, Tr. 239:12-18.
[126]   Exhibit Parent 14.
[127]   Tr. d47:14-24 – 49:1-7.
[128]   Tr. 49:19-24 –501-7; 69:10-20.
[129]   Tr. 73:17-24 –74:1-18.
[130]   Tr. 89:8-10.

School by letter dated July 12, 2005.[131]  The letter complies with the IDEA requirement for prior notice of the rejection of the CSE's recommendation and their intent to enroll their daughter in the Windward School.[132]  Through their prior attorney, on November 7, 2005,[133] they initiated a due process hearing seeking tuition reimbursement for the 2005-2006 school year but withdrew that request on January 19, 2006 in a letter[134] authored by the attorney and regarding which the Father testified that he had not authorized.[135] Subsequently, on June 22, 2006, the Parents requested a due process hearing for tuition reimbursement for the 2005-2006 school year.[136]

David Scholl, the special education teacher of the fifth grade special class recommended for the Student, testified about the composition and structure of the class.[137]  It became clear that shortly after the 2005-2006 school year began, the structure of this particular class changed from a special class model to what was described as a "full cooperative teaching method with the fifth grade mainstream teacher"[138] for "writing, social studies and science."[139]  Since that was not the CSE's recommendation in the IEP,[140] that model is irrelevant to my determination of the appropriateness of the 2005-2006 IEP and I consider only that much of the teacher's testimony that describes the class configuration commencing at the beginning of the school year as recommended in the IEP.

---

[131]    Exhibit Parent 15 at page 3; Tr. 604:5-14; Exhibit Parent 18; Tr. 1113:17-24 – 114:1-15.
[132]    20 U.S.C. §1412(a)(10)(C)(iii)(I)(aa) and (bb).
[133]    *See,* Exhibit District 24.
[134]    Exhibit District 22; Tr. 740:11-24 –741:1.
[135]    Tr. 1355:21 -24 –1357:1-10.
[136]    Exhibit District 11 which was later amended by the Parents' present counsel on August 9, 2006 to include a claim for the 2006-2007 school year as well.
[137]    Tr. 1733:4-5; 1735:6-15 – 1736:1-14 and 20-23; 1737:8-18; 1738:1-24 – 1744:1-7; 1753:4-22; 1754:10-24 – 1756:1-11; 1757:5-24 – 1758:19; 1763:12-23.
[138]    Tr. 1733:11-12.
[139]    Tr. 1733:14-16.
[140]    Exhibits Parent 20 and District 28.

Sixth Grade : 2006-2007:  At a June 7, 2006 CSE meeting, the Student's 2006-2007 IEP[141] was developed.  Participants in that meeting included school psychologist Stephanie Kutin-Senzon, who chaired the meeting, Diane Shein, a school psychologist, Jeanine Milo, Sue Anne Schwartz, Andrea Tripodi and Rene Lund, Special Education Teachers from the middle school, Barbara Landau from the Windward School who participated by telephone, the Parents and Sheila Sette, the Parent member on the Committee.[142]

The June 7, 2006 IEP, for the Student's sixth grade year, 2006-2007,[143] is also being challenged.  It placed the Student in a regular sixth grade class with resource room support four times weekly without counseling.   In the middle school, the resource room apparently is programmed into a student's schedule in lieu of a homeroom period.[144]

The Parents gave notice of their rejection of the proposed 2006-2007 IEP in writing as a footnote to their attorney's August 9, 2006 letter amending the Parent's hearing request[145] and, by doing so, complied with the statutory requirement for notice more than ten business days prior to the commencement of the school year.[146]

## REIMBURSEMENT CLAIM LEGAL ANALYSIS

The IDEA provides that a court or hearing officer:

> "may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public

---

141    Exhibits Parents 4 and District 13.
142    Tr. 593:11-22.
143    Exhibits Parents 4 and District 13 at p. 1.
144    Tr. 521:20-24 – 522:1-15.
145    Exhibit Parent 1 and District 1 at page 1.
146    20 U.S.C. §1412(a)(10)(C)(iii)(I)(aa) and (bb).

education available to the child in a timely manner prior to that enrollment."[147]

If the IEP services offered by a Board of Education are inadequate or inappropriate, the services selected by the parents were appropriate and equitable considerations support the parents' claim for reimbursement, a Board of Education may be required to pay for the privately-obtained educational services. *School Committee of Burlington v. Department of Education of Massachusetts.*[148] The United States Supreme Court held, in *Florence County School District Four v. Carter by Carter,*[149] that the parents' right to tuition reimbursement includes the right to obtain reimbursement for tuition in a private school which is not State approved, if the private school provided the child with an appropriate education.

The Parent's August 9, 2006 hearing request for tuition reimbursement for the 2005-2006 and 2006-2007 school years,[150] requires analysis of whether Scarsdale failed, procedurally or substantively, to offer and provide the Student with a Free Appropriate Public Education [Prong I], whether the program and services for which reimbursement is sought are appropriate [Prong II], and whether there are any compelling equitable considerations that would otherwise preclude a reimbursement award [Prong III].[151]

The Parent's post-hearing memorandum points out that equitable considerations are founded in 20 U.S.C. §1412(10)(c)(iii)(III) which provides that courts may reduce or deny reimbursement "upon a judicial finding of unreasonableness with respect to actions

---

[147]     20 U.S.C. §1412(a)(10)(C)(ii).
[148]     471 U.S. 359, 105 S.Ct. 1996, 23 Ed. Law Rptr. 1189 (1985); *see also, M.S. v. Yonkers Bd. of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000).
[149]     510 U.S. 7 (1993).
[150]     Exhibit District # 1; Parent # 1.
[151]     *Board of Education v. Rowley,* 458 U.S. 176 (1982); *Burlington v. Department of Education,* 471 U.S. 359 (1985); *Florence County School District 4 v. Carter,* 510 U.S. 7 (1993); *Walczak v. Florida Union Free School District,* 142 F.3d 119 (2d Cir. 1998); *Frank G. and Diane G. v. Board of Education of Hyde Park,* 459 F.3d 356 (2nd Cir. 2006), *cert. granted* (2007).

taken by the *parents.*"   Parent's counsel correctly notes that the conduct in question is not that of the child, the child's teachers, or the child's unilateral placement and program. In the case of the latter, the Windward School apparently places contractual obstacles in the way of Parents who enroll their children regarding their staff's availability as witnesses.[152]

### Claim for Reimbursement for the 2005-2006 School Year:

### Prong I

The CSE's composition on June 14, 2005 when developing the 2005-2006 IEP:[153]

The 2005-2006 IEP meeting was finalized at the second of two CSE meetings which were held on May 4 and June 14, 2005.[154]  The District's May 31, 2005 letter to the Parents gave notice to them of the June 14, 2005 CSE meeting and listed the name and title of the people expected to attend with the sole exception of the "additional parent member"[155] [*i.e.,* under the Commissioner's regulations identified solely as "Parent Representative"].[156]  The latter listing of the title of an expected attendee, but not the name, did not comply with the Commissioner's requirement that the meeting notice "*inform the parent(s) of . . . the name and title of those persons expected to attend the meeting.*"[157]   When initially acknowledging that Exhibit District 35 was the May 31,

---

[152]    Tr. 1229:11-17; *see,* Exhibits Parent 50 and 52 at the 5th paragraph of each.
[153]    Tr. 263:8-24 -- 268:1-21; 275:16-24 -- 277:1-3.
[154]    *See,* Exhibit Parents 20 and District 28 at p. 5 of 8 under "Comments" with a summary of the meetings on those two dates. *See also,* Parents Exhibit 17 and District 29, the June 21, 2006 letter transmitting the 2005-2006 IEP to the Parents.
[155]    8 N.Y.C.R.R. §200.3(a)(1)(viii) [of the Regulations in effect on May 31, 2005][the section has been modified since, but only as to the pool of parents who can serve in the capacity of "additional parent member."].
[156]    Exhibit District 35 in the second paragraph; Tr. 327:1-24 -- 328:1-4.
[157]    8 N.Y.C.R.R. §200.5(c)(2)(i).

2005 letter notice to the Parents about the June 14, 2005 CSE meeting, the Director of

Special Education's response was that:

> "The process that we generally follow is that when this notice [*i.e.,* Exhibit District # 35, the May 31, 2005 letter] goes out when we have a date established, we call, as I had explained yesterday, from a list of parent members to obtain a parent member."[158]

But this indicates a regular practice not to identify the available parent and not to comply

with the Commissioner's regulation at 8 N.Y.C.R.R. §200.5(c)(2)(i) requiring that CSE

meeting notices "inform the parent(s) of . . . the *name* and title of those persons expected

to attend the meeting."[159] (Emphasis added)

There were several CSE meetings leading up to the June 14, 2005 meeting which

shed light on the District's notification practices and, in particular, the attendance of the

CSE's additional parent member.  The April 1, 2005 invitation letter to the Parents for a

June 7, 2005 CSE meeting listed the persons expected to attend by name and title, with

the exception of the additional parent member who was identified by title only "Parent

Representative."[160]

The March 26, 2006 invitation notice[161] for the April 26, 2006 CSE meeting lists

the names and titles of only the Chairperson and the School Psychologist who were

expected to attend and lists only the title of five other members, "Representative from

Windward; Reg. Ed. Teacher; Spec. Ed. Teacher; SMS Spec. Ed. Teacher; SMS Reg. Ed.

---

[158]     Director of Special Education, Tr. 327:12-16.
[159]     Both the language of and citation to the Commissioner's regulatory requirement remained the same in the years prior to 2005 and after the December 2005 amendments to the Commissioner's regulations to take into account changes in the IDEA in December 2004.
[160]     Exhibit District 42, second paragraph.
[161]     Exhibit District 16 in the second paragraph.

Teacher"[162] and do not indicate that a "Parent Representative" is expected to attend except by inference because the letter asks the Parents to notify the District if they do not wish to have the additional parent member in attendance.[163] The IEP developed from that meeting and the sign-in sheet, however, do report a full constituency of required CSE members as being present, including a parent member.[164] Notably, even the invitation to the initial CSE meeting, the invitation letter of January 8, 2003,[165] lists only the "Parent Representative" without the name of the additional parent member expected to attend.

The Director testified that "I believe that there were efforts to secure a parent member"[166] for the June 14, 2005 CSE meeting. He thought that a parent member was going to be there.[167] He indicated that when he arrived at the meeting he saw that the parent member was not present.[168] He acknowledged that up to that moment, the parents had not declined the participation of the additional parent member as authorized by the Education Law[169] and the Commissioner's regulations.[170]

The Director testified that the parent member who did not appear was contacted and reportedly indicated that she could not attend the CSE meeting due to an injury emergency which had occurred the day earlier, June 13, 2005, involving her own son. On further examination, the Director indicated that his secretary of four years, Georgia Ghiozzi,[171] usually kept a calendar of meetings and made the calls to identify and

---

[162]    Exhibit District 16 in the second paragraph.
[163]    Exhibit District 16 in the second paragraph
[164]    *See,* Exhibit District 13, at p. 4 of 9; and District 14, the Sign-in Sheet for the June 7, 2006 CSE meeting.
[165]    Exhibit Parents 41.
[166]    Director of Special Education, Tr. 263:22-23.
[167]    Director of Special Education, Tr. 265:8-12.
[168]    Director of Special Education, Tr. 265:20-24 -- 266:1.
[169]    Education Law §4402(1)(b).
[170]    8 N.Y.C.R.R. §200.5(c)(2)(v).
[171]    Director of Special Education, Tr. 275:16-24 -- 276:1-7.

schedule the attendance of the additional parent members for the meetings of the CSE.[172] Further, testified that she doesn't usually keep a log of the contacts[173] and, apparently after inquiry, determined that the secretary's calendar, in which she would pencil in the name of the parent member expected to appear, was no longer in existence because more than one school year had passed since the June 14, 2005 CSE meeting.

Dr. Bell was in attendance at the June 14, 2005 CSE meeting at the request and private expense of the Parents.[174] Dr. Bell's presence is noted on the IEP from the June 14, 2005 meeting only as the "Pvt. Psych."[175] and her name appears on the sign-in sheet for that meeting.[176] The Director offered to re-schedule the CSE meeting in light of the missing additional parent member or to continue without the additional parent member.[177] The Parents indicated that as long as Dr. Bell was there, they should continue. He memorialized that exchange in his June 21, 2006 letter to the Parents.[178] The parents acknowledge that they then acquiesced to participate in the meeting due to the economic pressure on them for the cost they incurred to secure the services of a private psychologist to attend the June 14, 2005 meeting, which cost would have been increased had they not participated.[179]

The requirement that an "additional parent member" participate in CSE meetings has existed for many years and was only modified in 1999 to allow for CSE meetings without an additional parent member, but only if, after prior notice to the parents, the

---

[172]    Director of Special Education, Tr. 264:1-6 and 14 -16.
[173]    Director of Special Education, Tr. 276:8-13.
[174]    Dr. Bell, confirming that she was parentally-paid to attend the meeting, Tr. 61:18-20.
[175]    Exhibit Parents 20 and Exhibit District 28 at pp. 4-5 of 8 under "Attendance" following the entry 6/14/05.
[176]    Exhibit District 32.
[177]    Director of Special Education, Tr. 268:17-21.
[178]    Exhibit Parents 17 and District 29 at the first paragraph.
[179]    Father, Tr. 1076:10-24 – 1077:1-21.

parents chose "to decline, in writing, the participation of the additional parent member."[180]  The State Review Officer has held that a parent's participation in a CSE meeting where the additional parent member was not present and the parent was asked to sign a waiver under those circumstances "is ineffectual to overcome the requirement that the additional parent member participate in the CSE meeting."[181]  Similarly, the SRO has held that where a parent arrived at a CSE meeting on three occasions only to be informed that the additional parent member was not present but then participated after signing a form about the non-attending member, the parent's

> decision to participate in each CSE meeting with the knowledge that the additional parent member would not be in attendance does not constitute an affirmative request to exclude the additional parent member within the meaning of the regulation (Appeal of a Child with a Disability, Appeal No. 01-096).[182]

Again, the "decision to participate in the CSE meeting with knowledge that the additional parent member would not be in attendance does not constitute an affirmative request to exclude the additional parent member."[183]  In the SRO decisions, the focus was on the reality of the situation.  A required member was not present.  The evidentiary record of how the parent made the decision to participate revealed no affirmative intent to decline the participation of the additional parent member, even upon momentary reflection upon being confronted with the information at the commencement of the CSE meeting.  The parental participation in and of itself and coupled with a District request to sign a document declining or waiving the presence of the parent member has been held to be

---

[180]     8 N.Y.C.R.R. §200.5(c)(2)(v).
[181]     *Application of a Child with a Disability (BOE of the City School District of the City of New York)*, Appeal No. 01-096 at p. 5 of 7 (1-1-02, SRO Joseph P. Frey).
[182]     *Appeal of a Child with a Disability (BOE of the Brewster CSD)*, Appeal No. 02-092 at p. 6 of 9 (4-11-03, SRO Paul F. Kelly) (emphasis added).
[183]     *Appeal of a Child with a Disability (BOE of the Jamesville-DeWitt CSD)*, Appeal No. 03-065 at p. 3 of 4 (12-19-03, SRO Robert G. Bentley) (emphasis added).

legally insufficient to "constitute an affirmative request to exclude the additional parent member."[184]  Here, the economic pressure of the Parent's financial commitment to have a private psychologist present exacerbates rather than ameliorates the legal insufficiency of their decision to continue to participate in the June 14, 2005 CSE meeting in spite of the absence of the additional parent member.  I must, therefore, find that the June 14, 2005 CSE meeting was improperly composed and violated the Parents' procedural rights under Article 89 of the Education Law and the Commissioner of Education regulations at 8 N.Y.C.R.R. §200.3(a)(1)(vii).  The June 14, 2005 IEP was developed by an invalidly composed CSE and is a nullity.

