UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                        :
R.R. and D.R. o/b/o M.R.,               :
                                        :
                     Plaintiff,         :
                                        :        08 Cv. 247 (BSJ)
          v.                            :
                                        :
                                        :        **OPINION AND ORDER**
SCARSDALE UNION FREE SCHOOL DISTRICT,   :
                                        :
                     Defendant.         :
----------------------------------------x

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

       Pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1415 (2006), and Article 89 of the New

York State Education Law, and on behalf of their daughter M.R.,

R.R. and D.R. ("Plaintiffs") bring this action against the

Scarsdale Union Free School District (the "District").

Plaintiffs appeal from a September 24, 2007 administrative

decision (the "SRO Decision") of the New York State Department

of Education Office of State Review that declined to reimburse

their tuition payments for M.R.'s 2005-2006 and 2006-2007

placements at the Windward School.

       Plaintiffs now seek modified *de novo* review of the SRO

Decision, and the District has moved for summary judgment. For

the reasons that follow, the Court DENIES Plaintiffs' motion and

GRANTS the District's motion.

**BACKGROUND**

1

## I.    The IDEA

Under the IDEA, "states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'"  Gagliardo v. Arlington Centr. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting IDEA).  A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quotations and citation omitted).  These services are administered through a written individualized education program ("IEP"), which must be updated at least annually.  Walczak, 142 F.3d at 122.

New York receives federal funds under this statute and charges local Committees on Special Education ("CSE"s) with the responsibility of formulating the IEPs.  Each CSE is comprised of, among other people, the child's parent or guardian, the child's regular education teacher, the child's special education teacher, a school psychologist, and "an additional parent member of a student with a disability residing in the school district or a neighboring school district."  8 N.Y.C.R.R. 200.3(a)(1).

"In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning

2

characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08.

## II.  Facts and Administrative Record[1]

M.R., who is classified as a student with a learning disability, attended District schools from 2000, when she entered kindergarten, until 2005, when she entered the private Windward School.  In the second grade, M.R. was referred to a District CSE due to her difficulties in reading; she was evaluated from October 2002 through January 2003.  On January 21, 2003, the CSE first classified M.R.'s learning disability

In March 2004, Plaintiffs began exploring possible private-school placements for M.R.  On March 13, 2004, they submitted an application to the Windward School.  Windward denied M.R.'s application for the 2004-2005 school year, her fourth grade year.  In November 2004, Plaintiffs ended M.R.'s private tutoring after M.R.'s special education teacher suggested that the school could address M.R.'s needs.  In a December 2004 meeting, Plaintiffs expressed concern to M.R.'s special education teacher and general education teacher that M.R. was not making the progress for which they had hoped.  Following that meeting, M.R.'s teachers modified her curriculum accordingly.

---

[1] These facts are drawn from the parties' submissions and the IHO and SRO Decisions.  Unless otherwise noted, they are undisputed.

In March 2005, M.R. was accepted to Windward for the 2005-2006 school year, when she would enter the fifth grade.  On May 5, 2005, the CSE met with Plaintiffs to review M.R's progress and to begin the process of recommending services for the 2005-2006 school year.  At this meeting, Plaintiffs informed the CSE of M.R.'s acceptance at Windward.  After the meeting, the District's Director of Special Education ("the Director") contacted Plaintiffs to arrange for M.R. to undergo additional testing, but Plaintiffs responded that their private evaluator had already conducted such evaluations.

On May 16, 24, and 25, 2005, Dr. Allison Bell, Plaintiffs' privately-retained psychologist, evaluated M.R.  On May 24, Dr. Bell and school psychologist Dian Shein observed M.R. in her classroom.  On the basis of these observations, Dr. Bell recommended M.R.'s placement in a "highly individualized teaching program that emphasizes multi-sensory learning approaches in the classroom and plenty of 1:1 attention," and alongside students with similar learning needs. While the District did offer special educational services for M.R., Dr. Bell noted, she found these services inadequate in the mainstream classroom context.  Dr. Bell concluded that Windward would be an appropriate placement for M.R.

In June 2005, the District administered its own assessments of M.R., finding that her comprehension and language skills were

4

in the average range. A June 13, 2005 progress report reflected M.R.'s mastery of certain objectives and her progress toward the remainder of her objectives. Her report card noted slow but steady progress in reading and that her math basics had grown in a "differentiated" curriculum.