<u>The process by which the 2005-2006 IEP was developed:</u>

The Director of Special Education acknowledged that it is impermissible to propose a "placement or program before you flesh out and identify the child's individual needs and deficits"[185] and in response to a direct question about the hearing request claim that the district engaged in impermissible predetermination, he testified that "The way I'm interpreting that sentence, no"[186] the District did not engage in such conduct.

According to the Father, the Director of Special Education raised and made the recommendation that the Student be placed in the special education classroom in the June 24, 2005 CSE meeting prior to a full discussion of the program needed for his daughter.[187]  The Student's fourth grade teacher indicated that discussion of a different placement occurred as a result of the review of Dr. Bell's report.[188]  The teacher indicated

---

*Appeal of a Child with a Disability (BOE of the Brewster CSD),* Appeal No. 02-092 at p. 6 of 9. (4-11-03, SRO Paul F. Kelly).
[185]  Director of Special Education, Tr. 214:2-14.
[186]  Director of Special Education, Tr. 446:23-24; and 447:1-9.
[187]  Tr. 1055:9-11; 1056:11-24 – 1057:1-22.
[188]  Tr. 836:18-24 – 837:1-18.

that at the meeting she did not know the make up of the proposed class,[189] which is consistent with testimony of the Director that the class profile, marked Exhibit Parent # 19, was not before the Committee at the June meeting, but was supplied to them following the June 14, meeting after discussion about the class[190] and that the Parents might observe the class.[191]

The CSE meeting minutes on pages 4-6 of the '05-'06 IEP recite a somewhat sequential discussion of the Student starting with the May 4 meeting and continuing through the June 14, 2006 meeting. Starting with the May meeting, discussion of current levels of performance, the Mother's concern for achievable educational tasks for her daughter, teachers' concern for the student's self confidence, completion of a triennial before the end of the school year, parental inquiry about increasing services including use of Resource Room as an option or a special class, which "[the Parents] said they would not consider,"[192] was discussed before adjourning to reconvene with the additional test results were available. June's continued meeting began with a discussion about the absence of the parent member, followed by Dr. Bell's discussion of her evaluation, the Student's short term memory deficit and the Student's resistance "when the work becomes too complex,"[193] parental concern that "the more modifications put into the classroom, the more [the Student] feels different,"[194] a discussion of "how differentiated

---

[189]    Tr. 837:19-21; 840:18-24 – 841:1-11.
[190]    Exhibits Parent 20 and District 28 at page 6.
[191]    Exhibit Parent 19 and District 31, the June 17, 2005 cover letter from the Special Education Director to the Parents with attached class profile.
[192]    Exhibits Parent 20 and District 28 at page 5
[193]    Exhibits Parent 20 and District 28 at page 5.
[194]    Exhibits Parent 20 and District 28 at page 5; see Tr. 655:3-10 discussion about the Student had become "very sensitive to receiving assistance in the classroom from anyone, and we [the District] though that that [more push-in services] would not be a beneficial program for her."

instruction is conducted,"[195] the Mother's concern that when the Student leaves the classroom and returns she is not given the full curriculum. This discussion, in the June 14, 2005 meeting, is described as preceding a discussion of the special class option in the first meeting "again"[196] and how it would address the parents' concern for pull outs and missing parts of the curriculum at which time the Parents inquired about seeing the class and a comment that Dr. Bell "provided the parents with a description of how a special class can benefit [the Student],"[197] and the final topic discussed is described as follows:

> "After further discussion the CSE recommended the special class and reviewed the goals and objectives. The parents questioned some of them a[nd] slight modifications were made."[198]

The IEP summary of comments list a discussion of goals and objectives as the last item of business following the discussion, at some length, of the placement options and the special class recommended by the CSE.[199] The Director of Special Education, after concurring about the discussions at the June 14, 2005 CSE meeting, indicated that he did not "think it was the very last order of business"[200] and then sought to avoid the conclusion that the goals and objectives discussion occurred in a different order by indicating that "This [referring to the meeting summary on page 6 of the IEP] was not written in a sequential fashion."[201] He indicated, shortly thereafter in reference to the last sentence referring to the goals and objectives, that "some of the statements *might* have happened earlier than later"[202] and later in his examination that to the "[b]est of my

---

[195]   Exhibits Parent 20 and District 28 at page 5.
[196]   Exhibits Parent 20 and District 28 at page 6.
[197]   Exhibits Parent 20 and District 28 at page 6; Special Education Director, Tr. 322:7-9.
[198]   Exhibits Parent 20 and District 28 at page 6.
[199]   Exhibits Parent 20 and District 28 at page 6.
[200]   Tr. 404:23-24.
[201]   Tr. 405:4-6.
[202]   Tr. 413:18-20.

recollection, we went over each and every goal."[203]   The latter comment, however, did not clarify when, in the sequence of the meeting, that review of goals occurred.   Further, the resource teacher indicated that some goals had been discussed at the prior [May 4, 2005] meeting, but when clarifying her statement she said that "[t]o the best of my recollection, we tabled that meeting [May 4, 2005], and so we did not go over them."[204]   When referring to the second meeting, the June 14 meeting, the Father testified about goals discussion by stating that "[t]here wasn't any" discussion.[205]

The Director responded that there were CSE data sheets, *i.e.,* drafts of a possible proposed IEP, at the meeting,[206] but he could not recall discussion of a particular goal from them earlier in the meeting.   The purpose of the data forms is to collect information that can serve as a springboard for further discussion.[207]   What he indicated further was that the goals and objectives "came up at the – during the meeting.   At the end of the meeting I do review the goals and objectives."[208]

While various witnesses commented on the goals discussion, none brought additional clarity on the issue of the sequence of the decision making.   Considering all of the testimony and the documentary evidence, I am persuaded that the substantive discussion of placement impermissibly preceded the flushing out of the goals and objectives for the 2005-2006 school year.

<u>The CSE's Understanding of the Composition of the Special Class and its Appropriateness for the Student:</u>

---

[203]   Tr. 698:24 – 699:1.
[204]   Tr. 947:22-24 – 948:1-11.
[205]   Tr.  1055:3-6.
[206]   Tr. 407:5-24 – 408:1-12; *see, e.g.,* Exhibit Parent 27.
[207]   Tr. 608:18-24 –611:1-7; *see, e.g.,* Exhibits Parent 6, 7, 27,34, and 37.
[208]   Tr. 409:23-24.

The Student's Special Education Teacher did indicate that there was a discussion about mainstreaming the Student, the learning resource center and some other unspecified programs.[209]  Her testimony suggests that the discussion of a possible mainstream placement occurred in the earlier, May 4, 2005, CSE meeting but that the shift to a *discussion of a different placement occurred as a result of the review of Dr. Bell's report.*[210]

At the CSE meetings of May 4 and June 14, 2005, no document, like that sent to the parents three days after the June 14, 2005 CSE meeting,[211] was available to the CSE members showing the prospective class profile.[212]  The Director testified that he believed that there was discussion about what the class was like, what the children were like and their functioning levels[213] but acknowledged that such a discussion was not noted in the minutes of either meeting.[214]

The Commissioner of Education regulations require, for placement of students in special classes, that "in all cases, the size and composition of a class shall be based on the similarity of the individual needs of the students according to"[215] academic or educational achievement and learning characteristics, social development, physical development and management needs in the classroom.[216]  While the District's counsel argues somewhat persuasively about the appropriateness of the recommended special

---

[209]    Tr. 837:1-21; 919:17-24 – 920:17.
[210]    Tr. 837:1-18; *see also,* Exhibit Parent 20 and District 28, the 2005-200 IEP, at page 5 of 8.
[211]    *See,* Exhibit Parents 19 and District 31.
[212]    Director of Special Education, Tr. 458:12-20.
[213]    Director of Special Education, Tr. 458:21-24 – 459:1-8.
[214]    Director of Special Education, Tr. 459:10-24 – 460:1-11; and *see,* Exhibit P-20 at pp. 5-6 of 8.
[215]    8 N.Y.C.R.R. § 200.6(g)(2).
[216]    8 N.Y.C.R.R. § 200.6(g)(2)(i) – (iv).

class,[217] I conclude that there was a significant decrease in the Student's progress in fourth grade and that the Student, as she presented as a learner at the time of the June 14, 2006 meeting, was not an appropriate candidate for the special class. There was no clear understanding of the composition of the special class in which the CSE on June 14, 2005, and the composition requirements of the Commissioner's regulations for special class placements were not met[218] in light of the Student's learning characteristics and social development when compared with the composition of the class contained in the class profile.[219]

<u>Goals and Objectives in the 2005-2006 IEP:</u>

There was extensive questioning about the Student's IEP goals and objectives. The Parents' claim is that "the goals and objectives set forth in the challenged IEP do not pass inspection under state guidelines for IEP development."[220]  I find that the IEP contains sufficient information for understanding of the Student's present levels of performance in its statement of her levels and abilities, need and the reported Standardized Test Results.[221]  Each of the goals for the 2005-2006 school year is written in terms of "an improvement in" a particular area, such as "word recognition" (goal 1), "comprehension skills necessary to read for information and understanding" (goal 2), "the mechanics of written language such as spelling, capitalization ... *etc.*" (goal 3), "written language skills necessary to write for information, understanding and expression" (goal 4), "mathematical concepts, reasoning and computation necessary to

---

[217]    *See,* District's post-hearing memorandum of law at pp. 18 – 27.
[218]    Tr. 1084:8-11, where the Father asserts that no one knew the composition of the class.
[219]    Exhibits Parent 19 and District 31.
[220]    Exhibits Parent 1 and District 1 at page 3.
[221]    Exhibits Parents 1 and District 1 at pages 2 – 4.

develop problem-solving skills and to utilize mathematics to address everyday problems" (goal 5) and "self-awareness and self-concept" (goal 6). Each has short-term objectives following them, an indication of an evaluation criteria stated in percentages, an evaluation schedule and the person responsible for them. While much of the objectives may pass muster under at least one SRO discussion discussing goals and objectives,[222] the goals here do not have any indication of where the Student is expected to be one year from the date of the goal. Unlike the goals cited by the SRO in Appeal No. 02-037, the goals here do not indicate a target achievement level against which progress toward that target or goal can be measured within the meaning of the Commissioner's regulations in effect at the time.[223] The deficiency applies to all of the goals and deprived the Student of an appropriate IEP for the 2005-2006 school year.

## Prong II

To determine the appropriateness of the Parents' Windward School placement, one must review the analysis by the Second Circuit Court of Appeals in *Frank G. and Diane G. v. Board of Education of Hyde Park*[224] which recently reviewed, and changed, the standard for assessing the appropriateness of a unilateral private placement. In *Frank G.*, a child had been unilaterally placed and dually-enrolled in a "regular education class of 14 students"[225] in a local private religious school. The appropriateness of the private school placement under Prong II was the issue in *Frank G.*[226] since the school district had

---

[222]   *Board of Educ. Of the Penfield CSD for Review of the Determination of a Hearing Officer relating to the Provision of Educational Services to a Child with a Disability,* Appeal No. 02-037 (Nov. 5, 2002). Note the discussion of an IEP's goals and objectives at pages 4-6 which the SRO concluded "appropriately addressed the student's needs" [p. 6].
[223]   8 N.Y.C.R.R. § 200.4(2)(iii).
[224]   459 F.3d 356 (2nd Cir. 2006), *cert. granted* (2007).
[225]   459 F.3d 356 at 361 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 6.
[226]   459 F.3d 356 at 361 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 6.

conceded that it failed to meet the requirements for Prong I after the testimony of a teacher witness who opined that the District's placement was not appropriate.