The CSE reconvened on June 14, 2005 to formulate an IEP for the 2005-2006 school year, M.R.'s fifth grade year. Plaintiffs, Dr. Bell and M.R.'s fourth grade teachers attended this meeting. At this meeting, Plaintiffs were advised that no additional parent member was present or available. As a result, the Director gave Plaintiffs the option of rescheduling the meeting to allow for the attendance of an additional parent member, but they chose to allow the meeting to proceed, as Dr. Bell, their private psychologist, was in attendance. Once the meeting commenced, Dr. Bell reviewed the results of her evaluation of M.R., M.R.'s classroom teacher described the provision of differentiated instruction, and Plaintiffs expressed their concerns about the education and services that M.R. was receiving. After further discussion, the CSE produced an IEP (the "2005 IEP") recommending M.R.'s placement at the Edgewood School, where M.R. would attend a special class for four and one-half hours per day, and group counseling sessions up to five times a week. Under this IEP, physical education would comprise M.R.'s only general education class. The 2005 IEP also

5

recommended that M.R. attend a weekly counseling session with
the school psychologist, to discuss her feelings about her
learning disability. To address M.R.'s identified needs, the
2005 IEP set forth annual goals and objectives in reading,
writing, math, and social/emotional/behavioral areas.

After this meeting, Plaintiffs received a profile of the
proposed class and arranged a visit to that class in late June,
2005. The District anticipated that the class would consist of
eight students, two of whom were female; the female students
would only be present for the math program. After observing the
class and reviewing its profile, in a June 20, 2005 letter,
Plaintiffs expressed their dissatisfaction with the proposal;
they were concerned that their daughter would, at times, be the
only girl in the glass and that her learning profile was
different from other students in the class.

In a June 21, 2005 letter, the Director formally advised
Plaintiffs of the CSE's recommendations and the 2005 IEP and
sought their consent for services laid out in the IEP. He also
offered to reconvene the CSE to allow an additional parent
member to participate. Plaintiffs did not respond to this
letter. In a July 12, 2005 letter to the Director, Plaintiffs
voiced their displeasure with the 2005 IEP, identifying
discrepancies between the May and June 2005 CSE meetings. In
that letter, Plaintiffs informed the Director that they had

unilaterally enrolled M.R. at the Windward School for the 2005-2006 school year and that they would seek tuition reimbursement for that placement. In response, the Director disputed many of Plaintiffs' assertions and characterizations, and noted that he would attach Plaintiffs' July 12, 2005 letter to the 2005 IEP as an addendum.

M.R. began attending Windward soon thereafter, and on November 4, 2005, Dr. Bell conducted a follow-up evaluation of M.R. Dr. Bell agreed with the CSE's recommendation that M.R. attend a special class, but disagreed with the particular class that the CSE had recommended, due to M.R.'s anxiety issues and the composition of the class with regard to its students' gender and behavior. Dr. Bell found that the placement at Windward School was appropriate. She reported that M.R.'s academic functioning was stable, and that, while M.R. was still somewhat anxious and fidgety, she appeared happy, with a completely altered demeanor.

On November 7, 2005, Plaintiffs again advised the Director of their view that the 2005 IEP inappropriately addressed M.R.'s needs. They noted, again, that they had placed their daughter at Windward and initiated a due process hearing seeking tuition reimbursement for the 2005-2006 school year; Plaintiffs withdrew that request on January 19, 2006.

7

On January 25, 2006, with Plaintiffs' consent and cooperation, Dr. Stephanie Kutin-Senzon, a District psychologist, observed M.R. at her Windward program in order to prepare an annual review of the existing IEP.  She reported that M.R. appeared easily distracted by noise; M.R.'s teacher informed the psychologist that M.R. could be easily distracted. A February 2006 progress report from Windward noted that M.R. had difficulty with tasks that required inferential thinking, that her math work was variable, and that language difficulty often impeded her ability to solve math problems.

The CSE convened on June 7, 2006 for M.R.'s annual review and to develop an IEP for the 2006-2007 school year ("2006 IEP").  The CSE was composed of elementary and middle school regular and special education teachers and psychologists. Barbara Landau, the head of Windward's Middle School, and an additional parent member were also present.