The public school district's CSE recommended an IEP for the child for placement in a regular education elementary class of 26 – 30 students with direct consultant teacher services for math and organizational skills, a full-time individual aide and related services of counseling, group occupational therapy, a behavior modification program and test modifications.[227]  The Circuit Court's decision hinges, in large part, on a  focus on the testimony of one District witness who testified that the District's IEP was not appropriate because, in the witnesses opinion, a "combined self-contained fourth and fifth grade class in a classroom of nine students"[228] would be appropriate because "'[t]he small class . . . would be the better place for him.'"[229]  The Second Circuit held that:

> The small class size offered at [the private school] was one element of the special education services necessary to address a significant deficiency in the inappropriate public school placement the School District offered [the student], and it comes within the IDEA definition of "special education," namely, "specially designed instruction . . . to meet the unique needs of a child." 20 U.S.C. § 1401(29).[230]

By casting the issue in the way it did, the Second Circuit highlighted two things which render a standards-based analysis of the appropriateness of a private school placement almost non-existent. First, the Court holds that the public school's larger class size is the significant special education deficiency, yet a general-education-populated general education class is the intended entitlement under the IDEA.   Second, by reference to IDEA section 1401(29), the Court highlights how the definition of special education, as "specially designed instruction . . . to meet the unique needs of a child with a disability,

---

[227]    459 F.3d 356 at 360 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at pp. 5-6.
[228]    459 F.3d 356 at 365 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 9.
[229]    459 F.3d 356 at 365 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 9.
[230]    459 F.3d 356 at 365 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 9.

including (A) instruction conducted in the classroom," can encompass the whole of educational instruction -- both general and special education. The Circuit Court said that it was not deciding the case *solely* on the private school's small class size and pointed to the private school teacher's testimony that she worked with the student one-on-one, created a communications book, gave the student extra time to complete work, allowed him to work in isolated areas of the classroom, and allowed him to take tests orally.[231] Finally, the context of the Court's stated Prong II analysis was that parents are not barred "where the private school they choose does not meet the IDEA definition of a free appropriate public education," not barred because the private placement does "not meet state education standards or requirements," not barred because the private school does "not provide certified special education teachers" and not barred because the private school does not meet the same mainstreaming requirements as imposed on a school board.[232]

Here, the Student was placed in small classes of approximately ten to twelve students, some boys and some girls.[233] The school's educational focus is on students with learning disabilities. Dr. Lydia Soifer and consultant Kelly testified that the Windward school's philosophy is to group students homogeneously to facilitate their instruction.[234] Dr. Soifer also testified about a standard school day schedule, although only referencing it to the sixth grade, and testified that the school's instruction is a language based

---

[231]     459 F.3d 356 at 366 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 9.
[232]     459 F.3d 356 at 364 (2nd Cir. 2006), 2006 U.S. App. LEXIS 19029 at p. 8.
[233]     Kelly, Tr. 124:22-24 – 125:1-3; Soifer, Tr. 1181: 8-13 and 1185:4-10.
[234]     Tr. 1184:1-20; 131:6-23; *Note,* Private psychologist, Dr. Bell, also testified about the Windward School and she described it as a school for "the highest functioning kids" [ Tr. 14:9-11]. However, she had last been at the school eighteen years ago [Tr. 12:4-6; 20:21-24 – 21:1-8] and I consider that contact too remote to be probative regarding a student's program for the 2005-2006 or 2006-2007 school year. Her testimony as to the school, as to the current exchange she had with the Student, is, however relevant.

instructional approach based on the philosophy of Orton-Gillingham.[235]  Consultant Kelly, who visited the Windward School on September 18, 2006 for approximately three and one-half hours,[236] testified that she observed the Student's sixth-grade math class, which was apparently a co-teaching model with two teachers for the lower group of students in sixth grade.[237]  She also said that she spoke to the Student's fifth grade teacher, a Mrs. Brockhausen, and it appears that the Windward's fifth grade did not use the co-teaching approach.[238]  Finally, Ms. Kelly testified that the Windward School has a "tutorial period or extra help period built into their day."[239]

Dr. Soifer testified that the instructors require a minimum of a bachelor's degree with the majority having a master's degree in either special education, reading or a learning disability.[240]  Although the District's post-hearing memorandum correctly points out testimony about the lack of direct testimonial evidence from Windward about the Student's program and progress and lack of certain evidence about the training of the Windward teaching staff, the Soifer testimony and other indirect evidence and written reports are still probative on the Prong II analysis.

The progress reports for the Student's first year at Windward reflect that the student is progressing in the placement.[241]  District staff members who have been to the

---

[235]    Tr. 1185:17-24 – 1187:1-8.
[236]    Tr. 114:15-17; 121:5-10.
[237]    Tr. 128:3-24 – 129:1-4.
[238]    Tr. 129:5-24 –130:1-6.
[239]    Tr. 126:9-14.
[240]    Tr. 1187:9-17
[241]    Tr. 1536:12-17; *see,* June 2006 Windward Progress Reports, Exhibit Parent 5; Windward Middle School Report Card, Exhibit Parent 29; February 2006 Windward Progress Reports, Exhibits Parent 8 and District 19.

Windward School, acknowledge that the Windward School has an excellent reputation for helping students with learning disabilities.[242]

I conclude that the Second Circuit decision in *Frank G.* has diluted the standard by which private school placement's appropriateness under Prong II should be determined. Under the standard enunciated by the Second Circuit decision in *Frank G.,* the Windward School placement is appropriate for the Student.

## Prong III

The Parents' conduct, with respect to the 2005-2006 school year, does not bar their claim under Prong III. That the Parents applied to the private Windward School while their daughter was in third grade or that they raised various concerns or that then sought to have evaluations conducted privately do not adversely affect their claim. Further, they were candid about their concerns, frustrations and dissatisfaction with their daughter's education. They participated in the CSE meetings and expressed their desires for their child. Further, I find that the Parent's election to not disclose the existence and content of the April 4, 2004 Assessment of Emotional Functioning with the CSE does not require a material adverse inference to be drawn. It was disclosed as part of the pre-hearing 5-day document exchange and thus permitted the District the opportunity to offer countervailing evidence, if it saw fit to do so.

Upon the above findings and for the above reasons, I find that the Parents have sustained their burden on their claim for full tuition reimbursement for the 2005-2006 school year in the sum of $35,539.[243]

---

[242]    Lund, Tr. 1504:15-24 – 1505:1-16; 1468:7-11.
[243]    *See,* Exhibit Parent 53, page 1, itemization of Windward School charges to the Parents for their daughter's education at Windward for the 2005-2006 school year.

**Claim for Reimbursement for the 2006-2007 School Year:**

**Prong I**

Preliminary Issue:  The Parents assert, regarding the 2006-2007 school year, that "the district repeated a number of the above problems" without specifying the individual claims to which they are referring.   The IDEA provides that a party requesting a due process hearing "shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7) [IDEA's due process complaint entitlement], unless the other party agrees otherwise."[244]  An unspecified statement about "a number of the above problems,"[245] arguably, may not satisfy this IDEA requirement, but the circumstances under which the parties agreed to the service and acceptance of the August 9, 2006 amended complaint support a finding the Parents' complaint about the 2006-2007 school year is sufficient, particularly in light of the kind of detail into which the Parents' amended complaint delineated their position regarding the 2005-2006 school year.

Goals in the 2006-2007 IEP:

The standards for IEP development changed for the 2006-2007 school year because of the 2004 changes to the IDEA in which goals, without short-term objectives or benchmarks, became the law.[246]

I am satisfied that the IEP sufficiently indicates the Students present levels of performance based on the information available to them at the time of the CSE meeting in June 2006.  The District did have the Progress Reports from Windward and those are the then-most current indications of where the Student was performing in an educational

---

[244]    20 U.S.C. §1415(f)(3)(B).
[245]    Exhibit Parents # 1 and District # 1 at p.5 of each.
[246]    *See*, 20 U.S.C. § 1414(d)(1)(A)(II).

setting over which the District had no control. The testing information reported on the IEP is sufficiently current for the CSE to use for purposes of developing the IEP.

The 2006-2007 IEP lists seventeen goals[247] and each has a sub-listing of an evaluation criteria stated in percentages of success over a period of weeks, a procedure to evaluate with concrete materials listed, an evaluation schedule indicating various points during the school year and an identification of the person primarily responsible. Special education teacher Lund also testified regarding the proposed goals for the Student's sixth-grade school year and how she would implement and measure them.[248] Further, she testified that she thought that the goals would enable the Student to make meaningful progress.[249]

Upon review, however, I find that none of the goals, as is the case with the 2005-2006 IEP, indicate a target achievement level against which progress toward that target [or goal] can be objectively measured within the meaning of the IDEA or Commissioner's regulations in effect at the time.[250] The deficiency applies to all of the goals and deprived the Student of an appropriate IEP for the 2006-2007 school year. I conclude that they fail to comply with the Commissioner's regulations and deprive the Student of a free appropriate public education.

Adequacy of the recommended 2006-2007 program and placement:

Although I have determined that the goals in the 2006-2007 IEP are fatally deficient, I will address the balance of the Parent's dispute with the District over the essence of the recommendation for the mainstream placement for 2006-2007 because,

---

[247] *Exhibits Parent 4 and District 13 at pages 6 – 9.*
[248] Lund, Tr. 1473:5-24 – 1498:1.
[249] Lund, Tr. 1497:11-24 – 1498:1.
[250] 8 N.Y.C.R.R. § 200.4(2)(iii).

based on the information before the CSE, I think that the evidence points to it being otherwise appropriate and would likely have remained so had the goals been sufficient.

Regarding the 2006-2007 school year, the Parents also asserted that:

> Without proposing any kind of a transition plan, the district created a conditional, amorphous and 'wait and see' placement that threatened to place [the Student] in inappropriate 'parallel classes.' Learning support was inadequate and inappropriate.

> The district failed to adequately assess [the Student] at Windward. The district removed accommodations and supports that [the Student] had been previously offered.

The Parents' concern regarding the first of the claims was focused on the language of the comments in the 2006-2007 IEP. According to her IEP, the Student would have been placed in Cooper House within the Middle School[251] which is where parallel program for the sixth grade is located.[252]  Since the Student was not recommended for the parallel program, the IEP minutes comment about placement in Cooper House "so that if [the Student] experiences increased academic difficulty and needs to be switched into a parallel class, it can be done seamlessly"[253] and that "[i]f [the Student] does attend Scarsdale Middle School, school staff should convene after 6 weeks to review her program" [254] gave rise to questioning about whether the CSE's recommendation was either sound or really a contingent one.[255]  The special education teacher indicated that a six-week review reference in an IEP, such as that in the 2006-2007 IEP, would first generate a meeting of building staff to review and discuss the

---

[251]   Exhibits Parent 4 and District 13 at page 5 in the fourth paragraph; and *see,* Tr. 1464:5-23..
[252]   Tr. 1458:12-22.
[253]   Exhibits Parent 4 and District 13 at page 5 in the fourth paragraph.
[254]   Exhibits Parent 4 and District 13 at page 5 in the fourth paragraph.
[255]   Tr. 1514:9-24 – 1515:1-9; 1516:18-24 – 1517:1-2; *also,* 1544:21-24 – 1545:1-14; 1547:11-24 – 1548:1-7; 1548:8-24; 1549:7-20; and 1550:11-24 – 1551:1-9.

Student's progress and that meeting would lead to a full CSE meeting.[256]  Further, that group was identified as "Her [*i.e.,* the Student's] team of teachers, the house counselor and the psychologist."[257]  Further it was clear that while parents may, sometimes, attend such child study team meetings it was usually not the case.

When pressed whether the content of the IEP was "uncommon,"[258] the special education teacher indicated that "I don't think it's uncommon to reflect in the minutes of an IEP discussion of a program review . . ."[259] for students transferring from a private setting.  School Psychologist, Kutin-Senzon testified that there was a discussion of the parallel curriculum, and that the decision to place the Student in Cooper House just in case, which she indicated meant "[j]ust in case, meaning if [the Student] needed more intensive math help"[260] and because they have co-teaching there in science and social studies in which there is a regular educator and a special educator.[261]

I find that the CSE comments and indication that a six-week review should be conducted if the Student returned to be consistent with the IDEA's provision for review of a "child's IEP periodically"[262] and that the CSE did not indicate either an uncertainty of the appropriateness of the June 7, 2006 recommendation or that the Student would not likely make meaningful progress or require a more restrictive placement for her educational program.

The special education teacher indicated that in her view, the mainstream class placement for 2006-2007 was appropriate in light of her Windward test scores and that

---

[256]      Tr. 1514:16-24 –1515:1-9.
[257]      Tr. 1517:17-24 – 1518:1.
[258]      Tr. 1542:3-7.
[259]      Tr. 1542:9-14.
[260]      Tr. 1649:20-24 – 1650:1-14.
[261]      Tr. 1650:15-21.
[262]      20 U.S.C. §1414(d)(4)(A)(1).

the parallel program was more restrictive than needed at that point.[263]  She indicated that the Windward teacher, participating by telephone in the June 7 meeting, presented "the most current information in terms of her [the Student's] present level of performance across the curriculum"[264] and communicated that the Student was making meaningful progress at Windward.[265]    Similarly, the school psychologist cited Ms. Landau's presentation at the June 7, 2006 CSE meeting[266] as well as concurring that from her January 25, 2006 observation the Student "was having a good year at Windward."[267] The private consultant, Ms. Kelly, testified that in her September 2006 observation of the Student she discussed the Student's progress with the Windward teachers and that the Student was "able to close some gaps in the first year she was at Windward,"[268] She indicated that she observed the Student "raising her hand without prompting" and "interacting with other students"[269] and an active learner at that point in September 2006.[270] The Windward teacher was involved in the discussion of the goals for 2006-2007.[271]

In terms of the Student transitioning from Windward School back into public school, the special education teacher indicated, referring to students returning from Windward School, that "They have a solid foundation of study skills and strategies to handle the [middle school curriculum] content."[272]    When asked about math at Windward, the teacher indicated that on the Stanford Math Achievement Test, the

---

263    Tr. 1469:3-24 – 1470:1-11; 1509:3-10; 1509:20-24 – 1510:1-10.
264    Tr. 1534:13-16.
265    Tr. 1536:12-17.
266    Tr. 1641:7-24 – 1644:1; and see, Exhibit Parent 8.
267    Tr. 1683:1-6.
268    Tr. 117:12-18; 121:2-10; 129:19-24 – 130:1-6; and 132:21-24 -- 133:1-4.
269    Tr. 134:21-24.
270    Tr. 135:15-18.
271    Tr. 1560:3-7; 1644:2-22..
272    Lund, Tr. 1499:3-8.

Student was in the 45th percentile and that the score was within the average range.[273] Although there was questioning by the Parent's counsel regarding whether Windward recommends when its students, it its view, could or should transition back to public school, the evidence suggests that no such recommendation was given regarding the Student in this case for the 2006-2007 school year. While I find that affirmative information to that effect might enhance the likelihood of prediction of success in a return to a mainstream setting in public school, I do not find that the corollary, the lack of such a recommendation, as enhancing the prediction of a likelihood of lack of success.

On a collateral point, the 2006-2007 IEP meeting minutes state that the Parents expressed their agreement with the recommendation,[274] but the CSE Chairperson testified that she saw head nodding but that the "word expressed is not accurate."[275] While persons may perceive another's body language as indicating agreement, or disagreement, important matters such as parental agreement with a CSE's recommendation should not be based on anything short of a clearly expressed acknowledgement one way or the other.

**Prong II**

The Parents offered evidence about the Student's sixth-grade year through the testimony of Dr. Lydia Soifer, a speech language pathologist and Director of The Soifer Center for Learning and Child Development. She is also a member of the faculty of the Windward Teacher Training Institute.[276] Some of the testimony from Consultant Kelly touched on that sixth-grade placement as well since she observed the Student in September of her sixth-grade year. I do find that the added testimony of Dr. Soifer and

---

[273]     Tr. 1597;7-13.
[274]     Exhibits Parent 4 and District 13 at page 5 at the 4th paragraph.
[275]     Tr. 1665;6.
[276]     Exhibit Parent 63, page 1.

February 2007 progress reports[277] regarding the Student's Windward School placement for the sixth-grade year supplements and does not change my conclusion regarding its appropriateness under the Second Circuit's holding in *Frank G.*    Thus, under Prong II, I conclude that the Windward School continued to be an appropriate placement for the Student for the 2006-2007 school year.