The 2006 IEP recommended M.R.'s placement in a regular sixth grade class, which would be supplemented with resource room services four times per week for forty five minutes, but without counseling.  The resource room would be programmed into M.R.'s schedule instead of homeroom.  As such, the IEP recommended that M.R. participate in all general education programming.  The CSE aimed to allow M.R. to move to a parallel class in the event that she experienced increased difficulty

8

with academics; if M.R. were to return to a District school, the CSE would reconvene after six weeks to review M.R.'s program. The 2006 IEP also set forth annual goals to address M.R.'s study skills, reading, writing, and math needs.

By email dated July 18, 2006, Plaintiffs rejected the 2006 IEP and notified the District that M.R. would remain at Windward. Further, Plaintiffs simultaneously requested an impartial hearing to seek tuition reimbursement for M.R.'s placement at Windward for both the 2005-2006 and 2006-2007 school years. On August 3, 2006, after the Director asked them to do so, Plaintiffs explained their dissatisfaction with the 2006 IEP.

On August 9, 2006, Plaintiffs filed a due process complaint amending their prior hearing request. With regard to the 2005 IEP and the 2005-2006 school year, Plaintiffs alleged that the District failed to ensure the full attendance of mandated parent members of the CSE and engaged in impermissible "predetermination," that the proposed class composition was "skewed in terms of available peers," that the CSE failed to appropriately develop goals and objectives with Plaintiffs' full participation, and that the proposed classroom placement was inappropriate to meet M.R.'s needs. With regard to the 2006 IEP and the 2006-2007 school year, Plaintiffs alleged that the District "repeated a number" of the same "problems." After the

9

impartial hearing officer ("IHO") denied Plaintiff's motion that he recuse himself,[2] the impartial hearing began on October 23, 2006 and heard seven days of testimony before concluding on March 7, 2007.

In November 2006, while the impartial hearing was pending, the Director advised Plaintiffs that the CSE was planning for M.R.'s annual review and requested permission to conduct an observation of M.R. at Windward. In a December 5, 2006 letter, Plaintiffs indicated that they would provide consent if the District agreed not to use the observation as the basis for testimony or documents at the impartial hearing. The Director responded, on December 18, 2006, by asking for unrestricted consent, and Plaintiffs granted such consent, on February 16, 2007, for the exclusive purpose of the 2007-2008 annual review.

In a May 3, 2007 decision, the IHO found that the District failed to provide M.R. with a FAPE for both school years 2005-2006 and 2006-2007. He awarded Plaintiffs tuition reimbursement for the 2005-2006 school year, but found that equitable considerations precluded such an award for the 2006-2007 school year. Plaintiffs appealed the IHO decision relating to the 2006-2007 school year, and the District cross-appealed, contending that it had provided a FAPE in both school years.

---

[2] Because the IHO had represented school districts in his private practice, Plaintiffs were concerned that he would be biased in the District's favor and moved for his recusal.

10

With regard to the 2005-2006 school year, the IHO determined that the District failed to provide a FAPE in several respects. First, the District failed to ensure an additional parent member's presence at the June 14, 2005 CSE meeting, in violation of New York law. In view of that failure, the IHO found that the CSE meeting was improperly composed and declared the resulting 2005 IEP a nullity. (Affidavit of Gary S. Mayerson, Ex. A ("IHO Decision"), at 25.) Second, the CSE's "substantive discussion of placement impermissibly preceded the flushing out of the goals and objectives for the 2005-2006 school year." (IHO Decision, at 28.)

Third, in view of the composition of the proposed class, the IHO found that M.R. was an inappropriate candidate for that class: the 2005 IEP did not express a clear understanding of that composition of the class on June 14, 2005, and "the composition requirements of the Commissioner's regulations for special class placements were not met in light of M.R.'s learning characteristics and social development when compared to the composition of the class contained in the class profile." (IHO Decision, at 30.) Finally, the goals and objectives set forth in the 2005 IEP "did not give any indication of where M.R. was expected to be one year from the date of the goal." (Affidavit of Gary S. Mayerson, Ex. B ("SRO Decision"), at 8 (citing IHO Decision, at 31).) The IHO concluded that these

11

deficiencies deprived M.R. of an appropriate IEP for the 2005-2006 school year. The IHO also found that Windward was an appropriate placement for M.R. for the 2005-2006 school year and that equitable considerations did not bar Plaintiffs' claim for tuition reimbursement.