**Prong III**

A dispute arose between the Parents and the school regarding the testimony of the *Parentally-retained expert witness, Dr. Lydia H. Soifer*[278] *and a series of letters between* the District and the Parents regarding whether they would consent to a the District's observation of their daughter at Windward during the 2006-2007 under circumstances where the District observer would be able to testify about the observation in the pending hearing.    The documentation of the exchange between the Parents and District were *grouped together and collectively marked Exhibit Joint #1, and admitted into evidence on* March 1, 2007.

In this case, the Parent's, on December 5, 2006, consented to a November 16, 2006 request to conduct an observation of their child, but condition of their consent was that they wanted the school to:

> "you [Dr. Mendelson for the District]. . . kindly agree by signing and returning this letter that the District shall not make any attempt to testify about this observation or submit any documents in connection with such observation in connection with the ongoing hearing regarding school years 2005-2006 and 2006-2007, then we give such consent immediately."[279]

---

[277]    Exhibit Parent 64.
[278]    Tr. 1205:7-24 – 1218:1-19.
[279]    Exhibit Joint # 1, the second page consisting of the one-page December 5, 2006 letter from the Mother to the Director of Special Education, at the 2nd paragraph.

The District's response on December 18, 2006 was a request that the Parents give "an unrestricted consent to this observation or state that you are refusing to consent at this time."[280]

On February 16, 2007, the Parents wrote to the Director of Special Education reaffirming their consent for conducting an observation for the annual review but limiting their consent, as they had in their December 5, 2006 consent letter. Their position was stated differently with a focus on the District's request for information for an annual review for the next school year. They indicted that

> ". . . for the exclusive purpose of the annual review process for 2007-2008, once again we grant unrestricted consent for that purpose only"[281]

and they followed up by informing the Director of Special Education that as to the ongoing due process hearing, all further issues should be taken up with their attorney. I note that at the December 6, 2006 hearing proceedings, when establishing a schedule to complete the hearing testimony, the dates of February 16, 26 and 28, 2007 and March 1 and 2, 2007 were identified as the earliest dates on which all parties, witnesses and this hearing officer could conclude testimony.

On February 16, 2007, the Parents received a February 2, 2007 letter from CSE Chairperson Stephanie L. Kutin, Psy.D., who wrote to the Parents in connection with the District's intent to conduct an annual review and notifying the parents that:

> "According to our records, you have either declined or not responded to our request to permit us to exchange information with your child's current school."[282]

---

[280]    Exhibit Joint # 1, the sixth page consisting of the one-page December 18, 2006 letter from the Director of Special Education to the Parents.
[281]    Exhibit Joint # 1, the seventh page consisting of the one-page February 16, 2007 letter from the Parents to the Director of Special Education, at the 2nd paragraph.

Dr. Kutin enclosed another consent form for execution.   On February 21, 2007, the

Parents responded to Dr. Kutin, the CSE Chairperson, noting that although it was dated

February 2, 2007, it arrived with a post-mark date of February 15, 2007 and that the

enclosures did not include a copy of the due process rights referenced in the letter.   The

Parents re-stated that they

> "granted the District unrestricted consent exclusively for
> this [annual review for the 2007-2008 school year] sole
> purpose,"[283]

re-affirmed their prior position,[284] asked "who" would be conducting the observation,[285]

and stated that

> "We fully expect that the individual will be impartial and
> fair and not involved in the proceedings between us and the
> District in any way."[286]

The essence of this exchange was articulated during proceedings on February 26,

2007 upon the interposition of an objection to the testimony Dr. Lydia H. Soifer[287] when

she testified that she had observed the Student at the Windward School in December

2006.[288]   The District's attorney objected to testimony from Dr. Soifer about "an

observation that was done in this academic year"[289] and argued that

> "[the] district has not been able to do an observation of [the
> Student] at Windward this year.   The parents have not –

---

[282]      Exhibit Joint # 1, the eleventh page consisting of the one-page February 2, 2007 letter from the
CSE Chairperson to the Parents.
[283]      Exhibit Joint # 1, the eighth and ninth pages consisting of the two-page February 21, 2007 letter
from the Parents to the CSE Chairperson on the first page in the third paragraph.
[284]      Exhibit Joint # 1, the eighth and ninth pages consisting of the two-page February 21, 2007 letter
from the Parents to the CSE Chairperson on the second page in the second paragraph.
[285]      Exhibit Joint # 1, the eighth and ninth pages consisting of the two-page February 21, 2007 letter
from the Parents to the CSE Chairperson on the second page in the third paragraph.
[286]      Exhibit Joint # 1, the eighth and ninth pages consisting of the two-page February 21, 2007 letter
from the Parents to the CSE Chairperson on the second page in the third paragraph.
[287]      Tr. 1205:7-24 – 1218:1-19.
[288]      Tr. 1204:7-24 –1205:1-2.
[289]      Tr. 1205:16-17.

they conditionally consented to an observation and to the extent that we have not been able to do that observation."[290]

The Parent's counsel responded that the Parents did no more than hold the District to its representation, in the District's letters, that the observation as

"part of the planning for next year for '07-'08 school year, for the triennial"[291]

as opposed to

"seeking to put in such information as part of our existing lawsuit with the due process . . . ."[292]

The Parent's attorney argued that the District's request lacked specificity regarding whether the District's had requested unconditional consent for the observation and to be able to use the information against the Parents and he argued that the District acted in "bad faith"[293] and that the District's position was "not equitable."[294]  The District's attorney did not dispute the factual description regarding the letters exchanged between the Parents and the District, but did assert that she

"didn't know Dr. Soifer was to [be] testifying until . . . a week-and-a-half ago, and I didn't get any information that Dr. Soifer had done an evaluation or an observation of [the Student] and this is the first I'm hearing of it so I've got an issue now."[295]

What apparently occurred is that around February 13, 2007, there was an exchange between the parties in which Dr. Soifer's likely appearance was made known to the District and the witness' vitae was provided but the witness had not prepared a report.[296]

The Parent's counsel candidly indicated that at some point he would be asking the

---

[290] Tr. 1205: 16-24.
[291] Tr. 1206: 18-20.
[292] Tr. 1207:3-5.
[293] Tr. 1207: 18-19.
[294] Tr. 1207: 19.
[295] Tr. 1209:21-24 – 1210:1-3.
[296] 1211:15-21.

ultimate question of the witness whether she thought that the program at the Windward school was appropriate for the Student.[297] My ruling at the time was to permit testimony from Dr. Soifer as a fact witness with acknowledgement that the issue of obtaining opinions would have to await resolution later.[298] Ultimately, the witness was asked for her opinion,[299] which she provided, and she was cross-examined.[300]

The exchange between the attorneys for the parties confirmed that each party understood what the other was asking or giving regarding consent for the District to observe the Student for the annual review for the 2007-2008 school year and possible use of that information in the present due process hearing. The District was asking for the right to observe <u>and</u> also then be able to <u>use</u> the information so obtained in the current proceeding. The Parents were <u>declining</u> to grant <u>consent</u> to permit <u>for the District's</u> <u>observation of the Student at Windward and use in this due process hearing.</u>

What the Parent's witness did, however, is just what the Parents did not want the District to be able to do: Observe the Student at Windward during the 2006-2007 school year and use that information in the present due process proceeding.

While the scheduling of an annual review and observation of a student in a parentally-selected private school placement may not necessarily fall during the time a hearing is pending, the exchange between the parties in this case does raise a fundamental issue. I have been unable to uncover a controlling court decision clearly on point. Therefore, I assess this issue in its natural civil litigation context and apply principals of New York and Federal law in civil litigation. For instance, discovery is not authorized

---

[297]    1213:16-21.
[298]    1214:15-24 – 1215:1-14.
[299]    Tr. 1265:9-24.
[300]    Tr. 1260:21-24 – 1283:1-9.

under the IDEA, but that would not foreclose a parental request to allow a parentally-retained expert to observe their child in their public school placement for the possible use of the observation information in a then-pending due process hearing. Similarly, the IDEA does not foreclose a school district from requesting parental consent to allow a District-selected expert to observe a child in a private school placement for possible use of the observation in a then-pending due process hearing.

The issue of granting or withholding parental consent for a school district to observe a student regarding the child's present levels of performance and functioning in a private school setting when the parents seek reimbursement for the cost of that private setting does raise a legitimate question about the appropriate inference to be drawn and the appropriate determination of equitable considerations under Prong III.

The statutory authority granted to Parents to control access by school districts to information regarding their children raises the same kind of legal issues which arise in other civil litigation processes where a doctor-patient, hospital-patient, or even constitutional right not to testify against oneself [the fifth-amendment privilege against self incrimination] may be asserted by a party pursuing a claim against another. Such well-recognized rights can be exercised, but when exercised in some contexts an adverse inference may properly be drawn.

When an injured person makes a claim that the injury caused by the defendant was a "broken" leg and the claimant waives his or her doctor-patient privilege, the subsequent disclosure of the content of x-rays can establish whether the claim is meritorious or not. If a claimant in such a situation chooses to exercise their doctor-patient privilege and refuses to consent to disclosure or otherwise conceals disclosure of

the content of x-rays, a reasonable inference could be drawn that disclosure, if it had occurred, would have established that the leg is NOT broken and that the claim is NOT valid.   Similarly, if a claimant in a personal injury action asserts his constitutional right against self-incrimination to decline to answer a question whether they violated the vehicle and traffic law by driving through a red traffic light, their exercise of the privilege may lead to the fact-finder making an inference that had they testified, their testimony would have been adverse to their asserted claim.  If a person seeking money damages in an amount which can be ascertained by "appraisal" but then withholds the disputed item on which appraisal must be made, the withholding may reasonably lead to an adverse inference that an appraisal, if obtained, would not support the claim asserted.

In *I.D. v. Westmoreland*,[301] a U.S. Magistrate's analysis resulted in a finding of an implied waiver of a privilege in the context of an IDEA due process hearing because the privilege issue was placed before the court over a disputed evidentiary ruling.  The United States Magistrate pointed out that the:

> "purpose of the privilege [in *I.D.*, physician-patient privilege] is not to exclude relevant evidence, but to simply facilitate activities which require confidence."[302]

The Parents' claim for the 2006-2007 school year is, in fact, a monetary claim not unlike monetary claims arising out of different facts.  The Parents exercised their privilege here when they correctly and clearly perceived, from the District's correspondence, that <u>the District was seeking</u>, among other things, <u>consent to observe the Student and used the result of that observation in the present due process hearing</u>.  It is clear that the Parents' exercise of their privilege to decline consent for an observation of their child – if the

---

[301]  17 IDELR 417, 17 LRP 1206 (Feb. 8, 1991)
[302]  17 IDELR 417, 17 LRP 1206 (Feb. 8, 1991)

results of the District's observation could be used in this pending hearing -- was made to exclude otherwise relevant and material evidence.

My ruling, during the hearing, to allow the admission testimony by Dr. Soifer did not resolve the decisional issue of what effect the already-exercised privilege has on the inferences which should be drawn. Further, that I did not take the Parents' counsel up on his offer, albeit conditionally, on February 16, 2007[303] to adjourn proceedings to permit the District to conduct an observation and then return to conclude the hearing. That offer does not resolve the issue since I viewed, and continue to view, that option as far too late in the hearing process for a hearing request filed first in June 2006 and amendment on August 9, 2006. The District-sought observation would have been material on Prong I of the *Burlington* analysis in terms of information on the present levels of the Student's then-current performance and material on Prong II of the *Burlington* analysis in terms of information on the appropriateness [in this case the "continued" appropriateness] of the unilateral placement. In light of the facts and circumstances of this case, I conclude that a fact-finder may infer that had if the Parents had consented to the observation and had a District-selected witness observed the Student during the 2006-2007 school year, the evidence so adduced would have been adverse to the Parents' interests on either Prong I or Prong II or both. I conclude that the weight of the action by a Parent, which goes to the heart of the fact-finding purpose of a due process hearing, is heavy. It does tip the balance of the equities in favor of the District and against the Parents' monetary claim.

---

[303]     Tr. 1216:11-12 – 1217:1-8.

### Determination regarding FAPE

The IDEA requires that hearing officer decisions be made on substantive grounds regarding whether the child received or was offered a free appropriate public education.[304] I find that the deficiencies in the 2005-2006 CSE meeting and the 2005-2006 IEP have denied the Student a FAPE for the 2005-2006 school year (Prong I), that the Windward School is an appropriate unilateral placement for the Student (Prong II) and that equitable considerations weigh in favor of the Parents and against the District (Prong III) thereby entitling the parents to full tuition reimbursement for the 2005-2006 school year. I find that the deficiencies in the 2006-2007 IEP's goals have denied the Student a FAPE for the 2006-2007 school year (Prong I), that the Windward School is an appropriate unilateral placement for the Student (Prong II) but that equitable considerations between the parties regarding the 2006-2007 school year weigh against the Parents and in favor of the District (Prong III) thereby requiring dismissal of the tuition reimbursement claim for the 2006-2007 year.

### ORDER

**ORDERED,** that the 2005-2006 IEP is annulled and the Parents are awarded tuition reimbursement of $35,539;[305] and it is further

**ORDERED,** that the Parent's claims challenging the 2006-2007 IEP are dismissed.

<u>3 May 2007</u>
Date

Jerome D. Schad, IHO

---

[304]     20 U.S.C. § 1415(f)(3)(E).
[305]     *See,* Exhibit Parent 53, page 1, itemization of Windward School charges to the Parents for their daughter's education at Windward for the 2005-2006 school year.

**Notice to Parents and Board of Education of their right to obtain Review of this Decision**

Pursuant to 8 N.Y.C.R.R. §200.5(k), any party aggrieved by this decision has a right to obtain a review by the State review officer. The decision of the impartial hearing officer shall be binding upon both parties unless appealed to the State review officer. Such review shall be initiated and conducted in accordance with the provisions of 8 N.Y.C.R.R. Part 279.