With regard to the 2006-2007 school year, the IHO again "found that the goals on the 2006 IEP did not give any indication of where M.R. was expected to be one year from the date of the goal" and that such deficiency "deprived the student of an appropriate IEP for the 2006-2007 school year." (SRO Decision, at 8 (citing IHO Decision, at 37).) The IHO also found that Windward was an appropriate placement for M.R. for the 2006-2007 school year, but he concluded that equitable considerations weighed against Plaintiffs and dictated the denial of their tuition reimbursement claim for that year. (SRO Decision, at 8.)

On appeal, the SRO reversed the IHO's finding that the District failed to offer M.R. a FAPE for the 2005-2006 and 2006-2007 school years. Because the SRO found that the District had provided M.R. with a FAPE for both school years and denied Plaintiff's tuition reimbursement claim on that basis, it declined to address the appropriateness of the Windward School or equitable considerations.

Plaintiffs filed the instant complaint on January 11, 2008.

12

## LEGAL STANDARD

### I.   Standard of Review

On an IDEA-based appeal, the reviewing court:

> (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(B).

"Summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions,"[3] but in this context, "the inquiry . . . is not directed to discerning whether there are disputed issues of fact." Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ., 550 F. Supp. 2d 420, 429 n.10 (S.D.N.Y. 2008) (citations omitted).  "[R]ather, it is a pragmatic procedural mechanism for reviewing administrative decisions." T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (quotations and citation omitted).

"[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo, 489 F.3d 105, 112 (2d Cir. 2007) (quotations

---

[3]Here, the parties disagree over the procedural form that their motions should take: while Plaintiffs move for "modified de novo review," the District moves for summary judgment.  The District asks the Court to strike Plaintiffs' motion for noncompliance with summary judgment procedures, but the Court declines to do so.  While district courts generally review IDEA-based appeals through the procedural mechanism of summary judgment, the submissions and administrative record before the Court provide an ample basis for review.

13

omitted). While this Court must base its decision "on the preponderance of the evidence," it "must give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo, 489 F.3d at 113 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206, 208 (1982)).

Accordingly, district courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. "District courts therefore give 'substantial deference' to final administrative judgments implicating educational policies and practices. This deference is appropriate even where, as here, the SRO has partially disagreed with the IHO." Pinn ex rel. v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (citations and quotations omitted). Indeed, "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.'" A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Gagliardo, 489 F.3d at 113 n.2). Where the SRO disagrees with the IHO, the Court "defer[s] to the final decision of the state authorities." Id. (citation omitted).

14

## II.  **Tuition Reimbursement**

If a state fails to provide a handicapped child with a free appropriate public education, parents "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." Gagliardo, 489 F.3d at 111.  Tuition reimbursement is appropriate where (i) the services offered by the state were inadequate or inappropriate, (ii) the services selected by the parents were appropriate, and (iii) equitable considerations support the parents' claim. Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 370 (1985)).

"Only if the IEP is procedurally or substantively deficient" does the Court proceed to "ask whether the private schooling obtained by the parents is appropriate to the child's needs." A.C. ex rel M.C., 553 F.3d at 171.  "As the party commencing the administrative review, the parents bear the burden of persuasion as to the inappropriateness" of the District's 2005 and 2006 IEPs. Id., at 171-172.

### a. **Provision of FAPE**

In determining whether a student has been provided a FAPE, the Court must examine "(1) whether the state complied with the procedural requirements of IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive

15

educational benefits.'" Walczak, 142 F.3d at 129 (quoting Rowley, 458 U.S. at 206-07).

"Procedural flaws do not automatically require a finding of a denial of a FAPE. . . . [A] hearing officer may find a child did not receive a FAPE only if procedural inadequacies: (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE; or (iii) caused a deprivation of educational benefits." Matrejek v. Brewster Cent. School Dist., 471 F.Supp.2d 415, 419 (S.D.N.Y. 2007).

Substantively, the IDEA "does not articulate any specific level of educational benefits that must be provided through an IEP." Walczak, 142 F.3d at 130. "School districts are not required to 'furnish[] every special service necessary to maximize each handicapped child's potential.'" T.P., 554 F.3d at 254 (quoting Rowley, 458 U.S. at 189). The requirement that the IEP be "reasonably calculated" to provide educational benefits simply means that it must "provide such children with 'meaningful access' to education," and "must be 'likely to produce progress, not regression.'" Frank G., 459 F.3d at 364 (quoting Walczak, 142 F.3d at 130, 133).