## EXHIBITS:

**Parents' Exhibits
On Behalf of M.R.**

| | | | |
|---|---|---|---|
| P-1 | August 9, 2006 | Amended Demand for Due Process | 05 Pages |
| P-2 | September 18, 2006 | Observation<br>By: Kathleen H. Kelly, MS Ed.<br>　　Educational Consultant | 04 Pages |
| P-3 | August 16, 2006 | Letter to Mr. & Mrs. Rifkin from<br>Dr. Michael Mendelson | 02 Pages |
| P-4 | June 14, 2006 | Committee Recommendation for Continuation<br>Of Services & 2006-2007 IEP | 10 Pages |
| P-5 | June 2006 | Progress Reports<br>Windward School<br>By: Ms. Brockhausen<br>　　Mr. Kahn<br>　　Ms. Simon<br>　　Mrs. Sena<br>　　Mrs. Angst & Mrs. Shoemaker<br>　　Ms. Hunt, Mr. Vermette, Ms. Farano & Mr. Volpacchio | 08 Pages |
| P-6 | April 26, 2006 | CSE Draft Data Form | 07 Pages |
| P-7 | April 26, 2006 | CSE Draft Data Form | 11 Pages |
| P-8 | February 2006 | Progress Reports<br>Windward School<br>By: Ms. Brockhausen<br>　　Mr. Kahn<br>　　Miss Simon<br>　　Mrs. Sena<br>　　Ms. Hunt, Mr. Vermette, Ms. Farano & Mr. Volpacchio | 08 Pages |
| P-9 | January 25, 2006 | Student Observation<br>Scarsdale Committee on Special Education<br>By: Dr. Stephanie Kutin-Senzon | 01 Page |
| P-10 | 2005-2006 | Work Product | 10 Pages |



CASE #21038

**Nury Alvarez**

| | |
|---|---|
| **From:** | IHOSystem@schools.nyc.gov |
| **Sent:** | Monday, May 21, 2007 2:35 PM |
| **To:** | mauricio@mayerslaw.com; nury@mayerslaw.com; pebbles@mayerslaw.com |
| **Subject:** | REQUEST WITHDRAWAL/CASE DISMISSAL: 107852, ROBBINS, MATTHEW |

```
========================================================
The New York City Department of Education
Impartial Hearing Office
131 Livingston Street - Room 201
Brooklyn, New York 11201 ==================================================

Please note the following.

Case #: 107852
Student: ROBBINS, MATTHEW
Request withdrawn
Reason: Withdrawn - without prejudice
Hearing Date(s) Cancelled:
May 23, 2007

If you have any questions, please contact the Impartial Hearing Office.

Case Manager: Richard James
Telephone: (718) 935-3406
Email: RJames@nycboe.net

Thank you.
```

1 of 1 DOCUMENT

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2007, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

July 24, 2007 Tuesday

**SECTION:** Pg. A1

**LENGTH:** 2347 words

**HEADLINE:** Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns;
 Seeking a Home Tutor

**BYLINE:** By Daniel Golden

**BODY:**

   EAST ISLIP, N.Y. -- Paul McGlone, an iron worker, and his wife, Tricia, became worried in 2006 that their autistic son knew fewer letters in kindergarten than he had in preschool.

   When the East Islip school district refused their request for at-home tutoring by an autism specialist, they exercised their right under federal special-education law to an administrative hearing. There, a hearing officer ordered East Islip to pay for seven hours a week of home therapy. The McGlones hired a tutor, and their son "started to click again," his mother says.

   Then the district appealed the decision to Paul F. Kelly, the New York state review officer for special-education cases. He denied any reimbursement for home services. "The child's progress was consistent with his abilities," Mr. Kelly found in February. The family canceled the tutoring.

   The McGlone case is part of a pattern that has many parents and advocates for the disabled in an uproar. They say administrative reviews in many parts of the U.S. overwhelmingly back school districts in disputes over paying for special-education services. State education departments, which have an interest in keeping down special-education costs, typically train or hire the hearing officers. Also, recent U.S. Supreme Court decisions and changes to federal law have made it harder for parents to win cases.

   Although relatively few disputes between parents and school districts reach the hearing stage, the decisions set ground rules for how much extra assistance districts must provide disabled students, who comprise 14% of all public-school students. In recent years, schools have "mainstreamed" more students with disabilities in regular classrooms, hoping to benefit the children through interaction with nondisabled peers while saving money at the same time.

   The battles reflect tension over the high cost of special education. In 1999-2000, the latest year for which figures are available, national spending on special education reached $50 billion, according to the Center for Special Education Finance, a nonprofit research group. In 2005-06, New York City's public school system alone spent $390 million on private education for disabled students considered unsuited to public school. Such tuition can cost $50,000 a year or more per pupil.

   New York's Mr. Kelly is a particular target of special-education parents' anger. A study by Pamela Steen, a Patchogue, N.Y., lawyer for parents, found that he granted full or partial relief to districts in 60 of their 70 appeals, or 86%,

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns;  Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

in 2006 and 2007. Andrew Cuddy, an Auburn, N.Y., lawyer who represents parents, says Mr. Kelly is "being dictated to" by the state education department to save money.

Last week, about 20 lawyers for parents met to discuss possible legal action against Mr. Kelly. Advocates for the disabled have complained about him to Gov. Eliot Spitzer. John Farago, a City University of New York law professor and a New York hearing officer, says Mr. Kelly is "rewriting the rule book" to challenge precedents that enabled parents to put children in private schools at public expense.

A spokesman said Mr. Kelly declined to comment because he serves in a quasijudicial capacity. Kathy Ahearn, state education department counsel, said Mr. Kelly decides each case on "its own unique facts" and the department doesn't influence his rulings.

Under the 1975 federal law now known as the Individuals with Disabilities Education Act, parents who believe public schools fail to provide their disabled children with a "free appropriate" education may seek redress in a hearing before an independent arbiter.

In some states, lawyers or retired school administrators work part-time as hearing officers. Elsewhere, a full-time official handles special-education hearings as part of a broader caseload. In New York and Pennsylvania, initial decisions may be appealed to a second tier of administrative review. Once they exhaust these reviews, parents may pursue their case in state or federal court.

Administrative review was conceived as a faster and cheaper way of resolving special-education wrangles than going directly to court. But school districts soon considered it a financial nightmare. When they lost, they often had to pay not only private tuitions but also parents' legal bills.

In 2004, Congress amended the disabilities act to require parents to attend a mandatory "resolution session" with school officials before a hearing. It also allowed a district to recover its legal costs from parents if it wins at hearing and the complaint is deemed frivolous.

Two U.S. Supreme Court decisions also lengthened odds against parents. In 2005, the court ruled that parents seeking relief must bear the "burden of persuasion" in hearings. That means when both sides' evidence is equally compelling, the hearing officer should rule in the district's favor. Previously, in about 15 states, precedent or state law placed the burden on districts, says education professor Perry Zirkel of Lehigh University in Bethlehem, Pa.

At hearings, parents rely on expert witnesses, such as child psychologists, to offset testimony from teachers and other school staff. But the Supreme Court ruled last year that, even if parents win hearings, they can't recoup witnesses' fees -- often $100 an hour or more -- from districts.

The number of hearings nationwide dropped 31% to 4,170 in 2005-06 from 6,038 the year before. Publicly funded placements in private schools, which had climbed to 73,149 in 2004 from 52,012 in 1996, fell to 71,082 in 2005, the latest year tallied by the U.S. Department of Education.

The Supreme Court's burden-of-persuasion precedent played a role last year when Carolyn and Charles Johnson of East Islip challenged their school district, on Long Island's southern side. The district had determined that the Johnsons' son, Andrew, a lean, restless six-year-old whom his mother calls "a friendly kid with no friends," didn't qualify for special education.

Only 9.6% of the district's students were in special education in December 2005, below a statewide average of 12.3%. The average special-education student cost East Islip $21,847 in 2004-05, compared with $9,550 for general students. Guercio & Guercio, a law firm that represents East Islip, said the district "is fully committed to providing an appropriate education to all of its students" and offers services to children with disabilities even if they aren't in special education.

Six health-care professionals agreed that Andrew, who suffers from a form of autism called Asperger's Syndrome, needed help with social skills. His kindergarten teacher testified that he slapped classmates, leveled their building-block towers, grabbed puzzle pieces out of their hands, and threw pretzels and Play-Doh across the room.

The district argued that Asperger's wasn't hampering Andrew academically, and his misbehavior wasn't unusual for kindergarten. Hearing officer Harry Kershen, a retired school administrator, came down on East Islip's side, citing the Supreme Court decision. Andrew has "certain quirks," but "his behavior wasn't all that off the wall," Mr. Kershen says.

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns;  Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

Mr. Kelly, the New York state reviewer, upheld the ruling, leaving Andrew in a regular classroom without the aide the Johnsons sought. Mr. Kelly wrote that the record showed Andrew has "excellent work habits." The Johnsons appealed to federal district court in Central Islip, N.Y., in May.

Mr. Johnson, himself a middle-school principal in the Bronx, believes the district was ignoring his son's social needs. "Kids don't kill themselves because they can't pass algebra," he recalls telling district officials. "They kill themselves because they don't have friends."

New York State Assemblywoman Catherine Nolan says the Supreme Court's ruling has had a "chilling effect." A bill she filed to return the burden of persuasion to districts has passed the New York legislature but hasn't been sent to the governor yet. She believes the court meant its ruling to apply only to states that don't have their own laws on the matter.

Many districts are also limiting outside experts' access to classrooms. In California, a psychologist hired by parents of an autistic boy requested 90 minutes to observe an elementary-school program where the Capistrano school district wanted to place the child. After the district gave the psychologist 20 minutes, the parents sought a hearing. This past March, a federal court in Los Angeles reversed a hearing officer's ruling and ordered the district to reimburse the family for privately funded educational expenses.

In Reading, Mass., experts may observe for only 45 to 60 minutes, accompanied by school personnel. They must submit a resume and references to the district, and hand over copies of notes. "A lot of these evaluators are hired guns," says former Reading special-education director Stephen Gannon, who developed its policy.

The federal government doesn't track the outcomes of administrative hearings. But in most states that keep count, districts usually win. In New Jersey, districts prevailed in 27 of 28 hearings in 2005-06. In California, parents only won 11 of 119 hearings in that year. Districts prevailed in 77 cases, while the rest had mixed outcomes.

One Florida hearing officer was accused of reading during testimony for the parents. "Like some teenage girl reading a Harlequin romance novel during homeroom," the officer "attempted to hide the book behind a report cover," the parents' lawyer in the case wrote in a motion. The officer denied the allegation but recused herself from the case. She decided at least 25 special-education cases before retiring last fall, always in favor of the district.

School-board lawyers say they're winning because special-education services have improved. "Ten or more years ago, school districts frequently did not have adequate programs," says Charles Weatherly, whose Atlanta firm represents districts in several states and has also trained hearing officers. "Now that they have discovered the expense of litigation and of funding private placements, they're putting more money into programming."

Some parents and advocates for the disabled dispute that explanation. Former Pennsylvania hearing officer Linda Stengle, whose contract was not renewed last year, contends in a pending federal lawsuit against the state that its Office for Dispute Resolution "instructed hearing officers to selectively apply federal and state guidelines so that they always benefited school districts over parents." The office denies the allegations.

After hearing reviewers in Pennsylvania were accused of bias, the state overhauled its system for choosing them. Until recently, Pennsylvania had four appeals panels, each with a fixed roster of three administrative judges, to review initial rulings. In a federal lawsuit filed in 2005, lawyer Dennis McAndrews accused one of the four panels of bias, saying it decided 45 of 47 appeals for districts between August 2003 and August 2005.

Prof. Zirkel, the education professor at Lehigh University, was a member of that panel. He wrote most of its decisions, including one limiting the special-education services Mr. McAndrews's client could demand. Prof. Zirkel says his record over a longer period was less lopsided.

In May, the U.S. District Court in Philadelphia sided with Mr. McAndrews, ordering the state to take another look at the case. Around that time, the state dissolved the four panels. Now, a computer randomly assigns three judges to each case and picks which one will write the decision.

In New York, parents prevailed in 54% of issues adjudicated at hearings in 2005-06, according to state data. But the picture changes when either side appeals to Mr. Kelly. After a stint at Syracuse University teaching disability law and helping students represent the indigent, he became the state review officer in January 2003. While granting districts most of their appeals in 2006-07, he sided in full or part with parents filing appeals only 27% of the time, according to Ms. Steen, the lawyer who has studied his record.

Staying The Course: Schools Beat Back Demands For Special-Ed Services --- Parents Face Long Odds Amid Cost Concerns;  Seeking a Home Tutor The Wall Street Journal July 24, 2007 Tuesday

When lawyers working for Mr. Kelly prepared decisions in favor of parents, he often overruled them, according to two former staff members.

New York created Mr. Kelly's office in 1990 after a federal court ruled it was a conflict of interest for the state education commissioner to judge appeals. The state reimburses districts for some special-education costs. Although the state education department employs Mr. Kelly, he is required to act independently of it.

Mr. Cuddy and other parents' attorneys say Mr. Kelly's independence is compromised by his relationship with Kathleen Surgalla, an assistant counsel for the state education department. Ms. Surgalla has trained the part-time officers who conduct the initial hearings and handled other special-education matters. Mr. Kelly and Ms. Surgalla live together in an Albany suburb, voter-registration records show.

Mr. Kelly and Ms. Surgalla declined to comment through a department spokesman. Ms. Ahearn said department employees have an "obligation to keep business separate from personal. . . . I feel comfortable and certain that there's no inappropriate conversation or influence going on."

After Mr. Kelly denied home-based autism therapy to the McGlones' son, they considered moving out of East Islip. Then the district's new special-education director promised them therapy at home this summer and a one-on-one aide in the school year beginning this fall. So far, the therapy is going well, says Ms. McGlone. In the first two weeks, her son has mastered four more letters of the alphabet, compared with seven in the just-concluded school year, she says.

"He has the ability to learn to read, and that could change his whole world," she says.

(See related letters: "Letters to the Editor: For Parents of Children with Special Needs, Public School Offers No Relief" -- WSJ July 31, 2007)



License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** July 31, 2007

# The Scarsdale Inquirer

VOLUME 85, NUMBER 18

Founded in 1901

FRIDAY, OCTOBER 19, 2007

## Partnership planned with Windward School

### By CARRIE GILPIN

Scarsdale schools administrators are in the early stages of planning a partnership with the Windward Teacher Training Institute, a division of the Windward School, an independent, coeducational day school for students with language-based learning disabilities based in White Plains.

The partnership has two parts. First, the district hopes to bring staff from the Windward Teacher Training Institute to Scarsdale to offer professional development through the Scarsdale Teachers Institute, which offers continuing education for all Scarsdale staff.

Second, the district hopes to have Windward's help consulting on Scarsdale's new developmental reading assessment (DRA) tests and how teachers in the classroom can best use results from those tests.

"We are in the research and planning stage and need a broader conversation before we move forward," said Dr. Joan Weber, the assistant superintendent for personnel.

"We met with our professional development team a few weeks ago to discuss development of a continuum of courses offered through STI." said Weber, who cautioned that things are in the very early stages and details have not been discussed.

E-mail blasts from the Scarsdale High School PTA and Children Having Individual Learning Differences (CHILD) have gone out to parents announcing a meeting Tuesday, Oct. 23 at which Paul Folkemer, the assistant superintendent for instruction, will discuss details on the collaboration with Windward and other professional development initiatives in the areas of reading and writing instruction.