## DISCUSSION

Here, the SRO determined that the District offered M.R. a FAPE for both school years at issue. With regard to this

16

determination, Plaintiffs' moving brief highlights many of the IHO's contrary findings, repeats contentions that the SRO rejected, and asserts, cursorily, that the SRO Decision was "erroneous and contrary to law and statute" and "improperly disregarded and ignored the IHO's fact findings and credibility assessment." (Plaintiffs-Appellants' Memorandum of Law on Modified *De Novo* Review ("Pls.' Mem."), at 8.)

But the SRO Decision did not turn on - or even assess - credibility; nor did it disturb or disregard any of the IHO's findings of fact. As explained below, the SRO Decision grounds its determinations in law and educational policy. Plaintiffs' assertions are unavailing: they fall short of their burden of persuasion here. Giving due weight and substantial deference to the SRO's judgment, which implicates educational policies and practices, the Court affirms the SRO's conclusion that the 2005 and 2006 IEPs were adequate and appropriate. M.R. was not denied a FAPE for either school year.

**I.   The 2005 IEP - 2005-2006 School Year**

Plaintiffs argue, and the IHO found, that the 2005 IEP was procedurally and substantively inadequate. The Court disagrees and finds that the record amply supports the SRO's conclusions.

Plaintiffs first contend that the June 14, 2005 CSE was improperly constituted because it failed to include an additional parent member. But the SRO correctly found that the

17

absence of an additional parent member did not render the resulting 2005 IEP deficient. "The IDEA does not require that a parent member be present at the CSE. That a parent member was missing from the CSE, therefore, does not amount to an IDEA violation." Board of Educ. of City School Dist. of City of New York v. R.R., No. 03 Civ. 390 (DAB), 2006 WL 1441375, at *5 (S.D.N.Y., May 24, 2006)(internal citation omitted).

While New York law requires a parent member's presence at a CSE, a student's parents may waive that requirement. See id. Here, Plaintiffs did just that - they executed a written waiver on June 14, 2005. The record indicates that Plaintiffs declined the District's offer to reschedule that day's CSE meeting to allow for an additional parent member's presence. Indeed, in a June 21, 2005 letter, the Director even offered to reconvene the CSE in the presence of an additional parent member; Plaintiffs failed to respond to this offer.

Further, "there is no indication that the parent member's absence resulted in a loss of educational opportunity for [M.R.] or infringed on [Plaintiffs'] ability to participate in the CSE." Board of Educ. of the City of New York v. Mills, No. 03 Civ. 0050 (RCC), 2005 WL 16187565, at *5 (S.D.N.Y. July 11, 2005); see also T.P., 554 F.3d at 253 ("In considering whether [a school district] satisfied the procedural requirements of the IDEA, we focus on whether the [parents] had an adequate

18

opportunity to participate in the development of [the] IEP.").
To the contrary, the record reflects Plaintiffs' and Dr. Bell's
active participation at the CSE meeting and in the IEP process.
(See SRO Decision, at 11.) Accordingly, the Court upholds the
SRO's determination that the absence of an additional parent
member at the June 14, 2005 CSE did not nullify the 2005 IEP.

Next, contrary to Plaintiff's avowals, the 2005 IEP did not
result from, and the CSE did not engage in, impermissible
predetermination - in other words, the CSE's substantive
discussion of placement did not impermissibly precede its review
of M.R.'s goals and objectives. A school district must
determine a student's educational placement on the basis of the
student's IEP. See 34 C.F.R. § 300.116[b][2]. Here, the CSE
initially convened to begin M.R.'s annual review process on May
5, 2005. At that meeting, Plaintiffs were provided with a CSE
draft data form that included goals and objectives. When the
CSE reconvened in June, Dr. Bell reviewed the results of her own
evaluation of M.R., which included a program recommendation, and
it appears from the record that the CSE discussed placement
options and goals and objectives.

The SRO concluded that, "while . . . the June 2005 CSE
discussed the option of special class placement before reviewing
the goals and objectives, the . . . placement recommendation was
based on the IEP." The SRO Decision also notes that the CSE

19

considered regular class placement before concluding that such placement could not adequately address M.R.'s needs; these alternative considerations weigh against any finding that the CSE or the District "did not have an open mind as to the content" of the 2005 IEP. T.R., 554 F.3d at 253 (reversing district court's ruling that school district engaged in impermissible predetermination and holding that school district's consideration of program recommendations before CSE meeting complied with IDEA). Moreover, even if CSE members had discussed placement recommendations before the June 15, 2005 CSE meeting, "IDEA regulations allow school districts to engage in 'preparatory activities . . . to develop a proposal . . . that will be discussed at a later meeting." Id. Plaintiffs have failed to show that placements and programs were finalized before goals and objectives, and the Court finds no reason to disturb the SRO's decision on this issue.