Folkemer and Mike Mendelson, director of special education, also discussed the partnership with Windward at a board of education meeting Oct. 9 during a report on the district's education initiatives for the year.

### K-5 targeted

In a phone interview Tuesday, Mendelson said he hoped the STI course or courses would be in place during the second half of this year and would continue into the 2008-09 academic year. He said courses would be targeted for teachers in K-5 or 6 and that those teachers would be encouraged to take the courses. If teachers in older grades wished to participate, they would not be precluded.

Windward uses a systematic approach to reading and writing instruction called the Orton-Gillingham method.

Windward's Teacher Training Institute Web site explains, "The Windward Teacher Training Institute provides professional development in the latest research-based instructional tech-

Continued on page 10

## Partnership planned with Windward

Continued from page 1

niques to help successfully meet the wide range of abilities found in classrooms. WWTI courses provide teachers, parents, administrators, speech pathologists, psychologists and other professionals knowledge about multisensory methodologies proven to help both learning disabled and mainstream students."

Mendelson said that learning to read is a basic element of language, and that all students would be helped by any teachers taking the Windward STI courses, once they become available.

He explained that in any population, as much as 20 percent will have difficulty mastering basic reading skills. Reading comprises five subskills; a child who is proficient in one or more subskills may be deficient in another. A fluent reader, for example, may have difficulty with comprehension. Consequently, all teachers, both special education and regular classroom teachers, can use the systematic approach to reading that Windward can provide, Mendelson said.

> *Reading comprises five subskills; a child who is proficient in one or more subskills may be deficient in another.*

The Windward STI courses would be voluntary, as are all STI offerings to Scarsdale teachers and administrators.

Mendelson said there are several elementary school teachers in Scarsdale who have special education backgrounds who now teach in regular classrooms, and that, increasingly, special education teachers are "moving over to the other side. Obviously, they don't lose their skills and training, and when we look to mainstream kids it helps us enormously," if a teacher has training in special education.

At several CHILD and board of education meetings last year, CHILD representatives and Scarsdale parents whose children attend Windward School asked the district to provide additional teacher training in the Orton-Gillingham method for all Scarsdale teachers.

### DRAs

Mendelson also said that Scarsdale's new one-on-one DRA reading assessments for all students provide the district with an enormous amount of information, and that that information needs to be put to good use.

"With the help of Jerry Crisci [district technology director], we hope to use Windward's staff to interpret and put into statistical use some of this data," Mendelson said at the board of education meeting.

"This is an ideal opportunity for us to improve our skills, and Windward is anxious for this partnership as well. It will be a benefit to both institutions."

# The BEACON



CHARTING THE COURSE FOR SUCCESS

**The Windward School Newsletter for Professionals and Parents**          Spring/Summer '07

## HEAD LINES

*by Dr. John J. Russell*
*Head of School*

This year, after 30 years in public education, I became the Head of Windward School.  I was motivated to make this change for both altruistic and personal reasons. I was well aware of Windward's excellent reputation for teaching children with language-based learning disabilities and was eager to be part of this extraordinary program. It was also time for me to move out of my "comfort zone."  After eleven years experience as a superintendent of schools, I felt that it was time for new challenges and new learning. I realized that the learning curve at Windward would be steep, but I did not anticipate that being at Windward would cause me to change my closely held beliefs about how children learn and what constitutes effective instruction.

Like many educators during the 1970s, I believed in the principles of the progressive movement and fell

-continued on page 8

## In This Issue

Head Lines                          1
Teaching Expository Writing         1
Alumni Corner                       2
The Outplacement  Program           3
Summer School                       5
Educators Visit Windward            6
Alumni Reunion                      7
Returning Trustee                   8
Professional Article                9
Teacher Training Program           15

# Teaching Expository Writing in the Lower School

*The following is an interview with Carol Siegel, the language arts coordinator for the Lower School (grades 1-4). Ms. Siegel has taught at Windward for the past seventeen years, working with students of varying ages and levels of academic proficiency. Supervisor of the writing program for four years, she assumed responsibility for coodinating the entire language arts program for the Lower School in 2005. Although language arts encompasses reading, writing, spelling and handwriting, the following dialogue specifically addresses the Basic Writing Skills Program, which was developed by Dr. Judith C. Hochman, former Head of School.*

**Q. What is expository writing?**
**A.** Expository writing explains or informs. It is the type of writing most often required in school. For example, in writing assignments, students are frequently asked to define, discuss, criticize, analyze, or summarize. Windward's writing program gives students the linguistic competence to meet these demands.

**Q. Why is it more important to teach expository than creative writing?**
**A.** Since our goal is to return students to mainstream settings, we believe in preparing them with the written language skills they will need most often. As students progress through the elementary and secondary grades and then enter college, the writing that they will be expected to produce is mainly expository.

-continued on page 4



*A scene from the Middle School production,* Fairy Tales

# ALUMNI CORNER

*Kendal O'Leary attended Windward for eighth and ninth grades. Now in her senior year at Scarsdale High School, she has been accepted early decision by Washington and Lee University. The following autobiographical sketch evolved from one of her school assignments.*

A learning difference is a lens through which one looks at the world. It is not a definition of the person who looks. Many people at Scarsdale High School would never guess that I have a learning difference. That is because they never witnessed how I struggled in my early years at school.



My early years at Scarsdale's Edgewood Elementary School were filled with fond memories in which I developed an enjoyment of my classes and my social environment. However, during fourth and fifth grades, teachers identified my lack of organizational skills and misjudged me as a student who was "smart, but not trying." My parents were supportive of me and did all they could to give me encouragement. My mother, who had struggled with dyslexia throughout school, identified with my situation, recalling times when her teachers had labeled her "smart, but not trying." When my fourth grade teacher began to teach long division, the multi-digit process baffled me. On the other hand, my teachers were confused when they saw my skill in reading and art, since both were evidence of my capabilities as a student. My mother never scolded me or punished me for receiving poor grades because she had faith in me. She recognized my hard-working personality and the frustrations I was experiencing in school. Having an adult who believed in me and understood what I was going through prevented me from ever giving up. During those years I became determined to prove that I really was trying.

The worst years of my life actually took place in Middle School. In math class, my struggles reached an all-time high. While other students progressed with the new, more complex material, I fell further behind. My teacher assumed that I avoided participating in class because I was not paying attention and made a point of calling on me, although I almost never gave a correct answer. As my frustration increased, my math grade dropped to a C+. On the other hand, my skills in English and history became even stronger. I couldn't wait to do projects in science or any of my other classes because I loved to be creative. During these projects, I would integrate my artistic capabilities into the work, enhancing

the effort. In fact, I would often get carried away, becoming enthralled with the topic and spending far too much time on it. These were my first struggles with time management. Although I received an A+ in nearly every school project I completed, I hadn't developed adequate time management skills, preventing me from balancing my other assignments. I had yet to learn to meet deadlines and coordinate advanced planning.

After two years in middle school, I had begun to develop an image of myself as an incompetent student. I felt miserable with myself and with my lack of academic achievement. When my mother recognized how intense my struggle had become, she looked for alternatives. Both of my brothers had attended Windward School, an independent school for students with learning differences, and were able to achieve academic success. My brother Denis's outcome was a major influence on me. After Windward, he returned to mainstream schools with total confidence in his academic ability and the persistence to advocate for himself. He was eager to succeed and willing to work. Most importantly, he had developed a shrewdness that allowed him to learn how to succeed in his environment. Ultimately, Denis had come to terms with his learning disability.

My mother sent my application to Windward and I was enrolled in eighth grade. I was thrilled to learn I had been accepted, viewing it as an opportunity to move forward and achieve my potential as a student. I hoped that Windward would be an environment where my struggles would be recognized and where teachers would see me as the intellectually curious student I am. I recall not even feeling nervous on my first day at Windward. I felt safe just entering the school, despite the fact that I was surrounded by strangers and I was "the new kid." I loved the large classrooms, with small groups of students. I felt completely confident approaching my teachers and I knew that I would never be labeled "a student who wasn't trying."

*-continued on page 6*

# The Outplacement Program

*by Diane Kissner*
*Director of Outplacement Counseling*

In keeping with Windward's mission of preparing students for their return to the mainstream, the outplacement department facilitates the placement of students in public and independent schools each year. The outplacement department was created for the following purposes: to develop outplacement procedures to assist parents and students throughout this complex and often emotional process; and to develop relationships with both public and private schools in the tri-state area, and help these schools understand the Windward program and student population. The goal is to place our students in environments where they will be successful, as well as challenged. Options for placement may include public school, independent day school, boarding school or a school with a religious affiliation. Emphasis is placed on helping Windward families find the right match for each individual student.



*From left to right: Diane Kissner, Renee Kirnan (assistant to Ms. Kissner), and an 8th-grade student at a mock interview*

The first step in this process is identifying students who are ready to leave Windward. Division Heads and parents work together to determine who may be leaving at the end of a school year. Parents are asked to contact their division head with questions regarding readiness to leave. The outplacement process often begins in the spring before their last year. At that time, a formal outplacement meeting is arranged which includes the student's teachers, the Division Head and the Director of Outplacement. The purpose of this meeting is to report on progress to date, set academic goals for the following school year, and explore all the appropriate placement options.

In the fall of the exiting year, families that are interested in independent day or boarding schools, or schools with a religious affiliation begin to research those options by attending school tours, gathering and completing applications, and checking dates for admissions exams. Throughout the exiting year, the outplacement staff guides parents through each step of the process. Students are required to complete a portion of the admissions application. The outplacement staff is available to help students proof read their application essays. Teacher recommendations are reviewed and sent, and mock interviews are arranged to familiarize students with the various questions asked, and to put a student at ease with that process. In addition, this department is a resource for information regarding admissions exams.

For students who will be attending their home district schools, the process of contacting the school begins in January of the exiting year. The parents of a child entering his/her district for the first time begin the process by calling the principal's office to register, as well as the Director of Special Education. The special

*-continued on page 7*

# Expository Writing

*(continued from page 1)*



*Carol Siegel conducting a fourth-grade writing group. Some of the students are wearing clothing with numerical themes because it was Lower School Math Day.*

**Q. Are independent creative writing projects and daily journal entries included in the program?**
**A.** No, they aren't. Most youngsters, not just at Windward, need direct instruction in how to write sentences of increasing complexity and well-structured paragraphs. They generally will not develop these skills on their own.

**Q. What is the primary objective of the expository writing program?**
**A.** The main goal is to help students express themselves clearly in a well-organized manner. To accomplish this, we raise the level of linguistic complexity at the sentence level and teach planning and outlining skills that can be used at all grade levels and in all content areas. Students need these skills as they move on to formulate well-structured paragraphs and begin to do research assignments.

**Q. How are these goals specifically achieved?**
**A.** We use the explicit set of goals for writing sentences, paragraphs, and compositions that are defined in Dr. Judith C. Hochman's manual, *Basic Writing Skills*. Activities to achieve these goals are taught in sequence, as students proceed through the grades. Their writing is regularly evaluated to determine when mastery of specific goals has been achieved.

**Q. How are the students organized in writing groups?**
**A.** Students are grouped homogeneously for reading and writing and are placed in classes that are appropriate to their skill levels. Lower School students have one writing period a day. In the early grades, they are given basic sentence kernels, consisting of a noun and a verb, and then practice expanding these kernels to add more details. Youngsters practice a great variety of sentence activities. To give just a few examples: they may expand a sentence using where, when, why, and how; use different conjunctions to complete a sentence; produce a complete sentence from a fragment; change the tense in a sentence; and change a question to a statement, and vice versa. They also learn about the parts of speech, punctuation, fragments and run-ons, as well as tense and number agreement. Outlining and paragraph writing are generally group activities that are modeled by the teacher.

As students progress through the program, they do more paragraph writing. Students are taught that there are four steps in the writing process:
1. Planning and Outlining
2. Drafting
3. Revising and Editing
4. Producing a Final Copy

Teachers know that good writers spend the most time on the first and third steps and, therefore, the majority of their instructional time is devoted to giving the students strategies to develop these skills.

**Q. How is individual student progress assessed?**
**A.** Writing samples are taken three times yearly, and goals for sentence and paragraph activities are determined

*-continued on next page*

# Expository Writing

*(continued from page 4)*

for each student. The language arts coordinator reviews all writing samples, which together with the goal sheets, are kept in cumulative folders for each student. Throughout the year, the language arts coordinator reviews the folders and works with teachers to develop lessons that specifically address individual and group needs.

**Q. Is the writing skills program integrated into other subject areas?**
**A.** Definitely. Most direct written language instruction takes place in writing classes, but every content area teacher is trained in the strategies of the writing program. Students are expected to use the techniques for outlining, planning, and revising their written work in all subject areas.

**Q. How does the attainment of effective writing skills affect Windward students after they are mainstreamed?**
**A.** Many Windward alumni have told us that when they returned to mainstream schools, they had better writing skills than many of their classmates. For example, one alum wrote, "The one advantage I have over my friends is my Windward training. My work is organized, I have really good study habits, and I know how to outline and write an essay." An alumni parent, discussing her son's experience at boarding school, stated, "He has benefited immensely from the expository writing program. Using the techniques of outlining, drafting, and revising, he is able to break an assignment down into manageable segments and produce a first-rate paper. This was a task that he used to find agonizing, and he is especially proud of this accomplishment."

In addition to the improvement in expository writing, Windward students show gains in note-taking, paraphrasing, summarizing, and oral expression: skills that are directly related to the writing program. Thinking and writing are tightly linked, and a student's ability to function at higher levels is enhanced by direct instruction in the strategies of expository writing. ❏

# Windward Summer School
## *Charting the Course for Success*

**Our Program Features:**
- **Mathematics**
- **Science**
- **Study Skills**
- **Research Skills**
- **Technology**
- **Sports**
- **Art**
- **Music**



**O**ur exciting four-week program is designed for students going into grades 4-9, who desire to improve their skills or enrich their knowledge in math, science and study skills. There will also be an opportunity in the afternoon for socializing and fun through sport, art, music and photography. All students receive instruction from teachers trained in Windward's multi-sensory approach to learning.

July 9–August 3
Academic Program: 9:00 am–12:15 pm
Full Day: 9:00 am–2:45 pm
40 West Red Oak Lane, White Plains, NY 10604

For more information and a brochure, contact;
Christopher Eberhard,  Tel: (914) 949-6968 Ext. 1250
or visit our website at www:windwardny.org
and click on the Academic Programs link.