Third, the CSE-recommended class was an appropriate placement for M.R. New York law requires that students with special education needs be grouped by similarity of individual needs. See 8 NYCRR 200.6(a)(3). Upon careful consideration of the record and the composition of the District's proposed special class, the SRO found that M.R. was appropriately grouped with the students who were scheduled to attend the proposed special class at the Edgewood School. The Court agrees with the

SRO's reasoned conclusion that "the record does not show that
the composition of the recommended class would result in [M.R.]
being placed in a class composed of students of dissimilar
needs" or "that [the District's] proposed class was
inappropriate" for M.R.  (SRO Decision, at 12.)

Fourth, Plaintiffs assert that the goals stated in the 2005
IEP were deficient because they failed to include a target
achievement level against which progress could be measured.  An
IEP must include a statement of measurable annual goals. 34
C.F.R. § 300.320(a)(2); 8 NYCRR 200.4(d)(2)(iii).  To address
M.R.'s identified needs, the 2005 IEP contained annual goals and
objectives in reading, writing, math, and
social/emotional/behavioral areas.  Here, the SRO Decision
considers and discusses these stated goals and objectives in
detail.  (See SRO Decision, at 12-13.)

"While the annual goals . . . should have included
information about the level of performance expected to be
reached by the student during the [2005-2006 school year]," the
SRO stated, "the objectives are specific and provide sufficient
information to measure the student's performance."  (SRO
Decision, at 13.)  The Court finds no error in the SRO's
determination that "any inadequacy in the annual goals [does not
rise] to the level of a denial of a FAPE."  (SRO Decision, at
13.)  See W.S. v. Rye City Sch. Dist., 454 F.Supp.2d 134, 147

21

(S.D.N.Y. 2006) (affirming SRO's conclusion that IEP was
satisfactory despite IHO's and SRO's finding that IEP was
deficient in its statement of annual goals).

In sum, the 2005 IEP was neither procedurally flawed nor
substantively deficient.  The Court discerns no grounds upon
which to reverse the SRO's conclusion that the District provided
M.R. with a FAPE for the 2005-2006 school year.

## II.   The 2006 IEP - 2006-2007 School Year

Plaintiffs assert that the 2006 IEP's "goals were 'fatally
deficient' and deprived M.R. of FAPE."  (Pls.' Mem., at 14.)
The IHO found these goals deficient because they did not
indicate a target achievement level against which progress could
be measured.  Despite that determination, however, the IHO found
that the 2006 IEP's recommendations were otherwise appropriate.

Upon its own review of the 2006 IEP, the SRO found that the
annual goals in the June 2006 were "measurable and include a
description of how the student's progress toward meeting the
annual goals will be measured during the year the IEP is in
effect."  (SRO Decision, at 14.)  The SRO concluded that the
2006 IEP accurately reflected the results of evaluations that
identified M.R.'s needs, stated appropriate goals tailored to
those needs, and recommended appropriate special education
services.  The Court perceives no error in that finding.  See
W.S., 454 F.Supp.2d at 147.

22

As a general matter, these conclusions involve issues of educational policy and practice with which the SRO is better qualified to grapple than the Court. See Walczak, 142 F.3d at 129. On the whole, the Court finds the SRO Decision to be "'reasoned and supported by the record' and therefore defer[s] to the findings of the SRO" that the 2005 and 2006 IEPs were adequate and appropriate. T.R., 554 F.3d at 254 (concluding "that in finding the IEP substantively inadequate, the district court failed to defer appropriately to the decisions of the administrative experts"). To the extent that the Court has declined to address Plaintiffs' additional challenges to the 2005 and 2006 IEPs, it rejects those challenges as meritless.

Because the District complied with its IDEA obligations for both school years at issue, the Court need not proceed to assess the appropriateness of M.R.'s placement at the Windward School or weigh equitable considerations. See id. The Court affirms the SRO Decision and DENIES Plaintiffs' request for tuition reimbursement for both the 2005-2006 and 2006-2007 school years.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the District's motion for summary judgment and DENIES Plaintiffs' motion for modified *de novo* review. The Clerk of Court is directed to close this case.

SO ORDERED:

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          May 14, 2009