# Educators Visit Windward

The Education and Manpower Bureau of Hong Kong is planning to institute a multisensory reading program in the Hong Kong schools. To help implement the curriculum, representatives of the bureau wanted to see a school where this reading program is currently in practice. Teachers College, Columbia University, recommended that they visit Windward School.

In December, Detta Chow and Suzanne Chan, of the Hong Kong Education Bureau, toured Windward together with Judith Birsh and Mary Hercus-Rowe. Ms. Birsh was the founder and director of the Multisensory Teaching of Basic Language Skills program at Teachers College, and Ms. Hercus-Rowe is Director of its Academic Language Therapy Association. The tour was conducted by Phyllis Bertin, Director of Reading for the Windward Teacher Training Institute, and Maureen Sweeney, Assistant Head of Windward School and Director of Admissions. ❏



*From left to right: Judith Birsh, Maureen Sweeney, Suzanne Chan, Detta Chow, Mary Hercus-Rowe, and Phyllis Bertin.*

---

# Alumni Corner

*(continued from page 2 )*

I returned to Scarsdale High School in my sophomore year. It became a rite of passage. During this year, I learned how to apply my strengths in order to succeed. Furthermore, I learned not to measure myself by another's standards. I learned that success is not as simple as good grades; rather, it requires a strong interest in the subjects and classes. Every day represented an opportunity to me–an opportunity to prove to myself that I was capable of doing well in a mainstream school, despite my learning difference. To this day, I am extremely proud of how much progress I have made and how many obstacles I have overcome. I have developed efficient time management and organizational skills. I feel in control of my high school career,

and, although I feel overwhelmed at times, my grades have consistently improved as my workload has increased. I now like learning and I am enthusiastic about putting my time and effort into assignments, which require me to drive myself to the next level.

Windward allowed me to remember who I was, after years of not feeling good about myself and thinking I was "stupid." I had always been capable of excelling, despite my learning difference. Windward taught me that. What a major turning point Windward was in my life! I can hardly imagine where my frustration would have led me, but I do know one thing…it would not have been a healthy path. Today my academics are a testimony to

the development Windward has spurred in me. I have taken AP United States History (getting a 5 on the exam), and I took AP Art History and absolutely loved it. This year I am taking AP United States Government, AP Studio Art (art is one of my strongest passions) as well as AP English (a class I find incredibly enjoyable and stimulating).

The teachers at Windward all saw something in me that I was unable to see. They all pushed me until I was able to see their vision myself. When I did, I began pushing myself. No experience in my life can compare to the experience I had at Windward. I am so grateful for those two years; my life has turned around completely because of it. ❏

# Alumni Reunion



*Former Windward students at the Alumni Reunion*

Each school year, Windward holds two special receptions for alumni. A luncheon is held in December for all alumni who are currently in high school. In June, there is a barbecue for all alumni, regardless of age or grade level.

This year, more than fifty former Windward students attended the December event. They joined current Windward 9th graders and teachers for a delicious lunch and enjoyed the opportunity to reminisce and catch up with the latest news. After lunch, they attended a forum in which current 8th and 9th graders questioned the alums about student life since leaving Windward. It was, as always, a warm, enjoyable, and meaningful occasion. ❑

# Outplacement

*(continued from page 3)*

education department should familiarize the family with the services available, and arrange time for an evaluation. The purpose of the evaluation is to determine whether or not the student is eligible for any special services. After the evaluation is completed, the school district will arrange a conference called a Committee on Special Education team meeting (CSE). A number of people attend this meeting including parents, special education staff, the district's school psychologist, who administered the evaluation, a regular education teacher, and a special education teacher. In addition, a Windward faculty member who is most familiar with the student will participate by conference call for the purpose

of discussing progress and to give the committee Windward's recommendations regarding an appropriate academic program. At this meeting, the academic program for the entering year will be designed. Parents of a child already classified will contact the principal's office and director of special education. An annual review will be arranged to update information, and review the student's academic program. A Windward faculty member will be available by conference call at that review.

The outplacement process is just that, a process. As parents and students explore options, opinions about school choices may change. This is the time to keep an open mind, and con-

sider the alternatives. While the outplacement process is long, labor intensive and often stressful for both parents and students, it is also very rewarding. Our students work hard to master the skills that will help them to succeed in the mainstream and it is exciting for them to see that they have reached a stage of readiness to leave. Although it is sometimes difficult for parents to imagine how their children will manage without the support that Windward provides, our alumni have shown us time and again that they can succeed and often excel in their next academic settings. The staff of the outplacement department looks forward to working with you to plan your child's future school placement. ❑

# Headlines *(continued from page 1)*

under the spell of whole language. The wide-spread adoption of whole language by schools is not surprising given its endorsement by state education departments, schools of education, and groups such as the National Council of Teachers of English. More recently, the whole language movement, in response to a barrage of criticism, re-invented itself as "balanced literacy" claiming to combine the best practices of both whole language and direct, intensive, systematic, early, and comprehensive reading instruction. This seductive blend of approaches has been adopted by many well intended school districts, including the one where I was superintendent. This jazzed-up version of whole language once again received support from teachers, publishers, schools of education, and state education departments. With this type of encouragement, it seemed not only reasonable, but prudent, to adopt a balanced literacy approach. The only problem with

this tempting hybrid approach is that there is no scientific research to support it.

In 2000, the National Reading Panel reported that its members had reviewed vast quantities of reading research and were not able to corroborate the effectiveness of any of the unique principles of whole language in the development of children's reading ability. In her monograph, *Whole Language Lives On: The Illusion of "Balanced" Reading Instruction,* noted reading educator, Louisa Moats, flatly states that since "the premise advanced by whole language about how reading is learned has been contradicted by scientific investigation," then combining reading science with whole language should not even be considered.

In addition, early researchers such as Jeanne Chall (1967) and Rudolf Flesch (1955) have documented that "direct, intensive, systematic, early, and comprehensive (DISEC) instruction of a prearranged hierarchy

of discrete reading skills (particularly how to apply phonics information to recognize written words) is the most effective beginning reading instruction" (Groff, 2001). Windward's approach to reading is consistent with DISEC, which, in turn, is supported by an overwhelming body of scientific evidence.

At Windward, the faculty is immersed in reading and language research. A cadre of nationally recognized consultants, combined with numerous professional conferences and workshops provided by the Windward Teacher Training Institute, present the entire faculty, myself included, with the knowledge and skills necessary to implement and constantly improve a research-based instructional program. Having once been lost in the whole language maelstrom, I am now fully committed to championing the research-based instructional program that is the basis of our students' success and the hallmark of Windward. ❏

# Windward Welcomes Returning Trustee

Andrew R. Feldman, former treasurer of the Board of Trustees from 1996 to 1999, has renewed his membership in the Board. Mr. Feldman is a graduate of the University of Pennsylvania and received an M.B.A. in Finance from New York University. He is currently the Managing Director of BlueStar Capital Management in Westport, Connecticut. In addition to his professional duties, Andy is the Assistant Treasurer of the Westchester Jewish Center and a member of the Board of the Mid-Westchester Jewish Community Center.

Andy and his wife, Mindy, live in Scarsdale with their four children: Corey, Russell, Jackie and Tara. Corey is a freshman at the University of Pennsylvania; Russell is a junior at Scarsdale High School and Jackie and Tara are in elementary school in Scarsdale. Both Corey and Russell are Windward alumni.

Andy has joined the Finance, Investment and Audit Committees. His talent, dedication and expertise are valuable assets, and Windward is extraordinarily lucky to have him back on board. ❏



*Andrew R. Feldman*

# What Is Multisensory Structured Language?

## *A Potent and Powerful Pairing: Multisensory Teaching and Learning with a Structured Language Curriculum*

### *by Judith R. Birsh*

*Judith R. Birsh, Ed.D., was the founder and director of the Multisensory Teaching of Basic Language Skills program at Teachers College, Columbia University. Her primary interests are the teaching of literacy skills and the preparation of teachers who work with students that have dyslexia. She is a Certified Academic Language Therapist and served twice as president of the New York Branch of the International Dyslexia Association. She is the author of Multisensory Teachers of Basic Language Skills and co-author of the Activity Book for Teachers. This article is excerpted from Volume 32, #4, Fall, 2006 issue of* Perspectives, *a periodical of the International Dyslexia Association.*

Learning to read, write and spell are cognitive linguistic tasks. Extensive research over the last decades has shown that teaching in these basic cognitive linguistic areas must include a language-based approach that is direct, systematic, explicit in content, and addresses the following foundational skills: phonemic awareness, phonics, fluency, vocabulary study, comprehension strategies (NRP, 2000), spelling (Moats, 2006), and writing (Berninger & Amtmann, 2004), with an emphasis on accuracy and automaticity in every aspect. This kind of instruction is especially mandated for those who are at risk or are struggling to learn to read. For many students, learning to read is a painstaking process.

Beginning early in the 20th century, long before the use of sophisticated brain imaging techniques to illuminate the reading pathways, multisensory instruction formed the basis of treatment for diverse groups of students with reading difficulties. (Moats & Farrell, 2005) We now know much more about the brain through work in the neurosciences. Brain imaging has allowed scientists to follow the pathways used in reading in both children and adults. As the science of reading has evolved, however, there has been a great deal of research on what causes reading disability and how to define it.

This description of multisensory structured language (MSL) has a number of purposes. The first is to explain what MSL is, using the typical lesson plan format as the framework for the discussion. The second is to propose reasons from clinical and classroom experiences, why MSL seems to work with children and adults with dyslexia and other reading challenges. The third part will look briefly at some experimental research that uses programs that contain components of MSL and work well with a variety of groups.

Many experienced teachers who work with students with dyslexia and related learning difficulties teach the scientifically based components of reading instruction, using a multisensory structured language program to insure learning of the cognitive linguistic concepts necessary for successful reading acquisition.

---

*Three different areas of research offer support for multisensory instruction. The first area is the nature of memory; the second area comes from the neurosciences; and the third, from the nature of learning.*

---

Multisensory teaching and learning is a form of direct instruction of the phonological, morphemic, semantic and syntactic layers of language. Multisensory strategies simultaneously involve visual, auditory, tactile-kinesthetic sensory systems, and/or articulatory-motor components while linking listening, speaking, reading and writing; this means it directly involves students in seeing, hearing, saying and writing during instruction. After instruction, direct application of the sound/symbol correspondences to reading and spelling are practiced, using a variety of skills such as letter matching, blending words with the new sound, and analyzing words with the sound for spelling.

*-continued on page 10*

# What Is Multisensory Structured Language?

*(continued from page 9)*

In their daily lessons, teachers deliberately and systematically incorporate many multimodal opportunities to hear, see, say, and move, while following a carefully organized and sequenced approach to language structure. New knowledge is accumulated, based on what has already been previously learned and then maintained for daily review and practice in future lessons. The power behind these strategies resides in the pairing of multisensory teaching and learning with the structured language curriculum.

> *If experimental research is declared inappropriate, no evaluation of the efficacy of the reading and writing process approach is possible.*

The salient features of what makes a lesson multisensory will be highlighted in the routines of a typical MSL lesson. "The core content for instruction is the carefully sequenced teaching of the structure and use of sounds, syllables, words, sentences, and written discourse." (Moats & Farrell, 2005) The lesson plan format includes a progression of structured, scientifically based (NRP 2000) language activities. The essential components are rotated through carefully planned lessons on a daily basis with differing emphases according to the needs of the students. In each section of the lesson, teachers pay close attention to how they are going to involve different sensory systems to reinforce the learning in brief and varied routines that motivate students and hold their attention. It is common for MSL trained teachers to engage their students actively in question-response-feedback cycles.

The multisensory lesson plan formats of the programs based on the original Orton-Gillingham approach have many common features. Programs that are similar in structure and philosophy have been developing since the 1970s. They adhere to the principles learned from research studies and clinical experiences with input from many allied professionals from the fields of education, psychology, neuroscience, medicine, and speech-language pathology. (Birsh, 2005)

Daily lessons typically include the following discrete components of language, which are modified for each student or group and for different levels of instruction. All components do not appear every day. They are rotated through the weekly lesson plans to help students develop fast, accurate decoding, automatic recognition of familiar words and sight words, and fluent reading of text, spelling proficiency, comprehension and writing.

- Alphabet sequence and letter naming
- Phonemic awareness activities including segmenting and blending
- Review of sound-symbol associations, learned in previous lessons using letter decks and key words to aid memory
- Spelling dictated sound to integrate reading and spelling
- Introduction of new letter/sound associations and language concepts, and/or review of previously introduced concepts
- Reading phonetically regular words in lists and sentences with letter patterns already taught, and developing automatic recognition of high-frequency sight words to build automaticity
- Vocabulary study including Greek and Latin layers, focusing on morphology and syllabication
- Reading controlled and/or decodable text to develop fluency
- Spelling and writing words and sentences from dictation using words from reading practice
- Handwriting practice, with explicit instructions in letter formation
- Comprehension and listening strategies for use with connected text
- Oral language practice and written composition

*-continued on next page*

# What is Multisensory Language?

*(continued from page 10)*

The structured lesson plans used in MSL intervention target these specific skill components with the ultimate goal of increasing accuracy and fluency through sufficient practice and synthesizing these skills for effective comprehension and written expression.

**What May Make Multisensory Instruction Effective**

Despite long term use of multisensory techniques by  experienced practitioners for students with reading difficulties and the number of well-established instructional programs incorporating them as central to their design, very little is actually known about the efficacy of multisensory instruction. "Although devoted practitioners emphasize the significance of the multisensory component as pivotal for student success, it is perhaps this component that is least understood." (Moats and Farrell 2005)

Moats and Farrell (2005), however, provide some insights into why MSL is effective in language learning. Careful to note the lack of empirical evidence to support the power of the approach, they, nevertheless, see some theoretical support coming from the science of cognition and neuroscience.

Three different areas of research offer support for multisensory instruction. The first area is in the nature of memory; the second area comes from the neurosciences; and the third, from the nature of learning. (Moats & Farrell, 2005)

Research concerning short and long-term memory finds that the neural networks are temporarily activated during new learning. Focusing on specific pieces of information holds learners' attention when control processes are used. For example, "selective attention, attentional shift, and employment of strategies for remembering such as verbal rehearsal or use of imagery are features of working memory as well." (Moats & Farrell, 2005)  Selective attention is the ability to attend to certain stimuli while ignoring other stimuli, and working memory involves putting ideas on hold while working on other ideas or taking in new information. Storage mechanisms that store small pieces of speech information and graphic or print information are active in working memory. In a study cited by Moats & Farrell, (Mousavi, Low & Sweller,

1995), it was found that integrating in working memory what is being learned is more easily done when the material is physically conjoined through both the visual and auditory modalities. For children who show evidence of phonological disability with difficulty in sorting out speech sounds and storing them accurately in phonological memory, improvement in phoneme awareness, reading and spelling came as a result of working on the "articulatory features of the phonemes and phoneme sequences in words," (Moats & Farrell, 2005) combined with the written representations. (Gillon, 2003)

---

*In each section of the lesson, teachers pay close attention to how they are going to involve different sensory systems to reinforce the learning in brief and varied routines that motivate students and hold their attention.*

---

Functional neuroimaging has allowed researchers to understand how reading takes place in the brain and how language is processed then. Reading involves multiple sites and has multiple systems for processing the symbols into sounds. Dyslexia is manifested by a disruption in these language systems, which leads to phonological weaknesses. The phonologic weakness occurs "at the lowest level of the language system," and in turn impairs decoding. (Shaywitz, 2003) In fact, there are two neural systems for reading: one for word analysis in the parieto-temporal region and the other for automatic, rapid responses localized in the occipito-temporal area that is used by skilled readers for rapid word recognition. Low phonological processing skills are the result of left hemisphere posterior processing anomalies typical of children with dyslexia. (Birsh, 2005) This means that individuals with dyslexia have difficulty accessing and manipulating the sound structure (phonemes) of spoken language. Such a deficit prevents easy and early access to letter-sound correspondences and decoding

*-continued on page 12*

# What Is Multisensory Language?

*(continued from page 11)*

strategies that foster accurate and fluent word decoding and recognition.

Although these differences affect the ability to read, neural systems for reading are malleable and highly responsive to effective reading instruction. In their research using functional magnetic resonance imaging to study the effects of a systematic phonics-based intervention with 6 to 9-year-old children, Shaywitz & Shaywitz (2004) found evidence of plasticity of neural systems for reading. The changes in the brain made these readers comparable to good readers. "Teaching matters and can change the brain." (p. 931)

---

*Careful planning guarantees that all aspects of language are practiced and integrated systematically, based on an organized curriculum.*

---

It is possible that dyslexics can compensate for this neural disruption with the help of multisensory components within the lesson taught. Moats & Farrell, (2005) propose that when alternative circuits are engaged in order to circumvent those that are weak for developing phonological processing skills by activating sensorimotor pathways when using "fingertips, hand, arm, whole body, and/or vocal; speech apparatus during symbolic learning, that circuits for word recognition are more easily accessed and established" (p.32).

The third area of support for MSL comes from clinical evidence of successful instructional approaches over the years. In working with students with learning difficulties, clinicians and classroom teachers have found that the most successful interventions are carefully constructed with special attention to linking old and new information, reinforcement of what they know through multiple opportunities for practice and review, and the use of ready responses between

teachers and students along with acknowledged specific strategies for solving linguistic conundrums. Active learning is the key concept. Teachers accomplish this by using a conscious set of metacognitive strategies to group, rearrange, and transfer topics of information using a common language to refer, for example, to types of syllables, steps in a story map, or ways to spell the sound /o/. Moats and Farrell (2005) also suggest that creating mnemonic strategies such as using key words, chunking, rhyming, visualizing and grouping related facts tends to help students remember better than when given ready made ones. In addition, students who use verbal rehearsal while working remember more and are more accurate. Experienced teachers and clinicians have known about the benefits of MSL for a long time. Most importantly, structured lesson planning ensures that teachers include all levels of language in the same session as well as ample opportunities to incorporate instances of multisensory instruction.

MSL is based on teachers using a well-defined scope and sequence so that there is systematic introduction of new information in small steps for the precise teaching of skills. (Cox, 1992) This feature promotes the use of guided discovery through Socratic questioning to learn new language concepts based on what the students already know. "When students make a discovery, they understand and connect the new learning to prior knowledge." (Carreker, 2005) The guided discovery instructional process is an essential aspect of MSL; one that sets it apart from whole language instruction and balanced literacy. The basic steps in multisensory guided discovery teaching can be used at every level of language instruction.

In place of rote memorization, teachers and students engage in metacognitive dialogues about pertinent strategies. Teachers and students develop together a consistent language about concepts that need to be taught directly.

**Multisensory Teaching and Learning from the Students Point of View**

From the students' point of view, MSL lessons fit their need for structure, limits, and an anxiety-free atmosphere in which to learn. Students do not like surprises or last-minute changes that can confuse

*-continued on page 13*

# What Is Multisensory Language?

*(continued from page 12)*

them and affect their performance. There is less anxiety because the daily presentation of activities occurs in the same order so students know what to expect and when. MSL lessons adhere to a daily structure to ensure that students feel secure in knowing that the lesson is stable and predictable, and that it is designed for their success. Student attention is better focused because the activities rotate rapidly, none lasting more than about ten minutes.

Visual reminders in the form of procedure charts are frequently used for laying out the steps for spelling, making letter shapes, punctuation reminders, or story maps to prompt students to use strategies they have learned without the necessity of verbal repetition from the teacher.

Careful planning guarantees that aspects of language are practiced and integrated systematically, based on an organized curriculum. This seamless presentation assures students that the basic skills needed to become skilled readers are not presented in a disjointed, disconnected way. Students participate in short, intensive, interactive activities, that integrate reading, writing and spelling. What they read they write; what they write they read; what they read they spell. They are learning while using all pathways to learn in every lesson.

Grasping written language concepts presents difficulties, especially when attention is a problem. Therefore, activities are short and focused with small steps taken in sequence, at first easy and then more difficult. With the rapid changing of learning modalities (visual, auditory, and tactile/kinesthetic) and media, teachers keep the lesson interesting. Students learn to accept and even anticipate variety within the structure. (Tucker, 2003)

Necessary repetition builds toward mastery while all taught concepts are maintained in the lessons. (Wilson, 2002) New learning and practice with prior learning are well balanced. Review is automatically built in for purposes of fluency and automaticity of the essential components of reading and writing.

As students gain mastery of the sub skills, teachers continue to introduce new content in the curriculum sequence. Some students take longer to reach mastery during remediation. However, the strong organization of well-planned MSL lessons often helps students improve their memory over time, and thus have better retrieval of information.

In summary, research supports the general conclusion that knowledge of the structure of language, systematically and explicitly taught and learned within a complete lesson framework that focuses on fluency, is important for beginning and struggling readers. However, there is no scientific evidence behind the multisensory component, emphasized by practitioners of multisensory structured language education, and central to programs derived from the principles of Orton-Gillingham instruction. Yet, its efficacy has been demonstrated over and over again for students with dyslexia and other struggling learners in independent and public school contexts as well as in clinical settings. (Joshi, Dahlgren, Boulware-Gooden 2002)

---

*Proficient writers engage in substantial evaluation throughout the writing process and have well-practiced strategies for revision.*

---

The principles of multisensory teaching and learning rest on a bedrock of decades of clinical and classroom experience as the approach of choice for reading instruction for students with dyslexia. The emphasis on the basic language components of a comprehensive program along with the application of direct, intensive, and systematic instruction parallels the consensus derived from the science of reading on what and how to teach reading to beginners and those struggling to learn. The future promises new knowledge and information based on scientific evidence that will test the efficacy of the multisensory components deemed essential in multisensory teaching and learning. ❑

*-References on page 14*

# What is Multisensory Language?

## *References*

**Basic language skills:** Therapy for dyslexia, (1998). Neuhaus Education Center.

**Baker Hill, H. (2005).** Appendix B, materials and sources. In J.R. Birsh (Ed.), *Multisensory teaching of basic language skills* (2nd ed., pp. 609-611). Baltimore: Paul H. Brookes Publishing Co.

**Berninger, V., Amtmann, D. (2004).** Preventing written expression disabilities through early and continuing assessment and intervention for handwriting and/or spelling problems: Research into practice. In Swanson, H.L., Harris, K. Graham, S. (eds.): *Handbook of research on learning disabilities.* New York: Guildford Press.

**Birsh, J.R. (2005).** Research and reading disability in J.R. Birsh (Ed.), *Multisensory teaching of basic language skills* (2nd ed., pp. 1-22). Baltimore: Paul H. Brookes Publishing Co.

**Birsh, J.R. & Schedler, J.F. (2005).** Planning multisensory structured language lessons and the classroom environment. In J.R. Birsh (Ed.), *Multisensory teaching of basic language skills* (2nd ed., pp. 187-211). Baltimore: Paul H. Brookes Publishing Co.

**Blachman, B.A., Schatschneider, C., Fletcher, J.M., & Clonan, S.M. (2003).** Early reading intervention: A classroom prevention study and a remediation study. In B.R. Foorman (Ed.), *Preventing and remediating reading difficulties: Bringing science to scale.* Timonium, MD: York Press.

**Carreker, S. (2005).** Teaching reading: Accurate decoding and fluency. In J.R. Birsh (Ed.), *Multisensory teaching of basic language skills* (2nd ed., pp. 2213-255). Baltimore: Paul H. Brookes Publishing Co.

**Cox, A.R. (1992).** *Foundations for literacy: Structures and techniques for multisensory teaching of basic written English language skills.* Cambridge, MA: Educators Publishing Service.

**Eden, G.F., Jones, K.M., l Cappell, K., Gareau, L., Wood, F.B., Zeffiro, Dietz, N.A.E., Agnew, J.A., Flowers, D.L. (2004).** Neural changes following remediation in adult developmental dyslexia. *Neuron,* 44, 411-422.

**Gillon, G.T. (2003).** *Phonological awareness: From research to practice.* New York: Guilford Press.

**Henry, M.K. (2005).** *Framework for informed reading and language instruction: Matrix of Multisensory structured language programs.* Baltimore: The International Dyslexia Association.

**Joshi, R.M., Dahlgren, M. & Boulware-Gooden, R. (2002).** Teaching reading in an inner city school through a multisensory teaching approach. *Annals of Dyslexia*, 52, 229-242.

**Marzola, E.S. (2005).** Strategies to improve reading comprehension in the multisensory classroom. In J.R. Birsh (Ed.), *Multisensory teaching of basic language skills (2nd ed., pp 377-412). Baltimore: Paul H. Brookes Publishing Co.*

**Moats, L.C. (2006).** *How spelling supports reading.* American Educator, 29, 12-22, 42-3.

**Moats, L.C. & Farrell, M.L. (2005).** Multisensory structured language education. In J.R. Birsh (Ed.), *Multisensory teaching of basic language skills* (2nd ed., pp. 23-41). Baltimore: Paul H. Brookes Publishing Co.

**Mousavi, S.Y., Low, R. & Sweller, J. (1995)** Reducing cognitive load by mixing auditory and visual presentation modes. *Journal of Educational Psychology,* 87, 319-334.

**National Reading Panel (2000).** *Teaching children to read: An evidence based assessment of scientific research literature on reading and its implications for reading instruction.* Washington, DC; National Institute of Child Health and Human Development. (Publication No. 00-4754): Washington, D.C: Government Printing Office. Also available on-line: http://www.nichd.nih.gov/publications/nrp/report.htm

**Shaywitz, S.E. & Shaywitz,B.A. (2004).** Neurobiologic basis for reading and reading disability. In P. McCardle & V. Chabra (eds.), *The voice of evidence in reading research* (pp. 417-442). Baltimore: Paul H. Brookes Publishing Co.

**Shaywitz, S., (2003).** *Overcoming dyslexia: A new and complete science-based program for reading problems at any level.* New York: Alfred A. Knopf.

**Simos, P.G., Fletcher, J.M., Foorman, B.R., Francis, D.J., Castillo, E.M., Davis, R.N., et al. (2002).** Dyslexia-specific brain activation profile becomes normal following successful remedial training. *Neurology,* 58, 1203-1213.

**Tucker, V. (2003).** *Planning multisensory structured language lessons.* Manuscript in preparation.

**Wilson, B. (2002).** *Wilson reading system instructor manual* (3rd ed.). Milbury, MA: Wilson Language Training.* ❐



# Windward Teacher Training Institute

*Sandra Schwarz, Director*

## Spring/Summer 2007

### The Robert J. Schwartz Memorial Lecture

**Michael G. Thompson, Ph.D.**

**Best Friends/Worst Enemies:
Friendship Development, Popularity and
Social Cruelty in Childhood**

**Wednesday, April 25, 2007    7:30 pm    Red Oak Campus
Registration Required**

www.windwardny.org/lecture

### Courses and Workshops
• Expository Writing Instruction
• Multisensory Reading Instruction
• Multisensory Instruction in Specific Content Areas

**Phone: (914) 949-1279  E-mail: wtti@windwardny.org  Website: www.windwardny.org**

## Outplacement *(continued from page 7)*

*To date, Windward students have been accepted to the following schools for the 2007 – 2008 school year:*

Abraham Joshua Heschel School
Avon Old Farms School
Birch Wathen Lenox School
The Browning School
Brunswick School
Calhoun School
Churchill School
Convent of the Sacred Heart (NY)
Convent of the Sacred Heart (CT)
Cushing Academy
Dwight School
Eaglebrook School
Fordham Preparatory School
Greens Farms Academy
Greenwich Country Day School
The Harvey School

Hewitt School
Iona Preparatory School
King and Low-Heywood Thomas
Little Red Schoolhouse/
    Elizabeth Irwin High School
Loyola School
The Masters School
Marvelwood School
Marymount School
Millbrook School
Oakwood Friends School
Proctor Academy
Rippowam Cisqua School
Riverdale Country School
Rye Country Day School
Salisbury School

SAR High School
School of the Holy Child
Solomon Schechter School
Soundview Preparatory School
St. Ann's School
Stanwich School
St. Luke's School
Taft School
Trinity-Pawling School
Trinity School
Vermont Academy
Westchester Fairfield
    Hebrew Academy
Winston Preparatory School
York Preparatory School

# Basketball



*Windward competes in the Fairchester League, which is comprised of independent schools in the Westchester and Fairfield County areas. Sports include cross country, lacrosse, basketball and softball. Intramural sports are also available for younger Windward students.*

---

**Windward School**
**Windward Avenue**
**White Plains, New York 10605-5398**

*NONPROFIT ORG*
*US POSTAGE*
*PAID*
*WHITE PLAINS, NY*
*PERMIT NO. 16*

## Board of Trustees

### Head of School

Dr. John J. Russell

### Editor

Joan Metsch

Leigh M. Garry
President
Alyson H. Walker
Vice President
Michael S. Bruno, Jr.
Vice President
Devon Fredericks
Secretary
Ronald M. Ongaro
Treasurer

Theresa Davidson
Mitchell Dorf
Andrew R. Feldman
Thomas E. Flanagan
Linda M. Gibbs
Joseph Lorono
Michael V. McGill

Leslyn Rigoni
Michael Salzer
Christine Hearst
Schwarzman
Andrea Stewart
Lynn O'Connor Vos